1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

- - - - - - - - - - - - - - - -x
NORMAN NEAL,                          :
                                      :
          Plaintiff,                  :
                                      :        JAN 13 1983
     v.                               :
                                      :        Civil Action No.
FIBREBOARD CORPORATION, et al.,       :
                                      :        TY-79-11-CA
          Defendants.                 :
                                      :
- - - - - - - - - - - - - - - -x
NELL S. STEWART,                      :
                                      :
          Plaintiff,                  :
                                      :        Civil Action No.
     v.                               :
                                      :        TY-79-36-CA
FIBREBOARD CORPORATION, et al.,       :
                                      :
          Defendants.                 :
                                      :
- - - - - - - - - - - - - - - -x
BOBBY KINDLE,                         :
                                      :
          Plaintiff,                  :
                                      :        Civil Action No.
     v.                               :
                                      :        TY-79-35-CA
FIBREBOARD CORPORATION, et al.,       :
                                      :
          Defendants.                 :
                                      :
- - - - - - - - - - - - - - - -x

                              Washington, D. C.

                              Friday, August 13, 1982

FRIEDLI, WOLFF & PASTORE, INC.
1735 EYE STREET, N.W. SUITE #811
WASHINGTON, D.C. 20006

PHONES: 331-1981
        331-1982

. 2

1    Deposition of

2              BARRY CASTLEMAN,

3  a witness in the matter, called for examination by counsel for

4  the Defendant, Raybestos-Manhattan, pursuant to notice, at

5  the law offices of Frederick M. Baron & Associates, 1717 N

6  Street, N. W., Washington, D. C. beginning at 10:00 a.m.,

7  before Deidre A. Hake, Notary Public in and for the District

8  of Columbia, when the parties were represented by the following

9  counsel:

. 3

For the Plaintiffs:

FREDERICK M. BARON & ASSOCIATES
By:
    BRIAN D. WEINSTEIN, Esq.
    8333 Douglas Avenue
    Suite 1400
    Dallas, Texas 75225

For the Defendant, Raybestos-Manhattan:

VIAL, HAMILTON, KOCH, TUBB, KNOX & STRADLEY
By:
    RICHARD A. SHORE, Esq.
    1500 Republic Bank Tower
    Dallas, Texas  75201

For the Defendant, Eagle-Picher Industries, Inc:

SASSCER, CLAGETT, CHANNING & BUCHER
By:
    JAMES R. BUCHER, Esq.
    Upper Marlboro, Maryland 20870

- - -

C O N T E N T S

| Witness: | Examination by: | Page: |
|---|---|---|
| Barry Castleman | Mr. Shore | 6, 83 |
|  | Mr. Bucher | 68, 88 |

4

## E X H I B I T S

MARKED FOR
IDENTIFICATION

Defendants' Exhibits:

No. 1  - copy of the witness's resume                    8

No. 2  - copy of the witness's resume listing
           consulting activities                          13

No. 3  - list of articles dealing with
           abestos disease furnished by the
           witness                                        41

No. 4  - copy of an article in The Industrial
           Bulletin, dated 1934, from the Library
           of Congress                                    71

No. 5 -  copy of case record of Massachusetts
           General from Dr. Wagoner                       71

- - -

. 5

1        Whereupon,

2                    BARRY CASTLEMAN,

3        a witness herein, having been called by counsel

4        for the defendant, Raybestos-Manhattan and,

5        having been duly sworn by the notary, was ex-

6        amined and testified as follows:

7            MR. WEINSTEIN:  At the outset, Dick, Barry's fee

8    for this is $750   No problem; right?

9            MR. SHORE:  Obviously not.

10           MR. WEINSTEIN:  Okay.

11           MR. BUCHER:  I can't speak for my client.

12           MR. SHORE:  We are agreeing to reserve objections

13   until the time of trial as to substance.  Are you going to

14   make objections as to form now or reserve those?

15           MR. WEINSTEIN:  Whatever you want.

16           MR. BUCHER:  Reserve everything.

17           MR. WEINSTEIN: Reserve everything.

18           MR. SHORE:  Waive signature?

19           MR. WEINSTEIN:  Do you want to see the deposition?

20           THE WITNESS:  No.

21           MR. WEINSTEIN:  Okay.  We will waive signature

22           MR. SHORE:  And it can be used for all purposes

1    prior to trial, for any motions once it's transcribed, and at

2    trial?

3            MR. WEINSTEIN: So agreed.

4            MR. SHORE: Also this is taken in the Stewart,

5    Kindle and Neal cases.

6            MR. WEINSTEIN: Yes.

7            MR. SHORE: Okay.

8            BY MR. SHORE:

9       Q.    State your full name, sir.

10      A.    Barry R. Castleman.

11      Q.    Mr. Castleman, my name is Dick Shore and I

12    represent one of the defendants in some asbestos suits that

13    have been filed down in Texas and are coming up for trial at

14    the end of this month. You understand that although we are

15    in an informal setting here it is just as if you were testi-

16    fying before a judge and jury?

17      A.    Yes.

18      Q.    You do understand that you are under oath?

19      A.    Yes.

20      Q.    I would like to strike a deal with you, if I could,

21    and that is that if at any time you don't understand one of

22    my questions or don't hear me, you will ask me to repeat it

. 7

or rephrase it and I will do so.  Otherwise, I will assume
that you understood my question and your answer was in rela-
tion to that question.  Okay?

    A.    Yes.

    Q.    I assume you have given several depositions
before; right?

    A.    Yes, I have.

    Q.    And you understand that you are going to have to
speak out "yes" or "no."  You can't shake your head.

    A.    Yes, sir.

    Q.    All right.

    Mr. Castleman, what is your address, please?

    A.    1722 Linden Avenue.  That's L-i-n-d-e-n.
Baltimore, Maryland.  Zip Code 21217.

    Q.    By whom are you employed, sir?

    A.    Self-employed.

    Q.    Do you go by any association name or is it just
Barry Castleman?

    A.    Just my name, and I call myself an environmental
consultant.

    Q.    Mr. Castleman, did you bring a resume with you
today?

. 8

1    A.    Yes, I did.

2    Q.    Could I see that, please?

3    A.    Certainly.

4          (Document handed to counsel.)

5          MR. SHORE:  Would you mark this, please?

6                              (Defendants' Exhibit No. 1
                               is marked for identifica-
7                              tion and attached to the
                               deposition original.)

8

9          BY MR. SHORE:

10   Q.    Mr. Castleman, have you been retained to testify

11   in certain asbestos lawsuits in Texas by Mr. Fred Baron?

12   A.    Yes.

13   Q.    Which lawsuits have you been retained to testify in?

14   A.    Mr. Baron pays me an annual retainer, and I don't

15   know which lawsuits in particular he has listed me in.

16   Q.    Okay.  How much is that annual retainer?

17   A.    $750.

18   Q.    All right.  Do you charge him per case work done

19   in addition to your retainer?

20   A.    Only if I have to do some work on a case.

21   A.    Has he asked you to do any work on any cases in

22   Texas, in particular, the Norman Neal case, the Bobby L. Kindle

. 9

case, or the Nell, N-e-l-l Stewart case?

A.     No.   The first I heard of these cases was this morning at today's deposition which I understand you are calling.

Q.     Yes.

A.     That was my first acquaintance with these cases.

Q.     All right.

Mr. Castleman, Mr. Baron has listed you as a witness in the pretrial order which was filed with the court in regard to these cases filed Monday of this week, and this is the first you have been apprised that you might testify in those?

A.     Oh, no.   I was called last week some time when this deposition was scheduled.

Q.     And --

A.     And at that time I wasn't apprised of any of the details of these specific cases.

Q.     Who called you?

A.     Mr. Baron.

Q.     What did he ask you to do?

A.     He said that some attorneys in Texas wanted to take my deposition in a case in which he was involved and would I be available on Friday --

10

1  Q.  Okay.

2  A.  -- of this week, and I said yes.

3  Q.  Did he tell you why we wanted to take your

4 deposition?

5  A.  I think he said it was the usual, the usual thing.

6 I have been deposed at least six or eight times in the past.

7  Q.  We will get into that in a minute.

8    Do you intend to come down and testify in those

9 cases?

10  A.  If necessary; yes.  If the cases go to trial and

11 my services are requested.

12  Q.  But at this point in time he has not asked you

13 to come testify in those?

14  A.  No.  It's generally not done until an actual

15 trial is scheduled and the schedule of the trial starts firm-

16 ing itself up and he knows exactly what day he is going to

17 need me.

18  Q.  So as far as you know right now you are not

19 scheduled to go down there and testify?

20  A.  I don't have an appointment to do so; no.

21  Q.  Okay.

22    What is your fee for testifying at trial?

. 11

1    A.    $750 per day up to seven-and-a-half hours.  That's

2    the same for trial and deposition.  If it's more than seven-

3    and-a-half hours it's charged at $100 an hour.

4    Q.    All right.

5    A.    Plus expenses.

6    Q.    Okay.  How long have you been on retainer with

7    Mr. Baron?

8    A.    I guess a couple of years now.

9    Q.    In 1980 you started it?

10   A.    I think so.  I didn't originally charge a re-

11   tainer and after awhile I started doing that.

12   Q.    Let me rephrase my question.  How long have you

13   been associated with Mr. Baron in assisting him with his

14   asbestos cases?

15   A.    I suppose it goes back to some time in 1978.  The

16   first deposition was in March of '79.

17   Q.    Okay.  How many times have you testified on behalf

18   of Mr. Baron?

19   A.    I have no idea.  I could guess.

20   Q.    Give me a ballpark figure.

21   MR. WEINSTEIN:  You mean trial or deposition?

22   MR. SHORE:  Either.

1       THE WITNESS:   Maybe six times, trial and deposi-

2   tions combined.  Something like that.

3       MR. SHORE:  All right, sir.

4       BY MR. SHORE:

5       Q.   Have you ever testified in any other cases besides

6   Mr. Baron's cases in regards to asbestos?

7       A.   Yes, I have.

8       Q.   Okay.  Approximately how many times?

9       A.   Maybe an equal number of times.

10      Q.   About six other cases?

11      A.   Yes.  Well, about six other times; trials and

12  depositions.

13      Q.   Beginning back in what year?  Starting in what year?

14      A.   The earliest one was in March of '79.

15      Q.   Were all of those cases where you testified on

16  behalf of the plaintiff?

17      A.   Yes.

18      Q.   You have never testified on behalf of any defendant

19  in an asbestos case; correct?

20      A.   That's correct.

21      Q.   Okay.

22           What is an environmental consultant?

1    A.    It's a -- It's a phrase which I chose to very

2    vaguely characterize what it was that I do.  My work for the

3    past seven years has been in the area of toxic substances

4    control as an independent consultant.

5             MR. SHORE:  Would you mark  that, please?

6                                  (Defendants' Exhibit No. 2
                                   is marked for identifica-
7                                  tion and attached to the
                                   deposition original.)

8

9             (Document handed to witness.)

10            BY MR. SHORE:

11   Q.    You say you chose the term environmental consultant

12   to vaguely characterize what you do?

13   A.    Yes.

14   Q.    It just sounds good?

15   A.    Well, I didn't really know what else to call  my-

16   self, but obviously the term is a very nonspecific term.  It

17   could describe somebody whose specialty is in waste water and

18   sewage treatment.  It could describe someone who is a specialist

19   in air pollution control, so on and so forth.

20   Q.    But you don't testify on sewage treatment or air

21   pollution control; do you?

22   A.    No, I don't.

1    Defendants' Exhibit Number 2 and ask you if you can identify
2    that, sir?
3              (Document handed to witness.)
4              THE WITNESS:  This is a one-page summary of my
5    consulting activities through, it looks like 1979 or 1980.
6              BY MR. SHORE:
7         Q.   There under your education where it has your MSE
8    in environmental engineering from Johns Hopkins, that should
9    actually be 1972.  That's when you actually got your degree?
10        A.   Yes.  I was told that the -- that all the require-
11   ments had been fulfilled by October-something in '71, and that
12   the degree wouldn't be formally awarded until May --
13        Q.   Okay.
14        A.   -- of the next year.
15        Q.   Okay.
16             Have you done any postgraduate work besides
17   receiving your master's from Johns Hopkins?
18        A.   Yes.  I am currently a doctoral candidate in the
19   school of hygiene and public health of Johns Hopkins again.
20        Q.   When do you expect to receive your PhD?
21        A.   The degree will be called an ScD, doctor of
22   science I think that means -- probably in two years or so

1    from now.

2         Q    In 1984?

3         A.   Yes.

4         Q    When did you begin working on that?

5         A.   A year ago.

6         Q    Okay.  What does a doctor of science degree con-

7    vey upon you from this school of hygiene and public health?

8    What area is that in?

9         A.   Well, I am taking -- It's really up to me and my

10   advisor and, of course, this all has to be in accord with

11   the requirements of the university, but my interests are in

12   occupational and environmental health science and policy.

13   And so I am taking courses along these lines.

14        Q    Are you taking any courses in asbestos-related

15   diseases?

16        A.   Asbestos had come up.  I am taking courses in

17   toxicology and epidemiology and so on.

18        Q    All right, sir.  What about your degree, your

19   master's degree in environmental engineering?  What did that

20   entail?

21        A.   I took a bunch of courses which rounded out my

22   training in chemical engineering so that I would be equipped

to do air pollution control work and so I took courses in

such things as air pollution control; equipment -- courses on

the equipment that is used in air pollution control; courses

on laboratory measurement of air pollutants; courses on epi-

demiology and statistics and probability and meteorology.

    Q.    Any courses related to asbestos or asbestos-

related diseases?

    A.    I took a course on inhaled particles in the

respiratory tract and I wrote my master's thesis on the subject

of asbestos disease.

    Q.    Okay, sir.

    Any other type of formal education besides the

three you have mentioned?

    A.    No.

    I have attended a lot of scientific conferences,

but I gather that is not what you mean by "formal education."

    Q.    Right.

    What type of work did you do once you got your

undergraduate degree in '68?

    A.    I went to work for a chemical company called

Hercules.

    Q.    How long were you with them?

· 18

Q.    How long were you with them?

A.    A little more than a year.

Q.    What did you do for them?

A.    I was a -- I guess you could call me a process development engineer.  I was working at either new processes or -- Well, they were all new processes.  Some of them were new products that the company's research center was turning out, and other preparations which I supervised dealt with modifications of manufacturing of products that they had been manufacturing before, but they were tinkering with the way they made the stuff.

Q.    Was that from '68 to '69?

A.    Yes.

Q.    Did you have any involvement with asbestos during that time?

A.    Not that I can recall.

Q.    All right, sir.

       Where did you go to work after that?

A.    You mean my next employment?

Q.    That's right.

A.    That was after I got out of graduate school and I went to work for the Baltimore County Department of Health,

. 19

Division of Air Pollution and Industrial Hygiene.

Q.    In 1972?

A.    Yes.

Q.    What did you do for them?

A.    I dealt with the compliance activities in regard to industrial air pollution and handled special projects dealing with toxic chemicals investigations.

Q.    What types of toxic chemicals?

A.    Oh, there was one situation where a child had gotten aplastic anemia shortly after a school building was caulked.

Q.    Did you deal with asbestos?

A.    Yes, I did.  On my own I initiated trips to the local brewery, the local distillery to see if they were using asbestos filters, and also a notice went out to people who were doing brake servicing warning about the dangers of breathing asbestos dust and advising safe work practices.

Q.    That was in '72?

A.    Yes.

Q.    Okay, sir.

After that, by whom were you employed?

A.    I worked for the Center for Science in the Public

1    Interest, in Washington, D. C.

2          Q     That was in 1973?

3          A     '73; yes.

4          Q     Until what year?

5          A     Until some time in '74.

6          Q     What did you do for them?

7          A     I was involved in activities, writing about energy

8    consumption and various activities that people do and, also,

9    we started to get involved with vinyl chloride air pollution

10   at that time.  I had some involvement in problems with aerosol

11   sprays.

12         Q     Anything dealing with asbestos?

13         A     And quite a few things dealing with asbestos.

14         Q     Such as?

15         A     There was a petition sent to the Environmental

16   Protection Agency in December of 1973 which I drafted which

17   basically asked the administrator of the Environmental Pro-

18   tection Agency to stop the continuing use of asbestos cement

19   pipes being installed in water supply distribution systems.

20               I attended the National Institute for Environ-

21   mental Health Sciences meeting on biological effects of

22   ingested asbestos in November of 1973, and I was following

· 21

up on a petition which we had drafted to the Food and Drug

Administration dealing with the filtration of foods and drugs

with asbestos and the contamination resulting therefrom.

    Q.    Okay.

    A.    And there were other things.  I just can't recall
them now.

    Q.    All of your education in regard to asbestos which
enabled you to do some of the things you just mentioned, has
that been sort of a self-taught type thing?

    A.    I have been taught by some of the best people
around.  I have had the good fortune to spend a lot of time
talking to people like Irving Selikoff, Gerrit Schepers and
Wilhelm Hueper, and these people have all contributed to
my education.  And, of course, I have had to spend a lot of
time reading.

    Q.    Okay.

    You left the Center for Science in the Public
Interest in Washington in December of 1974?

    A.    Yes.

    Q.    What did you do after that?

    A.    I went to work for the Maryland Public Interest
Research Group which was a student funded organization at

22

the University of Maryland.

Q    How long were you there?

A.    About eight months.

Q    So you came and left in 1974?

A.    I came in '74 and left in '75.

Q    What did you do for them?

A.    I supervised various projects that the students were interested in, and initiated others of my own.

Q    Anything dealing with asbestos?

A.    Yes.  I was looking into the possibility that asbestos manufacturing was being exported to countries where there were no regulations to protect the workers or the people who lived near the factories.

Q    Okay.

A.    And statistics indicating that we were suddenly becoming dependent on Mexico, Venezuela, Brazil and Taiwan for imports of asbestos textiles were published by me in a report.

Q    What was the name of that report?

A.    Something like, The Flight of Hazardous Industries to Unregulating Countries.

Q    All right, sir.  What did you do after you left

. 23

1   the Public Interest Research Group?

2          A.    I printed up some business cards and stationery

3   and declared my independence.

4          Q.    As an environmental consultant?

5          A.    Yes.

6          Q.    That was in 1975?

7          A.    Yes.

8          Q.    And you have been so employed since then?

9          A.    That's right.

10          Q.    Okay.  And going over your employment history

11   since you graduated from Johns Hopkins with your undergraduate

12   degree, have we left out anything?

13          A.    I'm sorry.  I didn't hear the question.  Would

14   you read it back?

15              MR. SHORE:  I'll repeat it.

16              In covering your employment history here today

17   since you graduated from Johns Hopkins University with your

18   undergraduate degree, have we left out anything?

19              THE WITNESS:  No; not that I can recall.

20              MR. SHORE:  All right, sir.

21              BY MR. SHORE:

22          Q.    You published or are the co-author of a

. 24

publication entitled "Asbestos and You."  Correct?

A.    Yes.

Q.    And your co-author was Albert J. Fritsch?

A.    Yes.

Q.    What was your involvement in putting that together?

A.    I was the principal author.

Q.    Was it mainly from an informational gathering standpoint as far as articles, et cetera, on your part?

A.    I'm not sure I understand your question.

Q.    Well, you said you were the principal author. What were your contributions to this work?

A.    I did most of the research and writing that went into it.

Q.    Okay.  Was that based partly on your thesis, your master's thesis?

A.    Yes.

Q.    What did your master's thesis involve?

A.    The master's thesis was a review of the literature on asbestos disease and an attempt to appraise the situation as it existed in 1971.

Q.    Okay.  What were you attempting to appraise?

A.    Well, this was mainly an educational exercise

1   for me.  I wanted to just wade into the medical literature

2   and see just how bad was this asbestos.

3              At that time they were spraying it on buildings

4   and it was falling like snow on the streets of Baltimore,

5   and I had read a paper or two indicating that this stuff

6   causes lung cancer and it seemed kind of strange to me that

7   such a practice would be followed, much less permitted.

8        Q.   You had no training, so to speak, which enabled

9   you to perform an expert evaluation of the subject; did you,

10   sir?

11       A.   Well, I believe I have since performed an expert

12   evaluation, but at that time I was very new to reading things

13   like medical articles and I found them somewhat difficult at

14   first; yes.

15       Q.   All right, sir.  So your evaluation in your thesis

16   was basically just your own personal observation and writing

17   your own personal evaluation from what you read; right?

18       A.   It was my best attempt to evaluate what the

19   literature said.

20       Q.   Okay.  And the same thing with "Asbestos and You"

21   in 1973?

22       A.   Yes.  "Asbestos and You" was a little different

1    because it wasn't written with the same constraints that you

2    have with a thesis, and so with "Asbestos and You," we

3    expressed more opinions.

4         Q     You were allowed to involve yourself in more

5    speculation I assume then.

6         A     You might call it that.

7         Q     All right.

8              While we are on your publications, in Exhibit

9    Number 1 that you have handed me you have a list of the

10   principal publications and there are a few in here that do

11   deal with asbestos; correct, sir?

12        A     Yes.

13        Q     Okay.  I notice you have one here entitled, "The

14   Development of Knowledge about Asbestos Disease," which is

15   dated 1977.

16        A     Yes.

17        Q     Okay.  What moved you to prepare that article?

18        A     I was asked to summarize the medical literature,

19   the historic medical literature on asbestos disease.

20        Q     Who asked you to do that?

21        A     This was requested by Walter Umphrey, a lawyer

22   in east Texas, and he asked me to write a coherent summary

1  of all these medical articles --

2      Q.  Were you able to --

3      A.  -- which he could use to present the evidence

4  in court.

5      Q.  Were you able to write a coherent summary?

6      A.  I did the best I could.

7      Q.  Okay.  I take it Mr. Umphrey is a plaintiff's

8  attorney.

9      A.  Mr. Umphrey was a plaintiff's attorney in that case.

10     Q.  Okay.  And this summary was to be used in that

11  particular case; correct, sir?

12     A.  Well, --

13     Q.  That was the initial --

14     A.  It was to be used initially in that case.

15     Q.  Do you recall the style of that case, who the

16  plaintiff was?

17     A.  No.

18     Q.  All right, sir.

19         In preparing this work -- and the copyright date

20  was 1977 -- when did you begin your preparation for that

21  article?

22     A.  Some time in 1976, pretty late in the year.

Q    Okay.  And when in 1977 did you complete it?

A    February.

Q    So we are talking about a span of a couple months?

A    Oh, maybe five, six months.  I don't recall now exactly.

Q    So in five or six months you were able to review all of the medical literature in the United States and wherever else you went to for your sources and prepared a coherent summary of those articles?

A    I'm afraid I wasn't able to review all the medical literature.  The medical literature turned out to be a lot more vast than I then imagined it to be.  But I was able to review a substantial body of medical literature and summarize what I found.

Q    At least you purported to be conveying what you felt was an adequate summary of the medical literature at that time?

A    Yes.

Q    All right, sir.  And this was self-copyrighted; correct?

A    Yes.

Q    And no one asked you to get a copyright on it

or no one got it for you?

A.    No.

Q.    All right.

Have you revised that since that time?

A.    Not completely, but I am hoping to.

Q.    Are you in the process of doing that?

A.    Yes.  Well, I am trying -- I've been doing some writing for about two years now.

Q.    Okay.  Did you subsequently testify in that case?

A.    No.  It was settled.

Q.    Okay.

Did you have involvement in 1978 with a plaintiff's attorney in Texas by the name of M-o-t-1-e-y?

A.    It was some time around 1978, I guess, maybe early in '78 that I met a fellow named Ron Motley.  He is not in Texas.  He is in South Carolina.  But I assume that's the fellow you are asking about.

Q.    Umphrey was in Texas but Motley was not?

A.    That's right.

Q.    What did you do for Motley?

A.    Motley wanted to know whether there had been compensation claims against the contracting divisions of

asbestos manufacturing companies, and if so, could the records of such claims be located.

Q    Did you locate all the claims?

A    I located a few.  Motley was able to obtain from one of the defendants, Armstrong Cork, a list of compensation claims and when I went to the state agencies where the compensation records were held, it turned out that Armstrong wasn't the only defendant and there were other companies also involved in those proceedings.

Q    You may have already answered this, but let me make sure:  Subsequent to your writing in 1977 an article summarizing asbestos literature, you have not published anything else similar to a summary.  Is that correct?

A    I have written little comments for Congressional hearings but not a comprehensive sort of thing like that.

Q    Okay.

With your retainer with Mr. Baron, what is it that you are to do for him when he calls upon you to testify at trial?

A    Well, the retainer entitles him to list me as a witness without advance notice, but if he needs me, he should give me as much advance notice as he possibly can.  That's

1    the understanding -- meaning if he needs me in trial or a

2    deposition, if he needs specialized research on a case, let's

3    say it's an unusual case and the state-of-the-art evidence

4    for that case would be a little different than some others,

5    then that would be separately billed if it ran into a lot of

6    time.  But if it was just a little bit of time that would

7    be included free because of the retainer.

8         Q    Okay.  So for lack of a better term, would it be

9    a fair statement to say that you are sort of on a retainer

10   with Mr. Baron as a librarian or a researcher for medical

11   literature?

12        A    You could put it that way.

13        Q    When he comes to you he wants to know what's out

14   there as far as medical literature goes; right?

15        A    Yes.

16        Q    You don't testify in any formal capacity or

17   represent yourself to be an expert on any causal connection

18   between asbestos and asbestos-related disease; do you, sir?

19        A    No.

20        Q    Okay.  And so if you are called to testify in

21   any one of these three cases which presently are pending in

22   the Eastern District of Texas, it would be simply on a

. 32

summarization of the medical literature in the field; is that correct?

A.    Yes.  And by "medical literature" we would -- I would mean that in the broad sense of the words.

Q.    Okay.  Well, let's try to narrow the broad sense down then.  What type of literature are we actually referring to?

A.    Well, I don't mean solely published documents.  I would include things like the state compensation records that we have discussed.  I would include other records which I have seen at the Saranac Laboratory -- Trudeau Institute in Saranac Lake, New York.  And things of this sort which, while not all published documents, still would be helpful to a jury in determining who knew what about asbestos disease and when they knew it and what they did about it.

MR. SHORE:  Could you read that last answer back, please?

(Answer read.)

MR. SHORE:  All right.

BY MR. SHORE:

Q.    You presume it would be helpful to a jury.  You hope it would?

. 33

A.    I would provide as much information as is necessary for the jury to understand what went on.

Q.    You are not qualified as an expert to comment or editorialize on any of these articles; are you, sir?

A.    I think I am.

Q.    What makes you think you are?

A.    Well, I happen to think that I am.  I have been trained as well in toxicology and epidemiology and I have been reading articles like this for quite a long time, and I have been reading these articles in great profusion and I have some idea what they mean.

Q.    All right, sir.  So it's more self-professed expertise then; right?

A.    Let's just say it is an expertise that I think is recognized by most of the people I deal with, except defense attorneys.

Q.    All right, sir.

Have you ever testified either by deposition or in trial as an expert in toxicology and/or epidemiology?

A.    No.

Q.    How much education have you had concerning these two subjects?

1      A.     I have had about four courses in epidemiology

2   and five or so in toxicology.

3      Q.     Is that in regard to your doctorate program?

4      A.     Yes.  And previous training at the master's level.

5      Q.     How much of this training has been in regard to

6   your doctorate program?

7      A.     Most of it.

8      Q.     Which you have not completed yet; correct, sir?

9      A.     I have not completed the complete degree require-

10  ments.

11     Q.     As a matter of fact, I believe from your prior

12  testimony you have only been involved in your doctorate

13  program for approximately one year.

14     A.     That's right.

15     Q.     All right.  If you are called to testify in any

16  one of the previously three mentioned trials, do you intend

17  to testify as an expert in toxicology and/or epidemiology?

18     A.     No.

19     Q.     All right.  So, therefore, your basic function

20  will be simply to present the research you have conducted in

21  this field; correct?

22     A.     Yes.

· 35

Q    Okay.  And will you be giving any opinions in regard to that research?

A.    Most of the time I am not asked to give opinions in trial and I'm not fond of giving opinions.  But I do sometimes for the sake of brevity and comprehensibility try to summarize this information --

Q    Well, I realize --

A.    -- rather than read from every single article.

Q    Right.  I realize you can't go through and give a blow-by-blow description of every article you have read. You have to summarize a lot of it.  Why aren't you fond of giving opinions?

        MR. WEINSTEIN:  I didn't hear the question.

        MR. SHORE:  Why aren't you fond of giving opinions?

        MR. WEINSTEIN:  Why aren't you fond?

        MR. SHORE:  "Fond."  F-o-n-d.

        THE WITNESS:  I think that it doesn't really aid the jury a great deal to know what I think about all this stuff.  I think that it is -- and, of course, this opinion may or may not be shared by other parties involved in these actions, but I think that the documentation, if it can be presented in a reasonably complete way, speaks well enough

1    for itself that a jury should be able to understand it and

2    evaluate it.

3             MR. SHORE:  Okay.

4             BY MR. SHORE:

5       Q    Your attorney handed me something today from the

6    case records of the Massachusetts General Hospital where it

7    has a Benjamin Castleman, M.D., associate editor.  Is he akin

8    to you?

9       A.    I don't think so.

10       Q    Okay.

11           What type of consulting work have you done aside

12    from your work with the plaintiffs' bar in asbestos litigation?

13       A.    Well, as I said, when I worked with environmental

14    groups I was involved in preparing petitions to government

15    agencies and generally meeting with regulatory agencies and

16    trying to get them to take certain actions to protect the

17    public health.  This continued when I was an independent

18    consultant.  I was hired by the Natural Resources Defense

19    Council and the Environmental Defense Fund  to do research,

20    policy oriented research on the hazards of flame-retarded

21    children's sleepware.

22       Q    Is that Tris?

A.    Yes, Tris and asbestos in drywall spackling compounds.

Q.    All right, sir.

A.    And various other things.

Q.    In Exhibit Number 2, which I believe you said was an older resume of yours, it has Environmental Defense Fund, that you were a consultant for them in 1975, and it has asbestos and mercury in foods.  Was that in regard to asbestos in foods?

A.    Yes, it was.

Q.    And it had nothing to do with its effects on insulators and plant workers, et cetera?

A.    That's correct.  It was not a situation involving occupational exposure to asbestos.

Q.    All right, sir.  And on that same Exhibit 2 it has Federal Trade Commission, survey of asbestos in consumer products, 1976.  What did you do for the FTC during that time?

A.    I tried to -- I went through 30 years of back issues of Asbestos Magazine looking at their periodic listing of patents and new products and using this and other sources I tried to gather up a list of all the products in which asbestos was used.

Q      It says, "Consumer Products."  Would that encompass insulating materials?

A.     Yes.

Q      All right, sir.

Finally, down here we have got the Asbestos Litagation Group, 1978.  Now, what is the Asbestos Litigation Group?

A.     That's a group, a very loose-knit group of plaintiffs' attorneys involved in asbestos litigation.

Q      Are you on a retainer with the Asbestos Litiga-tion Group?

A.     No.

Q      Do you still work for them?

A.     Periodically I will find leads and want to pursue them in order to develop additional information on the state of the art, and I might contact the litigation group and ask for a few hundred dollars for it.

Q      If they were to call you tomorrow and ask you for services, what would your fee be?

A.     Generally the only services I have provided to this group have been research services, and for that I charge $62 an hour.

. 39

Q    I take it they are all plaintiffs' attorneys also.  Correct, sir?

A.    They all represent themselves to be plaintiffs' attorneys; yes.

Q    All right, sir.

Have you ever testified before any Congressional committees concerning asbestos and asbestos-related diseases?

A.    Yes, I have.

Q    Which ones and when?

MR. WEINSTEIN:  Which diseases or which committees?

MR. SHORE:  Which committees and when.

THE WITNESS:  Oh, it probably would be easier if I looked at the sheet you are holding.

(Document handed to witness.)

(Witness referring to document.)

THE WITNESS:  The first few times were before sub-committees of the U. S. Senate Commerce Committee on something known as the Toxic Substances Control Ac .  And then later on there was some concern over in the House of Representatives about asbestos hazards to school children, and I was asked by the counsel for the House Committee on Education and Labor to submit comments for the record of those hearings in

. 40

1   1979 or '80.

2           BY MR. SHORE:

3       Q.   And --

4       A.   Later on I was asked to testify in a hearing

5   in 1979 which I see here was published in 1981, dealing with

6   proposed changes in the Federal Criminal Code as it relates

7   to certain business practices.

8       Q.   In regard to dealing with testimony concerning

9   asbestos it was more of an informative type testimony for

10  the committee as to what you found in your research with

11  regard to what literature is out there?

12      A.   Yes, in the sense that I have described it, what

13  I mean by "literature."

14      Q.   All right, sir.  Let's go back to your testimony

15  in these trials if you are to give any that we have been

16  referring to, and I think we have established that you are

17  not going to be giving any opinions.  What type of literature

18  would be comprising the summaries that you are going to be

19  presenting if you do testify?

20      A.   I am not sure I understand your question.

21      Q.   All right.

22      A.   Let me have that document back.

. 41

1          (Document handed to witness.)

2          THE WITNESS:  This is a list of medical articles

3   used in a case of a man named Luther McCoy.

4          Q    Is that a case you testified in?

5          A    It was a case I was listed in, and I may have been

6   deposed in this case, but I'm pretty sure this one didn't

7   come to trial.

8          Q    All right, sir.

9          A    So here I have listed a large number of articles

10  which might be used.

11         Q    This is your document, sir?

12         A    Yes.

13         Q    Do you have another copy?

14         A    I'm sure I do, at home.

15         MR. SHORE:  Why don't you mark that, please, as

16  Number 3.

17                              (Defendants' Exhibit No. 3
18                              is marked for identifica-
                                tion and attached to the
19                              deposition original.)

20         BY MR. SHORE:

21         Q    While they are copying that document let's try to

22  talk in general terms about what you consider exists out

1  there as far as literature in the asbestos field that you will

2  be using to testify.  Basically what is it comprised of?

3       A.   Well, --

4       Q.   I am not asking for specifics.

5       A.   I understand.  It consists of medical articles,

6  primary medical articles such as this case report of the

7  Massachusetts General Hospital.  It consists of secondary

8  sources such as this thing called The Industrial Bulletin

9  published by the Industrial Commissioner of the State of

10  New York.  I have an article from 1934 from that.

11       And then there is even further downstream

12  literature like encyclopedia articles and things like that

13  which together comprise a body of written knowledge, and

14  this would include things like medical textbooks and trade

15  magazines that periodically carry articles on dust hazards.

16       Q.   Have you done that type of research for Mr. Baron?

17       A.   Well, I have done that type of research -- I'm not

18  sure I understand yc_r question.  You mean compiling this stuff?

19       Q.   Right.

20       A.   Yes.  I have done it for Mr. Baron, and for others.

21       Q.   All right.  When you established your retainer

22  agreement with Mr. Baron what did he ask you to do?

. 43

A.    Basically he just asked me to be available for trial or depositions if needed.

Q    Did he ask you what type of documents or summaries you have concerning medical literature in the asbestos field, or did he ask you to go out and find some?

A.    I think by the time I met Mr. Baron I had a fairly good collection of such articles.  It has been enlarged quite a bit since then, but the basic -- the basic picture of literature and the knowledge and how it developed was already embodied in the collection of documents I had when I met him.

Q    Well, sir, I think it's no secret to anyone that the plaintiffs' use of you as a witness is to attempt to show knowledge of hazards of asbestos at an early stage.  Would that be a fair statement?

A.    I suppose that's what they intend to use me for.

Q    And in doing your research has it not been geared mainly to finding that type of literature?

A.    The type of literature I have been looking for has been anything and everything dealing with the subject of asbestos disease.  And I have not been able to guide my search, even if I wanted to, so that I would only find things that are helpful to the plaintiffs.

. 44

Q. Okay. Well, at trial do you present things that are helpful to the plaintiff and things that are not helpful to the plaintiff?

A. We are generally limited to just presenting things that are most helpful to the plaintiff's case. But I think in fairness there isn't very much that's helpful to the defense in the entire history of medical literature on asbestos.

Q. And whatever, sir, that is helpful, you somehow seem to leave that out of your testimony; correct, sir?

A. Some of those articles are listed in the master list that we are reproducing and those articles do get discussed both by plaintiffs — both on direct and on cross-examination.

Q. Usually on cross; right?

A. We usually take up the Fleischer report on direct. We usually take that up on direct at least breifly.

Q. This article you published in 1979, "Asbestos Disease and Compensation," co-authored by a Mr. R. E. Sweeney, is that the plaintiff's lawyer down in Florida?

A. No.

Q. A different Sweeney?

A.     Yes.  He is a plaintiff's lawyer in Cleveland.

Q.     All right.

A.     Sweeney was giving a talk at a conference and I wanted to get some things into the literature and so I presented this article to Sweeney and said, would you mind being my co-author for this, and dumping it into the annals of the New York Academy of Sciences.  The article was subsequently accepted by the editors of the conference.

Q.     I would like for you to take a look at page two of Exhibit 1 and tell me if there are any articles that you published which are not on that page.

(Witness referring to document.)

THE WITNESS:  These are called principal publications.  In the early days when I worked for environmental groups I also wrote occasional articles for magazines like, "Not Man Apart" published by Friends of the Earth and other magazines of that sort.

MR. SHORE:  All right.  Let me --

THE WITNESS:  These things are not listed here.

MR. SHORE:  Let me rephrase my question.

BY MR. SHORE:

Q.     Do you have any other articles dealing with

46

asbestos which are not listed on that page?

A.   I don't think there is anything that I have published that has more than the least scintilla of value in connection with this litigation that is not on this page. This is all the substantive -- This is all the substantial work that has been done.

Q.   All right.  So if something else were to come up at trial dealing with asbestos, an article you published which is not on this page, it probably wouldn't have the least scintilla of value to a jury.  Correct, sir?

A.   That's correct.

Q.   Are all of these articles dealing in one form or another with asbestos?

A.   Not every one.

Q.   Okay.

A.   I don't think so.  Let me take another look, please.

(Witness referring to document.)

THE WITNESS:  Asbestos is probably mentioned at least briefly in — Well, almost every one.  There is one on the export of chemical waste.  I may have successfully com- pleted writing this article without mentioning asbestos. Almost all the other things in here mention it in some way.

MR. SHORE:  Okay.

BY MR. SHORE:

Q     In reviewing the medical literature or the
industry literature or both, whatever encompasses your work
in this area, has it mainly dealt with studies done on plant
workers as opposed to insulation workers?

A     I have tried to find out as much as I could on
both plant workers and insulation workers.

Q     What articles do you present in your testimony at
trial which deal with insulation workers?

A     There are a few dozen case reports and epidemi-
ological studies that were done prior to Selikoff's publica-
tion in 1964, And then there are -- And then there are, as I
would call them, downstream publications of the primary
literature such as mentioned in medical textbooks and trade
magazines and things like even encyclopedia articles which
show the drift of the knowledge as it -- as time passed from
the priamry literature to secondary and even more secondary
sources of knowledge.

Q     What sort of expertise  do you have to have to
dig up these articles?

A     Well, it helps to read -- It helps to read a

1   little German and French and to know how to use medical

2   libraries and the Library of Congress.  Basically it is a

3   straightforward matter of trying to read every darn thing

4   you can find, and that means if you have got an article and

5   the article has references to other articles, you look at

6   those other articles and you see if they might have something

7   of interest, and if necessary, you go and get them and read

8   them too.

9        Q.   All right, sir.  This literature is primarily

10  published literature which is available to anyone?

11       A.   Yes.

12       Q.   Is there any — Is there any of this literature

13  which is not published in the form of transcripts of pro-

14  ceedings or something which is not available to the public,

15  or do you throw that type of stuff into your summarizations

16  also?

17       A.   It depends on the rulings of the judge and it

18  depends on the plaintiff's attorneys.  Sometimes the plaintiff's

19  attorneys are only interested in presenting published informa-

20  tion, so that's all I discuss.  Others like to get into

21  things like the S-u-m-n-e-r Simpson documents.

22       Q.   Let me stop you there.  You don't purport to be

1    an expert on the Sumner Simpson documents; do you, sir?

2         A.    I don't know what you mean by that.  But I think

3    that I can read them and that they have much plainer English

4    than the medical literature and as such are quite compre-

5    hensible -- quite easily comprehensible to anyone with no

6    specialized training.

7         Q.    Go on.  I interrupted you.

8         A.    On the sorts of documents that I would use?

9         Q.    Yes.

10        A.    Well, as I say, I have been to the Industrial

11   Hygiene Foundation now called the Industrial Health Foundation

12   and I have looked at documents there.  I have been to the

13   Trudeau Institute and looked at documents there.  I have been

14   to the Walter Reed Hospital where the Armed Forces Institute

15   in Pathology has archives of Dr. Arthur V-o-r-w-a-l-d, and

16   I have looked at these old state compensation records that

17   we talked about.  And then there have been other things that

18   have been sent to me which were obtained by plaintiff's

19   lawyers in discovery; things like minutes of the Asbestos

20   Textile Institute and company documents from various defendants.

21        Q.    So a lot of these documents are documents which

22   are not available to the general public; is that correct?

1    A.    Yes.

2          MR. SHORE:  Let's go off the record.

3          (Discussion off the record.)

4          (Recess.)

5          BY MR. SHORE:

6    Q.    Mr. Castleman, earlier on you handed me a docu-

7    ment with a list of articles on it which we marked as Exhibit

8    Number 3.  Would you describe for  me again what that is,

9    please, sir?

10   A.    This is a list of articles most of which are

11   published documents dealing with asbestos disease.

12   Q.    When was it prepared?

13   A.    The original 208 list was prepared about a year-

14   and-a-half or two years ago, and the other documents were

15   added to it going up to 242.

16   Q.    Was this prepared by yourself?

17   A.    No.  This was done by an attorney I was working

18   with named Marlin Thompson.

19   Q.    Let me rephrase my question:

20         Were the articles provided to him by you?

21   A.    Yes, they were my articles.  Almost all -- some

22   of these were articles he had, so he blended his collection

· 51

with mine.

Q.    Okay.  It's obvious this was prepared for some sort of trial.  What did this attorney ask you to do when he asked you for these articles?

A.    I think I was testifying in a case that Mr. Thompson was involved in in Oklahoma City, and we decided to, or were required to actually come in with the documents that we intended to use to establish the state of the art.  And so this list was prepared and all the documents on it were photocopied and carried around in a big box.

A.    Now, you used the term "state of the art."  What do you mean by state of the art?

A.    Now this is my understanding of a legal expression so with that in mind I will try to define what I mean by it.

Q.    Okay.

A.    It is the developing recognition of the hazards of asbestos by various people who wrote about it and by inference, anybody who read what they wrote.

Q.    Okay.  Are you going to be used as a, quote, "state-of-the-art," close quote, witness?

A.    That's what I understand that my testimony is presented as.

· 52

Q    Okay.  And as a state-of-the-art witness, again I think we have established that your function is primarily, "This is the research I have found and this is what it says." Correct?

A    Yes.

Q    Okay.  And it is for others to make use of it in regard to who had knowledge of what when; right?

A    Yes.

Q    Okay.  So you are not presenting it and trying to say that any certain manufacturer had knowledge at any specific time; are you?

A    Well, there are a few things in here that might reflect on that.

Q    But all you can testify to --

A    In general; yes.  I'm trying to present a comprehensive picture of the knowledge as it evolved.

Q    All you can testify to is that these articles did in fact exist at a certain date?

A    Well, let me show you what I mean, why I am having a little trouble with your question.

Q    Before you do that can you answer my question?

MR. WEINSTEIN:  Apparently not.  That's why he

53

1    wants to show you.

2            THE WITNESS:  Some of these things are not things

3    that were published, but they were communications that were

4    received by companies manufacturing asbestos products.

5            BY MR. SHORE:

6        Q.   Let me stop you there.  How do you know that, or

7    was that an inference on your part?

8        A.   Well, in the case of Document 88  on this list --

9        Q.   Just a minute.

10           (Counsel and witness referring to document.)

11           THE WITNESS:  This is a report of research to

12   the Owens Illinois Company by the Saranac Laboratory, and it

13   talks about the -- it summarizes the findings -- I'm sorry.

14   Well, I believe that this exhibit is stapled to a letter

15   which should have been noted here but it wasn't, dated

16   November 16, 1948, and the letter and the report both went

17   to, or were sent to Owens Illinois by the Saranac Laboratory

18   according to documentation at the Saranac Laboratory.  And

19   I understand that some of these documents have also been

20   obtained in discovery from Owens Illinois.  So apparently the

21   documents were received.

22           BY MR. SHORE:

. 54

Q.   That's just hearsay on your part; right?

A.   Well, also in the cover letter, the November letter of 1948, there was some discussion of bills that were owed, and Document 103 seems to answer the question of that billing, and there was some stuff written in the margin about how it has all been paid.  So apparently the bills that were presented in the earlier letter in 1948 had been paid up by some time in 1950.

Q.   What I am getting at is, that's inferential treatment by you of the documents; correct?

A.   Yes.  I mean, I can't --

Q.   You can only relate what's in the documents.

A.   I cannot testify that those documents were received by somebody when I was four years old by having actually been present at the time it was received.  That's true.

Q.   All right.  So again, all you can testify to, going back to my original question, is that these documents are what you found and they are dated on a certain date and they contain certain material.  Right?

A.   Yes.

Q.   Okay.  And I guess depending on what the judge does, you normally can't, or you can't say whether or not

55

1    they were received by any specific manufacturer or any other

2    body.

3         A.    No.   I think I would be limited to telling what I

4    know and letting other people come to their own conclusions

5    about what it amounts to.

6         Q.    All right.

7              Now, you dug up every one of these articles?

8         A.    I think the expression "dug up" is a little unkind.

9         Q.    Well, I didn't mean it to be, but I will stick

10   with it.   These are all the result of your research?

11        A.    Other people have provided some of these articles

12   to me.   I didn't find every single one.   I mean, they were

13   there to be found.   It's just a question of whether I found

14   them first or whether somebody else who was interested in this

15   subject found  them and passed a copy along to me.   But most

16   of these articles I found myself and I'm pretty familiar

17   with them.

18        Q.    Give me a percentage of how many you found yourself.

19        A.    Well, it would be something over 90 percent, I

20   guess.

21        Q.    Okay.   Have you read every one of these articles?

22        A.    Yes.   But some I have not read recently.

Q.      Okay.   When did you start compiling this list

A.      I guess I started in earnest to develop a collec-

tion of articles like this when I started working with

Mr. Umphrey back in 1976.

Q.      It's obvious from this that we are dealing with

thousands and thousands and thousands of pages of documents;

right?

A.      Yes.

Q.      Of which you have read some but not all?

MR. WEINSTEIN:   No.   He testified he read all of it.

THE WITNESS:   I have read all the documents but

I wouldn't -- I wouldn't propose that I remember every single

thing that's in every one of them; no.

BY MR. SHORE:

Q.      I notice you have your own article listed here,

Number 241.

A.      I have several articles of mine listed here; yes.

Q.      Okay.   And it's your testimony that your articles

include or make up the so-called state of the art literature

out there; right?

A.      Yes; certainly.

Q.      Okay.   And if I were to write an article on

1    asbestos-related diseases with my limited background, would

2    that get included in here?

3         A.    It depends if your article had something useful

4    to contribute to the state of knowledge.

5         Q.    Okay.  So in your opinion all of these have

6    something useful to contribute to the state of knowledge;

7    correct, sir?

8         A.    Yes.  And my opinion is sometimes corroborated

9    by statements made by the companies themselves.

10         Q.    And sometimes they are not; right?

11         A.    Well, I mean yes, sometimes my writings and

12    pleadings have fallen on deaf ears.  For example, --

13         Q.    Well, I'm not speaking just in particular to your

14    articles.  I am speaking in particular to all of them.

15         MR. WEINSTEIN:  What's the pending question?

16         MR. SHORE:  Whether or not they have -- Whether

17    or not in his opinion they have value to the industry,

18    community, et cetera.

19         MR. WEINSTEIN:  I don't understand that.  Whether

20    or not every article has value to the industry?

21         MR. SHORE:  Let's go off the record a second.

22         MR. WEINSTEIN:  I lost the train of thought.

. 58

1     MR. SHORE:  Off the record.

2     (Discussion off the record.)

3     MR. SHORE:  Let me rephrase the question.

4     BY MR. SHORE:

5    Q. Mr. Castleman, I guess there is a little con-

6 fusion as to my question so I am going to restate it to you.

7 Based on your prior testimony I take it then that in your

8 opinion all of these articles in Exhibit Number 3 have some

9 usefulness or contribute some benefit to the industry,

10 community, et cetera.

11    A. Well, I'm afraid I would only hedge in looking at

12 Number 107, for example, which is crossed out which was an

13 advertisement which, as far as I can tell, was inadvertently

14 included in this list of articles.  And there may be one or

15 two other things like that which really don't contribute very

16 much but which were included by Mr. Thompson when he compiled

17 the list.

18    Q. So this is not entirely your list?

19    A. Well, the list was, as I say, compiled by

20 Mr. Thompson gathering together articles that I provided to

21 him and some articles that he had on his own which I wouldn't

22 -- I'm not sure I would have selected some of those articles

. 59

1   simply because I didn't -- I don't think that they add a

2   great deal.  Some of them are too recent to be involved, to

3   really deal with the issues in these cases.

4        Q.   Well, in gathering your material, did you exercise

5   any sort of judgment as to what you felt was beneficial and

6   nonbeneficial in preparing your list for these plaintiffs'

7   attorneys?

8        A.   Yes.  The plaintiffs' attorneys said that they

9   weren't terribly interested in a bunch of articles showing

10  people who worked in asbestos textile plants getting

11  asbestosis; that this was an issue which was conceded by the

12  defendants going back to 1930 or so, and that it would be

13  much better use of the court's time if I would try in the

14  case of an insulation worker to guide my testimony toward the

15  use of documents that specifically address the existence of

16  an asbestos disease risk in insulation work.

17       Q.   So in gathering your documents there is, to some

18  extent, objectivity on your part -- or excuse me -- subjectivity

19  on your part as to what information you feel is beneficial;

20  correct, sir?

21       A.   Well, I think the word "relevant" is probably

22  a better choice than "beneficial."  You have a choice

1    between trying to present thousands of articles or trying

2    to boil it down.  You will see that this list has numbers

3    going up to 20 or so, and in this particular case the judge

4    said he wanted to hear it all in 20 articles and that was it.

5    And so obviuosly you have to do some selection in terms of

6    what you think is relevant to the issues involved in the case

7    and present in a defensible, legitimate, honest way how the

8    knowledge developed.

9         Q.   So it involved subjectivity on your part --

10        A.   As I have described it.

11        Q.   -- as to what you feel is beneficial?

12        A.   As I have described it.

13        Q.   And preferably to the plaintiff's case; correct,

14   sir?

15        A.   Well, as I say, even in this list of 20, the

16   Fleischer article is listed, and this is an article which the

17   defendants are very fond of.

18        Q.   Well, --

19        A.   And it is also included.

20        Q.   I believe you have testified before, have you not,

21   sir, where you omitted testifying about the Fleischer article?

22        A.   It may have been omitted on direct in some cases.

. 61

1  In this case I wanted to use it even though I was limited to

2  only 20 articles.  It varies.  It depends partly on the

3  attorney that represents the plaintiff.

4          There is sometimes extremely minimal preparation

5  before trial in terms of discussing these things and the

6  attorney might just want presented encyclopedia articles and

7  figures that tell the jury enough.  So he wouldn't ask me

8  about the Fleischer article and I am not in a position to

9  raise it when I am sitting up there on the witness stand.  So

10 these aren't just decisions that I make.

11     Q.    Well, going back a little further into your

12 research, are you exercising subjectivity in gathering these

13 documents as to what may or may not be beneficial or, as you

14 use the term, "relevant?"

15     A.    Obviously some documents are more relevant to

16 the issues involved than others.

17     Q.    In your opinion --

18     A.    And I use my judgment in selecting documents which

19 are more relevant.  If it's a case report of asbestosis in a

20 German asbestos textile worker in an obscure journal that I

21 have not heard of, I think that's a lot less important and

22 relevant or beneficial or any other term you want to use than

a case report in the New England Journal of Medicine about

an insulation worker with asbestosis and mesothelioma, m-e-s-

o-t-h-e-l-i-o-m-a.

MR. WEINSTEIN:  Did you say what year that was?

THE WITNESS:  That's 1947.

BY MR. SHORE:

Q    Was your research geared more to case reports

or epidemiological studies?

A    As I say, I have tried to get ahold of anything

and everything that spoke of the developing knowledge about

asbestos disease.

Q    So --

A    I have not tried to limit it in any way.  That's

true, that I have not had as much opportunity to go through

some sources as others; like insurance industry journals might

be very interesting to read about all this.  I have not

had a chance to go through them.

Q    Okay.  Let's get into that just a little bit.

What areas do you feel you could have gone into

which would have provided you with a better basis for pre-

senting testimony in regard to what literature exists out there?

A    Well, there are innumerable trade journals and

. 63

these are journals of the chemical industry, journals of the

paint manufacturers and journals of the construction industry

in all of its innumerable manifestations.  And it's very hard

to get ahold of -- at least I have not so far gotten ahold of

any comprehensive listing of these very many trade journals

to try and select certain ones which would be most helpful

in showing what the construction industry in its own journals,

for example, have to say about asbestosis.

Q.    Would it be a fair statement to say that there

are many more articles out there than the ones you have

gathered?

A.    It depends on what you mean by "many."  I am sure

I have seen just about every real significant medical article.

I think you would be very hard pressed to find a case report

or an epidemiological study on asbestosis, insulators or

product users that I have not heard about.

Q.    Okay.  "Significant" in your judgment?

A.    I think you would have a hard time finding such

an article, significant or insignificant, which was a primary

report of disease in such workers.

Q.    In your judgment?

A.    What I am saying is I think I have read them all.

Q.    My question is, is it in your judgment?

A.    In my judgment.

Q.    Okay.

When do you expect to be hearing from Mr. Baron as to whether or not you are going to be testifying in these asbestos cases?

A.    Some time next week I guess.

Q.    Okay.  And you have no idea which, if any, of these cases you will be required to testify in?

A.    No.  As you are well aware, these things have a way of going right down to the wire and then getting settled or postponed very often.

Q.    How many other plaintiffs' attorneys are you on a retainer with?

A.    I don't know.

Q.    Take a guess.

A.    In terms of people who are currently paid on their bills?

Q.    Currently paid or not totally paid.

A.    I don't know.  A dozen.

MR. WEINSTEIN:  Are we on the currently paid list?

THE WITNESS:  Off the record.

· 65

1        (Discussion off the record.)

2        THE WITNESS:  Maybe a dozen or 15; something

3 like that.

4        MR. SHORE:  All right.

5        BY MR. SHORE:

6        Q.    Just one or two more questions.  I would like to

7 get an idea, a little bit more definite idea on how many

8 actual trials you have testified in on behalf of a plaintiff.

9        A.    I think there have been four trials in Oklahoma.

10 And all of these --

11        MR. WEINSTEIN:  Four in Oklahoma or Oklahoma is

12 one of the four?

13        THE WITNESS:  In the Oklahoma City Federal Court

14 the plaintiff's attorney was Silas, S-i-l-a-s, Wolf, W-o-l-f,

15 Junior, and then two in Texas, I think.  There was the Mason

16 case, and Gillis, G-i-l-l-i-s.

17        MR. SHORE:  Who was the attorney then?

18        THE WITNESS:  Mr. Baron.

19        And then there was one in Florida back in 1979.

20        MR. SHORE:  Who was the attorney there?

21        THE WITNESS:  Mr. Baron.

22        Then there was one in May in Boulder, Colorado,

• 66

1    in the state court.

2              BY MR. SHORE:

3         Q.   And the attorney?

4         A.   The plaintiff's attorney was Conard, C-o-n-a-r-d,

5    M-e-t-c-a-l-f.

6         Q.   How many other trials?

7         A.   Off the top of my head I can't think of any others.

8         Q.   Okay.  Without going into specifics, how many

9    times have you testified by way of depositions.  I know you

10   gave me a general number, but I would like for you to think

11   back specifically, if you can.

12        A.   Well, I have the feeling that there are more

13   depositions than trials.

14        Q.   You are probably right.

15        A.   I would guess around 10, but maybe not that many.

16   I'm not sure.

17        Q.   That would be in addition to these trials?

18        A.   Yes.  Well, for some of those trials there were

19   depositions as well as trial testimony; one or two of them.

20        Q.   Okay.

21        A.   Two of them that I can think of.

22        Q.   So would it be a fair approximation to say that

you have been involved either by deposition or actual, live

trial testimony in around 15 plaintiffs' cases, to date?

A.   Yes.

Q.   Okay.  And you are on a retainer with several

plaintiffs' attorneys; approximately 15 I believe your testi-

mony was.

A.   A dozen to 15 was my testimony.

Q.   Okay.

A.   And that's just a guess.

Q.   And you still do work for the Asbestos Litigation

Group which is comprised of plaintiffs' attorneys; correct?

A.   On occasion; yes.

Q.   You have done no work at all for defense counsel

in these asbestos cases; correct?

MR. WEINSTEIN:  He is testifying right now for

defense counsel.

MR. SHORE:  Called as an adverse witness.

MR. WEINSTEIN:  Being paid by defense counsel.

MR. SHORE:  Not by our choice.

THE WITNESS:  Defense counsel has never really

approached me to do anything for them, and I have not done

anything for them as far as being an expert for defendants.

. 68

MR. SHORE:  Okay.  I have no further questions at this time.

MR. WEINSTEIN:  I have no questions.

MR. BUCHER:  I have just a few.

BY MR. BUCHER:

Q.   Mr. Castleman, your retainer agreement with the 12 to 15 other plaintiffs' attorneys, is that the same terms as you have with Mr. Baron?

A.   Yes.

Q.   Have you ever been prohibited from testifying as an expert in any court?

A.   There was an attempt to get a class action certified down in Mobile, Alabama, I think in 1979, and the magistrate just didn't want to hear anything I had to say and ruled that I would not be allowed to testify.

Q.   Do you have any medical training, formal medical training?

A.   Well, I am not a doctor, but I have t ken medical physiology and some of these other courses at Johns Hopkins.

Q.   You would not be able to qualify as a doctor, however?

A.   I would think not.

1         MR. WEINSTEIN:  I wouldn't let him operate on me.

2         (Laughter.)

3         BY MR. BUCHER:

4       Q.   And you would not be in a position to testify as

5  to what weight the medical community gave to these some

6  240-odd articles that you have listed on Exhibit Number 3?

7       A.   I don't think that would be allowed; no.

8       Q.   Who else other than Mr. Thompson and you is the

9  source of the documents that you listed on Exhibit 3?

10      A.   Well, there is a fellow named Stephen Berger.

11      Q.   Who is he?

12      A.   He is a patent agent in California.

13      Q.   What did he provide?

14      A.   He looked into the substitutability of absestos

15  in thermal insulation material, looking at patents and

16  engineering journals.

17      Q.   What articles or what item numbers on Exhibit 3

18  would they be?

19      A.   I see Number 9 is one of his contributions.  This

20  was a very optimistic article on how fiberglass was capable

21  and ready to replace asbestos to a large degree in 1923.

22      Q.   Which one is this you are reading now?

1    A.    Number 9.

2    Q.    This is Palmer?

3    A.    Yes.

4    Q.    This was provided by Mr. Berger?

5    A.    Yes.

6    Q.    And what other articles?

7    A.    Number 69 is a letter from Dr. Leroy Gardner to

8  another doctor who was on a cancer advisory committee.

9    Q.    Mr. Berger provided this?

10   A.    No.   I got this one from -- when I was visiting

11  Mr. Motley one time.

12   Q.    Mr. Motley provided this one?

13   A.    Mr. Motley provided this one.

14   Q.    So it's Mr. Thompson, Mr. Motley, Mr. Berger and

15  you now who are the sources of this list on Exhibit 3.

16   A.    Yes.

17   Q.    Anybody else, or any other articles?

18   A.    I think Mr. Berger found Number 123 by Oliver

19  Bowles, B-o-w-l-e-s.  And there might be one or two more

20  like that.

21   Q.    Are there any other articles that you rely on

22  other than the ones listed on Exhibit 3 containing a total

· 71

1    of 242 less the deletes?

2         A.    I brought a couple more along today which have

3    come to my attention somewhat recently and I think that they

4    are useful.

5         Q.    When did you obtain these?

6              Well, let's mark these as Exhibits 4 and 5 to this

7    deposition.

8                                    (Defendants Exhibit Nos. 4
                                     and 5 are marked for identi-
9                                    fication and attached to the
                                     deposition original.)
10

11             THE WITNESS:   These came to my attention within the

12   last few weeks.

13             BY MR. BUCHER:

14        Q.    From whom?

15        A.    One of them I had obtained --

16        Q.    Which one?   Let's start with The Industrial

17   Bulletin, dated 1934.

18        A.    Okay.

19        Q.    Let's go to what has been marked as Defendants'

20   Exhibit Number 4, The Industrial Bulletin, dated April, 1934.

21   Where did this come from?

22        A.    This was from the Library of Congress.

Q    When did you obtain this?

A.    Within the last two weeks.

Q.    From whom?

A.    I have someone that I send down to the Library of Congress to procure articles for me which I list references to, and in this case I was referred to this by a three-volume book of abstracts and citations called Pneumoconiosis, and this appeared in the mid-1930s.  And one of the things it referred to was this article from The Industrial Bulletin which I then had pulled by my researcher so I could read it in its entirety.

Q    What was your conclusion after you read it as it pertains to this particular litigation?

A.    Well, it says in the second paragraph --

Q.    Is that, "It's a pity?"

A.    That's another very good editorial, but the one on asbestos, the second paragraph goes, "It is quite probable that the disease resulting from the breathing of asbestos dust will be similar to that resulting from silica.  If that be so, manufacturers or handlers of asbestos products might begin here and now to prevent trouble because of the fact that, like silicosis, the disease can be prevented — there is no cure."

· 73

Q.    These are all probabilities or possibilities?

A.    Well, your interpretation is --

Q.    Well, it will speak for itself.

A.    Yes.  I think it speaks for itself.

Q.    How about Exhibit Number 5, case record of Massachusetts General?  When did you get this?

A.    A couple of weeks ago.

Q.    From whom?

A.    Dr. Joseph Wagoner, W-a-g-o-n-e-r.

Q.    What was the reason for him providing this to you?

A.    He was over to my house and we were talking about historic documents on asbestos.  I was showing him a few that I thought he hadn't seen, and he tried to show me one or two that I hadn't seen and was eminently successful in the case of this one article.

Q.    Do you often meet with Dr. or Mr. Wagoner?

MR. WEINSTEIN:  It's Dr. Wagoner.

THE WITNESS:  I don't see him very often; no. Maybe a few times a year.

BY MR. BUCHER:

Q.    Is this on a social basis?

A.    It's basically business, but we are also --

. 74

1    we are also friends.

2        Q.    What is the business?  What is the business

3    relationship between you and Dr. Wagoner?

4        A.    Well, it's not a business where I pay him or he

5    pays me.  We just exchange information and we have common

6    interests.

7        Q.    What is that common interest?

8        A.    The common interest is the prevention of occupa-

9    tional disease and the literature relating to occupational

10   diseases in a wide number of industries.

11       Q.    Does that include the asbestos industry?

12       A.    Yes.

13       Q.    Do you discuss the asbestos facets of the

14   business with him?

15       A.    Yes.

16       Q.    Do you discuss your testimony at deposition or

17   trial with him?

18       A.    Well, he knows what I do and I know what he

19   does; yes.

20       Q.    He is also an expert, purported expert for

21   plaintiffs, asbestos plaintiffs?

22       A.    I think he is widely regarded as an expert on

epidemiology of asbestos and a number of other subjects, that they cause cancer; yes.

Q.     In any of your search of literature have you come across any publications by the federal government, federal or state governments pertaining to asbestos?

A.     Yes.

Q.     Are they listed on your -- on Exhibit 3?

A.     Some things are.

Q.     Do they -- Do they include product specifications to be provided to the government?

A.     No.

Q.     None of these records indicate that the government required the use of asbestos in certain products?

A.     I don't think so; no.

Q.     Would that be material?

A.     It's not a medical issue.

Q.     But you are not a doctor.

A.     Well, but I am basically presenting the history of knowledge on the hazards of the substance, not on its replaceability.  I am not -- In other words, Mr. Berger, for example, might be used as a witness to discuss the availability of substitutes for asbestos and the specifications and things

1    like that for asbestos products.  I am in no way an authority

2    on the government specifications for insulation materials

3    used by the Navy or whatever.

4         Q.    Do you consider yourself an expert on the medical

5    aspects of asbestos-related injuries?

6         A.    I consider myself an expert on the state of

7    medical knowledge and how it has developed.

8         Q.    But you are not able to say what weight the

9    medical profession has given these articles?

10        A.    I don't think it would be helpful for me to offer

11   such statements to a jury except perhaps by way of noting

12   that certain journals were more widely available than others

13   and certain articles were printed in the English language,

14   whereas, others were not, and certain articles were abstracted

15   and others were not.  In other words, I could make factual

16   statements that go to the question of accessibility of the

17   information.  But I don't think that it would be useful to

18   go beyond that into the realm of opinion.

19        Q.    Are all these 242 articles you list on Exhibit 3

20   readily accessible in the United States?

21        A.    I think I got them all in the United States.

22   Some are more readily accessible than others.  You have to

. 77

go to the Library of Congress for things like the annual

reports of the chief inspector of factories from Great Britain,

the old ones.

     Q.    How many of these articles pertain to insulation

workers as opposed to factory workers or mine workers?

     A.    I would say about two dozen, before 1964.

     Q.    Pertain to --

     A.    Insulation workers.  That's just a guess.

     Q.    Could you identify those?

     A.    Sure.  Number 28, --

     Q.    This is all on Exhibit 3?

     A.    Yes.

     Q.    Okay.

     A.    Number 32, 34, 35, 48, 57, 58; and I guess when I

say "insulators" I mean at least in the case of 57 this was

a guy who handled asbestos at a chemical plant and it is not

discussed in any detail.

     Q.    57?

     A.    Yes.

     Q.    Or 58?  Which one are you talking about?

     A.    57.  So I think it might be --

     Q.    The British -- Britain Journal of Tuberculosis?

1    Is that the one you are talking about?

2          A.    Yes.

3          Q.    Okay.

4          A.    These are product users that I am going to be

5    listing.  And almost all of them are identifiable as insula-

6    tors from the documents themselves.

7          To continue, 58, 60, 64, 69.

8          70 refers to disease in insulators although the

9    cases reported by Homburger, H-o-m-b-u-r-g-e-r, were not

10   insulators.  He has a table of earlier reports.

11         73, 77, 79, 81, 83, 88; 89 is not explicit about

12   insulators but it suggests to me that insulators were

13   considered.

14         96, 98. 100 and 101 are the same article.  They

15   deal with an insulator -- it deals with an insulator.

16         Q.    101, is that the translation of 100?

17         A.    Yes.

18         Q.    Is it a complete translation or just excerpts?

19         A.    A complete translation.

20         Q.    Do you know when it was translated?

21         A.    It says on the copies it is a certified trans-

22   lation done by some place here in Washington.

Q.   When?

A.   I think two years ago.

Q.   Two years ago?

A.   One or two years ago.

Q.   To your knowledge was it translated prior to that?

A.   I don't know of any translations prior to that or I would have obtained them rather than having it done at that time.

Q.   Okay.

A.   103 is in conjunction with the tests of insulation material on animals.

Q.   Animals?

A.   Animals.

105, 108.  109 is an industrial hygiene survey of a plant where they made the insulation material.  That's not the same as a product user.

Q.   So we are not going to count 109?

A.   No, let's not count 109.

Q.   Okay.

A.   112, 114, 115, 116, 120.

Q.   Is that a -- This is what? German?

A.   Yes.  That is an abstract of a German publication.

Q.   An abstract?

A.   Yes.

Q.   In English?

A.   In English.

Q.   When was that published?

A.   That was published in '54.  It's actually a reprinting of an abstract published in the Bulletin of Hygiene which appeared in 1942.  The original article was in 1940.

Q.   We wouldn't be too apt to have that in 1940, however?

A.   Pardon?

Q.   We wouldn't be too apt to have that in the United States in 1940 or '42; would we?

A.   A lot of German literature was being written about in the early '40s.  For example, Homburger in 1943 was citing German articles.  Even the British Journal, Bulletin of Hygiene was continuously publishing abstracts of German articles on asbestosis straight through World War II.

Q.   Very good intelligence system.

A.   The scientists were intelligent at least.

Q.   We are up to 130.

A.   130 might say "insulators."  It probably does.

Q.    You are not sure?  We'll put a question mark

beside 130.

A.    Yes, a very small question mark.  I'm pretty sure

it says something about product users being at risk.

Q.    Okay.

A.    131, 132, 133, 134, 135, 137.

Q.    That's a British report; is that right; 137?

A.    Yes.  And I think that just talks about the

hazards of ripping out insulation.  You might or might not

count 139

Q.    Why might I not?

A.    Well, the article was by some folks at Johns-

Manville, and they said that in the old days people who worked

with insulation worked with almost purely asbestos material

and were known as asbestos workers, but things have now

changed and they don't exactly say, I think that those

people's lives were in danger, and yet the article is about

the health hazards of asbestos to people working with it.

Q.    Okay; 139.  What's next?

A.    144.  145 talks about asbestosis in building

demolishers who were stripping asbestos insulation.

Q.    This was in South Africa?

1     A.     This was an international conference held in

2     South Africa.   Number 147, 148, 149, 151, 152, 154, 155, 156,

3     158, 159, 160, 161, 162, 163, 164, 165, and I think that takes

4     us up to Selikoff.

5          Q.     What?                                              •

6          A.     That takes us up to Selikoff.

7          Q.     Which means --

8          A.     1964.

9               MR. WEINSTEIN:  He said previously he thought

10    there were two dozen before 1964 or '65.  Selikoff was in '65.

11    That's what he means.

12              THE WITNESS:  His first publication was in the

13    Journal of the American Medical Association in 1964, and the

14    one that's more commonly discussed in these lawsuits is

15    Number 179, published in '65, which includes reference to

16    about a dozen-and-a-half previous reports of asbestosis and

17    cancer in asbestos product users.

18              BY MR. BUCHER:

19         Q.     And the articles that you have given us now are

20    the ones that you would be relying on in your, quote, "state-

21    of-the-art  presentation?"

22         A.     They are not the only ones.  They are not the

. 83

only ones but they are the ones that deal specifically with
insulators.  Obviously the literature on asbestosis didn't
develop only with literature on insulators.

Q    You would recognize the fact that the exposure,
the volume of or the amount of exposure in insulators is
different than that in the mill or in the mine?  The factory
setting and mine setting are different from the setting at
a building like this?

A.   Yes.

MR. BUCHER:  I think that's all.

MR. SHORE:  Sorry, but I have a couple more now.

MR. WIENSTEIN:  Go ahead.

BY MR. SHORE:

Q    Mr. Castleman, you mentioned that you had a
researcher.  Who all works with you?  Who all works with you
in this consulting work?

A    I hire people on a spot basis.  I don't have
full-time employees.

Q    Okay.

A    But I do hire people, students and other people
on an occasional basis when I need to just have someone go
and fetch me an article in the medical library in Washington.

. 84

Q    You had mentioned to me, Mr. Castleman, about
other people who work with you in this consulting group and
you were telling me it's basically spot researchers?

A    Yes.  It's not a consultant group.  It's just me.
I am the consultant.

Q    Okay.

A    And I occasionally hire people for a day or two
of going and getting me things.

Q    Okay.

Now, have you discussed with Dr. Wagoner either
one of you testifying at these trials in Texas?

A    No.  He just heard -- He did give me a call.  He
did give me a call yesterday and said, "What's with Baron?
He just called me this week and he wants me for these three
cases.  Did he give you any better notice than he gave me?"
And then I told Dr. Wagoner that I had in fact been contacted --

Q    Okay.

A    Somewhat more in advance about it.

Q    So it's your understanding that Dr. Wagoner was
just recently contacted, say, within the last week or 10 days?

A    Yes.

Q    Okay.  Did you discuss what your testimony would

. 85

1    be at trial if you were to testify?

2         A.   No.

3         Q.   Okay.

4              You testified just a little while ago that you

5    just received this Defendants' Exhibit Number 4, The Industrial

6    Bulletin, which was printed in April, 1934; correct?

7         A.   Yes.

8         Q.   So obviously your research wasn't quite thorough

9    enough in gathering all these documents; right?  Or, these are

10   some of the documents that you referred to that you just

11   couldn't get to.

12        A.   These are documents that aren't certified in the

13   medical literature.  The medical literature is easier to search

14   because if you search it thoroughly enough you will see that

15   just about everything that was written -- even the Fleischer

16   article is cited someplace by somebody else.

17        Q.   Okay.

18             How about Exhibit 5?  That looks like it came out

19   of some sort of medical material.

20        A.   The New England Journal of Medicine.  I had

21   somehow missed this one and I don't know how, but there it is

22   in the New England Journal which is a widely-distributed

1   medical journal, and it clearly states that this individual

2   had severe asbestosis and mesothelioma.  And his work con-

3   sisted in cutting asbestos insulating board.

4       Q.   Are you aware that the cases which Mr. Baron

5   contacted you about testifying on involve insulators as

6   opposed to plant workers?

7       A.   Yes, I am aware of that.

8       Q.   Will that change in any way the articles which

9   you recommend to him to be presented at trial?

10      A.   Well, I don't usually make recommendations to

11  Mr. Baron as to which articles to present in trial.  He is

12  fairly familiar with a lot of these articles and I have worked

13  with him enough times in the past that I don't tell him how

14  to put on his case.  He is a competent professional in the

15  field of law and he decides what he wants to put before the

16  jury.

17      Q.   Okay.

18          Just a couple other questions:

19          You made a distinction between medical knowledge,

20  or an apparent distinction between medical knowledge and

21  industry knowledge awhile ago when you referred simply to

22  medical knowledge.

. 87

A.    What's your question?

Q.    Is that correct?

A.    Well, there is knowledge that originates in medical journals and then there is knowledge that's found which are not medical journals, like this industrial bulletin.

Q.    Okay.

Well, do you purport to be an expert in gathering the medical knowledge or the industry knowledge, what you feel to be the medical knowledge or industry knowledge?

A.    I consider myself expert in presenting what was known about the hazards of asbestos disease in primarily medical literature, but also quite a few other sources which bear upon the availability of the knowledge.

Q.    Mr. Castelman, are you familiar with any epidemiological studies with respect to exposure of insulation workers to asbestos products prior to the Selikoff report in 1965?

A.    Yes.

Q.    Okay.  Have we covered those in this list that you have given us?

A.    Yes; I think so.

Q.    Not all of these are epidemiological studies?

1    A.    No.

2    Q.    How many out of that are the studies?

3    A.    Maybe five or so.

4    Q.    Could you quickly point to those?

5    A.    Sure.

6    Fleischer is the first, Number 77 and then Number

7  96 is an epidemiological study.

8    Number 116 is a study of asbestos exposed popula-

9  tion, including steam fitters, boilermakers, and asbestos

10  workers.  I believe those are the people that were in the

11  category of asbestos-exposed occupations in that study.

12    That is an epidemiological study on cancer

13  incidence.

14    132, 135; I think that's about it.

15    Q.    Is it your testimony that these studies would

16  show that asbestos workers were at risk, insulation workers

17  were at risk?

18    A.    Les; those studies show that.

19    MR. SHORE:  Okay.  Thank you, sir.

20    MR. BUCHER:  One more question.

21    BY MR. BUCHER:

22    Q.    Do you have any animosity towards manufacturers

. 89

of asbestos products?

A.   No.

Q.   I have an article that you were the author of;
"The Development of Knowledge About Asbestos Disease."

A.   Yes.

Q.   Published in February of 1977.

A.   Yes.

Q.   The last -- The last sentence appearing on
page 85 of that presentation is; "This is only one recent
example of the asbestos indursty's refusal to accept the
decline in sales to protect the health of its customers."

A.   That's a factual statement.

Q.   And what is the basis for that?

A.   The basis for that was that -- I am talking there
about drywall spackling compounds; aren't I?

Q.   Among other things; yes.

A.   Well, Selikoff had shown in an article published
in Sci nce Magazine that people were heavily exposed to asbes-
tos from mixing, sanding, and sweeping up after using these
compounds inside of buildings.  Only one-third of the products
on the market appeared to employ asbestos in them.  So it was
replaced.

. 90

Q      What year are we talking about now?  Was this '77?

A      1977.

Q      Okay.

A      And the trade association for the industry adamantly refused to concede that this was an unsafe and unwarranted use of asbestos in a consumer product.

Q      Well, if one of the defendants was not using asbestos in any of its products that it sold to the public in 1977, then this would not apply to them; is that correct?

A      Well, it applied to the asbestos companies --

Q      That were --

A      -- that were involved in the sale of asbestos or use of asbestos.

Q      In 1977?

A      Yes.

            MR. BUCHER:  I have nothing futther.

            MR. WEINSTEIN:  All right.

            (Whereupon, at 12:00 noon, the above-entitled deposition adjourned.)

                              (By stipulation of counsel,
                              with the consent of the
                              witness, reading and signa-
                              ture waived.)

. 91

## CERTIFICATE OF NOTARY PUBLIC

I, Deidre A. Hake, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Deidre A. Hake
Notary Public in and for
the District of Columbia

My commission expires
July 31, 1987.