Vol. XVI

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

WANDA JENKINS, ET AL

        Plaintiffs,

VS.

RAYMARK INDUSTRIES, INC. and
RAYBESTOS-MANHATTAN, ET AL,

        Defendants,

CIVIL NO. M-84-193-CA

-TRIAL PROCEEDINGS-

HEARD AT:  Marshall, Texas

     ON:  March 21, 1986

MORNING SESSION

Page:  1-472

1  ⠀⠀PARTY --

2

3  ⠀⠀⠀⠀THE COURT:  I UNDERSTAND.

4

5  ⠀⠀⠀⠀MR. BALDWIN:  SHALL WE PROCEED, YOUR HONOR?

6

7  ⠀⠀⠀⠀THE COURT:  YES, SIR.

8

9  BY MR. BALDWIN:

10  Q⠀⠀MR. CASTLEMAN, NEXT EXHIBIT.  THESE ARE A

11  ⠀⠀⠀CONTINUATION OF THE OWENS-CORNING DOCUMENTS --

12

13  ⠀⠀⠀⠀MR. SADLER:  YOUR HONOR, CAN WE DIM THE

14  ⠀⠀⠀LIGHTS?

15

16  ⠀⠀⠀⠀THE COURT:  YES, SIR.  GENTLEMEN, I HAVE THE

17  ⠀⠀⠀MARSHAL DOWNSTAIRS AND THE CLERICAL PEOPLE

18  ⠀⠀⠀DOWNSTAIRS, SO YOU'RE JUST GOING TO HAVE TO

19  ⠀⠀⠀ASSIST US WITH MANAGING OUR BUSINESS.

20

21  BY MR. BALDWIN:

22  Q⠀⠀NOW -- CAN YOU FOCUS IT A LITTLE BETTER?

23  ⠀⠀⠀PICKING UP WHERE WE LEFT OFF YESTERDAY, DR.

24  ⠀⠀⠀CASTLEMAN, THIS IS PLAINTIFFS' EXHIBIT 394, AN

25  ⠀⠀⠀INTEROFFICE MEMORANDUM OF OWENS-CORNING WITH

1746

1    REFERENCE TO THE WARNING LABEL OF KAYLO DATED

2    DECEMBER 5, 1966, AND COULD YOU JUST READ FOR THE

3    JURY THE HIGHLIGHTED PORTION OF THAT?

4    A    AS YOU SEE IT SAYS, "I BELIEVE IT IS MOST

5    IMPORTANT TO HAVE A PROMPT DECISION ON LABELING

6    KAYLO.  IS THERE ANYTHING FURTHER WE CAN DO TO

7    HELP?"

8    Q    NEXT EXHIBIT.  THE FIRST ATTENTION OF

9    OWENS-CORNING BEING GIVEN TO LABELING KAYLO WAS

10   IN 1964, I BELIEVE, IS THAT CORRECT?

11   A    YES, ACCORDING TO THE EXHIBITS.

12   Q    NOW, 394V, WHICH IS ANOTHER MEMORANDUM FROM

13   OWENS-CORNING, DATED JUNE 21, 19 -- CAN YOU MAKE

14   THAT DATE OUT, DR. CASTLEMAN?

15   A    1967.

16   Q    ALL RIGHT.  IT'S NOT REAL LEGIBLE, SO I

17   WOULD LIKE TO WITHDRAW IT AND PUT IN THE LEGIBLE

18   PORTION OF IT, IF YOU WOULD.

19

20   THE COURT:  YOU'RE NOT WITHDRAWING THE

21   EXHIBIT, ARE YOU?

22

23   MR. BADLWIN:  NO.  FROM THE MACHINE.

24

25   THE COURT:  ALL RIGHT.

BOYD-PARKS REPORTERS

1

2    BY MR. BALDWIN:

3    Q        NOW, WE'RE LOOKING AT A RETYPE OF THE SAME

4         EXHIBIT THAT WE JUST REFERRED TO, BUT TYPED ON A

5         TYPEWRITER WHERE YOU CAN READ IT AND WOULD YOU

6         READ THIS PARAGRAPH RIGHT HERE STARTING WITH "D.

7         W. LADD"?

8    A        "D. W. LADD POINTED OUT THAT WE HAVE A TEN

9         MILLION DOLLAR KAYLO OPERATION.  HE WANTS US AS A

10        TEAM TO BE IN THE POSITION TO TELL MANAGEMENT

11        WHAT FIBERS WE CAN USE TO RE-ENFORCE KAYLO IF AND

12        WHEN THE DAY ARRIVES WHEN THE WHOLE INDUSTRY IS

13        FORCED TO REMOVE ASBESTOS FROM THEIR PRODUCTS.

14        HE DOESN'T WANT O.C.F. TO WAIT UNTIL D-DAY TO

15        START LOOKING FOR SUBSTITUTE FIBERS."

16

17

18

19

20

21

22

23

24

25

1748

BY MR. BALDWIN:

Q        NEXT EXHIBIT.   THIS IS PLAINTIFFS' EXHIBIT
394-W, A LETTER OF OCTOBER 9, 1967, FROM THAT
SAME LADD THAT WAS REFERRED TO PREVIOUSLY, IS
THAT CORRECT?

A        YES, THE EXECUTIVE, D. W. LADD.

Q        AND WOULD YOU READ THE PERTINENT HIGHLIGHTED
PORTIONS OF THAT LETTER SIR?

A        IT SAYS, "AS YOU ARE WELL AWARE, THE
GOVERNMENT WILL PROBABLY BLOW THE WHISTLE
RELATIVE TO THE USE OF ASBESTOS IN THE NOT TOO
DISTANT FUTURE, AND BEFORE WE EMBARK UPON A
SUBSTANTIAL EXPANSION PROGRAM AT BERLIN, AND/OR
CONSIDER PUTTING A NEW FACILITY IN THE SOUTHWEST,
WE HAD BETTER BE DAMN SURE THAT WE HAVE AN ANSWER
TO THE ASBESTSO THREAT.   WORK HAS BEEN DONE ON
THIS IN THE PAST, TO DATE THERE HAS BEEN NO
SUCCESSFUL ANSWER."

Q        NEXT.   REFERRING THERE TO THE ASBESTOS
THREAT, WERE THEY?

A        YES, SIR.

Q        THIS IS PLAINTIFFS' EXHIBIT --


         MR. SADLER:   394-X.

1749

1   BY MR. BALDWIN:

2   Q        -- 394-X.  THE FIRST PAGE OF A FEASIBILITY

3       STUDY FOR OWENS-CORNING?

4   A        YES, 1968.

5   Q        THEN GO TO PAGE SEVEN, I BELIEVE IT IS.

6       THIS IS PAGE TWO OF THAT SAME EXHIBIT, WHERE IT

7       SAYS, "RECOMMENDATIONS AND VISITS TO

8       JOHNS-MANVILLE RESEARCH CENTER HAS ALREADY BEEN

9       MADE TO APPRAISE THE FILTER PROCESS.  THE VISIT

10      MUST BE FOLLOWED UP BY AN O.F.C. PREPARED COST

11      PROJECTION AND PLANT VISIT.  A VISIT SHOULD ALSO

12      BE MADE TO PHILIP CAREY TO APPRAISE THE BONDING

13      AGGREGATE PROCESS.  IT TOO SHOULD BE FOLLOWED UP

14      BY A COST PROJECTION, AND IF POSSIBLE, A PLANT

15      VISIT."

16          NOW, DOCTOR, DOES THAT OR NOT INDICATE TO

17      YOU WHAT HAS BEEN SUGGESTED BY THE OTHER

18      DOCUMENTS, THAT THERE IS A FREE EXCHANGE BETWEEN

19      THE MEMBERS OF THE INDUSTRY?  HERE YOU HAVE

20      OWENS-CORNING TALKING ABOUT VISITING A

21      JOHNS-MANVILLE PLANT, AND A PHILIP CAREY PLANT,

22      THEIR EMPLOYEES, TO GATHER INFORMATION AND TO

23      EXCHANGE INFORMATION, IS THAT CORRECT OR NOT?

24   A        YES.  THERE'S OBVIOUSLY EXCHANGE OF

25      INFORMATION GOING ON AT THE TECHNICAL LEVEL

1750

1     BETWEEN THESE COMPANIES.

2   Q     AND THIS IS THE MANAGEMENT LEVEL WE'RE

3     TALKING ABOUT HERE, ISN'T IT?

4   A     YES.

5   Q     NEXT ONE. WE'RE GOING NOW TO PAGE SEVEN OF

6     THE SAME DOCUMENT. "IF AND ONLY IF THE ASBESTOS

7     THREAT REACHES THE DANGER POINT WOULD WE THEN

8     WANT TO RECONSIDER AN ASBESTOS-FREE PRODUCT, SUCH

9     AS MULTI-TEMP FOR THE HIGH TEMPERATURE INSULATION

10    MARKET." AND AGAIN, ARE THEY ADDRESSING THE

11    ASBESTOS PROBLEM THAT WE REFERRED TO EARLIER IN

12    THE CORRESPONDENCE AND IN THIS MEMORANDUM?

13   A     YES.

14   Q     AND DO OR NOT THEY CONSIDER THAT AS A

15    THREAT?

16   A     THEY CONSIDER IT AS A THREAT TO THEIR

17    BUSINESS.

18   Q     NEXT NUMBER. THIS DOCUMENT IS TOO LONG TO

19    FIT IN THE MACHINE, AND I'LL JUST HAVE TO READ

20    IT. IT'S 393-Y, A MEMORANDUM ON CORPORATE

21    PLANNING TO R. F. SHANNON. AND WHO HAVE WE FOUND

22    THAT MR. SHANNON IS?

23   A     HE'S ONE OF THE EXECUTIVES IN THE COMPANY.

24   Q     AND ON THE SECOND PAGE OF THE DOCUMENT IT

25    SAYS, "ASBESTOS, THE CURRENT REINFORCED FIBER OF

1751

1    CALCIUM SILICATE IS REPORTED TO CAUSE CANCER.

2    BECAUSE OF ADVERSE PUBLICITY, POSSIBLE COURT

3    ACTIONS, AND FOR PROTECTION OF OUR POSITION IN

4    THE CALCIUM SILICATE MARKET, IT IS NECESSARY FOR

5    O.C. TO EVENTUALLY REMOVE ASBESTOS FIBERS

6    FROM KAYLO." WHAT DATE IS THAT?

7         AND IS THAT AN ACKNOWLEDGEMENT BY

8    OWENS-CORNING, SIR, THAT ASBESTOS IS NOT ONLY

9    DANGEROUS BUT THAT IT WILL CAUSE CANCER?

10   A    YES.

11   Q    AS USED IN THEIR PRODUCT KAYLO?

12   A    YES.

13   Q    NEXT NUMBER.

14

15        MR. CROSBY: JUST FOR THE RECORD, YOUR

16   HONOR, I THINK MR. BALDWIN REFERRED TO THAT AS

17   393-Y, AND IT'S 394-Y.  MR. BALDWIN, COULD YOU

18   TELL ME WHAT PAGE YOU WERE READING FROM, PLEASE?

19

20        MR. BALDWIN:  THE SECOND PAGE, I BELIEVE IT

21   WAS.

22

23        MR. CROSBY:  THANK YOU, SIR.

24

25   BY MR. BALDWIN:

1752

1    Q          AND NOW 394-Z.  AND IS THERE A SECOND PAGE

2          TO THAT DOCUMENT?  AND THE SECOND PAGE OF THE

3          LAST DOCUMENT, "LET'S GET RID OF ASBESTOS IN THE

4          INSULATION INDUSTRY AND WE CAN THEN GET RID OF

5          OTHER COSTLY PROBLEMS WHICH ARE BEGINNING TO

6          DEVELOP."

7               AND AGAIN, IS THAT AN INTERNAL MEMORANDUM IN

8          THE OWENS-CORNING FILE SHOWING THAT THEY HAVE NOW

9          FINALLY AGREED AND REALIZED THAT ASBESTOS IS

10         DANGEROUS, AT LEAST FROM A MANAGEMENT STANDPOINT?

11   A          YES.

12   Q          MANAGEMENT LEVEL?

13   A          YES.  THIS IS IN 1969.

14   Q          NEXT LETTER.  AND THIS AGAIN IS 394-AA, AN

15         INTERCOMPANY CORRESPONDENCE IN OWENS-CORNING WITH

16         REFERENCE TO THE ASBESTOS LABELING, DATED

17         SEPTEMBER, 1970, SOME SIX YEARS AFTER THE FIRST

18         TALK ABOUT LABELING THEIR PRODUCT.  AND WHAT DOES

19         THAT MEMORANDUM SAY?

20   A          THIS IS UNDER THE SUBJECT "ASBESTOS

21         LABELING."  THIS IS TO THE CORPORATE PHYSICIAN,

22         KONZEN, "REFERENCE IS MADE TO YOUR MEMO OF

23         SEPTEMBER 15TH REGARDING THE WARNING LABEL THAT

24         SHOULD APPEAR ON KAYLO.  ARE YOU SAYING THAT WE

25         HAVE TO DO THIS NOW?  I NATURALLY WOULD LIKE TO

1753

1    DELAY THIS REQUIREMENT AS LONG AS POSSIBLE."

2  Q    NEXT MEMORANDUM.  394-BB, SEPTEMBER 25,

3    1970, REFERENCE ASBESTOS LABELING, OWENS-CORNING

4    INTERNAL MEMORANDUM.

5  A    HERE DOCTOR --

6  Q    READ THE HIGHLIGHTED PART, PLEASE.

7  A    HERE DR. KONZEN REPLIES.

8  Q    HE'S REPLYING TO THE OTHER MEMORANDUM WE

9    JUST SAW?

10 A    YES.  A FEW DAYS LATER IN 1970, IN SEPTEMBER,

11   HE SAYS, "FROM A HEALTH STANDPOINT I FEEL THAT WE

12   SHOULD LABEL THE PRODUCT AT THIS TIME.  MY COPY

13   OF THIS LETTER -- BY COPY OF THIS LETTER I

14   SUGGEST TO MR. LOGAN A COMMENT CONCERNING THE

15   LEGAL NEED FOR SUCH A LABEL."

16 Q    NEXT NUMBER, PLEASE.  SO THEN WOULD THAT

17   EPISODE ON THE LABELING WHERE THEY HAVE WAITED

18   FROM 1964 TO 1970, AND THEY'RE STILL DEBATING AND

19   LAMENTING OVER WHETHER TO LABEL, WOULD THAT BE

20   EVIDENCE, DR. CASTLEMAN, OF A FURTHER CONSPIRACY

21   OF SILENCE FALLING IN YOUR CATEGORY ONE?

22

23      MR. CROSBY:  EXCUSE ME, YOUR HONOR -- I'M

24   SORRY.  I THOUGHT YOU WERE THROUGH, MR. BALDWIN.

25   I THOUGHT YOU HAD FINISHED YOUR QUESTIONING, AND

1754

1    THEN I HEARD YOU MAKE A SOUND LIKE YOU HADN'T.

2    IF YOU HADN'T, PLEASE GO AHEAD.

3

4         MR. BALDWIN:  WELL, I HADN'T.

5

6         MR. CROSBY:  I'M SORRY.  I'LL WAIT.

7

8         MR. BALDWIN:  WHILE WE'RE INTERRUPTED, I

9    THINK DR. CASTLEMAN CAN TAKE THE WITNESS STAND

10   BACK AND WE CAN TURN THE LIGHTS ON, YOUR HONOR.

11

12        THE COURT:  WELL, GO AHEAD AND MAKE YOUR

13   OBJECTION, COUNSEL.

14

15        MR. CROSBY:  MY OBJECTION IS, YOUR HONOR,

16   THAT THE WITNESS IS ASKED TO EXPRESS AN OPINION

17   ABOUT FACTS NOT IN EVIDENCE AND ABOUT FACTS THAT

18   ARE NOT SO, BECAUSE OWENS-CORNING WARNED IN 1964,

19   AGAIN IN 1966, AND REVISED IN 1970, AND THE

20   INSINUATION IS THAT WE DIDN'T WARN AT ALL.

21

22        THE COURT:  OVERRULE THE OBJECTION.  THE

23   JURY HAS ALL THE EVIDENCE BEFORE IT.

24

25   BY MR. BALDWIN:

1755

1    Q       WELL, DR. CASTLEMAN, IN VIEW OF THAT
2        STATEMENT BY COUNSEL, DOES IT SEEM STRANGE TO YOU
3        THAT IF THEY WERE WARNING IN 1964 OR '70 THAT
4        THEY WOULD BE WRITING MEMORANDUMS?
5
6            THE COURT:  MR. BALDWIN, THAT IS ARGUMENT.
7
8    BY MR. BALDWIN:
9    Q       MY QUESTION, DR. CASTLEMAN, IS, THIS WHOLE
10       BUSINESS OF THE LABELING EPISODE, THE FACT THAT
11       THEY FIRST CONSIDERED IT IN 1964 AND PUT IT OFF
12       FOR SOME, AT LEAST ACCORDING TO THEIR OWN COMPANY
13       MEMORANDA, THAT THEY WOULD PUT IT OFF,
14       CONSIDERATION OF LABELING, FOR SIX YEARS,
15       INDICATE TO YOU THAT THAT IS FURTHER EVIDENCE OF
16       THE CONSPIRACY OF SILENCE FALLING UNDER CATEGORY
17       ONE AND CATEGORY THREE, THAT IS, FURTHER EVIDENCE
18       OF A COVER UP OF THE DANGERS OF ASBESTOS, AND
19       FURTHER EFFORT TO PROTECT THE INDUSTRY?
20   A       YES.
21
22
23
24
25

1756

1    Q        NOW, WE'LL TURN TO THE WORKMANS'
2    COMPENSATION CLAIMS AGAINST OWENS-CORNING.  WOULD
3    YOU -- DO YOU HAVE ANY EVIDENCE THAT THERE WERE
4    ANY WORKMANS' COMPENSATION CLAIMS FILED AGAINST
5    OWENS-CORNING FIBREGLASS DURING THE YEARS 1957 TO
6    '63?
7    A        YES, I DO.
8    Q        AND WITHOUT -- I THINK IT WILL COME AS SOME
9    RELIEF TO BOTH THE JURY AND THE COURT IF WE DON'T --
10   YOU DON'T INTEND TO SHOW THE JURY ALL THOSE
11   DOCUMENTS IN THAT FILE, BUT THE FILE PRESENTLY
12   BEFORE YOU, DOES THAT CONTAIN THE WORKMANS'
13   COMPENSATION CLAIMS OR THE COURT DOCUMENTS
14   REFERRING TO THE WORKMANS' COMPENSATION CLAIMS
15   ABOUT WHICH YOU TALKED?
16   A        YES.  THIS IS AN EXAMPLE.  THIS IS A SINGLE
17   CLAIM FILE OF A WORKMANS' COMPENSATION PROCEEDING
18   IN THE STATE OF CALIFORNIA INVOLVING A NUMBER OF
19   THE DEFENDANTS AND AN INSULATION WORKER WHO FILED
20   A CLAIM IN 1957 CLAIMING THAT HE HAD ASBESTOSIS
21   FROM WORKING FOR THEIR CONTRACTING DIVISIONS.
22   Q        ALL RIGHT, SIR.  COULD YOU BRIEFLY SUMMARIZE
23   THE WORKMANS' COMPENSATION CLAIMS THAT HAVE BEEN
24   FILED AGAINST OWENS-CORNING FIBREGLASS?
25

1757

1     MR. CROSBY:  EXCUSE ME, DOCTOR.  COULD YOU

2     GIVE US AN EXHIBIT NUMBER, PLEASE?

3

4     THE WITNESS:  THE CLAIM FILE -- THIS IS THE

5     CLAIM FILE OF JAMES W. RILEY IN CALIFORNIA.  IT'S

6     399S.

7

8     MR. CROSBY:  THANK YOU, DOCTOR.

9

10    BY MR. BALDWIN:

11    Q     WOULD YOU EXPLAIN THE RILEY FILE FOR US,

12    DOCTOR, WITHOUT US HAVING TO GO THROUGH EACH OF

13    THOSE PIECES OF PAPER?

14    A     CERTAINLY.  MR. RILEY WAS A MAN WHO HAD DONE

15    INSULATION WORK FOR OVER THIRTY YEARS, AND HE HAD

16    WORKED FOR A NUMBER OF DIFFERENT CONSTRUCTION

17    CONTRACTING FIRMS, INCLUDING THE CONTRACTING

18    DIVISIONS OF OWENS-CORNING, PHILIP CAREY,

19    ARMSTRONG CORK, AND FIBREBOARD, AND WHEN HE FILED

20    A COMPENSATION CLAIM FOR ASBESTOSIS HE NAMED ALL

21    THESE COMPANIES AS WELL AS TWO DOZEN OR MORE

22    OTHERS AS DEFENDANTS.  HE HAD TO LIST ALL THE

23    COMPANIES HE HAD WORKED FOR WITH ASBESTOS

24    INSULATION PRODUCTS IN HIS COMPENSATION CLAIM,

25    AND EVERY TIME A HEARING WAS POSTPONED OR

1758

1    SCHEDULED OR RESCHEDULED, EVERY TIME A MOTION WAS

2    MADE, EVERY TIME A RULING WAS MADE IN THE COURSE

3    OF THIS, WHICH TOOK A NUMBER OF YEARS, THIS ENDS

4    IN 1961 SOME TIME, IT STARTED IN 1957, BY WHICH

5    TIME MR. RILEY HAD DIED OF LUNG CANCER.  EVERY

6    TIME ANOTHER RULING WAS MADE OR ANOTHER HEARING

7    WAS RESCHEDULED OR SOMETHING, THE SERVICE OF THE

8    PAPER WOULD BE MADE ON THE COMPANIES INVOLVED AT

9    THEIR VARIOUS CORPORATE HEADQUARTERS, AND --

10   Q        AND WHO WERE THE COMPANIES INVOLVED?

11   A        -- THIS IS SO INDICATEED IN THE CLAIM FILE.

12   COMPANIES INCLUDED OWENS-CORNING AND ITS

13   CONTRACTING DIVISION, FIBREGLASS ENGINEERING AND

14   SUPPLY COMPANY, AS WELL AS ARMSTRONG CORK,

15   FIBREBOARD, AND PHILIP CAREY COMPANIES, AND THE

16   OWENS-CORNING PACIFIC COAST DIVISION, SANTA

17   CLARA, CALIFORNIA IS LISTED AS THE RECIPIENT OF

18   THE NOTICE I HAPPENED TO HAVE OPENED UP TO HERE,

19   WHICH IS CALLED "ORIGINAL LIABILITY AND NEWLY

20   APPOINTED PARTIES DEFENDANT AND PENALITY FOR

21   WILLFUL FAILURE TO PAY COMPENSATION."

22   Q        WELL, DOCTOR, TO SHORTEN IT, DID THAT --

23   DOES THAT CLAIM ON MR. RILEY INVOLVE THE CLAIM OF

24   A PERSON WHO HAS BEEN EXPOSED TO ASBESTOS AND HAS

25   AN ASBESTOS-RELATED DISEASE?

1759

1    A        YES.  FROM USING INSULATION MATERIALS AS A

2    CAREER INSULATOR.

3    Q        HE WAS AN INSULATOR?

4    A        YES.

5    Q        WAS THAT CLAIM FILED AGAINST THOSE VARIOUS

6    COMPANIES WHO DEFENDED IT IN 1957?

7    A        YES.  AND THROUGH THE YEARS, THROUGH '61.

8    Q        AND THROUGH THAT CLAIM, WAS THERE AMPLE

9    LANGUAGE AND INFORMATION AVAILABLE TO THOSE

10   COMPANIES WHO RECEIVED THOSE DOCUMENTS THAT YOU

11   SPEAK OF TO NOTIFY THEM THAT ASBESTOS WAS A

12   DANGEROUS PRODUCT?

13   A        WELL, CERTAINLY THAT THIS INDIVIDUAL WAS

14   CLAIMING.  I MEAN, THIS INCLUDES MEDICAL REPORTS

15   AS WELL, AND SO THERE WAS ALL KINDS OF

16   INFORMATION INVOLVED IN THIS CLAIM FILE.

17   Q        NOW, THERE WERE OTHER WORKMANS' COMPENSATION

18   CLAIMS DURING THAT PERIOD AGAINST OWENS-CORNING

19   FIBREGLASS?

20   A        YES.  THERE WERE -- NOW, I AM REFERRING TO

21   TABLE THREE IN CHAPTER THREE OF MY BOOK.

22   Q        WHICH HAS NOT BEEN MARKED AS AN EXHIBIT, BUT

23   IF YOU WANT TO USE IT AS A MEMORANDUM TO REFRESH

24   YOUR MEMORY, GO AHEAD.

25   A        AND IN THIS TABLE I HAVE -- THIS IS

1760

1    BASICALLY A LIST OF COMPENSATION CLAIMS AGAINST

2    ARMSTRONG CORK WHICH ARMSTRONG CORK PRODUCED AND

3    WHEN A NUMBER OF THESE CLAIM FILES WERE EXAMINED

4    IN THE BUREAUS OF THE WORKMANS' COMPENSATION

5    FILES IN THE VARIOUS STATES, WE FOUND THAT A

6    NUMBER OF OTHER COMPANIES WERE ALSO DEFENDANTS IN

7    THE SAME ACTIONS INCLUDING OWENS-CORNING.  AND SO

8    OWENS-CORNING IS LISTED HERE AS A DEFENDANT IN

9    THE CLAIM OF IRVING MCCARROL IN LOS ANGELES IN

10    1959.  THE CLAIM WAS FILED IN '56, AND

11    OWENS-CORNING WAS JOINED IN 1959.

12   Q      EXCUSE ME.  COULD YOU TELL ME WHAT PAGE

13    YOU'RE ON IN YOUR BOOK, DOCTOR?

14   A      I THINK THIS IS 148.  I DON'T HAVE ANY

15    NUMBERS ON THIS THE WAY IT WAS PHOTOCOPIED.  THE

16    PAGE NUMBERS WERE CHOPPED OFF, BUT IT!S TABLE

17    THREE IN CHAPTER THREE.

18   Q      GO AHEAD, SIR.

19   A      OWENS-CORNING, AS MENTIONED, WAS INVOLVED IN

20    THE RILEY CASE, OWENS-CORNING WAS INVOLVED IN THE

21    STRICKLAND CASE.  IN CALIFORNIA A CLAIM WAS FILED

22    IN 1957.  THE TREATING PHYSICIAN WAS DR. HINSHAW.

23   Q      ALL RIGHT, SIR.  HOW MANY -- WITHOUT GOING

24    THROUGH ALL OF THOSE, HOW MANY OF THESE CLAIMS

25    WERE THERE DURING THAT PERIOD?

1761

1    A       IT LOOKS LIKE THERE WERE ABOUT NINE OR TEN

2            BETWEEN 1957 AND 1963 IN THE FILE.

3    Q       OKAY.   AND DID THEY ALL RELATE TO PEOPLE WHO

4            WERE ASBESTOS WORKERS AND WHO WERE CLAIMING THAT

5            THEY CONTRACTED DISEASE AS A RESULT OF WORKING

6            FROM ASBESTOS?

7    A       YES.   THESE WERE ALL INSULATION WORKERS WHO

8            HAD WORKED FOR THE CONTRACTING DIVISIONS OF THE

9            MANUFACTURER DEFENDANTS IN THE COURT TODAY, OR

10           SOME OF THEM.

11   Q       NOW, I BELIEVE THAT COMPLETES THE

12           OWENS-CORNING DOCUMENTARY EVIDENCE.   NOW I HAVE

13           AGAIN PREPARED A CHART WHICH I DON'T, DOES NOT

14           PROPORT TO BE EVIDENCE, BUT IT IS -- I'M USING IT

15           AS A TRIAL GUIDE IN ORDER TO SUMMARIZE YOUR

16           TESTIMONY IN KIND OF A NUTSHELL BECAUSE I KNOW

17           WE'VE BEEN THROUGH A LOT OF DOCUMENTS, AND IF YOU

18           WILL HELP ME WITH THIS, DOCTOR, I WANT TO GO

19           THROUGH IT QUICKLY AND THEN ASK YOU A QUESTION

20           ABOUT IT.   THIS RELATES TO OWENS-CORNING

21           FIBREGLASS, AND WE START OUT IN 1941 AND 1942

22           WHERE WE HAD THE WAR, YOU MIGHT SAY, BETWEEN

23           FIBREGLASS AND ASBESTOS AND THEY WERE HOLDING

24           BACK THE LITERATURE AND THE THREAT OF EXPOSING

25           ASBESTOS AS A DANGEROUS SUBSTANCE OF THE WEAPON

1762

1    IN RESERVE.

2

3         THE COURT:  MR. BALDWIN, WHY DON'T WE LET

4    THE DOCTOR SUMMARIZE HIS TESTIMONY?

5

6         MR. BALDWIN:  ALL RIGHT.  THAT WOULD BE

7    BETTER.

8

9    BY MR. BALDWIN:

10   Q      IF YOU WOULD COME DOWN HERE AND LOOK AT

11   THIS, DOCTOR.

12

13        MR. CROSBY:  YOUR HONOR, IF THE WITNESS IS

14   GOING TO BE PERMITTED TO SUMMARIZE HIS TESTIMONY,

15   I WOULD PREFER THAT HE DO IT FROM WHAT HE'S

16   REVIEWED AND NOT MR. BALDWIN'S CHART, WHICH MR.

17   BALDWIN SAYS HE PREPARED WHICH HE SAYS IS NOT

18   EVIDENCE.

19

20

21

22

23

24

25

1763

1     MR. CROSBY:  IF THE WITNESS IS GOING TO BE

2     PERMITTED TO SUMMARIZE HIS TESTIMONY, I WOULD

3     PREFER HE DO IT WITH WHAT HE HAS REVIEWED AND NOT

4     MR. BALDWIN'S CHART, WHICH MR. BALDWIN SAYS HE

5     PREPARED, WHICH HE SAYS IS NOT EVIDENCE.

6

7     THE COURT:  WELL, COUNSEL, I'M GOING TO

8     PERMIT THE WITNESS TO SUMMARIZE HIS TESTIMONY.

9     IT MAY OR MAY NOT BE IN ACCORDANCE WITH YOUR

10    PREFERENCES, OTHER COUNSEL'S PREFERENCES.  I SEE

11    NO LEGAL OBJECTION TO THE PROCEDURE.  GO AHEAD.

12

13    BY MR. BALDWIN:

14    Q      DR. CASTLEMAN, IF YOU COULD JUST VERY

15    QUICKLY RUN DOWN THIS SUMMARY OF THE DATA ON THIS

16    CHART FOR THE JURY, PLEASE, WITHOUT EXPOUNDING,

17    JUST TO REFRESH, FLASHBACK TO THE EVIDENCE THAT

18    WE HAVE COVERED ON EACH POINT.

19    A      ALL RIGHT.  IN 1941 AND '42 THERE WAS THE

20    CONCERN ABOUT FIBERGLASS COMPETING WITH ASBESTOS

21    INSULATION PRODUCTS WHICH WERE ALREADY ON THE

22    MARKET.  OWENS-CORNING FIBERGLASS PRODUCTS WERE

23    BREAKING INTO THIS MARKET, THE COMPANY HAD BEEN

24    FORMED IN 1938.  IN 1941 AND '42 THEY WERE

25    COMPILING WHAT THEY CALLED AN ASBESTOSIS WEAPON

1764

1   IN RESERVE CONSISTING OF FIVE OR SIX HUNDRED

2   PAGES OF DOCUMENTS ON ASBESTOSIS, WHICH THEY WERE

3   THINKING OF PROVIDING TO THE ASBESTOS WORKERS

4   UNION IN THE EVENT THAT THAT PROVED NECESSARY IN

5   ORDER TO CARRY OUT THEIR BUSINESS MARKETING

6   STRATEGY.

7       IN 1943 AN INTERNAL MEMORANDUM OF THE

8   COMPANY TALKS ABOUT THE FEAR OF SMEARING

9   FIBERGLASS WITH THE DANGERS OF ASBESTOS IN THE

10  EVENT THAT THEY WERE TO START USING MIXTURES OF

11  ASBESTOS WITH FIBERGLASS IN PRODUCTS WHICH WERE

12  PREVIOUSLY ONLY FIBERGLASS PRODUCTS, OR

13  DEVELOPING NEW PRODUCTS WHICH WOULD COMBINE

14  ASBESTOS WITH FIBERGLASS, THAT THIS PRESENTED

15  POTENTIAL HAZARDS FROM THE STANDPOINT OF SMEARING

16  THEM WITH -- AS SELLING A HEALTH HAZARD MATERIAL.

17      IN 1957 THROUGH 1963 THERE WERE WORKER'S

18  COMPENSATION CLAIMS BROUGHT AGAINST THE COMPANY,

19  SOME OF WHICH INVOLVED LUNG CANCER, SOME OF WHICH

20  INVOLVED ONLY ASBESTOSIS, A NUMBER OF WHICH

21  INVOLVED PAYMENTS BY OWENS-CORNING, AND THESE

22  CLAIMS WERE FILED STARTING IN 1957, AND THROUGH

23  1963, IN VARIOUS PARTS OF THE UNITED STATES BY

24  THE CONTRACTING DIVISION EMPLOYEES, FORMER

25  EMPLOYEES OF THE COMPANY, AND THEIR SURVIVORS.

1765

1    Q        MAY I INTERRUPT THERE, DR. CASTLEMAN, TO ASK
2        YOU THIS QUESTION, WHEN YOU WERE TESTIFYING ABOUT
3        THOSE WORKER'S COMPENSATION CASES I DID NOT HEAR
4        YOU SAY THAT THERE WERE CASES INVOLVING CANCER.
5        WERE THERE IN FACT CASES INVOLVING CANCER IN THE
6        NINE OR TEN WORKER'S COMPENSATION CASES THAT YOU
7        REFERRED TO EARLIER?
8    A        YES.   MR. RILEY, WHOSE CLAIM I SHOWED YOU,
9        DIED OF LUNG CANCER.
10   Q        GO AHEAD, SIR.   NUMBER FOUR, I BELIEVE.
11   A        IN 1957, INTERNAL MEMORANDUM OF THE COMPANY,
12       JUST EXPRESSES AGAIN THAT PEOPLE IN THE COMPANY
13       AT LEAST WERE AWARE OF THE APPREHENSIONS OF THE
14       INSULATION WORKERS ABOUT A FEARED LUNG DISEASE
15       HAZARD, WHICH THE INTERNAL MEMORANDUM DESCRIBES
16       AS ASBESTOSIS.
17           IN 1958 THE KAYLO BUSINESS WAS ENTIRELY
18       PURCHASED BY OWENS-CORNING FROM OWENS-ILLINOIS,
19       AND AT THAT TIME THE DOCUMENTATION FROM THE
20       SARANAC LABORATORY TESTING BY DR. VORWALD WAS
21       ALSO TRANSFERRED TO THE NEW OWNER OF THE KAYLO
22       BUSINESS.
23           IN 1963 AN INTERNAL DOCUMENT SPEAKS ABOUT
24       ASBESTOS IN KAYLO AS A CAUSE OF CANCER.
25           IN 1964 THE SELIKOFF STUDY IN THE JOURNAL OF

1766

1    THE AMERICAN MEDICAL ASSOCIATION IS NOTED, AND

2    THERE'S SOME DISPUTE OVER WHETHER THE FINDINGS

3    NECESSARILY WOULD APPLY TO KAYLO, SINCE SELIKOFF

4    HAD STRESSED THAT GENERALLY THESE INSULATION

5    WORKERS DEVELOPED CANCER TWENTY YEARS OR MORE

6    FROM ONSET OF THEIR EXPOSURE, AND SINCE KAYLO

7    HADN'T BEEN ON THE MARKET BY THEN FOR TWENTY

8    YEARS, THE CLEVER WRITER OF THE MEMORANDUM SAID

9    THAT PROBABLY KAYLO CAN'T BE BLAMED FOR CAUSING

10   THE DISEASE BECAUSE OF THE TWENTY YEAR RULE.

11        IN ANY EVENT, THERE WAS DEFINITELY AN

12   AWARENESS OF THIS EPIDEMIOLOGICAL STUDY SHOWING

13   THE HIGH RATE OF LUNG CANCER AMONGST INSULATION

14   WORKERS PUBLISHED BY IRVING SELIKOFF.

15        ALSO IN 1964 BEGINS A SERIES OF DISCUSSIONS

16   INTERNALLY IN THE COMPANY, AND INTERNALLY IN THE

17   INSULATION MANUFACTURING INDUSTRY THROUGH THE

18   TRADE ASSOCIATION, AT LEAST ACKNOWLEDGING THAT

19   JOHNS-MANVILLE CORPORATION, FOLLOWING THE

20   PUBLICATION OF SELIKOFF'S REPORT, WAS STARTING TO

21   PUT WARNING LABELS ON CARTONS OF INSULATION

22   PRODUCTS.

23        AND THIS JUST CONTINUES YEAR AFTER YEAR,

24   THESE INTERNAL MEMORANDA, INDICATING NO EVIDENCE

25   THAT THERE WAS ANY KIND OF A WARNING YET BEING

1   USED, TALKING ABOUT VARIOUS THINGS THAT WERE

2   COMING OUT, THAT THERE WERE MORE AND MORE

3   INQUIRIES COMING INTO THE COMPANY BECAUSE OF

4   SELIKOFF'S -- THE PUBLICITY ABOUT SELIKOFF'S WORK

5   OVER THE YEARS, THAT SELIKOFF SAID THAT ONE FIBER

6   MIGHT BE SUFFICIENT TO CAUSE CANCER, THAT THE

7   GOVERNMENT WAS GOING TO BLOW THE WHISTLE SOME DAY

8   SOON ON ASBESTOS, WHICH IN FACT HAPPENED WITH THE

9   ENACTMENT OF THE OCCUPATIONAL SAFETY AND HEALTH

10  ACT A COUPLE OF YEARS AFTER THIS MEMORANDUM IN

11  1967.  I THINK -- AND TALK ABOUT "D" DAY FOR

12  SUBSTITUTING ASBESTOS WHEN THE PRESSURE REACHED A

13  DANGER POINT, VARIOUS TYPES OF LANGUAGE LIKE

14  THAT, INTERSPERSED WITH CONCERNS ABOUT PUBLICITY

15  AND LIABILITY.

16      AND IN 1970 STILL DISCUSSIONS ABOUT WHETHER

17  WARNING LABELS WILL HAVE TO BE USED, OR WHETHER

18  SOME DELAY CAN STILL BE HAD IN THE USE OF THESE

19  WARNING LABELS.

20  Q      NOW, DOCTOR, A COUPLE OF GENERAL QUESTIONS.

21  DO YOU HAVE AN OPINION BASED ON ALL THAT EVIDENCE

22  THAT YOU'VE SUMMARIZED AS TO WHETHER OR NOT

23  PITTSBURG-CORNING -- OWENS-CORNING ACTED IN

24  CONSORT WITH OTHER COMPANIES OF THE INDUSTRY,

25  MEMBERS OF THE INDUSTRY, TO ACHIEVE COMMON

1768

1    PURPOSES?

2

3        MR. COOK:  YOUR HONOR, FOR CLARIFICATION, I

4    WOULD LIKE TO BE CLEAR THAT HE'S ANSWERED THIS

5    QUESTION AS TO OWENS-CORNING AT THIS POINT IN

6    TIME.

7

8        MR. BALDWIN:  THE QUESTION WAS DIRECTED TO

9    OWENS-CORNING, BUT REFERRED TO OTHER MEMBERS OF

10   THE INDUSTRY.

11

12       THE WITNESS:  YES, IN WHAT MIGHT BEST BE

13   DESCRIBED AS A CONSPIRACY OF SILENCE.

14

15   BY MR. BALDWIN:

16   Q       AND THAT IS MY NEXT QUESTION, DOCTOR,

17   WITHOUT DETAILING THIS INFORMATION AGAIN, WHICH

18   YOU'VE SUMMARIZED, DO YOU HAVE AN OPINION AS TO

19   WHETHER OR NOT THE ACTIONS OF OWENS-CORNING, AS

20   WE'VE SEEN TODAY, AND AS YOU'VE TESTIFIED ABOUT,

21   AMOUNT TO A CONSPIRACY OF SILENCE, WHERE THEY

22   HAVE COVERED UP KNOWLEDGE ABOUT ASBESTOS, COVERED

23   UP THE DANGERS OF ASBESTOS, ATTEMPTED TO FIX,

24   DISTORT, AND SHAPE THE LITERATURE, AND THREE, HAD

25   THE EFFECT OF PROTECTING INDUSTRY AGAINST PEOPLE

1769

1        WHO WOULD FILE CLAIMS, DOCTORS AND LAWYERS?

2    A      YES.

3    Q      IS THAT YOUR OPINION?

4    A      YES, I HAVE AN OPINION.

5    Q      AND WHAT IS YOUR OPINION?

6    A      MY OPINION IS THEY SHOULDN'T HAVE GOTTEN

7        INTO THE ASBESTOS BUSINESS KNOWING WHAT THEY

8        KNEW, AND ONCE THEY DID, THEY CONDUCTED

9        THEMSELVES AS YOU HAVE JUST DESCRIBED.

10   Q      THANK YOU, SIR.  NOW LET'S TAKE CARE OF ONE

11       BIT OF HOUSEKEEPING.

12

13       THE COURT:  DO YOU WANT THE DOCTOR BACK ON

14       THE STAND?

15

16       MR. BALDWIN:  WELL, NO, I WANTED TO ASK HIM

17       ABOUT THIS DOCUMENT.

18

19   BY MR. BALDWIN:

20   Q      DOCTOR, I'LL PREFACE THIS BY GOING BACK TO

21       YOUR GENERAL DISCUSSION OF THE GENERAL ACTIONS OF

22       THE INDUSTRY.  I FAILED TO ASK YOU ABOUT THE

23       LEWINSOHN REPORT.  WOULD YOU TELL US WHO -- THIS

24       IS EXHIBIT 393-MM -- WHO HILTON C. LEWINSOHN IS?

25   A      DR. LEWINSOHN WAS THE, AT THE TIME OF THIS

1770

1    PRESENTATION, WAS THE CORPORATE MEDICAL DIRECTOR

2    FOR THE RAYBESTOS-MANHATTAN COMPANY, THIS WAS IN

3    1977.  PREVIOUS TO THAT HE HAD BEEN THE CORPORATE

4    MEDICAL DIRECTOR WITH A LARGE ASBESTOS COMPANY IN

5    THE UNITED KINGDOM CALLED TURNER AND NEWELL,

6    WHICH WHOM WE'VE ALSO DISCUSSED.

7         AND SUBSEQUENT TO THAT HE WENT TO ANOTHER

8    COMPANY, WHICH WAS INVOLVED IN THE ABESTOS FIELD,

9    UNION CARBIDE, WHERE HE NOW WORKS TODAY.

10   Q    NEXT PAGE, PLEASE.  WELL, FIRST OF ALL, THIS

11   IS ADDRESSED TO MEMBERS OF THE FRICTION MATERIALS

12   STANDARD INSTITUTE ANNUAL MEETING ON JUNE 22,

13   1977.  IS THAT ANOTHER EXAMPLE, DOCTOR, OF

14   DISSEMINATION AND EXCHANGE OF IDEAS AND

15   INFORMATION BETWEEN MEMBERS OF THE ASBESTOS

16   INDUSTRY, AND OTHER PEOPLE AND OTHER INDUSTRIES

17   AS WELL AS THE ASBESTOS INDUSTRY?

18   A    YES.  THIS IS PRETTY MUCH PURELY AN ASBESTOS

19   INDUSTRY TRADE ASSOCIATION.  FRICTION MATERIALS

20   REFERS TO BRAKE LININGS, CLUTCH FACINGS,

21   AUTOMOTIVE TRANSMISSION PARTS, THINGS OF THAT

22   SORT.

23   Q    SO, IF HE MADE AN ADDRESS TO MEMBERS OF THAT

24   ORGANIZATION HE WOULD BE ADDRESSING MEMBERS OF

25   THE INDUSTRY?

1771

1   A      YES.  ALL THOSE PRODUCTS WERE MADE WITH

2   ASBESTOS, AT LEAST TO THE BEST OF MY KNOWLEDGE,

3   IN 1977, ALMOST EXCLUSIVELY THEY WERE MADE WITH

4   ASBESTOS.

5   Q      I SHOW YOU ONE PORTION OF THAT ADDRESS,

6   DOCTOR.  WOULD YOU READ THE PART THAT HAS BEEN

7   HIGHLIGHTED, PLEASE, SIR?

8   A      UNDER THE HEADING "ASBESTOS, CANCER", HE

9   SAYS, "ACCORDING TO GILSON, IT WAS ABOUT FIFTY

10   YEARS AGO AFTER COMMERCIAL EXPLOITATION OF

11   ASBESTOS BEGAN THAT LUNG CANCER WAS FIRST THOUGHT

12   TO BE CAUSED BY THE DUST," IN PARENTHESIS HE SAYS

13   1935, "AND ANOTHER TEN YEARS BEFORE THIS WAS

14   GENERALLY THOUGHT PROBABLE," IN PARENTHESIS HE

15   SAYS 1945, "AND A FURTHER TEN BEFORE IT WAS

16   FINALLY ESTABLISHED IN THE ASBESTOS TEXTILE

17   INDUSTRY," AND IN PARENTHESIS HE HAS "DOLL,

18   1955." HE SAYS, "LUNG CANCER COMPLICATES FIFTY TO

19   SIXTY PERCENT OF ASBESTOSIS CASES RESULTING FROM

20   EXPOSURE TO CONDITIONS MORE THAN THIRTY TO FORTY

21   YEARS PREVIOUSLY."

22

23

24

25

1772

1    Q        SO, HERE WE HAVE AN ADDRESS IN '67 BY MR.

2        LEWINSOHN ACKNOWLEDGING THE CONNECTION BETWEEN

3        LUNG CANCER AND ASBESTOSIS, I MEAN, AN ASBESTOS

4        EXPOSURE SAYING IT GOES BACK TO 1935 AS BEING

5        SUSPECTED, '45 AS BEING PROBABLE, AND '55 AS

6        BEING ESTABLISHED, IS THAT CORRECT?

7    A        YES.  AND THIS IS SIMILAR TO THINGS THAT

8        LEWINSOHN HAS SAID IN PUBLISHED WRITINGS.

9    Q        I BELIEVE THAT'S ALL.  NEXT, DOCTOR, I THINK

10       WE CAN JUST PROCEED FASTER, IF YOU DON'T MIND, I

11       THINK MAYBE YOU COULD TURN THIS AROUND HERE AND

12       THEN YOU CAN TALK INTO THE "MIC" STRAIGHT.  THE

13       PHILIP CAREY, WE WANT TO TALK ABOUT, 399J.  AND

14       ALONG ABOUT THE SAME TIME OF THE SUMNER SIMPSON

15       PAPERS WHERE THEY WERE TALKING ABOUT THE LESS

16       SAID ABOUT ASBESTOS THE BETTER, THE ASBESTOS

17       MAGAZINE WAS PUBLISHED IN MARCH OF 1930.  IS THAT

18       THE SAME MAGAZINE THAT MRS. ROSSITER WHO WROTE

19       SUMNER SIMPSON ABOUT WAS THE EDITOR OF?

20   A        YES.  SHE WAS THE EDITOR OF ASBESTOS

21       MAGAZINE.

22   Q        ALL RIGHT.

23   A        HERE, IT'S MARCH 1930.

24   Q        COULD YOU FIND FOR ME, DOCTOR, THE REFERENCE

25       TO PHILIP CAREY?  THE PAGE OF THE SAME EXHIBIT,

BOYD-PARKS REPORTERS

1773

1    DOCTOR, WOULD YOU TELL US THE SIGNIFICANCE OF

2    THIS PAGE FIVE?

3    A        THIS IS AN ADVERTISEMENT FOR THE PHILIP

4    CAREY COMPANY NOTING THAT THEY ARE, IN MARCH

5    1930, NOTING THAT THEY SELL ASBESTOS FIBER WHICH

6    THEY MINE IN CANADA AND A WHOLE RANGE OF ASBESTOS

7    PRODUCTS INCLUDING INSULATION PRODUCTS LIKE

8    EIGHTY-FIVE PERCENT MAGNESIA.  THEY ALSO NOTE

9    THEY'VE BEEN IN THIS BUSINESS FOR OVER FIFTY

10   YEARS, CAREY ASBESTOS, MAGNESIA, AND ASPHALT

11   PRODUCT HAVE BEEN SUPPLIED TO MANUFACTURERS ALL

12   OVER THE WORLD THEY SAY.

13   Q        SO, IN 1930, THEY'VE BEEN IN THE BUSINESS

14   OVER FIFTY YEARS?

15   A        YES.

16   Q        ALL RIGHT, SIR.  DID THAT ISSUE OF ASBESTOS

17   MAGAZINE ALSO CONTAIN AN ARTICLE IN IT ABOUT

18   ASBESTOS DISEASE, ASBESTOSIS?

19   A        YES, IT DID.

20   Q        WE'LL FIND IT AND COME BACK TO IT BECAUSE

21   WE'RE GOING TO HAVE SOME OTHER PEOPLE -- NEXT

22   EXHIBIT, PLEASE.  BUT ANYWAY BEFORE WE GO TO THE

23   NEXT EXHIBIT, IS IT YOUR TESTIMONY THAT THE ISSUE

24   OF ASBESTOS MAGAZINE WHICH WENT TO THE TRADE

25   ASBESTOS INDUSTRY THAT PHILIP CAREY HAS THIS PAGE

1       ADVERTISEMENT IN THAT YOU JUST TESTIFIED ABOUT,

2       THAT VERY SAME ISSUE ALSO CARRIED AN ARTICLE

3       ABOUT THE DANGER OF ASBESTOS AND ASBESTOSIS?

4   A      YES, THERE IS AN ARTICLE ON PAGE TWENTY

5       CALLED "PULMONARY ASBESTOSIS."

6   Q      ALL RIGHT. GO AHEAD. THIS IS BACK IN 1930

7       THEN THAT PHILIP CAREY, IF THEY HAD READ THE

8       MAGAZINE, THAT IT ADVERTISED IN WOULD HAVE KNOWN

9       ABOUT THE DANGERS OF ASBESTOS?

10   A      YES, SIR.

11   Q      AND ABOUT THE DISEASE ASBESTOSIS, IS THAT

12       CORRECT?

13   A      YES, SIR.

14   Q      ALL RIGHT, SIR. NOW, PLAINTIFFS' EXHIBIT

15       399K. WOULD YOU TELL US WHAT THAT IS?

16   A      THIS IS A TRADE MAGAZINE CALLED "HEATING AND

17       VENTILATING." IT'S --

18   Q      WHAT DOES THIS MAGAZINE GO TO?

19   A      THE VERY NEXT PAGE DESCRIBES THE AUDIENCE,

20       BUT THESE ARE ESSENTIALLY COMPANIES OR FIRMS THAT

21       WOULD USE ASBESTOS INSULATION PRODUCTS AND OTHER

22       THINGS. IT'S DESCRIBED AS A MONTHLY MAGAZINE FOR

23       ENGINEERS, CONTRACTOR, AND CONTRACTORS CONCERNED

24       WITH INDUSTRIAL, COMMERCIAL, AND INSTITUTIONAL

25       AIR CONDITIONING, REFRIGERATION, PIPING, HEATING,

1775

1    AND VENTILATION.  AND IT HAS THIS ARTICLE IN THE

2    JUNE 1944 ISSUE CALLED "DUST AS AN INDUSTRIAL

3    HEALTH HAZARD" BY HUTCHINSON.

4    Q       AND WHAT IS THE CONNECTION WITH PHILIP

5    CAREY?

6    A       PHILIP CAREY ALSO ADVERTISED AN ASBESTOS

7    PRODUCT IN THIS MAGAZINE.

8    Q       IS THIS THE ADVERTISEMENT THAT YOU'RE

9    SPEAKING OF IN THAT MAGAZINE?

10   A       YES, THIS IS THE ADVERTISEMENT FOR AN

11   ALL-ASBESTOS PRODUCT FROM PHILIP CAREY COMPANY,

12   AND THEY SHOW PICTURES OF A HOSPITAL AND A KROGER

13   GROCERY STORE AND OTHER PLACES WHERE THEY HAD

14   INSTALLED THIS.

15

16

17

18

19

20

21

22

23

24

25

BOYD-PARKS REPORTERS

1776

BY MR. BALDWIN:

1

2   Q        DOCTOR, IS PHILIP CAREY THE SAME THING

3        AS CELOTEX AS WE KNOW IT TODAY?

4   A        YES.

5   Q        IS THIS EXHIBIT NOW THAT YOU'RE SEEING FROM

6        THE SAME ARTICLE, ENTITLED "DUST AS AN INDUSTRIAL

7        HAZARD", HUTCHINSON, IS THAT THE ARTICLE THAT YOU

8        REFERRED TO ABOUT ASBESTOSIS?

9   A        RIGHT.   THIS IS THE FIRST PAGE OF THAT

10        ARTICLE.

11   Q        NEXT PAGE.   AND WHEN DID THAT APPEAR IN THAT

12        MAGAZINE, THAT CELOTEX, PHILIP CAREY, RATHER,

13        ADVERTISED IN?

14   A        THIS IS JUNE, 1944.

15   Q        AND COULD YOU READ THE PERTINENT PART OF THE

16        ARTICLE AS IT RELATES TO ASBESTOSIS, DOCTOR, AS

17        SHOWN ON THIS EXHIBIT, WHICH IS A PAGE OF THE

18        SAME ARTICLE?

19   A        UNDER THE HEADING "ASBESTOSIS", THE ARTICLE

20        SAYS, "THE LUNG CONDITION RESULTING FROM THE

21        INHALATION OF THIS DUST IS KNOWN AS ASBESTOSIS,

22        AND RESEMBLES SILICOSIS IN ITS MAIN CLINICAL

23        ASPECTS, BUT DIFFERS DUE TO THE ENHANCED RATE OF

24        DEVELOPMENT."

25   Q        NEXT.   AGAIN READING FROM THE SAME ARTICLE.

1777

1    A        HE SAYS, "IT IS ESTIMATED THAT THERE ARE IN

2         THE UNITED STATES APPROXIMATELY TEN THOUSAND MEN

3         EXPOSED TO THE HAZARD AS A RESULT OF WORK IN THE

4         INSULATING ASBESTOS CLOTH AND SIMILAR

5         INDUSTRIES." FURTHER DOWN HE SAYS, "LIKE

6         SILICOSIS, IT IS INCURABLE AND PROGRESSIVE.  A

7         CASE IS REPORTED OF A PATIENT WHO WAS EXPOSED TO

8         ASBESTOS DUST IN ONE YEAR, AND WHOSE SPUTUM

9         SHOWED THE PRESENCE OF ASBESTOSIS BODIES FOURTEEN

10        YEARS LATER.  VERY FEW DATA ARE AVAILABLE ON THE

11        RELATION OF DUST CONCENTRATION TO THE INCIDENCE

12        OF DISEASE.  NO MINIMAL SAFE CONCENTRATIONS HAVE

13        YET BEEN SET UP, AND INFORMATION IS SCANT AS TO

14        THE CONDITIONS IN THOSE PLANTS WHERE HAZARD IS

15        KNOWN TO EXIST."

16   Q        SO, IN 1944 THEY'RE TALKING ABOUT ASBESTOSIS

17        AS IT RELATES TO INSULATION WORKERS, ARE THEY

18        NOT?

19   A        YES.

20   Q        AND THEY'RE DESCRIBING IT AS AN INCURABLE

21        AND PROGRESSIVE DISEASE, MUCH AS YOU'VE DESCRIBED

22        IT --

23   A        YES.

24   Q        -- TODAY, IS THAT CORRECT?

25   A        YES, SIR.

1778

1   Q      AND THAT'S TO A MAGAZINE THAT GOES OUT TO

2      THE ASBESTOS INDUSTRY?

3   A      YES.  OWENS-CORNING WAS ANOTHER ADVERTISER

4      IN THIS ISSUE OF THIS MAGAZINE.

5   Q      WE'LL COME TO OWENS-CORNING.  NEXT.  AND

6      WHAT DOES THIS DOCUMENT SHOW?  IT'S PART OF THE

7      SAME EXHIBIT, IS THAT CORRECT, DOCTOR?

8   A      YES.  THIS IS FROM THE SAME MAGAZINE.  THIS

9      IS CALLED "ALPHABETICAL INDEX OF ADVERTISERS",

10     AND IT LISTS A WHOLE BUNCH OF COMPANIES THAT

11     ADVERTISED IN THIS MAGAZINE.

12  Q      DOES IT SHOW PHILIP CAREY?

13  A      IT SHOWS PHILIP CAREY.

14  Q      OWENS-CORNING?

15  A      AND OWENS-CORNING FIBREGLAS CORPORATION.

16

17     MR. BALDWIN:  YOUR HONOR, THE NEXT DOCUMENT

18     IS THE MATTER THAT YOU ASKED ME TO ADDRESS THE

19     COURT BEFORE WE WENT INTO.

20

21     THE COURT:  COULD WE HAVE THE LIGHTS, MR.

22     NORMAN?

23

24     MR. BALDWIN:  I THINK I COULD DO IT IN JUST

25     A MATTER OF -- LAY THE QUALIFICATIONS WITHOUT

1779

1    SHOWING THE DOCUMENT, IF YOU JUST WANTED TO

2    CHARGE THE JURY, AND THE COURT COULD RULE IN A

3    MATTER OF THIRTY SECONDS.

4         I THINK I COULD DEVELOP IT IN A COUPLE OF

5    QUESTIONS.

6

7         THE COURT:  GO AHEAD.

8

9    BY MR. BALDWIN:

10   Q     I JUST WANT TO REFER TO THE SCOBIE MATTER,

11   DOCTOR.  HAVE YOU DEVELOPED CERTAIN DOCUMENTS IN

12   CONNECTION WITH HUBERT SCOBIE?

13   A     I HAVE LOCATED CERTAIN DOCUMENTS IN

14   CONNECTION WITH MR. SCOBIE, YES.

15   Q     AND WHERE DID YOU FIND THEM, DOCTOR?

16   A     THE DOCUMENTATION WAS AT THE ARMED FORCES

17   INSTITUTE OF PATHOLOGY AT THE WALTER REED

18   HOSPITAL IN WASHINGTON, D.C.  THESE WERE FROM THE

19   ARCHIVES OF DR. ARTHUR VORWALD, WHICH HIS WIFE

20   HAD DONATED TO THE ARMED FORCES INSTITUTE OF

21   PATHOLOGY.

22   Q     AND YOU'VE ACTUALLY MADE A VISIT TO THERE

23   AND FOUND THESE DOCUMENTS IN THAT PLACE THAT YOU

24   JUST DESCRIBED?

25   A     YES.  AND THESE WERE THE PRIVATE PATIENT

1780

1    FILES. CASES IN WHICH THE SARANAC LABORATORY HAD

2    EXAMINED EITHER TISSUES OR CHEST X-RAYS, OR HAD

3    OTHER KINDS OF RECORDS, AND HAD COME TO SOME

4    CONCLUSIONS ABOUT WHETHER CERTAIN INDIVIDUALS HAD

5    DEVELOPED OR DIED FROM OCCUPATIONAL DISEASES.

6    Q        AND IS THIS DOCUMENT, PLAINTIFFS' EXHIBIT

7    399-L, WAS IT FOUND IN THAT FILE?

8    A        YES.   IT WAS ONE OF THOSE FILES.

9    Q        WAS IT A PART OF THAT FILE?

10   A        YES.

11   Q        AND IS IT DATED NOVEMBER 20, 1944?

12   A        YES.

13

14        MR. BALDWIN:   YOUR HONOR, I THINK THE

15   PREDICATE HAS BEEN LAID FOR THE ADMISSIBILITY OF

16   THE DOCUMENTS UNDER 901 AND 803, RULE OF ANCIENT

17   DOCUMENTS.

18

19        MS. JENKINS:   YOUR HONOR, MY OBJECTION TO

20   THIS PARTICULAR DOCUMENT IS THAT IT'S NOT SHOWN

21   THAT IT WAS EVER INDICATED, OR ANY INFORMATION

22   ABOUT THIS, WAS EVER GIVEN TO PHILIP CAREY.

23

24        THE COURT:   I NEVER HAVE LOOKED AT THE

25   EXHIBIT ITSELF.   LET ME SEE THE EXHIBIT ITSELF.

1781

1

2      MS. JENKINS: YOUR HONOR, IN ADDITION, WE

3  WOULD LIKE TO REURGE OUR PREVIOUS OBJECTIONS,

4  THAT THIS DOCUMENT IS UNSIGNED, WE DON'T KNOW WHO

5  WROTE IT --

6

7      THE COURT: WELL, I UNDERSTAND YOUR 901

8  OBJECTION.

9

10      MS. JENKINS: YOUR HONOR, IT'S NOT ADDRESSED

11  TO ANYBODY, AND IT'S CERTAINLY NOT ADDRESSED TO

12  PHILIP CAREY.

13

14      THE COURT: ABSENT FURTHER EVIDENCE, I

15  SUSTAIN THE OBJECTION.

16

17      MS. JENKINS: THANK YOU, YOUR HONOR.

18

19      THE COURT: SHOWING SOME CONNECTION TO

20  PHILIP CAREY. THE PART OF THE OBJECTION RELATING

21  TO AUTHENTICITY I OVERRULE, BECAUSE IT DOES

22  APPEAR TO BE WHAT IT PURPORTS TO BE, ENOUGH TO

23  SATISFY THE COURT.

24

25      MR. BALDWIN: WE'LL NOT OFFER IT AT THIS

1782

1    TIME, YOUR HONOR.

2

3          THE COURT:  ALL RIGHT.

4

5    BY MR. BALDWIN:

6    Q          NEXT DOCUMENT.  393-P, COULD YOU TELL US

7          WHAT THAT IS, DOCTOR?

8    A          IT'S A LETTER FROM THE INDIANA STATE BOARD

9          OF HEALTH, 1961, TO MR. LOUIS PECKSTEIN,

10         ASSISTANT SECRETARY, OR THAT WOULD BE A HIGHLY

11         PLACED LAWYER WITH THE COMPANY, OF THE PHILIP

12         CAREY MANUFACTURING COMPANY.  AND THEY'RE ASKING

13         FOR THE CHEMICAL COMPOSITION OF CAREYTEMP

14         INSULATION, THEY'RE SAYING THE INFORMATION WILL

15         BE HELD IN STRICT CONFIDENCE AND USED ONLY TO

16         EVALUATE POTENTIAL HEALTH HAZARDS.

17   Q          AND THAT IS AN EXAMPLE OF PHILIP CAREY

18         WANTING THEIR INFORMATION CONFIDENTIAL ABOUT THE

19         HAZARDS OF ASBESTOS?

20   A          WELL, IT'S AN EXAMPLE OF THE STATE OFFERING

21         TO KEEP IT CONFIDENTIAL.  I HAVE NO WAY OF

22         KNOWING WHETHER PHILIP CAREY HAD REQUESTED OR

23         DEMANDED CONFIDENTIALITY.

24

25

1783

1  Q       NEXT DOCUMENT.  AND DOES THE SECOND PAGE OF

2         THAT 1961 EXHIBIT -- WOULD YOU READ JUST THE

3         PERTINENT PARTS OF THAT?

4  A       THE MR. PECKSTEIN'S NOTE TO FILE SAYS MR.

5         EDWARDS, THE GENTLEMAN WHO HAD WRITTEN FROM THE

6         STATE OF INDIANA, "PHONED AND THANKED ME FOR MY

7         LETTER OF FEBRUARY 14.  HE SAID THE ONLY

8         INGREDIENTS WE USE IN OUR CAREY TEMP WHICH IS

9         TOXIC IS THE ASBESTOS FIBER.  HE SAID THE WORKMAN

10        HAD BEEN SAWING THE MATERIAL IN A CONFINED,

11        UNVENTILATED AREA USING NO MASKS NOR A DUST

12        COLLECTOR ON THE SAW.  HE SAID THE COMPLAINTANTS

13        WERE OUR OWN CONTRACT DEPARTMENT WORKERS ACTING

14        THROUGH THE INDIANAPOLIS LOCAL."

15 Q       IS THAT CLEAR KNOWLEDGE OF TWO THINGS, ONE

16        THAT ASBESTOS IS A HAZARDOUS PRODUCT, THAT IT

17        CONTAINED INGREDIENTS WHICH ARE TOXIC, AND THAT

18        IT IS BEING USED BY PEOPLE WHO DO INSULATION TYPE

19        WORK?

20 A       YES.

21 Q       NEXT NUMBER.

22

23        THE COURT:  I DIDN'T GET THAT EXHIBIT

24        NUMBER, MR. BALDWIN.

25

BOYD-PARKS REPORTERS

1          MR. FLUGER:  399P, YOUR HONOR.

2

3    BY MR. BALDWIN:

4    Q          AND 399Q.  COULD YOU TELL US WHAT THAT IS,

5          DOCTOR?

6    A          THIS IS PART OF A SERIES OF DOCUMENTS

7          RELATING TO THE HANDLING OF A WORKERS'

8          COMPENSATION CLAIM BROUGHT BY WILLIAM LATTO IN

9          1961.  MR. LATTO'S -- THE DOCUMENT HERE INDICATES

10         THAT THE CAUSE OF, OR THE EXPOSURE WAS FROM

11         APPLYING ASBESTOS PRODUCTS COMMERCIALLY FOR A

12         NUMBER OF YEARS, AND THAT HE WAS CLAIMING THAT HE

13         HAD ASBESTOSIS.

14   Q          NEXT DOCUMENT.  THAT DOCUMENT CLEARLY SHOWS

15         THE MAN WAS AT LEAST CLAIMING THE DISEASE

16         ASBESTOSIS?

17   A          YES.

18   Q          SECOND PAGE OF THE SAME DOCUMENT.  COULD YOU

19         READ THE IMPORTANT INFORMATION ON THAT?

20   A          "OCCUPATION, ASBESTOS WORKER.  EXPOSURE,

21         APPLYING ASBESTOS PRODUCTS COMMERCIALLY FOR

22         THIRTY-FIVE YEARS.  HISTORY OF THE CLAIM, IT WAS

23         CONSIDERED BY THE BUREAU OF WORKMANS'

24         COMPENSATION AND ALLOWED FOR ASBESTOSIS AND

25         PERMANENT TOTAL DISABLITY AT A HEARING ON MAY 24,

1785

1        1962."

2    Q        SO, HERE'S A CLAIM FOR THE PURPOSES OF THE

3        BUREAU OF WORKMANS' COMPENSATION, AT LEAST WAS

4        DETERMINED TO HAVE ASBESTOSIS?

5    A        YES.

6    Q        399R.

7    A        THIS IS -- THIS ACTUALLY IS A DOCUMENT THAT

8        CAME OUT OF THE OWENS-CORNING FILES, AND IT'S

9        FROM THE WAR YEARS, 1943.

10   Q        DOES IT RELATE -- MISTAKE, RIGHT?  OH, OKAY.

11       THAT'S RIGHT.  THAT'S THE SECOND PAGE.  THIRD

12       PAGE OF THE SAME DOCUMENT IS AN OWENS-CORNING

13       DOCUMENT, IS THAT CORRECT, DOCTOR?

14   A        YES.

15   Q        GO AHEAD.

16   A        AND THEY MENTIONED THAT THE "CELOTEX

17       CORPORATION NOW HAS A CEMENT-O-BOARD WHICH

18       CONSISTS OF CELOTEX BETWEEN TWO SHEETS OF

19       ASBESTOS BOARD."

20   Q        DOES THAT INDICATE AN EXCHANGE OF

21       INFORMATION OR KNOWLEDGE FROM ONE COMPANY TO THE

22       OTHER?

23   A        YES.  IT INDICATES THAT THE CELOTEX

24       CORPORATION WAS IN THE ASBESTOS BUSINESS IN 1943,

25       AND THAT THIS WAS DISCUSSED IN AN INTERNAL

1786

```
 1        MEMORANDUM OF THE OWENS-CORNING COMPANY AT THAT
 2        TIME.
 3   Q        ALL RIGHT.  NEXT ONE.  NOW, IF WE MAY HAVE
 4        THE LIGHTS, PLEASE.
 5
 6             MR. BALDWIN:  YOUR HONOR, ON THIS CHART,
 7        COULD I HAVE LEAVE TO USE IT LATER BECAUSE
 8        THERE'S A MATTER ON THERE THAT THE COURT RULED ON
 9        THAT NEEDS TO BE TAKEN OFF BEFORE WE --
10
11             THE COURT:  IT HAS NOT BEEN CORRECTED?
12
13             MR. BALDWIN:  NO, SIR.  WE'LL HAVE TO COME
14        BACK TO THAT CHART AFTER WE GET SOMEBODY TO COVER
15        UP THE PART THAT YOU LEFT OFF.
16
17   BY MR. BALDWIN:
18   Q        WHAT IS THE NEXT ONE, ARMSTRONG?  ALL RIGHT,
19        DOCTOR, WITH REFERENCE TO THE ARMSTRONG
20        CORPORATION --
21
22             THE COURT:  OKAY.  WELL, WE'LL TAKE A BREAK
23        UNTIL FIFTEEN UNTIL.
24
25             THE MARSHAL:  ALL RISE.
```

BOYD-PARKS REPORTERS

1787

1
2          (WHEREUPON, THERE WAS A SHORT RECESS IN THE
3      PROCEEDINGS, AFTER WHICH THEY RESUMED AS FOLLOWS:)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1788

1    THE MARSHAL:  ALL RISE.

2

3    THE COURT:  BE SEATED.  READY?

4

5    MR. BALDWIN:  YES, SIR.

6

7  BY MR. BALDWIN:

8    Q    DR. CASTLEMAN, I BELIEVE YOU CAN TAKE YOUR

9         SEAT ON THE WITNESS STAND.  BEFORE WE WIND UP ON

10        PHILIP CAREY, COULD YOU TELL US ABOUT THE QUEBEC

11        MINING STRIKE EPISODE, DOCTOR, JUST IN YOUR OWN

12        WORDS, VERY BRIEFLY?

13   A    YES.  CAREY OWNED MINING ACTIVITIES IN

14        CANADA, AND IN 1949 NEWSPAPER EXPOSES' WERE

15        PUBLISHED IN QUEBEC ABOUT CONDITIONS AT THE

16        MINING SUBSIDIARY OF PHILIP CAREY, WHICH WAS

17        CALLED QUEBEC ASBESTOS CORPORATION.

18             THE REPORTS INCLUDED DESCRIPTIONS OF WORKERS

19        WHO WERE, ACCORDING TO THE REPORT, DYING WITH

20        ASBESTOSIS, NOT RECEIVING ANY WORKER'S

21        COMPENSATION, THINGS TO THAT EFFECT.

22             AND THE GOVERNMENT WAS ALSO CRITICIZED FOR

23        NOT DOING ANYTHING ABOUT THE ASBESTOSIS PROBLEM

24        IN QUEBEC.

25             WITHIN A MONTH AFTER THESE STORIES APPEARED

1789

1    IN THE NEWSPAPERS THERE WAS A HISTORIC STRIKE IN

2    QUEBEC WHICH LASTED FIVE MONTHS, AND SHUT DOWN

3    VIRTUALLY THE ENTIRE ASBESTOS MINING INDUSTRY IN

4    1949.  AND THIS IS DESCRIBED IN A BOOK BY PIERRE

5    ELLIOT TRUDEAU, WHO WAS A YOUNG POLITICIAN AT THE

6    TIME, AND LATER BECAME PRIME MINISTER OF CANADA.

7    THE BOOK IS CALLED "THE ASBESTOS STRIKE".

8    Q    AND THE CONNECTION BETWEEN PHILIP CAREY WAS

9    WHAT?

10   A    WELL, CAREY OWNED THE MINING PROPERTY WHICH

11   WAS THE SUBJECT OF THE ORIGIANL EXPOSE' IN

12   JANUARY OF 1949, WHICH WAS FOLLOWED BY THE STRIKE

13   EFFECTING THE REST OF THE INDUSTRY STARTING IN

14   FEBRUARY OF 1949.

15   Q    WOULD IT BE ACCURATE TO SUMMARIZE BY SAYING

16   THAT THE WHOLE RUCKUS WAS OVER THE HAZARDS OF

17   ASBESTOS?

18   A    YES.

19   Q    AND PEOPLE WORKING WITH ASBESTOS?

20   A    YES.

21   Q    AND THIS IS BACK IN THE '40'S?

22   A    YES.

23   Q    NOW, DOCTOR, WE HAVE A SUMMARY ON THE BOARD

24   HERE, PHILIP CAREY, OR CELOTEX, WHICH AGAIN IS

25   NOT OFFERED FOR EVIDENCE OR PRESENTED AS

1790

1   EVIDENCE, BUT RATHER AS A TRIAL GUIDE, OR SUMMARY

2   OF YOUR TESTIMONY.  WOULD YOU BRIEFLY GO OVER

3   THAT FOR US?

4   A        YES.  THE FIRST -- THE EARLIEST ITEM IS THE

5   1930 ASBESTOS MAGAZINE, WITH THE ARTICLE ON

6   PULMONARY ASBESTOSIS.  THE PHILIP CAREY COMPANY

7   AND ITS QUEBEC SUBSIDIARY BOTH HAD FULL PAGE

8   ADVERTISEMENTS IN THE SAME ISSUE, MARCH, 1930, OF

9   THE TRADE MAGAZINE.

10        AND THEN IN 1944 CAREY WAS SELLING A --

11   AGAIN HAD A FULL PAGE ADVERTISEMENT FOR AN ALL

12   ASBESTOS PRODUCT, SO-CALLED ALL ASBESTOS PRODUCT,

13   IN THE SAME ISSUE OF A HEATING AND VENTILATING

14   MAGAZINE, THE MAGAZINE DISTRIBUTED TO COMMERCIAL

15   USERS OF ASBESTOS INSULATION MATERIALS.  AND THIS

16   NEWSPAPER, I MEAN, THIS TRADE MAGAZINE, ALSO

17   CONTAINED AN ARTICLE ON DUST DISEASES INCLUDING

18   ASBESTOSIS, DESCRIBING THAT ASBESTOSIS WAS A

19   HAZARD IN THE INSULATING INDUSTRY, THAT THERE WAS

20   NO MINIMAL SAFE LEVEL THAT HAD YET BEEN

21   ESTABLISHED, THAT THE DISEASE WAS A PROGRESSIVE

22   DISEASE, THAT THE DISEASE WAS A VERY, VERY

23   SERIOUS THREAT TO LIFE.

24        AND THEN I CAN'T REALLY SEE THE CHART, BUT I

25   THINK --

Q       NUMBER FOUR SAYS, "1955 WORKER'S
COMPENSATION CLAIMS".

A       THEN COME THESE WORKERS' COMPENSATION CLAIMS
INVOLVING PHILIP CAREY.  I THINK THERE ARE ABOUT
A HALF DOZEN ON THIS LIST, IN WHICH CAREY WAS A
DEFENDANT, ALONG WITH ARMSTRONG CORK, AND IN SOME
CASES OWENS-CORNING, JOHNS-MANVILLE.

AND SO, IN SOME OF THESE CLAIMS, INCLUDING
THE RILEY CASE, PHILIP CAREY WAS INVOLVED IN THE
RILEY CASE, THE MAN DIED WITH LUNG CANCER BY THE
TIME THIS PROCEEDING WAS FINISHED, AND CAREY WAS
INVOLVED AS A DEFENDANT IN THAT, ALONG WITH, AS I
SAY, A NUMBER OF OTHERS.

AND SOME OF THESE CONTRACT UNIT PROBLEMS
WITH ASBESTOSIS EVEN CAME TO THE ATTENTION OF
HEALTH OFFICIALS, SUCH AS THE INDIANA HEALTH
OFFICALS, WHO WROTE TO MR. PECKSTEIN ABOUT THE
PRESENCE OF ASBESTOS IN CAREYTEMP INSULATION
BEING A TOXIC MATERIAL, IN 1961.

Q       DO THOSE ACTIONS, DOCTOR, IN YOUR OPINION,
INDICATE A CLEAR KNOWLEDGE ON THE PART OF PHILIP
CAREY, GOING BACK TO AS FAR AS 1930, THAT
ASBESTOS WAS A DANGEROUS PRODUCT AND THAT
ASBESTOSIS WAS A DANGEROUS DISEASE THAT WAS LIFE
THREATENING?

1    A       YES.

2    Q       AND CHARACTERIZED -- AS YOU'VE CHARACTERIZED

3            AS INCURABLE, PROGRESSIVE, AND IRREVERSIBLE?

4    A       YES.   ALMOST THE IDENTICAL LANGUAGE YOU JUST

5            USED WAS IN THE THE HEATING AND VENTILATING

6            MAGAZINE ARTICLE IN 1944.

7    Q       AND WE HAVE SEEN A NUMBER OF SUBSCRIBERS,

8            ADVERTISERS IN THAT ASBESTOS MAGAZINE, HAVE WE

9            NOT?

10   A       YES.

11   Q       ALL RIGHT, SIR.   NOW, LET'S GO ON TO TURN

12           OUR ATTENTION TO ARMSTRONG.   DO YOU HAVE EXAMPLES --

13           WELL, FIRST OF ALL, IF WE LOOK AT THE BOOK -- DO

14           YOU HAVE A COPY OF THE NOTEBOOK THAT THE JUDGE

15           HAS FURNISHED TO THE JURY ON PRODUCTS LIST, PAGE

16           SEVEN?   IF THE JURY CARES TO TURN TO THAT PAGE,

17           YOU MAY BE ABLE TO FOLLOW, AND THAT WAY WE WON'T

18           HAVE TO PUT IT ON THE PROJECTOR AND TURN THE

19           LIGHTS OUT.   IT'S A PRODUCTS LIST, I BELIEVE.

20   A       YES, I HAVE THAT.

21   Q       WOULD YOU JUST KIND OF RUN DOWN THAT, DR.

22           CASTLEMAN, AND TELL US THE RELATIONSHIP BETWEEN

23           ARMSTRONG AND KEASBY-MATTISON?

24   A       WELL, THE LIST INDICATES --

25   Q       FIRST OF ALL, WHERE THE WORD "K-M" APPEARS

1       ON THAT PAGE, WHAT DOES THAT REFER TO?

2   A       KEASBY-MATTISON.

3   Q       ALL RIGHT.  GO AHEAD.

4   A       IT'S EVIDENT FROM THIS PAGE THAT ARMSTRONG --

5   Q       PAGE SEVEN YOU'RE ON?

6   A       YES, SIR.

7   Q       ALL RIGHT.

8   A       A NUMBER OF ARMSTRONG PRODUCTS, INSULATION

9   PRODUCTS, WERE IN FACT MANUFACTURED BY

10  KEASBY-MATTISON, AND THERE ARE EVEN A COUPLE OF

11  OTHER PRODUCTS I SEE LISTED AS CONTESTED

12  PRODUCTS, SO I WON'T GET INTO THEM.  BUT THERE

13  ARE OTHER PRODUCTS THAT ARE MANUFACTURED BY

14  KEASBY-MATTISON, AND THIS APPARENTLY GOES BACK TO

15  1945, THAT THESE AGREEMENTS, ARRANGEMENTS EXISTED

16  BETWEEN KEASBY-MATTISON COMPANY, THE

17  MANUFACTURER, AND ARMSTRONG CORK, WHICH WAS

18  DISTRIBUTING THESE PRODUCTS AS THEIR OWN.

19

20      MR. DEHAY:  EXCUSE ME.  I OBJECT TO THE

21  TESTIMONY OF THE WITNESS WITH RESPECT TO THE

22  DISTRIBUTION, BECAUSE THAT WOULD VIOLATE RULE

23  602.  THE WITNESS HAS NO PERSONAL KNOWLEDGE OF

24  THAT, YOUR HONOR.

25      IT WOULD NOT BE SUBJECT TO EXPERT TESTIMONY

BOYD-PARKS REPORTERS

1794

1    PROVIDED BY RULE 703.

2        IT REPRESENTS A LEGAL CONCLUSION ON THE PART

3    OF THIS WITNESS, AND THIS WOULD REPRESENT A LAY

4    OPINION PRECLUDED BY RULE 701.

5

6        THE COURT:  OKAY.  OVERRULED.  I THINK YOUR

7    OBJECTION RELATES TO THE WEIGHT, AND COUNSEL CAN

8    ADDRESS PORTIONS OF IT ON CROSS-EXAMINATION.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1795

1  Q       DR. CASTLEMAN, I DIDN'T WANT YOU TO GET MUCH
2  FURTHUR THAN THAT ANYWAY EXCEPT TO SHOW THAT
3  ARMSTRONG PURCHASED MANY OF ITS PRODUCTS FROM
4  KEASBY-MATTISON THROUGH THE YEARS.
5  A       YES.
6  Q       AND WAS THAT OR NOT ACCORDING TO YOUR
7  INVESTIGATION THE SUBJECT OF A SO-CALLED LABELING
8  AGREEMENT?
9  A       YES.  I'VE HEARD TERMS LIKE "LABELING" OR
10 "REBRANDING" AGREEMENTS WHERE --
11 Q       COULD YOU TELL US BASICALLY WHAT ONE OF
12 THOSE AGREEMENTS IS?
13 A       WELL, IT'S JUST LIKE SEARS MIGHT HAVE
14 SOMEBODY MANUFACTURE A PRODUCT AND SEARS PUTS
15 THEIR OWN LABEL ON IT AS A SEARS PRODUCT,
16 WHEREAS, IN FACT, ITS MANUFACTURED BY SOMEBODY
17 ELSE.
18 Q       WHERE ARMSTRONG MIGHT PURCHASE THESE
19 PRODUCTS FROM KEASBY-MATTISON AND STAMP THE
20 ARMSTRONG LABEL ON IT AND SELL IT, IS THAT WHAT
21 YOU'RE SAYING?
22 A       RIGHT.
23 Q       IS THIS A COMMON PRACTICE IN THE INDUSTRY?
24 A       YES.
25 Q       AND DOES THAT OR NOT EXHIBIT A FREE EXCHANGE

1    BETWEEN KEASBY-MATTISON AT LEAST AND ARMSTRONG OR

2    EXHIBIT A FREE EXCHANGE BETWEEN INDUSTRIES AS

3    WE'VE TALKED ABOUT, OF INFORMATION?

4    A     IT DOES.

5    Q     AND HAVE WE SEEN KEASBY-MATTISON IN ANY OF

6    THESE OTHER DO UMENTS THAT WE'VE REVIEWED?

7    A     YES.

8    Q     AND WHERE HAVE WE SEEN THE NAME?

9    A     KEASBY-MATTISON WAS A RECIPIENT OF THE

10   STUDIES DONE BY DR. GARDNER IN 1943 SHOWING THAT

11   ASBESTOS CAUSES A HIGH RATE OF LUNG CANCER IN

12   MICE BY INHALLATION.  THIS WAS THE REPORT FROM

13   DR. GARDNER WHICH WAS TRANSMITTED BY THE KEASBY

14   AND MATTISON PEOPLE TO THEIR PARENT COMPANY IN

15   ENGLAND, TURNER AND NEWELL.

16   Q     AND ARE THESE AGREEMENTS THAT WE'RE TALKING

17   ABOUT ON PAGE SEVEN OF THE NOTBOOK GOING BACK TO

18   THAT PERIOD?

19   A     PRACTICALLY GO BACK TO 1945.

20

21   MR. DEHAY:  YOUR HONOR PLEASE, I OBJECT TO

22   THAT BECAUSE THAT REPRESENTS THE OPINION OF THIS

23   WITNESS PRECLUDED BY THE OPINION RULE IN THE

24   RULES OF EVIDENCE.  PURE SPECULATION ON HIS PART,

25   YOUR HONOR.

1797

1

2    BY MR. BALDWIN:

3    Q        I'M NOT ASKING YOU TO SPECULATE.  I'M JUST

4        ASKING YOU TO LOOK AT THIS BOOK THERE AND SEE IF --

5

6        THE COURT:  I THINK IT GOES TO THE WEIGHT.

7

8    BY MR. BALDWIN:

9    Q        DR. CASTLEMAN, JUST LOOK AT THE BOOK THERE

10       AND SEE IF SOME OF THOSE ARRANGEMENTS WHERE THEY

11       PURCHASED KEASBY AND MATTISON MATERIALS THAT GO

12       BACK TO THE FORTIES.

13   A        THEY DO.

14   Q        ALL RIGHT.  NOW, DID ARMSTRONG BUY -- ARE

15       YOU AWARE THAT ARMSTRONG BOUGHT

16       BALDWIN-EHERT-HILL AND/OR KEENE PRODUCTS, TOO,

17       THROUGH THE YEARS UNDER THE SAME TYPE

18       ARRANGEMENT?

19   A        WELL, OR EHERT, WHICH IS ANOTHER

20       PREDECESSOR, TOO.

21

22       MR. WEBER:  YOUR HONOR, WE WOULD HAVE

23       EXACTLY THE SAME OBJECTION, YOUR HONOR, AS STATED

24       BY MR. DEHAY.

25

1798

1        THE COURT:  SAME RULING.

2

3        MR. WEBER:  THANK YOU.

4

5    BY MR. BALDWIN:

6    Q        I DIDN'T GET YOUR ANSWER.

7    A        YES.  KEENE, OR RATHER, PREDECESSORS TO THE

8        KEENE CORPORATION DID SUPPLY ASBESTOS  RODUCTS TO

9        ARMSTRONG.  IN ADDITION, TO KEASBY AND MATTISON.

10

11        MR. WEBER:  YOUR HONOR, WE WOULD OBJECT TO

12        THE PHRASIOLOGY "PREDECESSORS TO KEENE" BECAUSE

13        IT CARRIES A LEGAL CONNOTATION, AND WE OBJECT TO

14        THE WITNESS CONFINING HIMSELF TO MAGNESIA OR

15        BALDWIN-EHERT-HILL, WHICH IS WHAT HE'S PREVIOUSLY

16        DONE.

17

18        THE COURT:  WELL, I THINK THE JURY

19        UNDERSTANDS THAT THAT'S A DISPUTED ASPECT OF THIS

20        CASE AND THE WITNESS IS EXPRESSING OPINIONS AND

21        THE JURY WILL HAVE TO EXERCISE ITS JUDGEMENT AT

22        THE PROPER TIME.

23

24    BY MR. BALDWIN:

25    Q        ONE FINAL QUESTION.  AT KEASBY-MATTISON AT

1     THIS POINT.  IS KEASBY-MATTISON NOW OR UP TO

2     RECENT DATE AT LEAST AND THROUGH THE YEARS BEEN A

3     PROMINENT MEMBER OF THE ASBESTOS INDUSTRY?

4     A     YES.  THIS WAS AT LEAST UNTIL THE 1960'S.

5     Q     AND A PARTICIPANT IN MANY OF THE

6     ORGANIZATIONS?

7     A     YES.

8     Q     NOW, DO YOU HAVE ANY EVIDENCE OF WORKMANS'

9     COMPENSATION CLAIMS IN WHICH ARMSTRONG WAS

10     INVOLVED?

11     A     YES.

12     Q     COULD YOU TELL US ABOUT THAT VERY BRIEFLY?

13     A     THIS IS THE LIST OF WORKERS' COMPENSATION

14     CONTRACT UNIT CLAIMS WHICH I REFERRED TO EARLIER

15     WHICH IS TABULATED IN MY BOOK, AND THIS LIST IS

16     SOMETHING LIKE I THINK THIRTY-NINE CLAIMS THAT

17     WERE FILED PRIOR TO 19 -- BETWEEN 1952 AND 1963

18     IN WHICH ARMSTRONG WAS A DEFENDANT.  THIS IS A

19     LIST OF CLAIMS THAT WAS PRODUCED BY ARMSTRONG

20     COMPANY IN THE FIRST PLACE.  THAT'S HOW I WAS --

21     Q     DID THAT THIRTY SOME ODD CLAIMS COME OUT OF

22     THE FILES OF THE ARMSTRONG COMPANY?

23     A     YES.

24     Q     AND DID THEY INVOLVE CLAIMS OF THIRTY ODD

25     WORKERS WHO HAD CLAIMS FOR ASBESTOSIS?

1800

1    A        FOR ASBESTOSIS, SOMETIMES INCLUDING LUNG

2    CANCER AS WELL, YES.

3    Q        ALL RIGHT, SIR.  SO, WOULD THAT BE ANOTHER

4    EXAMPLE OF ARMSTR  G HAVING ACTUAL KNOWLEDGE OF

5    THE CLAIM THAT ASBESTOSIS WAS A DANGEROUS

6    DISEASE, THAT ASBESTOS WAS A DANGEROUS PRODUCT,

7    AND THAT IT COULD CAUSE CANCER?

8    A        YES.  INVOLVING INSULATION WORKERS SUCH AS

9    MR. RILEY.

10   Q        I BELIEVE YOU HAVE CHARACTERIZED MR. RILEY'S

11   CASE PREVIOUSLY AS HE DIED OF CANCER, LUNG

12   CANCER?

13   A        YES.

14   Q        NOW, WE HAVE KIND OF A SUMMARY BOARD ON

15   ARMSTRONG WHICH IS AGAIN IS NOT EVIDENCE BUT IS

16   USED AS A GUIDE TO SUMMARIZE AND CAPSULATE YOUR

17   TESTIMONY.  COULD YOU READ OVER THAT FOR US,

18   DOCTOR, AND SUMMARIZE THAT?

19   A        IT JUST REITERATES THAT THE COMPANY WAS A

20   DEFENDANT IN THE WORKERS' COMPENSATION ACTIONS

21   INVOLVING NUMEROUS INSULATION WORKERS CLAIMING TO

22   HAVE ASBESTOSIS AND IN SOME CASES LUNG CANCER AS

23   WELL DURING THE YEARS 1952 TO 1963.  THE FIRST OF

24   THESE CLAIMS IN 1952, IN FACT, WAS A WORKER WHO

25   DIED OF LUNG CANCER.

1802

1    BY MR. BALDWIN:

2    Q        AND BASED ON THEN YOUR SUMMARY OF, YOUR

3             KNOWLEDGE RATHER, OF THE TESTIMONY THAT YOU'VE

4             GIVEN ABOUT ARMSTRONG, AND THE DOCUMENTS AND

5             OTHER DATA AVAILABLE AGAINST ARMSTRONG, DO YOU

6             HAVE AN OPINION, DOCTOR, AS TO WHETHER OR NOT

7             ARMSTRONG KNEW OF THE DANGERS OF ASBESTOS, THAT

8             IT WOULD CAUSE ASBESTOSIS, AND COULD CAUSE

9             CANCER, GOING BACK AS FAR AS AT LEAST 1952?

10   A        YES, I DO.

11   Q        AND WHAT IS YOUR OPINION?

12   A        MY OPINION IS THAT THEY HAD AMPLE

13            OPPORTUNITY TO KNOW THOSE THINGS IN 1952.

14   Q        ALL RIGHT, SIR.  DO YOU KNOW OF ANY INCIDENT

15            WHERE ARMSTRONG TESTED ITS PRODUCT AT ANY TIME,

16            OR ANY DOCUMENT WHERE THE ARMSTRONG COMPANY

17            TESTED ITS PRODUCT AT ANY TIME TO DETERMINE THE

18            DUST LEVELS THAT MIGHT BE GENERATED WHEN IT WAS

19            USED BY AN INSULATION WORKER OR AN END PRODUCT

20            USER?

21   A        I HAVE NEVER SEEN ANY SUCH DOCUMENTATION.

22   Q        AND WOULD THE SAME BE TRUE OF CELOTEX, WHICH

23            WE'VE JUST COVERED?

24   A        YES.

25   Q        PHILIP CAREY?

1803

1    A       YES.

2    Q       DO YOU KNOW OF ANY DOCUMENT OR ANY OTHER

3          INFORMATION THAT PHILIP CAREY OR CELOTEX EVER

4          TESTED ANY OF ITS PRODUCTS TO DETERMINE WHAT ITS

5          DUST LEVELS MIGHT BE WHEN PUT TO USE BY AN

6          INSULATOR OR OTHER END PRODUCT USER?

7    A       I HAVE NEVER SEEN ANY SUCH DOCUMENTATION

8          PRODUCED TO THE EFFECT THAT THESE PRODUCTS WERE

9          TESTED, OR TO THE EFFECT THAT WARNING LABELS WERE

10        EVER PLACED ON SUCH PRODUCTS.

11    Q      AND WHAT COMPANY ARE YOU REFERRING TO THERE?

12    A      PHILIP CAREY, WHICH WAS THEN LATER ABSORBED

13        BY CELOTEX AND JIM WALTER CORPORATION.

14    Q      ALL RIGHT, SIR. AND WOULD THE SAME BE TRUE,

15        I DON'T THINK I'VE ASKED YOU THE QUESTION, ABOUT

16        OWENS-CORNING, I KNOW I DID ASK YOU, I THINK,

17        ABOUT OWENS-ILLINOIS, AS TO WHETHER OR NOT YOU

18        HAVE ANY DOCUMENTATION OR ANY OTHER EVIDENCE TO

19        SUPPORT ANY INDICATION THAT OWENS-CORNING

20        FIBREGLAS EVER TESTED ITS OWN PRODUCT TO

21        DETERMINE THE DUST LEVELS WHEN USED BY INSULATORS

22        OR OTHER END USERS?

23    A      I HAVE NEVER SEEN ANY SUCH TESTING.

24    Q      DOCTOR, WOULD YOU MIND COMING BACK TO THIS

25        MACHINE? WE'LL TALK ABOUT FIBREBOARD A LITTLE

1804

1    BIT.   TRY TO HURRY ALONG HERE.

2

3        MR. STEVENS:   YOUR HONOR, BEFORE THE LIGHTS

4    GO OUT, I BELIEVE HE IS FIXING TO INTRODUCE THE

5    1930 MAGAZINE, AND I HAVE OBJECTION TO IT FOR

6    FIBREBOARD CORPORATION.   MR. BALDWIN IS GOING TO

7    READ A PORTION OF IT SHOWING THAT WE HAVE

8    ENLARGED OUR CAPABILITIES FOR INSULATION

9    PRODUCTS, AND I BELIEVE THAT INJECTS UTILITY,

10   BECAUSE I WILL HAVE TO REBUT IT AS EVIDENCE OF

11   MILITARY SPECIFICATIONS FOR WAR VESSELS IN THE

12   PACIFIC THEATER, AND ALSO THE FACT THAT IT WAS

13   REQUIRED BY THE MILITARY GOVERNMENT TO USE

14   ASBESTOS-CONTAINING INSULATION PRODUCTS.   AND I

15   OBJECT TO IT AS INTRODUCING UTILITY INTO THE

16   TRIAL.

17

18       THE COURT:   OVERRULED.

19

20       MR. BALDWIN:   YOUR HONOR, WE'RE NOT

21   ATTEMPTING TO DO THAT, THE ONLY THING WE'RE

22   OFFERING THIS EXHIBIT FOR IS TO SHOW THAT THEY

23   WERE A SUBSCRIBER IN THE MAGAZINE, AND THAT THE

24   SAME MAGAZINE CONTAINED AN ARTICLE ON ASBESTOSIS.

25

1805

1    BY MR. BALDWIN:

2    Q        AND THIS IS PLAINTIFFS' EXHIBIT 399-J,

3    MARCH, 1930, THE SAME ISSUE OF ASBESTOS MAGAZINE

4    THAT WE TALKED ABOUT PREVIOUSLY, IS IT NOT,

5    DOCTOR?

6    A        THAT'S RIGHT, IT'S THE SAME MAGAZINE.

7    Q        NO, WE DID NOT WANT THAT, JUST THE ONE THAT

8    SHOWS WHERE -- AND IS THERE AN ADVERTISEMENT IN

9    THIS MAGAZINE BY FIBREBOARD?

10   A        NO.   THERE IS A NEWS REPORT ABOUT

11   FIBREBOARD.

12   Q        ALL RIGHT.

13   A        FIBREBOARD'S ACTIVITIES ON THE WEST COAST.

14   Q        IS THAT THE REFERENCE -- ALL RIGHT.   THERE'S

15   A REFERENCE TO FIBREBOARD IN THE MAGAZINE, IS

16   THAT WHAT YOU'RE SAYING, ITS ACTIVITIES?

17   A        YES.

18   Q        WITHOUT GOING INTO WHAT IT IS?

19   A        YES.

20   Q        NEXT EXHIBIT?

21   A        AND THIS IS THE ASBESTOSIS ARTICLE.

22   Q        IS THIS THE ARTICLE ON ASBESTOSIS?

23   A        YES, SIR.

24   Q        NOW, WHEN WE HAD THIS SAME MAGAZINE UP HERE

25   BEFORE ON CAREY WE WERE NOT ABLE TO FIND IT IN

1     OUR COPY OF THE ASBESTOS ARTICLE.  IS THAT

2     ARTICLE IN THIS SAME MAGAZINE?

3  A     YES.  THAT'S WHAT WE JUST SHOWED THE JURY

4     RATHER BRIEFLY.

5  Q     ALL RIGHT, SIR.

6

7     THE COURT:  MR. NORMAN, IS THERE ANOTHER

8     MARSHAL DOWNSTAIRS?

9

10     MR. NORMAN:  YOUR HONOR, I HAVE INFORMATION

11     THAT THERE IS.  I HAVE NOT SEEN HIM PERSONALLY.

12

13     THE COURT:  OKAY.

14

15  BY MR. BALDWIN:

16  Q     THIS IS PLAINTIFFS' EXHIBIT 402-D, AGAIN

17     COPIES OF WHICH WE WON'T GO OVER, BECAUSE WE'VE

18     ALREADY GONE OVER THEM ONCE, OF THE NIMA,

19     NATIONAL INSULATION MANUFACTURERS ASSOCIATION, IS

20     THAT CORRECT?

21  A     YES, SIR.

22  Q     AND DOES IT SHOW FIBREBOARD AS A MEMBER?

23  A     YES, IT DOES, IN 1960.

24  Q     AND ALSO KEASBY-MATTISON?

25  A     YES.

1807

1    Q        AND BALDWIN-EHRET?

2    A        BALDWIN-EHRET-HILL, YES.

3    Q        AND PITTSBURG-CORNING?

4    A        YES.

5    Q        AND OWENS-CORNING FIBREGLAS?

6    A        YES.

7    Q        AND WITHOUT SHOWING THE OTHER TWO ARTICLES,

8        WE'VE ALREADY SHOWN THEM TO THE JURY ONCE, SO I

9        WON'T DO IT AGAIN, IF YOU SUM UP THOSE THREE

10       ARTICLES, THE TWO ARTICLES, IT IS THAT THEY

11       PROPOSED A HEALTH PROGRAM AT ONE OF THE MEETINGS,

12       AT THE VERY NEXT MEETING THEY REJECTED THE HEALTH

13       PROGRAM, AND THEN IN THE FINAL MEETING THEY

14       DISCUSSED JOHNS-MANVILLE LABELING ITS PRODUCTS?

15   A        YES.  THIS IS IN THE PERIOD 1960 AND 1964.

16   Q        NOW, IF WE MAY HAVE THE CHART ON FIBREBOARD.

17       WOULD YOU SUMMARIZE THAT FOR US, DOCTOR?

18   A        FIBREBOARD WAS -- THEIR ACTIVITIES ON THE

19       WEST COAST WERE DESCRIBED IN THE TRADE MAGAZINE

20       IN 1930, AND THEY WERE A PROMINENT MEMBER OF THE

21       INDUSTRY, RATHER THEIR PREDECESSOR, PLANT RUBBER

22       AND ASBESTOS COMPANY, WAS.

23   Q        THAT SAME MAGAZINE FEATURED AN ARTICLE ON

24       ASBESTOSIS?

25   A        YES, SIR.  AND THEN DURING THE PERIOD, IN

1  THE 1950'S AND THE 1960'S, THERE WERE A NUMBER OF

2  WORKER'S COMPENSATION CONTRACT UNIT CLAIMS,

3  INCLUDING SOME WITH -- MANY WITH ASBESTOSIS, AND

4  SOME AS WELL WITH LUNG CANCER, INCLUDING MR.

5  RILEY'S CLAIM, INVOLVING NUMEROUS NOTICES TO THE

6  DEFENDANT COMPANIES IN EACH CASE.

7 Q  AND IS THERE A DOCUMENT, MEMA, AND THE

8  PRODUCT OFFERS NO HAZARD TO WORKMEN?

9 A  YES.   THIS IS SOMETHING THAT HASN'T BEEN

10  MENTIONED.   THIS IS MIMA, AS OPPOSED TO NIMA,

11  MIMA BEING THE PREDECESSOR TO NIMA, CALLED THE

12  MAGNESIA INSULATION MANUFACTURERS ASSOCIATION.

13  AND MIMA PUBLISHED A GUIDE TO THE USE OF EIGHTY-

14  FIVE PERCENT MAGNESIA INSULATION IN 1955.   AND IN

15  THIS GUIDE, WHICH CONTAINED NUMEROUS DESCRIPTIONS

16  OF HOW YOU WOULD APPLY THERMAL INSULATION --

17

18  MR. STEVENS:  YOUR HONOR, I WOULD LIKE TO

19  HAVE AN OPPORTUNITY TO REVIEW THE ARTICLE

20  THAT THIS WITNESS IS SPEAKING FROM, BECAUSE HE'S

21  SEEKING THINGS THAT ARE HEARSAY TO MY CLIENT AS

22  FAR AS I KNOW, AND I WOULD LIKE AN OPPORTUNITY TO

23  AT LEAST REVIEW THAT DOCUMENT BEFORE HE BEGINS TO

24  TESTIFY BEFORE THIS JURY, SO I HAVE A RIGHT TO

25  OBJECT TO THE OPINION HE'S ADDRESSING TO,

1809

1    AND WOULD ALSO LIKE TO CROSS-EXAMINE HIM AS TO THE

2    DOCUMENT.   IT DENIES ME A RIGHT OF

3    CROSS-EXAMINATION OF THE WITNESS.

4

5         THE COURT:  WELL, OVERRULED.

6

7    BY MR. BALDWIN:

8    Q        ARE YOU AWARE OF THE DOCUMENT THAT YOU'RE

9         TALKING ABOUT?

10   A        YES.   THIS IS A TYPESET PUBLISHED DOCUMENT

11        IN 1955.   AN EARLIER VERSION OF IT CAME OUT IN

12        1949.

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q       AND IT REFERS TO WHAT?

2   A       IT DESCRIBES HOW YOU APPLY MAGNESIA

3   INSULATION PRODUCTS, AND IT SAYS THAT IN THE 1955

4   EDIT, IT SAYS THESE WORDS, THAT THE PRODUCT

5   QUOTE, OFFERS NO HAZARD TO THE WORKMEN.  THAT'S A

6   SPECIFIC STATEMENT THAT IS CONTAINED AND A NUMBER

7   OF COMPANIES ARE MENTIONED IN THE N.I.M.A. MANUAL

8   WHICH I'M REFERRING TO HERE, INCLUDING PRODUCTS

9   OF FIBREBOARD COMPANY.

10  Q       ALL RIGHT, SIR.  AND THE NEXT ITEM?

11  A       THE NEXT ITEM ARE THE N.I.M.A. MINUTES,

12  WHICH WE'VE JUST DISCUSSED, WHERE THE HEALTH

13  PROGRAM IDEA WAS RAISED IN 1960 AMONG THE MEMBERS

14  OF THE INSULATION MANUFACTURERS ASSOCIATION AND

15  DROPPED OR REJECTED LATER IN 1960, THEN IN 1964

16  JOHNS-MANVILLE'S USE OF A WARNING LABEL ON ITS

17  INSULATION PRODUCTS WAS QUOTED VERBATUM IN THE

18  MINUTES OF THE TRADE ASSOCIATION IN 1964.

19  Q       THOSE ARE THE DOCUMENTS WE'VE SEEN EARLIER?

20  A       YES.

21  Q       NOW, DOCTOR, BASED ON THIS INFORMATION, THE

22  INFORMATION THAT YOU HAVE GATHERED ON FIBREBOARD,

23  DO YOU HAVE AN OPINION AS TO WHETHER OR NOT

24  FIBREBOARD HAD KNOWLEDGE THAT THERE WAS SUCH A

25  DISEASE AS ASBESTOSIS, THAT IT WAS A SERIOUS

1    DISEASE, AND IT WOULD CAUSE SERIOUS BODILY

2    CONDITIONS, AND THAT ASBESTOS WAS HARMFUL GOING

3    BACK TO THE THIRTIES?

4    A      YES, I DO.

5

6         MR. STEVENS:  YOUR HONOR, I'M GOING TO

7    IMPOSE A 703 OBJECTION ON THE BASIS OF THIS

8    OPINION.  THERE IS NO FOUNDATION FOR IT IN THE

9    EVIDENCE.

10

11        THE COURT:  WELL, THE JURY UNDERSTANDS THIS

12   WITNESS IS STATING HIS OPINION.  OVERRULED.

13

14   BY MR. BALDWIN:

15   Q      NOW, DOCTOR, DO WE HAVE EVIDENCE OF

16   FIBREBOARD PARTICIPATING IN THE ASBESTOS MAGAZINE

17   AND THE TWO ADDITIONAL TRADE ORGANIZATIONS?

18   A      WELL, WE HAVE EVIDENCE OF THE COMPANY BEING

19   PREDOMINATELY DESCRIBED IN THE TRADE MAGAZINE AND

20   PARTICIPATING IN THESE TRADE -- THESE TRADE

21   ASSOCIATIONS, THE PUBLICATION FOR THE PUBLIC, AND

22   THE MINUTES NOT MADE PUBLIC IN THE 1960'S, YES.

23   Q      WERE THEY -- DID THEY HAVE FREE ACCESS THEN

24   TO INFORMATION, EXCHANGE OF IDEAS BETWEEN OTHER

25   MEMBERS OFPTHE INDUSTRY THROUGH THOSE VARIOUS

1812

1      VEHICLES THAT YOU'VE JUST DESCRIBED?

2  A     YES.

3  Q     NOW, WE'LL TALK ABOUT PITTSBURGH-CORNING.

4      FIRST OR ALL, DOCTOR, DO YOU KNOW, OR DO YOU KNOW

5      WHETHER OR NOT PITTSBURGH-CORNING IS A JOINT

6      VENTURE BETWEEN PITTSBURGH PLATE GLASS AND THE

7      CORNING CORPORATION?

8  A     YES, I DO.

9  Q     FIRST, DOCTOR, WE'RE AT 399A, MAY 16, 1962,

10     IS A LETTER FROM RUDDICH TO BAUMNER, AND WHAT

11     DOES THAT PORTRAY, DOCTOR?

12  A    THIS IS A LETTER TO THE VICE PRESIDENT OF

13     PITTSBURGH-CORNING FROM A SAFETY AND PLANT

14     PROTECTION MANAGER AT PITTSBURGH PLATE GLASS

15     COMPANY, AND HE ATTACHES A NUMBER OF ARTICLES

16     RELATING TO THE HEALTH HAZARDS OF ASBESTOS.  SOME

17     OF THE ARTICLES ARE CALLED ASBESTOSIS, SOME OF

18     THEM ARE RECOGNIZABLE TO ME AS ARTICLES ABOUT THE

19     HAZARDS OF ASBESTOS.  THIS ONE CALLED THE

20     "HYGIENIC GUIDE SERIES ON ASBESTOS" IS SOMETHING

21     FROM THE AMERICAN INDUSTRIAL HYGIENE ASSOCIATION,

22     AND IT MAKES PROMINENT MENTION OF THE FACT THAT

23     ASBESTOS WAS SUSPECTED OF CAUSING CANCER.  MR.

24     BALDWIN, I THINK HAD WRITTEN THE WORD "CANCER" ON

25     HERE.  IT DID NOT APPEAR ON THE ORIGINAL LETTER,

1   JUST TO MAKE IT CLEAR TO THE JURY, AS THE LETTER

2   ACTUALLY WENT TO THE VICE PRESIDENT OF

3   PITTSBURGH-CORNING, AND THERE'S ALSO MENTION

4   THERE OF THE INDUSTRIAL HYGIENE FOUNDATION DOWN

5   BELOW AND THE AVAILABILITY OF ITS SERVICES TO

6   PITTSBURGH-CORNING CORPORATION.

7   Q       NOW, TO PUT THIS IN PROSPECTIVE, IS IT NOT A

8   FACT THAT THE PITTSBURGH-CORNING OPERATION BEGAN

9   IN JUNE OR JULY OF 1962?

10   A       IT BEGAN IN 1962.  PITTSBURGH-CORNING BECAME

11   A MANUFACTURER OF THERMAL INSULATION PRODUCTS

12   CONTAINING ASBESTOS IN THEM.

13   Q       THEY HAD AMONG OTHER THINGS, THIS PLANT

14   LOCAL OVER HERE IN TYLER, TEXAS, IS THAT NOT

15   CORRECT?

16   A       YES, THAT'S CORRECT.

17   Q       AND THIS LETTER, DOES IT INDICATE THEN, AT

18   LEAST ASSUMING THE PLANT BEGAN IN JULY OF '62,

19   THAT FROM THE VERY INCEPTION OF

20   PITTSBURGH-CORNING THEY HAD INFORMATION ABOUT

21   ASBESTOS AND THE DANGERS OF ASBESTOS AS IT

22   RELATED TO ASBESTOSIS, PARTICULARLY ASBESTOS AND

23   CANCER, IS THAT TRUE?

24   A       YES, THE LETTER SO INDICATES.

25   Q       AND IT CAME FROM PITTSBURGH PLATE GLASS

1814

1       WHICH OWNED FIFTY PERCENT OF PITTSBURGH-CORNING,

2       IS THAT RIGHT?

3   A       RIGHT.

4   Q       NEXT DOCUMENT.  AND AGAIN, DID THAT DOCUMENT

5       MAKE THE SERVICES OF THE INDUSTRIAL HYGIENE

6       FOUNDATION AVAILABLE TO PITTSBURGH-CORNING?

7   A       YES.

8   Q       AND THE INDUSTRIAL HYGIENE FOUNDATION IS THE

9       ONE THAT PUBLISHED THE ARTICLE ABOUT CANCER, OR

10      PASSED THE ARTICLE ABOUT CANCER OUT TO ITS

11      MEMBERS, BUT THAT WOULD HAVE BEEN LONG BEFORE

12      THIS, WOULDN'T IT?

13  A       INDUSTRIAL HYGIENE FOUNDATION WAS THE SAME

14      OUTFIT THAT PUBLISHED THE INDUSTRIAL HYGIENE

15      DIGEST, AND THAT CERTAINLY INCLUDED A NUMBER OF

16      ARTICLES OR SUMMARIES OF ARTICLES ABOUT

17      ASBESTOSIS AND LUNG CANCER FROM ASBESTOS.

18  Q       ALL RIGHT.  NOW, GO AHEAD.  399B.  ANOTHER

19      LETTER ON THAT LETTERHEAD OF PITTSBURGH PLATE

20      GLASS, MAY 25, '62.  COULD YOU TELL US WHAT THAT

21      IS, DOCTOR?

22  A       THIS IS A COUPLE OF WEEKS AFTER THE ONE THAT

23      WE JUST SHOWED THE JURY, AND HERE ADDITIONAL

24      ARTICLES ARE ENCLOSED RELATING TO THE HAZARDS OF

25      ASBESTOS AND THE, ACCORDING TO THIS, THE LIBRARY

1815

1       CAME THROUGH "AND I FEEL YOU NOW HAVE AMPLE

2       REFERENCE MATERIAL ABOUT ASBESTOS AND ITS

3       EFFECTS," WRITES PITTSBURGH PLATE GLASS COMPANY

4       TO THE VICE PRESIDENT OF PITTSBURGH-CORNING

5       CORPORATION.

6    Q       NOW, DOCTOR, THIS IS 399H, AND IT'S APRIL

7       21, 1966.  IT'S HARD TO READ, AND I'M GOING TO

8       PUT A RETYPED IN THE MACHINE SO IT WILL BE EASIER

9       TO READ.  THE SAME EXHIBIT.  THIS IS A MEMORANDUM

10      BY DR. LEE GRANT.  CAN YOU TELL US WHO HE IS?

11   A       WELL, HE WAS THE CORPORATE MEDICAL DIRECTOR

12      FOR PITTSBURGH PLATE GLASS.

13   Q       WHICH OWNED HALF INTEREST IN

14      PITTSBURGH-CORNING?

15   A       YES.

16   Q       ALL RIGHT.

17   A       WHAT HE SAYS HERE IS "DR. IRVING SELIKOFF -- "

18   Q       WELL --

19   A       SORRY.

20   Q       GO RIGHT AHEAD.

21   A       "DR. IRVING SELIKOFF, A PHYSICIAN AT THE

22      MOUNT SINAI HOSPITAL IN NEW YORK HAS MADE

23      UNWARRANTED AND UNSCIENTIFICALLY BASED CLAIMS

24      CONCERNING THE HEALTH HAZARDS ASSOCIATED WITH THE

25      USE OF ASBESTOS AND FIBERGLASS MATERIALS IN THE

1816

1    CONSTRUCTION INDUSTRY.

2  Q    NOW, JUST A MINUTE, DOCTOR.  I WANT TO ASK

3    YOU A COUPLE OF THINGS ON THAT IN CONNECTION.

4    FIRST OF ALL, I THINK THE EVIDENCE IN THIS RECORD

5    SHOWS THAT THE DR. LEE GRANT IS THE CONSULTANT TO

6    THE PITTSBURGH-CORNING AS MEDICAL DIRECTOR.

7  A    YES.

8  Q    NOW, IT HAS BEEN SAID IN THIS COURT BY THE

9    DEFENDANTS THAT THE STUDIES OF DR. SELIKOFF WERE

10    A CLASSIC, THEY HAVE BEEN CHARACTERIZED AS

11    LANDMARK, I BELIEVE THE STATEMENT HAS BEEN MADE

12    THAT THERE WAS NO REAL INFORMATION ABOUT ASBESTOS

13    THAT WAS RELIABLE UNTIL THE STUDY OF DR. SELIKOFF

14    CAME ALONG.  NOW, I'LL ASK YOU IF THIS IS THE

15    SAME DR. SELIKOFF THAT HAS BEEN REFERRED TO.

16

17    MR. CROSBY:  EXCUSE ME, PLEASE, DOCTOR.

18    YOUR HONOR, THE QUESTION IS ARGUMENTATIVE IN THAT

19    THE DEFENDANTS HAVE POINTED OUT THAT IN 1984 IT

20    WAS RECOGNIZED AS A LANDMARK, NOT IN 1964, BUT

21    '84 IT WAS RECOGNIZED AS A LANDMARK, AND THIS

22    MISCHARACTERIZES THAT.

23

24    THE COURT:  OVERRULED.  GO AHEAD.

25

BOYD-PARKS REPORTERS

1817

1    BY MR. BALDWIN:

2    Q        THE DEFENDANT REITERATES THAT -- HE STATES

3         THAT DR. SELIKOFF'S ARTICLE IS A LANDMARK AND A

4         CLASSIC ARTICLE, THE ONLY RELIABLE ARTICLE ON

5         ASBESTOSIS BEFORE ITS TIME, AND I'LL ASK YOU IF

6         THAT IS THE SAME DR. SELIKOFF THAT'S BEING

7         REFERRED TO IN THIS LETTER?

8    A        YES, THIS IS DR. IRVING J. SELIKOFF.

9    Q        AT MOUNT SINAI?

10   A        YES.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1818

BY MR. BALDWIN:

Q       AND THEY SAID HE'S MADE SOME UNWARRANTED AND
UNSCIENTIFICALLY BASED CLAIMS, IS THAT CORRECT?

A       YES.

Q       AND WHAT IS THE NEXT LANGUAGE?

A       THEY SAY, "INDUSTRY HAS NOT ACCOMPLISHED
AND/OR PUBLISHED IN PLANT ENVIRONMENTAL STUDIES
NOR RESEARCH LABORATORY INVESTIGATIONS WHICH
COULD BE USED TO REFUTE DR. SELIKOFF'S CLAIMS.
THE JOHNS-MANVILLE CORPORATION HAS BEEN DOING
ENVIRONMENTAL AND MEDICAL STUDIES IN THEIR
ASBESTOS WORKERS." OWENS-CORNING IS ALSO
MENTIONED.

Q       IS THIS EVIDENCE OF PITTSBURG-CORNING
JOINING THE CONSPIRACY OF SILENCE TO SHAPE AND
FIX THE LITERATURE, DOCTOR?

        MR. COOK:  YOUR HONOR, I RENEW THE
OBJECTION I MADE YESTERDAY CONCERNING HIS
EXPERTISE, IT'S ARGUMENTATIVE AND SPECULATION.

        THE COURT:  COUNSEL, HOW MANY TIMES DO I
NEED TO RULE ON IT?

        MR. COOK:  THIS IS THE FIRST TIME I OBJECTED T

1819

1    YOUR HONOR.  WE'RE TALKING ABOUT MY DOCUMENTS

2    NOW.

3

4         THE COURT:  OVERRULED.

5

6         THE WITNESS:  WELL, IT CERTAINLY SHOWS A

7    WIDE-SPREAD AWARENESS OF THE ACTIVITIES OF OTHER

8    COMPANIES IN THE INDUSTRY BY PITTSBURG-CORNING.

9

10   BY MR. BALDWIN:

11   Q       READ THE NEXT PART, DOCTOR, THAT HAS BEEN

12   HIGHLIGHTED.

13   A       "THERE IS CONSIDERABLE RELUCTANCE ON THE PART

14   OF A COMPANY TO PUBLISH SUCH INFORMATION

15   CONCERNING THEIR COMPANY IN THE SCIENTIFIC

16   LITERATURE, IF IT IS IDENTIFIED AS THEIR

17   COMPANY'S DATA.  DR. SELIKOFF'S ACTIVITIES HAVE

18   STIMULATED AN URGENT NEED FOR INDUSTRY TO

19   CONTRIBUTE ITS EXPERIENCE TO THE SCIENTIFIC

20   LITERATURE.  THIS COULD BE DONE ON AN

21   INDUSTRY-WIDE BASIS THROUGH THE INDUSTRIAL

22   HYGIENE FOUNDATION, PRESERVING THE ANONYMITY OF

23   THE PARTICIPATING COMPANIES."

24   Q       SO, IS THIS A SUGGESTION BY

25   PITTSBURG-CORNING THAT THE INDUSTRIAL HYGIENE

1820

1     FOUNDATION BE USED TO PUBLISH LITERATURE SO THAT

2     ITS NAME NOT BE USED?

3   A     YES.

4   Q     AND WHERE DOES THAT FIT IN YOUR CONSPIRACY

5     OF SILENCE, DOCTOR, ITEM TWO --

6   A     I SUPPOSE -- WELL --

7   Q     -- OR ITEM ONE?

8   A     WELL, THE NAMING OF THE COMPANY WOULDN'T BE

9     SO IMPORTANT IF THEY WOULD PUBLISH THEIR

10     EXPERIENCES.  THE FAILURE TO PUBLISH HAS REALLY

11     BEEN THE PROBLEM.

12   Q     GO AHEAD, DOCTOR.

13   A     IT WAS FELT THAT THE MOST SERIOUS EFFECT OF

14     DR. SELIKOFF'S CLAIMS HAVE BEEN ON CUSTOMER AND

15     GENERAL PUBLIC RELATIONS.  THE PUBLIC WILL

16     HESITATE TO USE A PRODUCT THAT IS PURPORTED TO BE

17     ASSOCIATED WITH SERIOUS HEALTH IMPLICATIONS.

18   Q     GO AHEAD.

19   A     JOHNS-MANVILLE CORPORATION HAS PAID OFF ON

20     FIVE OR SIX MESOTHELIOMA CASES WHERE THEY WERE

21     ASSOCIATED WITH SIGNIFICANT PULMONARY FIBROSIS

22     AND MASSIVE DUST EXPOSURES.

23   Q     SO, IS THIS DOCUMENT HERE EVIDENCE OF THE

24     FACT THAT YOU HAVE AT LEAST THREE COMPANIES, OR

25     AT LEAST REFER TO THREE COMPANIES, ACTING TO

1821

1       CRITICIZE AND TO MINIMIZE THE REPORTS OF DR.

2       SELIKOFF ABOUT THE DANGERS OF ASBESTOS?

3   A     YES.  AT LEAST IN THEIR INTERNAL DOCUMENTS

4       THEY HAVE BEEN RATHER CRITICAL OF DR. SELIKOFF

5       FOR A NUMBER OF REASONS.

6   Q     GO AHEAD NOW.  THE NEXT, WOULD YOU READ THE

7       PERTINENT PART OF THE THIRD PAGE OF THAT DOCUMENT?

8   A     THIS IS 1966, "THE REACTIVATION OF THE

9       NATIONAL INSULATION MANUFACTURERS ASSOCIATIONS

10      HEALTH AND SAFETY COMMITTEE WAS DISCUSSED WITH

11      MR. F. H. EDWARDS OF OWENS-CORNING FIBREGLAS

12      CORPORATION, AND MR. C. L. SCHECKLER OF

13      JOHNS-MANVILLE CORPORATION," WHO WILL BE THEIR

14      COMPANY'S REPRESENTATIVES ON THIS COMMITTEE.

15      "IT WAS FELT THAT OUR RESPECTIVE COMPANIES

16      WOULD BE ABLE TO CONTRIBUTE SIGNIFICANTLY BY

17      A CLOSE STUDY OF OUR OWN EXPERIENCES IN HANDLING

18      ASBESTOS AND FIBERGLASS MATERIALS.

19   Q     AND IS THAT EVIDENCE OF CONSORTED ACTION

20      BETWEEN THE COMPANIES TO ACHIEVE A COMMON

21      PURPOSE?

22   A     YES.  IN THIS CASE IT LOOKS LIKE A GOOD

23      PURPOSE.

24   Q     NEXT DOCUMENT.  399-G, COULD YOU READ THE

25      HIGHLIGHTED PORTION OF THAT, DOCTOR?

1822

1   A        THEY REFER TO CONCERNS STIMULATED BY PUBLIC

2        NEWS MEDIA ARTICLES ATTRIBUTED TO DR. SELIKOFF,

3        AND SAY, "IT IS THE OPINION OF MANY PERSONS

4        WITHIN THE SCIENTIFIC COMMUNITY THAT THE

5        STATEMENTS ATTRIBUTED TO DR. SELIKOFF ARE NOT

6        SCIENTIFICALLY SOUND."

7   Q        ARE THESE THE SAME STATEMENTS THEY'RE NOW

8        CALLING CLASSIC AND LANDMARK, AND THE ONLY

9        RELIABLE STUDY PUBLISHED ON ASBESTOSIS?

10  A        WELL, I HAVEN'T HEARD THAT TESTIMONY, OF

11        COURSE.

12  Q        WELL, IF THEY SO CHARACTERIZED IT, WOULD

13        THAT BE IN HARMONY WITH WHAT THEY'RE SAYING HERE?

14  A        IT WOULD CONTRADICT WHAT THEY'RE SAYING

15        HERE.

16  Q        NEXT.

17  A        THE NATIONAL INSULATION MANUFACTURERS

18        ASSOCIATION, NIMA, AT AN APRIL 12, 1966, MEETING

19        DECIDED TO ESTABLISH A HEALTH AND SAFETY

20        COMMITTEE WHICH WOULD CONSIDER APPROPRIATE

21        MEASURES TO COMBAT ADVERSE OPINIONS WITH RESPECT

22        TO THE HEALTH AND SAFETY ASPECTS OF THERMAL

23        INSULATION ASBESTOS AND MINERAL FIBER.  THIS --

24  Q        IS THAT AT THE VERY LEAST AN EFFORT TO SHAPE

25        THE LITERATURE AND INFLUENCE THE LITERATURE?

1823

1    A      YES.

2    Q      ALL RIGHT.  GO AHEAD AND FINISH YOUR

3        STATEMENT.

4    A      "THIS COMMITTEE IS SCHEDULED TO MEET ON MAY

5        10, 1966, IN THE NIMA OFFICE IN NEW YORK.  THE

6        INDUSTRIAL HYGIENE FOUNDATIONS RESEARCH PROPOSAL,

7        AS WELL AS THE WAYS AND MEANS OF BETTER UTILIZING

8        OUR INDUSTRY-WISE HEALTH EXPERIENCES, APPEARS TO

9        BE APPROPRIATE SUBJECTS FOR THE NIMA COMMITTEE.

10       INASMUCH AS I AM A MEMBER OF THIS COMMITTEE,

11      I WOULD LIKE AN EXPRESSION OF OPINION FROM YOU

12      CONCERNING THE DEGREE TO WHICH PITTSBURG-CORNING

13      CORPORATION IS WILLING TO FINANCIALLY SUPPORT THE

14      INDUSTRIAL HYGIENE FOUNDATION'S RESEARCH PROPOSAL

15      AND PARTICIPATE IN THE STUDIES."

16    Q      SO, HERE WE HAVE DR. GRANT, THE MEDICAL

17      DIRECTOR OF PITTSBURG PLATE GLASS, WHICH OWNED

18      FIFTY PERCENT OF PITTSBURG-CORNING, AND WHO IS A

19      MEDICAL CONSULTANT FOR PITTSBURG-CORNING, ASKING

20      TO WHAT EXTENT THEY WOULD BE WILLING,

21      PITTSBURG-CORNING, WOULD BE WILLING TO FINANCE

22      THE INDUSTRIAL HYGIENE FOUNDATION THAT WE HAVE

23      TALKED ABOUT?

24    A      RIGHT.  TO DO --

25    Q      IS THAT THE SAME ONE THAT SOME PEOPLE HAVE

1824

1      REFERRED TO AS THE CREATURE OF INDUSTRY?

2    A       YES.

3    Q       NOW, DOCTOR, I BELIEVE THAT'S THE END OF THE

4    DOCUMENTS ON PITTSBURG-CORNING.  BEFORE WE GET TO

5    THE BOARD, MAY I ASK YOU THIS -- I DON'T WANT TO

6    BE UNDULY REPETITIOUS, BUT I WOULD LIKE TO PUT IT

7    IN CONTEXT.

8

9       THE COURT:  ARE YOU READY FOR THE LIGHTS?

10

11      MR. BALDWIN:  YEAH, THAT WOULD BE ALL RIGHT.

12

13   BY MR. BALDWIN:

14   Q       I WOULD LIKE TO PUT IT IN CONTEXT, THE

15   TESTIMONY OF DR. GAZE, SO COULD YOU JUST TELL US --

16   MR. HOUSTON HAS READ A SUMMARY, SO LET'S NOT BE

17   REPETITIOUS, JUST HIT THE HIGHLIGHTS OF WHAT DR.

18   GAZE HAS SAID AS IT RELATES TO PITTSBURG-CORNING

19   SO WE'LL HAVE IT IN CONTEXT.

20

21      MR. COOK:  YOUR HONOR, I OBJECT TO HIS

22   TESTIMONY ABOUT THE DEPOSITION TESTIMONY OF DR.

23   GAZE.  IT IS DOUBLE HEARSAY, IT IS REPETITIOUS,

24   HE HAS NOT BEEN SHOWN TO BE COMPETENT AS AN

25   EXPERT ON DEPOSITION READING AND INTERPRETATION.

1825

1    I WOULD HAVE A 703 OBJECTION AS WELL, YOUR HONOR.

2

3        THE COURT:  OVERRULED.

4

5        THE WITNESS:  "DR. GAZE, WHO WAS CHIEF

6    SCIENTIST WITH CAPE ASBESTOS, THE SUPPLIER OF THE

7    ASBESTOS USED BY PITTSBURG-CORNING, HAS TESTIFIED

8    THAT BETWEEN THE YEARS 1961 AND 1971 HE WAS

9    CONTINUOUSLY ADVISING THE OFFICIALS OF THE

10   PITTSBURG-CORNING CORPORATION ABOUT THE HAZARDS

11   OF ASBESTOS, WHICH HIS COMPANY WAS SUPPLYING TO THE

12   AS A RAW MATERIAL, AND THAT HE EVEN FLEW A COUPLE

13   OF THESE GUYS UP TO SEE A PLANT WHERE INSULATION

14   WAS BEING MADE WITH CAPE ASBESTOS, IN A WAY

15   WHICH DR. GAZE FELT WAS PROPER FROM AN

16   INDUSTRIAL HYGIENE DESIGN STANDPOINT.  AND THAT

17   WAS AT THE BEGINNING OF PITTSBURG-CORNING'S ENTRY

18   INTO THE INSULATION MANUFACTURING BUSINESS IN

19   1961 OR '62."

20   Q       AND I BELIEVE THAT THE SUMMARY WAS THAT HE

21   TOLD THEM EACH YEAR THEREAFTER ABOUT THE HAZARDS

22   OF ASBESTOSIS?

23   A       YES.  DR. GAZE SO TESTIFIED.

24   Q       NOW, WOULD YOU SUMMARIZE THEN THIS CHART

25   THAT WE'VE PREPARED TO HIT THE HIGHLIGHTS OF YOUR

1826

1    TESTIMONY FOR ILLUSTRATIVE PURPOSES, PLEASE, SIR?

2    A        OKAY.  WELL, THE FIRST ITEM IS DR. GAZE,

3    WHOM I'VE JUST GONE OVER, THE SECOND IS THE TWO

4    LETTERS IN 1962, ATTACHING DOCUMENTS RELATING TO

5    THE HEALTH HAZARDS OF ASBESTOS PROVIDED BY

6    PITTSBURG PLATE GLASS TO PITTSBURG-CORNING.  THE

7    THIRD ITEM IS THE PARTICIPATION OF

8    PITTSBURG-CORNING IN NIMA, THE NATIONAL

9    INSULATION MANUFACURERS ASSOCIATION, WHERE IN

10   1960 THE IDEA OF A HEALTH COMMITTE WAS CONSIDERED

11   AND REJECTED, AND THE SAME HEALTH COMMITTEE

12   APPARENTLY BEING ESTABLISHED IN 1966 ACCORDING TO

13   THE DOCUMENTS WE'VE JUST SEEN, AND IN 1964 THE

14   WARNING LABELS USED ON THE JOHNS-MANVILLE CARTONS

15   OF INSULATION BEING QUOTED VERBATIM IN THE TRADE

16   ASSOCIATION'S MINUTES, IN WHICH PITTSBURG-CORNING

17   WAS A PARTICIPANT.

18        AND IN 1966 THE INTERNAL DOCUMENTS VERY

19   STRONGLY ATTACKING DR. SELIKOFF'S WORK, AND

20   DESCRIBING THE NEED TO POSSIBLY ORGANIZE SOME

21   KIND OF DEFENSIVE RESEARCH TO GET PUBLISHED IN

22   THE LITERATURE AND COUNTER THE ADVERSE PUBLICITY

23   CREATED BY SELIKOFF'S ACTIVITIES.

24   Q        DOCTOR, DO YOU HAVE ANY EVIDENCE, ANY

25   DOCUMENTATION WHATSOEVER, THAT PITTSBURG-CORNING

1827

1    AT ANY TIME MADE ANY EFFORT TO TEST ITS OWN

2    PRODUCTS TO DETERMINE THE DUST LEVELS THAT MIGHT

3    BE GENERATED WHEN IT WAS SAWED, OR CUT, OR USED

4    BY -- AS IT WOULD BE USED BY AN INSULATOR OR AN

5    END PRODUCT USER?

6    A    NO, I'VE NEVER SEEN ANY DOCUMENTATION TO THE

7    EFFECT THAT THIS COMPANY EITHER TESTED THESE

8    PRODUCTS AS DESCRIBED BY MR. BALDWIN, OR PUT

9    WARNING LABELS ON THEM.

10   Q    THAT WAS GOING TO BE MY NEXT QUESTION, THEY

11   DID -- THEY WERE A PARTICIPANT IN NIMA I BELIEVE

12   YOU SAID?

13   A    YES.

14   Q    AND THE NIMA RECORDS CLEARLY REFLECT THE

15   J.M. WARNING LABELS IN 1964?

16   A    YES.

17   Q    AND IS IT YOUR TESTIMONY THAT YOU HAVE SEEN

18   NO EVIDENCE OR DOCUMENTATION, OR EVIDENCE OF ANY

19   NATURE, THAT THEY AT ANY TIME EVER PLACED ANY

20   WARNING OR CAUTION LABELS ON THEIR PRODUCTS?

21   A    I'VE SEEN OCCASIONAL ANSWERS TO

22   INTERROGATORIES TO THAT EFFECT, BUT I'VE NEVER

23   SEEN ANY CORPORATE DOCUMENTS WHICH WOULD SUPPORT

24   THOSE ANSWERS TO INTERROGATORIES.

25   Q    THAT THEY LABELED THEIR PRODUCTS?

1828

1    A        THAT THEY LABELED THEIR PRODUCTS.   AND THE

2        ANSWERS TO INTERROGATORIES, I BELIEVE, SAID THAT

3        THEY LABELED THE PRODUCTS IN 1986.

4              SO, THAT WAS THE COMPANY'S OWN VERSION OF

5        WHEN IT PUT WARNING LABELS ON ITS PRODUCTS.   AND

6        I HAVEN'T SEEN ANYTHING TO CORROBORATE THAT

7        CLAIM.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1829

1   Q      DOCTOR, TO PUT IT IN A SHORTHAND RENDITION

2   OR A SHORTHAND FASHION, DO YOU HAVE AN OPINION AS

3   TO WHETHER OR NOT PITTSBURGH-CORNING ACTED IN

4   CONCERT WITH OTHER MEMBERS OF THE INDUSTRY FOR A

5   COMMON PURPOSE?

6   A      I DO.

7   Q      WHAT IS YOUR OPINION?

8   A      THEY DID.

9   Q      AND, DOCTOR, DO YOU HAVE AN OPINION AS TO

10   WHETHER OR NOT PITTSBURGH-CORNING JOINED IN THE

11   CONSPIRACY OF SILENCE THAT THE OTHER MEMBERS OF

12   THE INDUSTRY PARTICIPATED IN?

13   A      YES, I DO.

14   Q      AND WHAT IS THAT OPINION?

15   A      YES, THEY DID JOIN THIS CONSPIRACY OF

16   SILENCE.

17   Q      WHAT ELEMENTS OF YOUR CONSPIRACY OF SILENCE

18   DID THEY PARTICIPATE IN?

19   A      MAINLY A COVER-UP. I DON'T KNOW THAT THERE

20   WAS EVER ANY INDUSTRY STUDY THAT, DONE BY THE

21   INDUSTRIAL HYGIENE FOUNDATION THAT ACTUALLY DID

22   PUBLISH THE INDUSTRIES' EXPERIENCES WITH RESPECT

23   TO THE HAZARDS OF INSULATION PRODUCTS, AT LEAST

24   TO PRODUCT USERS. THE INDUSTRY DID EVENTUALLY

25   START CONTRIBUTING MONEY TO DR. SELIFOFF'S

```
1         LABORATORY.  PERHAPS THIS WAS THE WAY IT WAS

2         ULTIMATELY DONE.

3    Q         AND DID THEY PARTICIPATE IN PROTECTING THE

4         INDUSTRY --

5    A         YES.

6    Q         -- PRESERVING IT?

7    A         YES, THEY DID.

8    Q         NEXT, KEENE CORPORATION.  BEFORE WE TURN THE

9         LIGHTS OUT, DOCTOR, I WISH YOU WOULD LOOK AT THIS

10        EXHIBIT HERE, PLAINTIFFS' EXHIBIT NUMBER 397G,

11        AND TELL US WHAT IT IS.

12   A         THESE ARE EXCERPTS FROM MOODY'S INDUSTRIAL

13        MANUAL, WHICH IS A RELIABLE SOURCE OF INFORMATION

14        ON HISTORY OF CORPORATIONS, HISTORY OF

15        ACQUISITIONS AND SALES OF WHEN THEY'RE BUYING AND

16        SELLING COMPANIES AND DIVISIONS AND THINGS LIKE

17        THAT.

18   Q         IS THAT A RECOGNIZED TREATIS IN THAT REGARD?

19   A         YES, IT IS.

20   Q         SOMETHING THAT YOU WOULD RELY UPON?

21   A         YES.  IT'S PUBLISHED BY MOODY'S INVESTOR'S

22        SERVICE, A COMPANY OF THE DUNN AND BRADSTREET

23        CORPORATION.

24   Q         COULD YOU LOOK AT THAT AND BRIEFLY TELL THE

25        JURY, OUTLINE FOR THE JURY THE CORPORATE HISTORY
```

1    OF THE KEENE CORPORATION?

2  A      WELL, THE KEENE CORPORATION --

3

4        MR. WEBER:  YOUR HONOR, I JUST HAVE A BEST

5    EVIDENCE OBJECTION PLUS THE OTHER OBJECTIONS I

6    HAVE MADE.

7

8        THE COURT:  OVERRULED.

9

10        THE WITNESS:  -- IN 1968 AQUIRED

11   NINETY-EIGHT PERCENT OF THE OUTSTANDING CAPITAL

12   STOCK OF BALDWIN-EHERT-HILL, INCORPORATED AND IT

13   SAYS SUBSEQUENTLY SOLD, AND PREVIOUS TO THAT,

14   BALDWIN-EHERT-HILL'S HISTORY IS GIVEN, OR -- THIS

15   IS BALDWIN-HILL.  WE DON'T HAVE

16   BALDWIN-EHERT-HILL.  IT JUST TALKS ABOUT

17   BALDWIN-HILL AS A MANUFACTURER INCORPORATED IN

18   1935.  SO, IT WAS BALDWIN-HILL, THEN BALDWIN-HILL

19   AND EHERT MAGNESIA BECAME BALDWIN-EHERT-HILL SOME

20   TIME AFTER 1935, AND THEN BALDWIN-EHERT-HILL WAS

21   ABSORBED BY THE KEENE CORPORATION.

22

23        THE COURT:  MR. WEBER, AS I UNDERSTAND IT,

24   THAT INFORMATION IS NOT CONTESTED, IS IT?

25

BOYD-PARKS REPORTERS

1832

1    MR. WEBER:  NO, SIR.  EXCEPT THAT I WOULD

2    OBJECT TO THE LAST CONCLUSION AS IT WAS ABSORBED

3    BY KEENE CORPORATION.  WE DON'T CONTEST THAT THEY

4    ACQUIRED NINETY-EIGHT PERCENT OF THE STOCK IN

5    1968 --

6

7    MR. HOUSTON:  IT'S ALREADY IN EVIDENCE,

8    OTHERWISE, FROM YOUR INTERROGATORIES.

9

10    MR. WEBER:  YES, THAT'S NO PROBLEM.  YOUR

11    HONOR, WE WOULD OBJECT TO SIDEBAR REMARKS MADE BY

12    COUNSEL --

13

14    THE COURT:  SUSTAINED.

15

16    MR. WEBER:  -- THAT MIGHT BE HEARD BY THE

17    JURY, AND WE REQUEST THAT HE REFRAIN FROM IT --

18

19    THE COURT:  THE REQUEST IS GRANTED.

20

21  BY MR. BALDWIN:

22  Q    DR. CASTLEMAN, I'VE HANDED YOU THE

23    PLAINTIFFS' EXHIBIT NUMBER ONE.

24  A    399H.

25  Q    AND IS THAT AGAIN THE ASBESTOS MAGAZINE 1930

BOYD-PARKS REPORTERS

1833

1        THAT WE DON'T NEED TO PUT BACK IN THE MACHINE?

2   A        YES.  RIGHT.

3   Q        AND DID NOT KEENE ADVERTISE IN THAT ISSUE OF

4        THAT MAGAZINE OR ONE OF ITS SUCCESSORS?

5        PREDECESSORS IS A BETTER WORD FOR IT.

6   A        YES.  AS --

7   Q        IF SO, WHICH?

8

9        MR. WEBER:  YOUR HONOR, MAY I MAKE MY

10        OBJECTION, AND THESE OBJECTIONS WILL GO TO THIS

11        EXHIBIT PLUS THE ONE OR TWO OF THE OTHERS THAT I

12        ANTICIPATE.  SO, LET ME DO SO.  WE WOULD MAKE A,

13        FIRST OF ALL, A MATERIALITY OBJECTION BECAUSE THE

14        ISSUE HERE IS NOT WHEN THE PEOPLE IN THE ASBESTOS

15        BUSINESS KNEW THAT ASBESTOS CAUSES ASBESTOSIS,

16        WHICH IS WHAT IS ADDRESSED IN THIS ASBESTOS

17        MAGAZINE, BUT RATHER WHEN THE ASBESTOS COMPANIES

18        KNEW OR SHOULD HAVE KNOWN THAT END USERS OF

19        INSULATION --

20

21        MR. HOUSTON:  EXCUSE ME.

22

23        MR. WEBER:  -- CONTAINING ASBESTOS PRODUCTS

24        WERE AT UNUSUAL RISK --

25

BOYD-PARKS REPORTERS

1834

1       MR. HOUSTON:  EXCUSE ME.

2

3       MR. WEBER:  -- OF HAZARD --

4

5       THE COURT:  MR. WEBER, JUST A MINUTE.  HE

6   ASKED YOU.

7

8       MR. HOUSTON:  YOUR HONOR, NOW, THIS IS

9   CLEARLY A SPEECH MAKING ON THE PART OF COUNSEL IN

10  THE GUISE OF AN OBJECTION.  I OBJECT TO IT.  IT'S

11  BEEN DONE TOO MANY TIMES, AND THIS IS CLEARLY

12  SPEECH MAKING AND AN OBVIOUS ATTEMPT TO INTERRUPT

13  THE PLAINTIFFS' PRESENTATION OF EVIDENCE, AND I

14  OBJECT TO IT.

15

16      THE COURT:  I THINK, GENTLEMEN, THE JURY

17  UNDERSTANDS VERY WELL BOTH SIDES' POSITION ON THE

18  QUESTION AND WILL HAVE TO MAKE A DECISION AT THE

19  APPROPIATE TIME.

20

21      MR. WEBER:  IN ADDITION, YOUR HONOR, I HAVE

22  A 102 RULE OBJECTION.  I KNOW THE COURT IS

23  FAMILIAR WITH THAT RULE.  I HAVE AN OBJECTION

24  UNDER RULE 403, NOT BASED ON PERSONAL KNOWLEDGE,

25  AN OBJECTION UNDER 703, WHICH IS THE PREJUDICIAL

1835

1    VALUE OUTWEIGHS ANY PROBATIVE VALUE IT MIGHT

2    HAVE, AND A 602 OBJECTION, AND THOSE OBJECTIONS I

3    BELIEVE ARE THE ONES I WISH TO URGE.

4

5         THE COURT:  ALL RIGHT.  OVERRULED.

6

7    BY MR. BALDWIN:

8    Q        WHERE WERE WE?

9    A        WELL, WE WERE UP TO THE ARTICLE ON

10       ASBESTOSIS AND THE ADVERTISEMENT.

11   Q        YES, SIR.  YOU WERE ABOUT TO TELL US WHAT

12       THE ADVERTISEMENT IN THAT MAGAZINE IS.

13   A        WELL, EVERY MONTH OF THAT YEAR

14       EHERT-MAGNESIA HAD AN ADVERTISEMENT ON THE INSIDE

15       BACK COVER OF THE ASBESTOS MAGAZINE JUST

16       PICTURING THESE VARIOUS PIPE COVERING AND BLOCK

17       INSULATION MATERIALS.

18   Q        WITHOUT REITERATING, WAS THAT THE SAME

19       MAGAZINE THAT CARRIED THE ARTICLE ABOUT THE

20       HAZARDS OF ASBESTOS AND ASBESTOSIS?

21   A        YES.

22   Q        NOW, WERE OR NOT, DOCTOR, THERE SOME

23       WORKMANS' COMPENSATION CLAIMS IN CONNECTION WITH

24       KEENE?

25   A        NOT THAT I'VE SEEN.  THIS IS SOMETHING ELSE.

1836

1    Q        OKAY.  I'M SORRY.  I'M GOING TO ASK YOU

2         ABOUT THOSE DOCUMENTS I JUST HANDED YOU AND ASK

3         YOU IF YOU COULD SUMMARIZE THEM FOR THE JURY, NOT

4         PUT EVERYTHING IN THEM, BUT JUST TELL THEM HOW

5         THEY RELATE TO THE KEENE CORPORATION WITHOUT

6         HAVING TO TURN OUT THE LIGHTS.

7    A        ONE OF THESE IS A DEPOSITION OF DWIGHT LORD

8         SATTERWAITE, WHO TESTIFIES IN HERE THAT HE WAS

9         HIRED AS A CLERICAL WORKER BY KEENE, OR RATHER BY

10        EHERT-MAGNESIA IN 1936, AND WITHIN A MONTH OF

11        COMING TO WORK THERE HE WAS APPRISED OF THE FACT

12        THAT THERE WAS A HAZARD OF BREATHING ASBESTOS

13        DUST.  THE OTHER IS A DEPOSITION --

14   Q        WOULD YOU REFER TO THE NUMBER, PLEASE?

15   A        THE NUMBER OF THIS EXHIBIT -- THE FIRST ONE,

16        SATTERWAITE, WAS 397E.  397F IS A DEPOSITION OF A

17        MAN NAMED MCALLISTER.  MR. MCALLISTER WAS A

18        CHEMIST WHO HAD WORKED WITH OWENS-ILLINOIS, AND

19        IN 1952 HE WAS HIRED BY THE EHERT-MAGNESIA

20        COMPANY TO DEVELOP A CALICUMSILICATE INSULATION

21        TO COMPLEMENT THEIR LINE OF INSULATIONS, WHICH

22        WERE MAGNESIA INSULATIONS UP UNTIL THAT TIME, AND

23        HE SPENT THE PERIOD 1952 TO 1960 TRYING TO

24        DEVELOP AT A PILOT PLANT AND EVENTUALLY TRIED TO

25        COMMERCIALIZE THE PRODUCTION OF A CALCIUMSILICATE

1837

1    ASBESTOS-CONTAINING INSULATION PRODUCT FOR

2    EHERT-MAGNESIA, AND HE DESCRIBES GOING SHOPPING

3    FOR RESPIRATORS, WARNING THE WORKERS ABOUT THE

4    HAZARDS OF ASBESTOS, AND INSTALLING VENTILATION

5    CONTROLS IN THE PILOT PLANT, AND THINGS OF THAT

6    SORT TO PROTECT THEM FROM THE HAZARDS OF ASBESTOS

7    IN THE MANUFACTURER OF THESE INSULATION PRODUCTS

8    HE WAS DEVELOPING.

9    Q        NEXT EXHIBIT IS 397C.  NOW, JUST TELL US

10   WHAT THAT IS, DOCTOR.

11   A        THIS IS A PATENT GRANTED TO BALDWIN-HILL

12   COMPANY BY THE U. S. PATENT OFFICE IN 1953 --

13   Q        AND ARE --

14   A        -- FOR AN INSULATING MATERIAL.

15   Q        ARE THESE DOCUMENTS A MATTER OF PUBLIC

16   RECORD?

17   A        YES.

18   Q        WHICH MEANS THEY'RE AVAILABLE TO ANYONE WHO

19   WISHED TO GO TO THE PATENT OFFICE AND MAKE A

20   SEARCH FOR THE DOCUMENT?

21   A        YES.

22   Q        AND WHAT IS THE SIGNIFICANCE OF THIS PATENT?

23   A        WELL, THE PATENT ELSEWHERE IN THIS PAGE

24   TALKS ABOUT THE DUST FROM INSULATION MATERIALS.

25

1838

1          MR. WEBER:   YOUR HONOR, I WOULD OBJECT.

2     HE'S INJECTING UTILITY INTO THE CASE, AND --

3

4          THE COURT:   OVERRULED.

5

6     BY MR. BALDWIN:

7     Q          DOCTOR, WITHOUT TRYING TO PUT EVERYBODY'S

8          EYES OUT READING THIS SMALL PRINT, COULD YOU JUST

9          SUMMARIZE THAT PATENT AS IT RELATES TO THIS CASE?

10    A          THE INVENTION CLAIMED IN THIS PATENT IS ONE

11         FOR AN INSULATION MATERIAL THAT IS VERY LOW IN

12         THE DUST FORMED IN THE COURSE OF ITS HANDLING,

13         AND IT SAYS, "THEREFORE, IT CONTAINS LESS OF AN

14         INDUSTRIAL HEALTH HAZARD."

15    Q          ALL RIGHT, SIR.   AND THERE'S ANOTHER PATENT.

16         AND GIVE THE EXHIBIT NUMBER AND THE DATE, IF YOU

17         WOULD.

18    A          YES.   THIS ONE IS 397-B.

19    Q          AND WHO TO?

20    A          AND THIS WAS ALSO GRANTED TO -- ASSIGNED TO

21         BALDWIN-HILL COMPANY.   THIS WAS IN 1956, AND THE

22         SAME LANGUAGE APPEARS.   THE PRODUCT IS

23         CHARACTERIZED BY IT'S EASE OF HANDLING, AND MAY

24         BE UTILIZED WITH A MINIMUM OF DUSTING AND

25         BREAKAGE, AND THEREFORE WITH PRACTICALLY NO

1839

1       INDUSTRIAL HEALTH HAZARD.

2   Q        SO, WHAT WERE THEY DESCRIBING THERE?

3   A        A HEALTH HAZARD ASSOCIATED WITH THE DUST

4       FROM THERMAL INSULATION MATERIALS.

5   Q        SO, THAT WOULD BE KNOWLEDGE TO THEM OF SUCH

6       A HAZARD, WOULD IT NOT, BACK IN THE '50'S, OR THE

7       DATE OF --

8

9            MR. WEBER:  YOUR HONOR, IF THE COURT PLEASE,

10       THE DOCUMENT SPEAKS FOR ITSELF.

11

12            THE COURT:  OVERRULED.

13

14   BY MR. BALDWIN:

15   Q        WELL, LET ME PUT IT THIS WAY, THE PATENT WAS

16       ISSUED TO WHOM?

17   A        BALDWIN-HILL COMPANY.

18   Q        AND AGAIN, THE MINUTES OF NIMA, WITHOUT

19       GOING BACK OVER THEM, WAS BALDWIN-EHRET-HILL A

20       MEMBER OF THAT ORGANIZATION?

21   A        YES.

22   Q        AND THAT WAS THE ORGANIZATION THAT FIRST

23       PROPOSED A HEALTH PROGRAM AND THEN REJECTED IT?

24   A        IN 1960.

25   Q        AND THEN IN 1964 THEY HAD THE DOCUMENT

1840

1    RELATING TO THE JOHNS-MANVILLE LABEL, IS THAT
2    CORRECT?
3 A      YES.
4
5        MR. WEBER:  YOUR HONOR, THE OBJECTION TO
6    THAT TESTIMONY IS, THERE'S BEEN NO IDENTIFICATION
7    AS FOR WHOM THE HEALTH PROGRAM WAS INTENDED, AND
8    TO WHOM IT WAS DIRECTED, OR FOR CLASS OF PERSONS
9    WHO WERE SOUGHT TO BE PROTECTED BY IT.  AND IN
10   VIEW OF THAT, IT'S NOT SHOWN TO BE MATERIAL OR
11   RELEVANT TO THE ISSUES HERE BEFORE THIS JURY.
12
13       THE COURT:  I THINK YOUR OBJECTION GOES TO
14   WEIGHT.
15
16       MR. WEBER:  ALL RIGHT, SIR.
17
18 BY MR. BALDWIN:
19 Q      ARE YOU AWARE OF THE TYPE HEALTH PROGRAM
20   THAT THEY WERE DESCRIBING AT THAT MEETING?
21 A      I CAN ONLY GO BY WHAT THE DOCUMENT ITSELF
22   SAYS.
23 Q      WHAT DOES IT SAY?
24 Q      IT SAYS THEY WERE CONSIDERING ESTABLISHING A
25   HEALTH PROGRAM, THE INDUSTRY WAS, AND

1841

1    SUBSEQUENTLY REJECTED THE IDEA OF HAVING A HEALTH

2    PROGRAM.

3  Q      NOW, THIS CHART ON KEENE, COULD YOU

4    CAPSULIZE YOUR TESTIMONY ABOUT KEENE BY THE USE

5    OF THAT CHART, SIR?

6  A      YES.

7  Q      WOULD YOU DO THAT, PLEASE, VERY QUICKLY?

8  A      ONCE AGAIN, WE HAVE THE 1930 ASBESTOS

9    MAGAZINE WITH THE ARTICLE ON ASBESTOSIS,

10   PUBLISHED BEFORE SUMNER SIMPSON AND VANDIVER

11   BROWN CENSORED ALL FURTHER MENTION OF ASBESTOSIS

12   FROM ASBESTOS MAGAZINE, AND THIS IS ACCOMPANIED

13   BY A FULL PAGE ADVERTISEMENT OF EHRET MAGNESIA

14   FOR INSULATION PRODUCTS USING ASBESTOS.

15       THE NEXT ITEMS ARE THE TESTIMONIES, THE

16   DEPOSITIONS OF MR. SATTERWAITE, THE OFFICE

17   WORKER, AND MR. MCALLISTER, THE CHEMIST, WHO SAID

18   THEY WERE AWARE OF THE HAZARDS OF ASBESTOS, OR

19   THAT ASBESTOS WAS A HAZARDOUS DUST IN 1936 AND IN

20   THE 1950'S, RESPECTIVELY, MR. MCALLISTER

21   PROVIDING CONSIDERABLY MORE DETAIL ABOUT THE

22   MEASURES THAT HE TOOK AS A MANAGEMENT PERSON, AS

23   A CHEMIST, AND AS SOMEONE WHO WAS A PARTICIPANT

24   IN THE DEVELOPMENT OF THE PRODUCT, TO SAFEGUARD

25   EMPLOYEES FROM THE ASBESTOS HAZARD IN THE PROCESS

1842

1    THERE.

2         AND THEN IN 1960 THE NIMA HEALTH PROGRAM

3    IDEA BEING RAISED AND REJECTED, BOTH IN THE YEAR

4    1960, AND IN 1964, THE JOHNS-MANVILLE WARNING

5    LABEL APPEARING VERBATIM IN THE MINUTES OF THE

6    NATIONAL INSULATION MANUFACTURERS ASSOCIATION, IN

7    WHICH THE COMPANY WAS A PARTICIPANT.

8    Q    THANK YOU.   I THINK YOU FAILED TO MENTION

9    THE PATENTS.

10   A    YES.   I'M SORRY.   THE PATENTS OF THIS

11   COMPANY IN THE 1950'S ALSO ALLUDE TO AN

12   INDUSTRIAL HEALTH HAZARD ASSOCIATED WITH THE DUST

13   FROM INSULATION MATERIALS.

14   Q    SO, DOCTOR, BASED ON THE EVIDENCE THAT

15   YOU'VE GATHERED IN CONNECTION WITH KEENE

16   CORPORATION AND ITS PREDECESSORS, DO YOU HAVE ANY

17   EVIDENCE THAT ANY OF THOSE COMPANIES AT ANY TIME

18   TESTED THEIR OWN PRODUCTS TO DETERMINE WHAT DUST

19   LEVELS THEY MIGHT GENERATE IF USED BY A WORKER OR

20   AN END PRODUCT USER?

21   A    I'VE NEVER SEEN ANY REPORTS.   THEY, AT LEAST

22   FROM A VISUAL STANDPOINT, FELT THAT ONE OF THESE

23   PATENTED PRODUCTS WAS LESS DUSTY THAN OTHERS.

24   BUT I HAVE NEVER SEEN ANY QUANTITATIVE

25   MEASUREMENTS OF IT ASSOCIATED WITH THE HANDLING

1843

1    OF THEIR PRODUCTS.

2    Q        DOCTOR, DO YOU HAVE AN OPINION AS TO WHETHER

3    OR NOT THE KEENE CORPORATION AND ITS PREDECESSORS

4    HAD KNOWLEDGE OF THE DANGERS OF ASBESTOS AND

5    ASBESTOSIS AS A DANGEROUS DISEASE, ASBESTOS AS A

6    DANGEROUS PRODUCT, GOING BACK TO THE 1930'S?

7    A        I DO.

8    Q        WHAT IS THAT OPINION?

9    A        MY OPINION IS THAT THEY CERTAINLY DID KNOW.

10

11        MR. WEBER:  SAME OBJECTION, YOUR HONOR.

12

13        THE COURT:  NOTED.  WE'LL BREAK FOR LUNCH.

14    RESUME THE TESTIMONY AT 1:30.

15

16        THE MARSHAL:  ALL RISE.

17

18        (WHEREUPON, THE PROCEEDINGS WERE IN RECESS

19    FROM 11:50 A.M., UNTIL 1:30 P.M., AT WHICH TIME

20    THE FOLLOWING OCCURRED:)

21

22

23

24

25

1844

1       THE MARSHAL:  ALL RISE.

2

3       THE COURT:  BE SEATED.

4

5       MR. BALDWIN:  SHALL I CONTINUE, YOUR HONOR?

6

7       THE COURT:  YES, SIR.

8

9    BY MR. BALDWIN:

10   Q       LET'S TURN NOW TO THE A.T.I. MINUTES, AND

11       YOU'VE ALREADY EXPLAINED MORE THAN ONE TIME WHAT

12       THE A.T.I. IS, ASBESTOS TEXTILE INSTITUTE, AND I

13       WON'T GO BACK OVER THAT EXCEPT TO SHOW YOU THESE

14       EXHIBITS.  ALL RIGHT.  THIS IS PLAINTIFFS'

15       EXHIBIT 401A, AND IS IT A COPY OF THE MINUTES OF

16       THE ASBESTOS TEXTILE INSTITUTE FOR APRIL 7, 1949

17       AT A MEETING THAT WAS HELD IN CHICAGO, ILLINOIS?

18   A       YES, SIR.  THAT'S EXHIBIT 401A.

19   Q       ALL RIGHT.  AND WE HAVE SEVERAL MEMBERS OF

20       THE ASBESTOS INDUSTRY REPRESENTED?

21   A       YES.

22   Q       OKAY.  NEXT PAGE ON THAT ONE.  AND WOULD YOU

23       COMMENT ON THE -- WELL, READ THE HIGHLIGHTED

24       SECTION OF THIS PAGE TO THE SAME SET OF MINUTES.

25

1845

1        MR. JOSEPHSON:  EXCUSE ME, YOUR HONOR.  OUR

2  OBJECTION WOULD GO TO THIS ONE IF THE COURT WILL

3  GIVE US A RUNNING BILL ON IT.

4

5        THE COURT:  YES, SIR.

6

7        THE WITNESS:  "THE SECRETARY READ EXCERPTS

8  FROM AN ARTICLE ENTITLED "CANCER IN ENVIRONMENT"

9  WRITTEN BY GRAFF CONKLIN AND PUBLISHED IN

10  SCIENTIFIC AMERICA, JANUARY 1949.  IT WAS FELT

11  THAT THE INFORMATION HERE OFFERED UNJUSTIFIABLY

12  INCRIMINATED ASBESTOS AS A CARCINOGENIC MATERIAL,

13  AND IT WAS FELT THAT SOME CLARIFICATION OF THE

14  SUBJECT SHOULD BE EXTENDED."

15

16  BY MR. BALDWIN:

17  Q        NOW, THIS WAS TALKING ABOUT ASBESTOS AND

18  CANCER IN 1949 AT THE MEETING OF A TRADE

19  ORGANIZATION?

20  A        RIGHT.  DISCUSSING A PUBLISHED ARTICLE.

21  Q        NEXT EXHIBIT, 401B.  IS THAT THE MINUTES OF

22  THE MEETING OF THE SAME ASBESTOS TEXTILE

23  INSTITUTE OCTOBER 6, 1954 WHERE MR. SCHEPERS WAS

24  PRESENT?

25  A        YES.  DR. SCHEPERS FROM THE SARANAC

1846

1        LABORATORY HERE IS PRESENT.

2    Q        AND SARANAC LABORATORY BEING THE ONE THAT

3        BOTH O.I. AND OWENS-CORNING AND OWENS-ILLINOIS AT

4        ONE TIME OR ANOTHER HIRED TO DO WORK FOR THEM?

5    A        YES.

6    Q        AND WHAT DOES THE BOTTOM PART SAY?

7    A        "DR. SCHEPERS SHOWED SLIDES OF SPECIMENS

8        TAKEN DURING AN AUTOPSY OF AN ASBESTOSTOTIC."

9    Q        NEXT PAGE.  SO, THEY WERE DISCUSSING

10        ASBESTOS-RELATED DISEASES AT THAT CONFERENCE?

11    A        YES.

12    Q        AND COULD YOU READ THE BOTTOM PORTION OF

13        THAT?

14    A        "THE ENTIRE AFTERNOON SESSION WAS SPENT IN

15        LISTENING TO THE DISCUSSION OF THE RELATIONSHIP

16        OF ASBESTOSIS TO PULMONARY CANCER BY DR.

17        SCHEPERS.  A NUMBER OF SLIDES CONTAINING FACTS

18        AND FIGURES CONCERNING THE SUBJECT OF CANCER WERE

19        SHOWN.  IN THE LATTER PART OF HIS DISCUSSION HE

20        MADE SOME CONCLUSIONS CONCERNING THE RELATIONSHIP

21        OF ASBESTOS TO LUNG CANCER."

22    Q        THAT WAS IN 1954?

23    A        YES.

24    Q        AND THE NEXT HIGHLIGHTED PORTION?

25    A        "THE FIRST CASE OF CANCER OF THE LUNGS DUE

1847

1    TO ASBESTOS WAS FOUND IN ENGLAND IN 1932.  THE

2    WEST GERMAN GOVERNMENT IN 1951 RECOGNIZED LUNG

3    CANCER CAUSED BY ASBESTOS.  DR. SCHEPERS OF THE

4    SARANAC LABORATORIES SUGGESTED THAT PARTICLES OF

5    ASBESTOS BE INSERTED IN ANIMAL LUNGS IN ORDER

6    THAT RESEARCH BE DONE ON THIS PROBLEM, CANCER AND

7    ASBESTOS, SO THAT THE FACTS MAY BE DETERMINED TO

8    COMBAT UNJUST COMPENSATION CLAIMS.  THIS PROPOSAL

9    WAS OFFERED TO THE BOARD, AND IT WAS THEIR

10   RECOMMENDANTION THAT DR. SCHEPERS BE REQUESTED TO

11   SUBMIT A PROPOSAL FOR FURTHER CONSIDERATION."

12   Q      SO, HERE WE HAVE THE A.T.I. ASKING DR.

13   SCHEPERS OF SARANAC TO MAKE THEM A PROPOSAL TO DO

14   A STUDY ON THE RELATIONSHIP BETWEEN ASBESTOS AND

15   CANCER?

16   A      YES.

17   Q      THIS IS 1954, RIGHT?

18   A      RIGHT.

19   Q      EXHIBIT 401C, A MEETING OF THE SAME ASBESTOS

20   TEXTILE INSTITUTE, AIR HYGIENE COMMITTEE,

21   DECEMBER 1, 1954.  COULD YOU READ THE HIGHLIGHTED

22   LANGUAGE?

23   A      "THE RESEARCH PROPOSAL FROM DR. SCHEEPERS

24   FOR INVESTIGATION INTO THE RELATIONSHIP OF

25   ASBESTOS AND PULMONARY CANCER IS ANTICIPATED

BOYD-PARKS REPORTERS

1848

1        PRIOR TO OUR NEXT MEETING.  ASBESTOS AS A

2    CANCER-PRODUCING AGENT IS RECEIVING INTERNATIONAL

3    ATTENTION AND AS INDICATED BY A SPEECH OF DR. W.

4    C. HUEPER OF THE NATIONAL CANCER INSTITUTE BEFORE

5    THE INTERNATIONAL ASSOCIATION OF ACCIDENT BOARDS

6    AND COMMISSIONS.  IN HIS PAPER ON INDUSTRIAL

7    CARCINOGENS, DR. HUEPER REFERRED FREQUENTLY TO

8    ASBESTOS AND ALMOST ALL OF THE SLIDES USED TO

9    DEMONSTRATE PULMONARY CANCER WERE OF CASES

10    INVOLVING ASBESTOS AND CANCER."

11  Q        ASBESTOSIS.

12  A        "BOTH ASBESTOSIS AND CANCER.  THE SUBJECT IS

13    OF CONSIDERABLE IMPORTANCE TO THE INSTITUTE

14    MEMBERS, AND THE PROPOSAL WILL BE REVIEWED IN

15    DETAIL."

16  Q        NOW, THEY REFER TO SLIDES.  WOULD YOU TELL

17    THE JURY WHAT THOSE SLIDES WOULD BE THAT THEY

18    WERE SHOWING?

19  A        WELL, THESE COULD HAVE BEEN PATHOLOGY SLIDES

20    SEEN UNDER A MICROSCOPE AND PHOTOGRAPHED, OR THEY

21    COULD HAVE BEEN OTHER KINDS OF SLIDES PRESENTING

22    CHEST X-RAY PICTURES AND THINGS LIKE THAT.

23

24            ,

25

BOYD-PARKS REPORTERS

1849

1    BY MR. BALDWIN:

2    Q        ALL RIGHT.   AND DID THIS --

3    A        IN DR. HUEPER'S CASE I THINK IT WOULD HAVE

4        BEEN JUST THE USUAL TYPE OF CAROUSEL SLIDES,

5        BECAUSE HUPER WAS MAKING SCIENTIFIC PRESENTATIONS

6        WHICH WERE LATER PUBLISHED IN THE LITERATURE.

7    Q        AT THIS POINT AT LEAST THE ASBESTOS INDUSTRY

8        WAS TALKING ABOUT THE RELATIONSHIP BETWEEN

9        ASBESTOSIS AND CANCER AS BEING AN INTERNATIONAL

10       RECOGNIZED PROBLEM, WERE THEY NOT?

11   A        YES, IN 1954.

12   Q        ALL RIGHT.   NEXT.   AND THEY WERE LOOKING

13       FORWARD TO DR. SCHEPERS MAKING A REPORT ON THE

14       RELATIONSHIP BETWEEN ASBESTOS AND CANCER, IS THAT

15       RIGHT?

16   A        YES.

17   Q        AND THIS IS 401-D, SEPTEMBER 7, 1955.  WHAT,

18       ABOUT A YEAR LATER, NOT QUITE A YEAR LATER, OF

19       THE SAME ASBESTOS TEXTILE INSTITUTE, AND WHAT IS

20       THE HIGHLIGHTING?

21   A        THEY'RE TALKING ABOUT THEIR GUESTS FROM THE

22       QUEBEC ASBESTOS MINING ASSOCIATION, AND MR.

23       SALVORON, WHO WAS THE ATTORNEY FOR QUEBEC

24       ASBESTOS MINING ASSOCIATION, STATED --

25   Q        SO, HERE YOU HAVE -- I'M SORRY.

1850

1    A        -- THAT THE PRESENT MAJOR HEALTH PROBLEMS OF

2            THE INDUSTRY PERTAIN TO THE RELATIONSHIP OF HEART

3            DIFFICULTIES AND CANCER TO ASBESTOS EXPOSURE.

4    Q        SO, HERE YOU HAVE AN EXCHANGE OF INFORMATION

5            BETWEEN CANADA AND THE U.S. ON ASBESTOS,

6            ASBESTOS-RELATED PROBLEMS, IS THAT CORRECT?

7    A        YES.

8    Q        401-E, MARCH 7, 1956, ALMOST TWO YEARS NOW

9            SINCE THE SCHEPERS STUDY WAS FIRST SUGGESTED, IS

10           THAT RIGHT?

11   A        YES.  A YEAR AND A HALF, SOMETHING LIKE

12           THAT.

13   Q        AND THE AGENDA, "ASBESTOS AND CANCER" WAS

14           THE AGENDA FOR THE MEETING, IS THAT RIGHT?

15   A        YET.

16   Q        GO AHEAD AND READ THE HIGHLIGHTED.

17   A        THEY TALK ABOUT HOW THE MEDICAL DIRECTOR OF

18           JOHNS-MANVILLE REQUESTED TO BE PRESENT AT THE

19           MEETING BECAUSE OF RECENT DEVELOPMENTS IN THE

20           COMPENSATION FIELD REGARDING ASBESTOSIS AND

21           CANCER.

22               "DR. SMITH INFORMED US THAT IN HIS OPINION

23           WE HAVE AN EPIDEMIC OF LUNG CANCER IN THE WORLD

24           TODAY."  DOWN BELOW, "THE FINDING BY THE REFEREE

25           IN THIS CASE," THEY'RE TALKING ABOUT A

1851

1    COMPENSATION CASE, "WAS ASBESTOS CANCER."  THE

2    REFEREE IN THIS CASE QUOTED DR. HUEPER'S

3    WRITINGS.

4        THEN BELOW THAT DR. HUEPER CLAIMS "THAT

5    ASBESTOSIS CANCER CAN BE FOUND AFTER EXPOSURE TO

6    SIX MONTHS TO FORTY-TWO YEARS IN AGES OF PEOPLE

7    FROM TWENTY-FIVE TO SIXTY-FIVE YEARS." HE ALSO

8    HAS A NEW DEFINITION OF ASBESTOSIS, SUCH AS "ONE

9    PARTICLE OF ASBESTOS WITH THE PHYSICAL CONDITIONS

10   SURROUNDING IT CAN BE DIAGNOSED AS ASBESTOSIS."

11       ACCORDING TO HIM "ALL WORKERS IN THIS

12   INDUSTRY ARE SUSCEPTIBLE."

13  Q      PAGE TWO OF THE SAME DOCUMENT.

14  A      DR. HUEPER ALSO INFERS "THAT ASBESTOSIS

15   CANCER MAY BE DETERMINED IN AN AUTOPSY PERFORMED

16   ON PERSONS LIVING IN THE AREA OF A PLANT."

17       FURTHER DOWN, "DR. SMITH RECOMMENDS VERY

18   STRONGLY THAT THIS INSTITUTE BEGIN A STUDY OF THE

19   RELATIONSHIP OF LUNG CANCER TO ASBESTOSIS IN OUR

20   INDUSTRY.  HE RECOMMENDS THAT THIS SHOULD BE DONE

21   THROUGH THE INDUSTRIAL HYGIENE FOUNDATION IN

22   PITTSBURG.  DR. SMITH INDICATED THAT HE HAS NO

23   EVIDENCE THAT THERE IS NOT A RELATIONSHIP BETWEEN

24   ASBESTOSIS AND CANCER."

25  Q      DR. SMITH BEING WHO?

1852

1    A        MEDICAL DIRECTOR FOR JOHNS-MANVILLE.

2    Q        GO AHEAD.

3    A        "DR. SMITH ALSO", RATHER, "ALSO ADVISED THAT

4             THERE IS OTHER DAMAGING INFORMATION BEING

5             CIRCULATED WRITTEN BY THE SAME DR. W. C. HUEPER,

6             WHO IS CHIEF OF THE ENVIRONMENTAL CANCER SECTION

7             OF THE NATIONAL CANCER INSTITUTE."

8    Q        SO, NOW THEY'RE TALKING ABOUT A STUDY OF THE

9             RELATIONSHIP BETWEEN ASBESTOS AND CANCER NOT

10            BEING DONE BY DR. SCHEPERS OF SARANAC, BUT RATHER

11            BEING DONE BY THE INDUSTRIAL HYGIENE GROUP, WHICH

12            SOME HAVE DESCRIBED AS THE CREATURE OF INDUSTRY,

13            IS THAT RIGHT?

14   A        YES.

15   Q        I THINK THE NEXT ONE I HAVE A CHART.  IF

16            YOU'LL TURN THE LIGHT ON, PLEASE, SIR.

17            SO, IN ANY EVENT THEY'RE LOOKING FORWARD TO

18            THE STUDY, SOME KIND OF A STUDY ON THE

19            RELATIONSHIP BETWEEN ASBESTOS AND CANCER AT THIS

20            POINT?

21   A        YES.

22   Q        SO, NOW WE HAVE THE MEETING OF MARCH 7,

23            1957, OF THE SAME INDUSTRIAL -- THE SAME ASBESTOS

24            TEXTILE INSTITUTE, AIR HYGIENE MANUFACTURING

25            COMMITTEE.  IT SAYS, "THE FIRST ITEM FOR

1853

1    DISCUSSION WAS THE MEMORANDUM ON PROPOSED

2    EPIDEMIOLOGICAL STUDY OF LUNG CANCER IN ASBESTOS

3    WORKERS FOR THE ASBESTOS TEXTILE INSTITUTE."  IT

4    SAYS, "THIS PROPOSAL HAS BEEN UNDER DISCUSSION

5    FOR APPROXIMATELY ONE YEAR, AND THE COST OF IT

6    COULD RUN FROM SEVENTEEN THOUSAND TO THIRTY

7    THOUSAND DOLLARS.  AFTER A LENGTHY DISCUSSION THE

8    PROPOSAL WAS PUT TO A VOTE, AND SIX OF THE EIGHT

9    MEMBERS OF THE COMMITTEE VOTED AGAINST THE

10   CONTINUANCE OF THE CONSIDERATION OF THE PROPOSAL.

11   IT THEREFORE WAS REJECTED FOR THE FOLLOWING

12   REASONS."

13        NOW, WHAT WERE THE REASONS, DOCTOR, THAT

14   THEY REJECTED THE STUDY THAT THEY HAD BEEN

15   TALKING ABOUT NOW FOR A YEAR AND A HALF ON THE

16   CONNECTION BETWEEN ASBESTOS AND CANCER?

17 A      WELL, THEY SAY THAT, "THE QUEBEC ASBESTOS

18   MINING ASSOCIATION HAS A SIMILAR PROGRAM, AND SO

19   WE SHOULD NOT ENTER INTO A PROGRAM OF OUR OWN AS

20   THE RESULT OF THE QUAMA INVESTIGATION WILL BE

21   MADE AVAILABLE TO US UPON THE COMPLETION OF THAT

22   INVESTIGATION.  TWO, THERE IS A FEELING AMONGST

23   CERTAIN MEMBERS THAT SUCH AN INVESTIGATION WOULD

24   STIR UP A HORNET'S NEST, AND PUT THE WHOLE

25   INDUSTRY UNDER SUSPICION."

1854

1    Q        STIR UP A HORNET'S NEST, IS THAT WHAT THEY

2         SAID, PUT THE WHOLE INDUSTRY UNDER SUSPICION?

3    A        THAT'S WHAT THEY SAID.   THEN THEY SAY THAT,

4         "WE DO NOT BELIEVE THERE'S ENOUGH EVIDENCE OF

5         CANCER NOR ASBESTOSIS -- OR CANCER AND ASBESTOSIS

6         IN THIS INDUSTRY TO WARRANT THIS SURVEY."

7    Q        NOW THEN, THE NEXT DOCUMENT IS THE MINUTES

8         OF THE SAME ORGANIZATION.   THE THIRD PAGE OF THE

9         MINUTES -- DO YOU WANT TO PUT THE FIRST ONE IN

10        JUST SO THEY CAN SEE WHAT WE'RE TALKING ABOUT?

11

12             MR. JOSEPHSON: EXCUSE ME.   WHAT WAS THE

13        EXHIBIT NUMBER OF THE LAST ONE?

14

15             MR. BALDWIN:  OF THE LAST ONE?

16

17             MR. JOSEPHSON:  YEAH.

18

19             MR BALDWIN:  401-F.

20

21             MR. JOSEPHSON:  401-F?

22

23   BY MR. BALDWIN:

24   Q        401-I IS THE MINUTES OF THE MEETING OF THE

25        ASBESTOS TEXTILE INSTITUTE, FEBRUARY, 1971, IS

1855

1      THAT CORRECT?

2    A      YES.

3    Q      THEN THE NEXT PAGE -- WE HAVE THE THIRD PAGE

4      OF THAT BLOWN UP HERE.   OKAY.   STARTING WITH "DR.

5      GOODMAN" UP NEAR THE TOP, DR. CASTLEMAN, WOULD

6      YOU READ THE PERTINENT PARTS OF THAT DOCUMENT?

7    A      "DR. J. L. GOODMAN, NORTH CHARLESTON, SOUTH

8      CAROLINA, ASSOCIATED WITH RAYBESTOS-MANHATTAN,

9      INC., SPEAKING AS A MEMBER OF THE A.P.I.

10      ENVIRONMENTAL HEALTH COMMITTEE, REPORTED THAT HE

11      HAD ATTENDED A SESSION ON ASBESTOS ARRANGED BY

12      DR. IRVING J. SELIKOFF, AND THAT WAS HELD JUNE

13      15TH TO 18TH IN 1970 AT THE MOUNT SINAI SCHOOL OF

14      MEDICINE, NEW YORK CITY.   IT SAID THAT HE WAS

15      SURPRISED TO FIND A GOODLY NUMBER OF

16      REPRESENTATIVES OF LABOR IN ATTENDANCE."

17    Q      NOW, THAT INDICATES AGAIN AN EXCHANGE OF

18      INFORMATION WHERE YOU'VE GOT A MEETING ATTENDED

19      BY VARIOUS PEOPLE OF THE INDUSTRY, INCLUDING

20      LABOR, AND THE MEDICAL COMMUNITY --

21    A      YES.

22    Q      -- IS THAT TRUE?

23    A      THIS IS MORE OF AN OPEN MEETING.

24    Q      GO AHEAD.

25    A      "DR. SELIKOFF'S STAFF MEMBERS PRESENTED A

1856

1  PROGRAM WHICH TURNED OUT TO BE A DIATRIBE AGAINST

2  INDUSTRY.  AT THE OPENING OF THE MEETING IT WAS

3  ANNOUNCED THAT THE SPRAYING OF STEELFRAME WORK

4  WITH ASBESTOS FIBERS OF NEW BUILDINGS UNDER

5  CONSTRUCTION HAD BEEN DISCONTINUED IN NEW YORK.

6.  DR. GOODMAN WAS CRITICAL OF SELIKOFF'S

7  PRESENTATION AND ACCUSATIONS AGAINST THE

8  INDUSTRY.  WHEN QUESTIONS WERE DIRECTED TO

9  VARIOUS STAFF SPEAKERS DR. SELIKOFF SPOKE UP TO

10  ANSWER THE QUESTIONS, SOMETIMES QUITE RUDELY.

11  THE SECOND DAY OF THE SEMINAR WAS DEVOTED TO

12  MESOTHELIOMA, WHICH DR. GOODMAN SAID WAS A VERY

13  CONTROVERSIAL AND DEBATABLE FORM OF CANCER AS TO

14  CAUSE.  HE DOES NOT AGREE WITH MANY OF DR.

15  SELIKOFF'S STATEMENTS AND/OR CONCLUSIONS ON THE

16  SUBJECT.

17      DR. GOODMAN FEELS THAT DR. SELIKOFF WAS A

18  DANGEROUS MAN, AND THE ASBESTOS INDUSTRY IS GOING

19  TO HAVE TO LEARN HOW TO COMBAT HIS TACTICS.  WE

20  CAN NOT AND SHOULD NOT TAKE DR. SELIKOFF LIGHTLY,

21  AS HE HAS THE FACILITIES FOR GETTING HIS VERSION

22  OF THE FACTS WIDELY DISTRIBUTED, AND THE ONLY WAY

23  HE CAN BE REBUTTED IS BY BEING FACED WITH THE

24  OVERWHELMING WEIGHT OF OBJECTIVE, SCIENTIFIC AND

25  FACTUAL DATA.

1857

1    WHEN HE ASKED IF SOMETHING COULD BE DONE
2    THROUGH THE AMERICAN MEDICAL ASSOCIATION TO
3    CONTROL DR. SELIKOFF, DR. GOODMAN EXPRESSED,
4    DOUBT.  THERE IS A GRIEVANCE COMMITTEE OF THE
5    AMA, BUT IT IS VERY DIFFICULT TO GET IT TO ACT.
6    HE THOUGHT THAT PERHAPS PRESSURE ON THE MOUNT
7    SINAI SCHOOL OF MEDICINE MIGHT BE EFFECTIVE."
8  Q    SO, IN OTHER WORDS, IS THIS THE SAME DR.
9    SELIKOFF THAT HAS BEEN DESCRIBED IN THE TESTIMONY
10   HERE BY THESE DEFENDANTS AS HAVING WRITTEN
11   ARTICLES, SERIES OF ARTICLES THAT WERE CLASSIC,
12   LANDMARK ARTICLES?
13 A    I'M SURE IT IS.
14 Q    HE'S FROM MOUNT SINAI, IS HE NOT?
15 A    YES, SIR.
16 Q    AND THEY FIRST WANT TO PUT PRESSURE ON HIM
17   BY TRYING TO GET THE AMERICAN MEDICAL ASSOCIATION
18   DOING SOMETHING ABOUT HIM FROM A GRIEVANCE
19   STANDPOINT, IS THAT ONE OF THEIR CONSIDERATIONS?
20 A    YES.
21 Q    AND THEY SAY, "NO, THAT WON'T WORK, SO LET'S
22   SEE IF WE CAN GET HIS JOB AT MOUNT SINAI," IS
23   THAT IN EFFECT WHAT THEY'RE SAYING HERE?
24 A    WELL, THEY'RE SAYING SOMETHING THAT AMOUNTS
25   TO THAT, YES.

1858

1   Q      NOW, WOULD YOU PUT THE LAST PAGE OF THAT

2       DOCUMENT UP?

3

4       MR. JOSEPHSON:  YOUR HONOR, LET ME ADD 403

5       TO THAT, BECAUSE NOT ONE SINGLE DEFENDANT IN THIS

6       CASE WAS AT ANY OF THOSE MEETINGS, AS SHOWN BY

7       THE EXHIBITS.

8

9       THE COURT:  OVERRULED.

10

11   BY MR. BALDWIN:

12   Q      AND NOW, ON THE LAST PAGE OF THAT SAME

13       DOCUMENT, WOULD YOU READ THE HIGHLIGHTED YELLOW?

14   A      CONCLUDING HIS REMARKS, MR. SHECKLER, WHO

15       WAS FROM JOHNS-MANVILLE, SAID, "THAT WARNING

16       LABELS ON PRODUCTS WERE NOW VOLUNTARY, BUT

17       PROBABLY WOULD BECOME MANDATORY AT SOME FUTURE

18       DATE.  THINKS THAT OUR INDUSTRY MUST GIVE SERIOUS

19       CONSIDERATION TO THE USE OF WARNING LABELS ON

20       ASBESTOS PRODUCTS.  MENTIONED THAT COMMON LAW

21       PRODUCT LAW LIABILITY SUITS ARE PROLIFERATING IN

22       THE THERMAL INSULATION INDUSTRY.  DATE THAT LABEL

23       USE BEGAN COULD INDICATE WHETHER A MANUFACTURER

24       HAD BEEN NEGLIGENT IF LAWSUIT ARISES."

25   Q      IS THAT PRECISELY ONE OF THE ISSUES INVOLVED

1859

1    IN THIS CASE, YOUR UNDERSTANDING?

2  A    YES, SIR.

3  Q    AND THIS WAS 1971?

4  A    YES.

5  Q    THANK YOU.  NOW WE GO TO EAGLE-PICHER.  THIS

6    FIRST DOCUMENT I JUST PUT IN -- YES.  PLAINTIFFS'

7    EXHIBIT 392, AND COULD YOU TELL US -- NEXT PAGE --

8    THIS IS THE BUREAU OF MINES DOCUMENT THAT, YOU

9    WEREN'T HERE, BUT MR. HOUSTON HAS ALREADY READ TO

10    THE JURY, AND I'M NOT GOING TO REPEAT IT, EXCEPT

11    TO PUT ONE OR TWO SENTENCES OF IT INTO CONTEXT.

12    THE BUREAU OF MINES IS WRITING EAGLE-PICHER

13    BACK IN 1932 ABOUT A REPORT ON THEIR PLANTS, AND,

14    "THIS REPORT IS SUBMITTED FOR YOUR CONFIDENTIAL

15    INFORMATION"?

16  A    YES.

17

18

19

20

21

22

23

24

25

1860

1   Q      NEXT ONE.  AND WOULD YOU READ THE

2       HIGHLIGHTED PART OF THAT REPORT ON THIS PAGE OF

3       THE SAME REPORT, SAME EXHIBIT?

4   A      "IN SEPTEMBER 1931 AT THE REQUEST OF THE

5       SAFETY ENGINEER OF THE EAGLE-PICHER MINING AND

6       SMELTING COMPANY, AN INVESTIGATION WAS MADE OF

7       THE COMPANY'S ROCK WOOL PLANT OF JOPLIN,

8       MISSOURI."

9   Q      AND READING FROM THE SAME REPORT, WOULD YOU

10      READ THE CONCLUSION DRAWN?

11  A     "BASED ON THE CHEMICAL ANALYSIS, QUANTITY OF

12     DUST, AND EVIDENCE OF SUCH PARABRONCHIAL

13     THICKENING IN THE MEN WHO HAD BEEN EXPOSED

14     ACCORDING TO THE HISTORIES ONLY A RELATIVE SHORT

15     PERIOD OF TIME TO THE DUST, IT IS VERY LIKELY

16     THAT THE DUST IS HARMFUL IF THE DUST IS BREATHED

17     OVER A RELATIVELY LONG PERIOD OF TIME.  THIS IS

18     PARTICULARLY TRUE IN THE MIXING ROOM WHERE IT IS

19     STATED BY THE EMPLOYEES THAT ROCK WOOL IS MIXED

20     WITH ASBESTOS IN VARIOUS MIXTURES RANGING FROM

21     TEN TO SEVENTY-FIVE PERCENT.  THIS IS A

22     PARTICULARLY DUSTY PLACE, AND IT IS NOW KNOWN

23     DEFINITELY THAT ASBESTOS DUST IS ONE OF THE MOST

24     DANGEROUS DUSTS TO WHICH MAN IS EXPOSED."

25  Q      NOW, THEY'RE SAYING THAT IT IS KNOWN

1861

1      DEFINITELY THAT ASBESTOS DUST IS ONE OF THE MOST

2      DANGEROUS DUSTS TO WHICH MAN IS EXPOSED IN 1932,

3      IS THAT CORRECT?

4   A      YES.

5   Q      AND THAT'S THE UNITED STATES GOVERNMENT

6      SAYING THAT.

7   A      TO THE EAGLE-PICHER COMPANY, YES.

8   Q      NEXT.  PLAINTIFFS' EXHIBIT 392A, AND WHAT IS

9      THAT, DOCTOR?

10  A      THIS IS AN INTERNAL MEMORANDUM OF THE

11     EAGLE-PICHER SALES COMPANY IN 1942 BY THE

12     SALESMAN H. M. ABER, AND MR. ABER REPORTS -- OH,

13     EXCUSE ME.  YOU HAVEN'T ASKED WHAT IT SAYS.

14  Q      THE NEXT PAGE.  HE'S A SALEMAN FOR WHO?

15  A      EAGLE-PICHER.

16  Q      AND THIS IS 1932, YOU SAID?

17  A      1942.

18  Q      EXCUSE ME.  '42.  ALL RIGHT.  AND WHAT IS --

19     I SAW SOME REFERENCE TO THE STATE OF TEXAS, DID

20     I?

21  A      YES.  HE WAS IN THE OFFICES OF THE TEXAS

22     STATE BOARD OF HEALTH.

23  Q      HE WAS IN THE OFFICES OF THE STATE BOARD OF

24     HEALTH?

25  A      YES.

BOYL-PARKS REPORTERS

1862

1    Q        ALL RIGHT.  GO AHEAD.  HE SAYS -- READ THE
2    HIGHLIGHTED PARTS.
3    A        HE SAID, "WHILE IN MR. WARDLOW'S OFFICE -- "
4    Q        IS THAT THE ONE YOU'RE TALKING ABOUT?
5    A        YES.
6    Q        ALL RIGHT.
7    A        " -- I HAD THE OPPORTUNITY TO READ A SECTION
8    ON OCCUPATION AND HEALTH AS COMPILED BY THE
9    INTERNATIONAL LABOR INSTITUTE ON ASBESTOS
10   COMPILED IN 1938.  THIS ARTICLE WAS BY DR. S. R.
11   GLOYNE IN LONDON, ENGLAND AND DR. E. R. A.
12   MEREWETHER OF BIRMINGHAM, ENGLAND.  IF YOU THINK
13   MINERAL WOOL IS DANGEROUS, YOU OUGHT TO READ
14   THIS.  YOU SHOULD READ THIS."  AND HE TELLS HIM
15   WHERE TO GET A COPY.
16   Q        THAT WAS APRIL 8, 1942.  PLAINTIFFS' EXHIBIT
17   392D.  WHAT IS THAT, DOCTOR?
18   A        THIS IS THE SUPPLEMENT TO THE ENCYCLOPEDIA
19   ON OCCUPATION AND HEALTH BY THE INTERNATIONAL
20   LABOR OFFICE AND THIS IS ATTACHED TO THIS PAGE AS
21   THE ARTICLE ON ASBESTOS.
22   Q        ALL RIGHT.  HE POINTS OUT THAT THE VARIOUS
23   COMPANIES THAT ARE REPRESENTED HERE, THIS IS A
24   WORLD WIDE REPRESENTATION THERE, IS IT NOT?  NEW
25   DELI, SHANG HAI, SYDNEY, DUBLIN, TOKYO,

1863

1        WELLINGTON, WASHINGTON D.C. --

2   A        YES.   THESE ARE ALL THE PLACES WHERE THIS

3        THING CAN BE ORDERED ACCORDING TO THE DOCUMENT.

4   Q        VIRTUALLY ALL OVER THE WORLD?

5   A        YES.

6   Q        ALL RIGHT.   NEXT DOCUMENT.   NOW, LET ME ASK

7        YOU, IN ORDER TO GET THIS IN CONTEXT, IS THIS THE

8        PART OF THE SAME EXHIBIT WHICH IS NOW A PART OF

9        THE DOCUMENT THAT HE REFERRED WHEN HE SAYS IF YOU

10       THINK SILICOSIS IS DANGEROUS, YOU OUGHT TO READ

11       THIS?   OR ROCK WOOL OR WHATEVER IT WAS HE SAID.

12  A        YES.   THIS IS THE DOCUMENT OF THE

13       INTERNATIONAL LABOR OFFICE ON ASBESTOS.

14  Q        ALL RIGHT.   GO AHEAD.

15  A        WHAT GLOYNE AND MEREWETHER ARE DOING HERE IS

16       TALKING ABOUT THE COMPLICATIONS AND SEQUELA OF

17       PULMONARY ASBESTOSIS, AND THEN THEY MENTION --

18  Q        WHEN YOU SAY "SEQUELA" -- THAT'S A BIG WORD

19       THAT I'M NOT SURE I UNDERSTAND.

20  A        WELL, ONCE YOU HAVE ASBESTOSIS, THIS IS THE

21       SEQUAL, THIS IS WHAT CAN COME NEXT.

22  Q        ALL RIGHT.   GO AHEAD.

23  A        AND THEY SAY BELOW "IN ADDITION TO THESE

24       FOUR MAIN COMPLICATIONS MAY BE NOTED TWO WHICH

25       ARE LESS COMMON, AND ONE OF THESE TWO IS

1    CARCINOMA."

2  Q       IS CARCINOMA ANOTHER WORD FOR CANCER?

3  A       YES, SIR.

4  Q       ALL RIGHT, SIR.  NEXT ONE.

5  A       FURTHUR DISCUSSING THE EVIDENCE ON CANCER.

6    THEY SAY THAT IT'S, AT THAT TIME, THIS IS 1938,

7    THAT THE EVIDENCE WAS INCONCLUSIVE, BUT THERE IS

8    SUFFICIENT EVIDENCE TO WARRANT CAREFUL

9    OBSERVATION IN THE FUTURE.  THEY GO ON TO NOTE

10   THAT FATAL CASES OF ASBESTOSIS HAVE RESULTED FROM

11   EXPOSURE AS SHORT AS TWO YEARS.

12 Q       THIS IS IN '42 THEY'RE NOTICING CASES IN

13   WHICH PEOPLE WHO HAVE BEEN EXPOSED AS SHORT AS

14   TWO YEARS ARE DYING FROM ASBESTOSIS?

15 A       THIS IS WHAT WAS PUBLISHED IN THE I.L.O. IN

16   1938 AND WHAT WAS OBSERVED BY THE EAGLE-PICHER

17   SALESMAN IN 1942?

18 Q       SAME ARTICLE, RIGHT?

19 A       YES.

20 Q       WOULD YOU READ THE HIGHLIGHTED PORTION?

21 A       "THE VIEW MUST ACCEPT THAT THE EXISTENCE OF

22   EVEN A MODERATE DEGREE OF ASBESTOSIS IS A SERIOUS

23   AND EVER PRESENT POTENTIAL RISK TO LIFE.  SINCE A

24   WORKER WITH DEVELOPED ASBESTOSIS MAY STILL REMAIN

25   AT WORK AND BE LITTLE CONCERNED AS TO THE STATE

1865

1      OF HIS HEALTH, THE QUESTION MAY WELL BE ASKED, IS

2      ASBESTOSIS A SERIOUS DISEASE?  TO THIS QUESTION,

3      UNFORTUNATELY, THE ANSWER IS EMPHATICALLY, YES."

4    Q      AND AGAIN READING FROM THE SAME ARTICLE, IS

5      THAT RIGHT?

6    A      YES.

7    Q      ALL RIGHT.

8    A      "THE RISK OF ASBESTOSIS IN THE ASBESTOS

9      INDUSTRY IS NO LESS GRAVE THAT THE MOST SERIOUS

10     RISKS FROM SILICOSIS IN THE SILICOSIS-PRODUCING

11     INDUSTRIES.  THE PREVENTIVE MEASURES NECESSARY

12     THEREFORE WILL BE EXTENSIVE AND STRINGENT."

13   Q      ALL RIGHT.  I THINK EARLIER I ASKED YOU THE

14     QUESTION WHAT A BIBLIOGRAPHY IS AND YOU TOLD US

15     IT WAS A LIST OF ARTICLES, AND I WOULD LIKE FOR

16     YOU TO JUST POINT OUT ON THIS EXHIBIT, WHICH IS A

17     PART OF THE SAME ARTICLE, THE BIBLIOGRAPHY.  IS

18     THIS A LISTING OF THE ARTICLES THAT THE AUTHOR

19     HAS REFERRED TO IN THE BODY OF HIS PAPER?

20   A      YES.  OR AT LEAST THEY ARE SOURCES THAT THE

21     AUTHOR ADVISES ARE AVAILABLE FOR FURTHER DETAILED

22     INFORMATION.

23   Q      AND THAT WOULD BE AVAILABLE TO THE AUTHOR OR

24     ANYBODY ELSE THAT WANTED TO READ THEM?

25   A      YES.  YOU JUST GO TO THE MEDICAL LIBRARY AND

1         LOOK THEM UP.

2  Q      COULD YOU GET THAT IN BETTER FOCUS?  AND

3         HERE HE'S REFERRING TO THE MEREWETHER STUDY OF

4         1930, ISN'T HE?

5  A      YES.

6  Q      AMONG OTHER ARTICLES?

7  A      WELL, I MEAN, WE WOULD EXPECT DR. MEREWETHER

8         TO DO THAT, WOULDN'T WE?

9  Q      NEXT, DOCTOR.  WOULD YOU TURN THE LIGHTS ON

10       PLEASE, SIR?  I THINK WE CAN SPEED THIS UP BY

11       JUST REFERRING TO THE NEXT THREE DOCUMENTS,

12       DOCTOR, 392E "F" AND "G" COLLECTIVELY.  COULD YOU

13       TELL US WHAT THEY ARE?

14  A     THESE ARE EXCERPTS FROM TEXT BOOKS THAT WERE

15       RECEIVED BY EAGLE-PICHER RESEARCH LIBRARY AND

16       HAVE STAMPS ON THEM INDICATING THE TIME OF THEIR

17       RECEIPT.  ONE OF THESE IS "INDUSTRIAL DUST" BY

18       PHILIP DRINKER AND THEODORE HATCH, PUBLISHED IN

19       1936, RECEIVED IN 1938 AND THIS TALKS ABOUT --

20  Q     WHICH ONE IS THAT?  REFER TO THE EXHIBIT.

21  A     THIS IS 392E.

22  Q     WHAT DO THEY TALK ABOUT THERE?

23  A     AND THEY HAVE A SECTION ON ASBESTOSIS IN

24       HERE. ,

25  Q     ALL RIGHT.

1867

1    A        THEY TALK ABOUT SOME OF THE PUBLICATIONS IN

2    ENGLAND AND SO ON.  392F IS IRVING SACKS'

3    "HANDBOOK OF DANGEROUS MATERIALS" PUBLISHED IN

4    1951, RECEIVED IN 1951, TALKING ABOUT ASBESTOS

5    AND MAXIMUM ALLOWABLE CONCENTRATION, FIVE MILLION

6    PARTICLES PER CUBIC FOOT AND SOME DESCRIPTION

7    ABOUT HAZARDOUS PROPERTIES AND SO ON MENTIONING

8    THAT EXPOSURE OCCURS IN THE INSULATING AND

9    FIREPROOFING INDUSTRY AND OTHERS.

10   Q        NEXT.

11   A        AND THE NEXT ONE IS 392G RECEIVED IN 1953.

12   PUBLISHED 1948, RUTHERFORD JOHNSTONE'S BOOK,

13   "OCCUPATIONAL MEDICINE AND INDUSTRIAL HYGIENE"

14   AND IT'S A RATHER LENGTHY TABLE OF CONTENTS FIRST

15   AND THEN A CHAPTER THIRTY CALLED "ASBESTOSIS".

16   AND HE SAYS HERE, "OCCUPATIONAL EXPOSURE OCCURS

17   IN THOSE TRADES WHERE IT IS USED FOR PACKING,

18   INSULATING, FIREPROOFING, AND SO ON," AND IT

19   TALKS ABOUT WHAT ASBESTOSIS IS.

20   Q        ALL RIGHT.  NEXT DOCUMENT, PLEASE.

21   PLAINTIFFS' EXHIBIT 392B, WHICH IS VERY DIFFICULT

22   TO READ, AND WE HAVE A CLEAR COPY.  OKAY.  NOW,

23   IT APPEARS THAT IT'S -- JUST DESCRIBE THAT

24   DOCUMENT IF YOU WOULD, PLEASE.

25   A        IT'S 1968.  THIS IS A LETTER FROM THE

1868

1    DIRECTOR OF RESEARCH AT EAGLE-PICHER INDUSTRIES

2    TO THE SHELL OIL COMPANY LOCATION IN ILLINOIS

3    REGARDING TOXIC INGREDIENTS AT EAGLE-PICHER SUPER

4    66 AND ONE COTE CEMENTS.   HE SAYS, "THE ABOVE

5    EAGLE-PICHER PRODUCTS DO NOT CONTAIN ANY TOXIC

6    INGREDIENTS, THEREFORE NO ANTEDOTES ARE NEEDED."

7    Q      AND THEY BOTH CONTAIN ASBESTOS, DO THEY NOT,

8    DOCTOR?

9    A      THEY DO.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1869

BY MR. BALDWIN:

Q       PLAINTIFFS' EXHIBIT 392-C, AND THAT IS
DIFFICULT TO READ, WE'RE GOING TO REPLACE IT WITH
A LEGIBLE COPY.  APRIL 6, 1965.  AND DO YOU
RECOGNIZE THAT DOCUMENT, WHO IT'S FROM AND WHO
IT'S TO, DOCTOR?

A       YES.  IT'S TO SUN SHIPBUILDING AND DRYDOCK
COMPANY.  THIS IS ANOTHER LETTER FROM
EAGLE-PICHER.  IT SAYS, "YOUR INQUIRY REGARDING
THE TYPE OF INSULATING MATERIALS USED IN SHIP
CONSTRUCTION FROM 1920 TO THE PRESENT DATE
ADDRESSED TO OUR CINCINNATI OFFICE HAS BEEN
PASSED ON TO ME FOR CONSIDERATION.  FROM THE TYPE
OF QUESTIONS YOU ASKED IT IS EVIDENT THAT YOU ARE
CONCERNED WITH THEIR POTENTIAL HEALTH HAZARDS."
DOWN BELOW HE SAYS, "IN ADDITION TO THE BASIC
FIBER OUR INSULATIONS CONTAIN MINOR AMOUNTS OF
CLAY, PORTLAND CEMENT, ASBESTOS FIBER, RESIN
BINDERS, AND THE LIKE.  AGAIN, WHILE EACH OF
THESE ADDED INGREDIENTS COULD BE A HEALTH HAZARD
IF EXPOSURE WERE TO A BIG CONCENTRATION, SUCH IS
NOT THE CASE."

THEN HE SAYS, "IN COMMON WITH OTHER FORMS,
MANY OTHER FORMS OF THERMAL INSULATIONS, THE
INSULATIONS WE MANUFACTURE TEND TO BE DUSTY."

1          AND THEN FURTHER DOWN HE SAYS, "BUT IN VIEW

2     OF THE ABOVE RELATIVE MINOR HAZARD POTENTIAL FOR

3     THE MATERIALS WE MANUFACTURE, WE DO NOT HAVE ANY

4     MEDICAL REPORTS RELATIVE TO THIS MATTER."

5          WHAT HE MEANS BY "THE ABOVE MINOR HAZARD"

6     IS, HE'S TALKING ABOUT SKIN REACTIONS, TALKING

7     ABOUT DERMATITIS HERE.

8   Q      BUT HE'S ADMITTING THAT THEIR TYPE

9     INSULATION IS DUSTY?

10  A      YES, HE IS.

11  Q      THE LIGHTS NOW, PLEASE.  WE'RE NOT GOING TO

12    TAKE THE TIME TO PUT THESE DOCUMENTS BACK IN THE

13    MACHINE, DOCTOR, EXCEPT TO SAY THAT I HAVE IN MY

14    HAND 402-D, "E", AND "F", WHICH ARE THE MINUTES

15    OF THE NATIONAL INSULATION MANUFACTURERS

16    ASSOCIATION MEETINGS THAT WE'VE REFERRED TO

17    PREVIOUSLY TODAY, AND ASK IF EAGLE-PICHER ISN'T

18    SHOWN AS A PARTICIPANT ON THESE DOCUMENTS?

19  A      YES, EAGLE-PICHER WAS A MEMBER OF THE

20    NATIONAL INSULATION MANUFACTURERS ASSOCIATION.

21  Q      AND THAT IS THE ASSOCIATION THAT FIRST

22    PROPOSED A HEALTH PROGRAM AND THEN REJECTED IT?

23  A      YES, IN 1960.

24  Q      AND THE SAME ORGANIZATION THAT DISCUSSED THE

25    JOHNS-MANVILLE LABELING OF THEIR PRODUCTS IN

1871

1       1964?

2    A       YES, SIR.

3    Q       NOW, AGAIN DIRECTING YOUR ATTENTION TO THE

4    CHART, EAGLE-PICHER, WHICH WE'RE USING TO

5    SUMMARIZE OR CAPSULIZE YOUR TESTIMONY, DOCTOR,

6    WOULD YOU SUMMARIZE IT TO THE JURY?

7    A       YES.   IN 1932 THEY RECEIVED A REPORT FROM

8    THE U.S. GOVERNMENT THAT ASBESTOS WAS ONE OF THE

9    MOST DANGEROUS DUSTS TO WHICH MAN IS EXPOSED.

10   BETWEEN 1938 AND 1953 THEY RECEIVED REFERENCE

11   TEXTS AT THE RESEARCH LIBRARY REGARDING HEALTH

12   HAZARDS AND ASBESTOSIS.

13       IN 1942 THEIR SALESMEN IN TEXAS, MR. AVER,

14   POINTED OUT THE GLOYNE AND MEREWETHER PUBLICATION

15   IN THE I.L.O., SUBSUPPLEMENT TO THE ENCYCLOPEDIA

16   ON OCCUPATIONAL HEALTH.

17   Q       IS THAT THE ONE THAT SAID THAT, "IF YOU

18   THINK THAT IT'S DANGEROUS, READ THIS"?

19   A       YES.   IN HIS MEMORANDUM HE CALLED ATTENTION

20   TO THAT.

21       IN 19 -- ACTUALLY GOING BACK IN 1936,

22   EAGLE-PICHER WAS A MEMBER OF THE INDUSTRIAL

23   HYGIENE FOUNDATION, AND RECEIVED THE INDUSTRIAL

24   HYGIENE DIGEST, AND HAD ACCESS TO THE RESOURCE OF

25   THE INDUSTRIAL HYGIENE FOUNDATION REGARDING

1872

1    HEALTH HAZARDS.

2    Q        AND DID THAT DIGEST HAVE A COPY OF THE

3    ARTICLES THAT THE JOURNAL OF THE AMERICAN MEDICAL

4    ASSOCIATION PUT OUT ON THE RELATIONSHIP BETWEEN

5    ASBESTOS AND CANCER IN 1949?

6    A        YES.   AMONGST THE DOZENS OF ARTICLES

7    SUMMARIZED ABOUT ASBESTOS AND ASBESTOSIS AND

8    CANCER (INAUDIBLE) -- JOURNAL OF AMERICAN MEDICAL

9    ASSOCIATION EDITORIAL IN 1949.

10        IN 1960 AND 1964 EAGLE-PICHER WAS A MEMBER

11    OF THE NATIONAL INSULATION MANUFACTURERS

12    ASSOCIATION, WHERE THIS IDEA OF A HEALTH PROGRAM

13    WAS RAISED AND PROJECTED, THEN LATER ON

14    JOHNS-MANVILLE WARNING LABEL WAS QUOTED IN ITS

15    ENTIRETY.

16        IN 1965 AND 1968 LETTERS WERE SENT BY THE

17    COMPANY TO VARIOUS INDUSTRIAL CONSUMERS OF THE

18    EAGLE-PICHER INSULATION PRODUCTS TO THE EFFECT

19    THAT, AT LEAST ONE LETTER, THERE WERE NO TOXIC

20    INGREDIENTS, OR IN ANY EVENT, IF THERE WAS A

21    LITTLE ASBESTOS IN IT, IT WASN'T ENOUGH TO BE

22    ANYTHING TO CONCERN YOURSELF ABOUT.

23    Q        THIS WAS IN 1968 AFTER THEY HAD BEEN TOLD

24    BACK IN 1932 THAT IT WAS ONE OF THE MOST

25    DANGEROUS DUSTS TO WHICH MAN IS EXPOSED, IS THAT

1873

1    TRUE?

2    A        YES.

3    Q        THEY WERE WRITING ONE OF THEIR CUSTOMERS

4    SAYING, "THERE'S NOTHING TOXIC IN OUR PRODUCT"?

5    A        YES.

6    Q        AND WAS THE PRODUCT THEY WERE REFERRING TO

7    AN ASBESTOSIS-CONTAINING PRODUCT?

8    A        YES.

9    Q        YOU CAN TAKE YOUR SEAT, DOCTOR.  DOCTOR, DO

10   YOU HAVE ANY EVIDENCE, OR HAVE YOU FOUND ANY

11   DOCUMENT OR BIT OF INFORMATION THAT INDICATES

12   THAT EAGLE-PICHER AT ANY TIME EVER TESTED ONE OF

13   ITS OWN PRODUCTS TO DETERMINE WHAT THE DUST

14   CONTENT MIGHT BE WHEN USED BY AN INSULATOR OR END

15   PRODUCT USER?

16   A        I'VE NEVER SEEN ANY INDICATION THAT THE

17   COMPANY TESTED ITS PRODUCTS FOR EXPOSURE THAT A

18   PRODUCT USER WOULD SUSTAIN, NO.

19   Q        AND DOCTOR, DO YOU HAVE AN OPINION BASED ON

20   YOUR INVESTIGATION AS TO WHETHER OR NOT

21   EAGLE-PICHER HAD ACTUAL KNOWLEDGE THAT ASBESTOS

22   WAS A DANGEROUS PRODUCT, THAT ASBESTOS WAS ONE OF

23   THE MOST DANGEROUS DUSTS KNOWN TO MAN, AND THAT

24   ASBESTOSIS WAS A SEVERE DISEASE GOING BACK TO THE

25   1930'S?

187.4

1    A       YES.

2    Q       AND WHAT IS YOUR OPINION?

3    A       THAT THEY KNEW.

4    Q       AND DOCTOR, I'LL ASK YOU THIS ONE QUESTION

5            RELATING TO ALL OF THE DEFENDANTS' CHARTS THAT

6            HAVE BEEN PLACED BEFORE THIS JURY UP TO NOW, DO

7            YOU HAVE AN OPINION AS TO WHETHER OR NOT IF THOSE

8            MANUFACTURERS AND/OR SELLERS WERE HELD TO THE

9            CARE AND DEGREE OF AN EXPERT IN THEIR FIELD THAT

10           THEY KNEW OR SHOULD HAVE KNOWN THAT ASBESTOS WAS

11           A DANGEROUS AND HAZARDOUS PRODUCT LONG BEFORE THE

12           '40'S?

13   A       YES.

14   Q       WHAT IS YOUR OPINION, SIR?

15   A       MY OPINION IS THAT CERTAINLY SOMETIME BEFORE

16           1940 THEY SHOULD HAVE KNOWN THAT.

17   Q       AND WITHOUT REPEATING THE QUESTION, WOULD

18           YOU HAVE AN OPINION AS TO WHETHER OR NOT THEY

19           KNEW OR SHOULD HAVE KNOWN THAT ASBESTOS WAS A

20           DANGEROUS PRODUCT BEFORE THE '50'S?

21   A       YES.

22   Q       AND WHAT IS THAT OPINION?

23   A       WELL, THEY CERTAINLY SHOULD HAVE KNOWN THAT,

24           WHAT WITH THE LITERATURE ON CANCER FROM ASBESTOS

25           BEING ADDED TO THE LITERATURE ON ASBESTOSIS.

1875

1   Q        AND THE SAME QUESTION AS TO WHETHER OR NOT

2   THEY, BEING HELD TO THE DEGREE AND CARE OF AN

3   EXPERT IN THEIR FIELD, THEY KNEW OR SHOULD HAVE

4   KNOWN THAT ASBESTOS WAS A DANGEROUS PRODUCT

5   BEFORE THE '60'S?

6   A        YES.

7   Q        AND WHAT IS THAT OPINION?

8   A        THAT THEY CERTAINLY KNEW.

9   Q        THAT IT WAS A DANGEROUS PRODUCT?

10  A        YES.  ALL OF THEM KNEW.

11  Q        AND MAYBE I CAN ASK ONE QUESTION INSTEAD OF

12  THREE BY ASKING YOU IF YOU HAVE AN OPINION AS TO

13  WHETHER OR NOT THESE MANUFACTURERS AND/OR

14  SELLERS, WHOSE CHARTS YOU'VE PLACED BEFORE THIS

15  JURY -- HOW MANY OF THEM IS IT, EIGHT -- WHEN

16  HELD TO THE DEGREE AND CARE OF AN EXPERT, KNEW OR

17  SHOULD HAVE KNOWN THAT ASBESTOSIS WAS A DISEASE

18  THAT WAS PROGRESSIVE, IRREVERSIBLE, INCURABLE,

19  AND TERMINAL BEFORE THE '40'S, BEFORE THE '50'S,

20  BEFORE THE '60'S?

21  A        YES.

22  Q        AND WHAT IS YOUR OPINION?

23  A        THEY SHOULD HAVE KNOWN.

24

25           MR. BALDWIN:  I HAVE NO FURTHER QUESTIONS,

1876

1    YOUR HONOR.

2

3        THE COURT:  WELL, MS. JENKINS, DID YOU GET

4    AN OPPORTUNITY TO EXAMINE THE EXHIBIT WE HELD IN

5    OBEYANCE?

6

7        MR. BALDWIN:  YOU HONOR, WE'RE GOING TO

8    WITHDRAW THAT.

9

10       THE COURT:  YOU'RE GOING TO WITHDRAW IT?

11   OKAY.  ARE YOU READY FOR CROSS-EXAMINATION?

12

13       MR. JOSEPHSON:  YES, YOUR HONOR, I'M GOING

14   TO DO THE HONORS, BUT IT'S GOING TO TAKE ME A

15   MINUTE TO GET ORGANIZED.

16

17

18

19

20

21

22

23

24

25

1877

1    Q       DO YOU HAVE ANY EVIDENCE, OR DID YOU FIND

2           ANY EVIDENCE THAT POINTED TO ANY ONE OF THESE

3           MANUFACTURERS OR SELLERS WARNING OF ANY OF THE

4           DANGERS OF THEIR PRODUCTS PRIOR TO 1930, PRIOR TO

5           1940, PRIOR TO 1950, OR PRIOR TO 1960?

6    A       NO.

7    Q       DO YOU HAVE AN OPINION AS TO WHETHER OR NOT

8           THEY ISSUED SUCH A WARNING PRIOR TO 1930, PRIOR

9           TO 1940, PRIOR TO 1950, AND PRIOR TO 1960?

10    A       YES, I DO.

11    Q       AND WHAT'S YOUR OPINION?

12    A       THAT THEY DID NOT.

13

14           MR. BALDWIN:  THANK YOU.

15

16           THE COURT:  MR. CROSBY, WHY DON'T YOU

17           STRAIGHTEN IT UP SO COUNSEL CAN MOVE A LITTLE

18           BETTER?

19

20           MR. JOSEPHSON:  MAY I PROCEED, YOUR HONOR?

21

22           THE COURT:  YES.

23

24    CROSS-EXAMINATION BY MR. JOSEPHSON:

25    Q       GOOD AFTERNOON, DR. CASTLEMAN.

1878

1   A       GOOD AFTERNOON.

2   Q       I'M FRANKLY NOT SURE WHO I SHOULD BE

3   CROSS-EXAMINING, BUT I CAN'T CROSS-EXAMINE MR.

4   BALDWIN, SO I'LL GO AHEAD AND CROSS-EXAMINE YOU.

5   I WANT TO ASK YOU IF YOU COULD TO TELL US YOUR

6   DATE OF BIRTH.

7   A       SEPTEMBER 6, 1946.

8   Q       AND WHERE WERE YOU BORN, SIR?

9   A       BALTIMORE.

10  Q       YOU HAVE PREPARED WHAT'S CALLED A CURRICULUM

11  VITAE, HAVE YOU NOT?

12  A       I HAVE.

13  Q       AND IN YOUR CURRICULUM VITAE YOU LIST YOUR

14  EDUCATION AND YOUR CONSULTATIONS AND YOUR

15  PUBLICATIONS AND SO FORTH, IS THAT CORRECT?

16  A       YES, SIR.

17  Q       YOU DO NOT LIST, DO YOU, SIR, IN YOUR

18  CURRICULUM VITAE THE PLACES THAT YOU HAVE BEEN

19  EMPLOYED ALONG THE WAY SINCE FINISHING COLLEGE,

20  DO YOU, SIR?

21  A       NO.

22  Q       ISN'T IT COMMON FOR SOMEONE GENERALLY WHEN

23  THEY'RE GIVING A CURRICULUM VITAE OR PREPARING

24  ONE, LISTING THEIR QUALIFICATIONS TO LIST THE

25  PLACES THAT ONE HAS BEEN EMPLOYED?

1    A         YOU CAN WRITE THESE THINGS AS LONG AS YOU
2         WANT.  I JUST FIGURE PEOPLE AREN'T REALLY THAT
3         CONCERNED ABOUT WHERE I WENT TO HIGH SCHOOL, AND
4         THEY'RE NOT THAT CONCERNED ABOUT JOBS I HAD IN
5         THE EARLY 1970'S.  I'VE BEEN AN INDEPENDANT
6         CONSULTANT SINCE 1975, AND THAT'S THE PART OF MY
7         CAREER THAT I FIGURE IS MOST RELEVANT TO PEOPLE
8         WHO ARE INTERESTED IN WHAT MY QUALIFICATIONS ARE.
9    Q         YES, SIR.  BASICALLY THEN, AND I'LL GO OVER
10        WHAT YOU DID DO BY WAY OF EMPLOYMENT PRIOR TO
11        BECOMING AN INDEPENDANT CONSULTANT, BUT HAVE YOU
12        LISTED ON YOUR CURRICULUM VITAE THAT YOU'RE A
13        CONSULTANT FOR SOMETHING CALLED THE ASBESTOS
14        LITIGATION GROUP AND INDIVIDUAL ATTORNEYS FROM
15        1976 TO DATE?
16   A         YES.
17   Q         AND WOULDN'T IT BE TRUE, SIR, THAT THE
18        OVERWHELMING AMOUNT OF YOUR ACTIVITIES WHEN YOU
19        HAVE NOT BEEN A STUDENT, SINCE 1976, HAVE BEEN
20        YOUR ENGAGEMENT IN ASBESTOS LITIGATION ON BEHALF
21        OF PLAINTIFF'S ATTORNEYS MANY OF WHOM ARE MEMBERS
22        OR PARTICIPANTS IN WHAT'S CALLED THE ASBESTOS
23        LITIGATION GROUP?
24   A         I WOULDN'T CALL IT THE OVERWHELMING AMOUNT.
25        IT'S PROBABLY OCCUPIED ABOUT HALF OF MY TIME OR A

1880

1     LITTLE BIT LESS OVER THAT PERIOD OF 1976 -- AS

2     YOU POINT OUT, I'VE GOTTEN A DOCTORAL DEGREE.  I

3     WAS A FULL-TIME DOCTORAL STUDENT FROM 1981 TO

4     1985 AND I'VE DONE CONSULTING FOR A WHOLE LOT OF

5     OTHER AGENCIES WHOSE NAMES WERE READ TO THE JURY

6     INITIALLY, AND I ALSO DO A LOT OF WORK.  I DO

7     TEACHING.  I'M ON THE FACULTY OF THE

8     JOHNS-HOPKINS UNIVERSITY.  I HAVE GIVEN GUEST

9     LECTURES IN OTHER UNIVERSITIES IN THIS COUNTRY

10    AND OTHER COUNTRIES, AND SO I DO LOTS OF OTHER

11    THINGS WITH MY TIME.

12 Q     YES, SIR.  BUT ISN'T IT CORRECT -- LET'S

13    JUST TAKE 1984, FOR EXAMPLE --

14 A     RIGHT.

15 Q     -- AS A YEAR.  THAT NINETY PERCENT OF YOUR

16    INCOME DURING 1984 CAME OUT OF THE ASBESTOS

17    LITIGATION WORKING ON BEHALF OF PLAINTIFF'S

18    ATTORNEYS?

19 A     YES.  WELL, YOU WERE ASKING ABOUT MY TIME

20    NOT MY INCOME.  THAT'S A SEPARATE ISSUE.  WHILE I

21    HAD BEEN AT SCHOOL, IT GOT TO THE POINT I WASN'T

22    DOING ANYMORE CONSULTING EXCEPT WALKING INTO

23    COURTROOMS AND SAYING WHO I WAS AND WHAT I KNEW.

24    THE REST OF IT WAS SPENT IN SCHOOL.

25 Q     NOW, ARE YOU TELLING -- ARE YOU A TENURED

BOYD-PARKS REPORTERS

1881

1        PROFESSOR AT JOHNS-HOPKINS UNIVERSITY?

2    A        NO.  I'M WHAT'S CALLED -- I'M A LECTURER.

3    Q        YOU ARE NOT EVEN AN ASSISTANT PROFESSOR AT

4        JOHNS-HOPKINS, ARE YOU?

5    A        WELL, I'M NOT ON WHAT'S CALLED THE TENURE OF

6        TRACK OF ASSISTANT PROFESSORS, ASSOCIATE

7        PROFESSORS, AND FULL PROFESSORS.  I GIVE LECTURES

8        THERE AS PART OF TWO COURSES, THREE COURSES

9        ACTUALLY AT THE SCHOOL OF HYGIENE AND PUBLIC

10        HEALTH AND AT THE ENGINEERING SCHOOL FOR WHICH I

11        SOMETIME GET PAID, SOMETIMES I DON'T GET PAID.

12   Q        YES, SIR.

13   A        I'M NOT A CAREER PROFESSOR.  I'LL FREELY

14        ADMIT THAT.

15   Q        YOU'RE NOT ANY SORT OF A PROFESSOR AT THE

16        JOHNS-HOPKINS UNIVERSITY?

17   A        WELL, I THINK IT'S SPLITTING HAIRS TO SAY

18        THAT A LECTURER IS NOT A PROFESSOR.  I DO AS MUCH

19        TEACHING AS SOME OF THE PROFESSORS OVER THERE.

20

21

22

23

24

25

BOYD-PARKS REPORTERS

1   BY MR. JOSEPHSON:

2   Q      YES, SIR.  BUT MY QUESTION AGAIN, WAS THAT

3       YOU ARE NOT A PROFESSOR, YOU ARE NOT ON THE --

4       YOU ARE NOT AN ASSISTANT PROFESSOR, AN ASSOCIATE

5       PROFESSOR, OR A FULL PROFESSOR AT THE

6       JOHNS-HOPKINS UNIVERSITY?

7   A      OKAY.  MY TITLE IS THAT I'M A LECTURER, AND

8       THAT THEREFORE I'M NOT TITLED AS A PROFESSOR IN

9       THE CATALOG, THAT'S CORRECT.

10   Q      NOW THEN, I WOULD LIKE TO TALK TO YOU IF I

11       COULD A LITTLE BIT ABOUT YOUR BACKGROUND, TRY TO

12       GET SOME DATES DOWN.  I THINK THAT WE HAVE SOME

13       PAPER UNDER HERE.  MIGHT I MOVE THE CONSPIRACY

14       FOR A BRIEF MOMENT?

15       LET'S SEE IF WE MIGHT JUST GO OVER, IF WE

16       COULD, SIR, WHEN YOU FINISHED, GRADUATED FROM

17       COLLEGE.

18   A      1968.

19   Q      AND YOU GOT AN ENGINEERING DEGREE, IS THAT

20       CORRECT?

21   A      CHEMICAL ENGINEERING, YES, SIR.

22   Q      AND THEN DID YOU GO TO WORK FOR SOMEONE?

23   A      YES.  I WENT TO WORK FOR HERCULES,

24       INCORPORATED, IN THE CHEMICAL INDUSTRY.

25   Q      YES, SIR.  AND DID YOU WORK THERE

1883

1        APPROXIMATELY A YEAR AND A HALF?

2   A     YES.

3   Q     AND WOULD THAT TAKE US UP TO ABOUT 1970?

4   A     LATE '69.

5   Q     NOW, WHEN YOU LEFT HERCULES -- YOU LEFT

6        HERCULES IN 1969?

7   A     YES, SIR.

8   Q     NOW, THIS JOB DIDN'T HAVE ANYTHING TO DO

9        WITH ASBESTOS, DID IT?

10  A     ASIDE FROM BREATHING IT, NO.

11  Q     YES, SIR.  YOU WEREN'T INVOLVED WITH

12       ASBESTOS, WERE YOU, SIR?

13  A     WELL, I MEAN, IT WAS USED AS AN INSULATION

14       PRODUCT IN THE CHEMICAL PLANT WHERE I WORKED, BUT

15       I WAS NOT STUDYING THE HEALTH AFFECTS OF ASBESTOS

16       AT THAT TIME.

17  Q     YOU LEFT ABOUT 1969 IN PART BECAUSE YOU

18       WEREN'T PROMOTED, ISN'T THAT CORRECT?

19  A     NO.

20  Q     THAT'S NOT TRUE AT ALL?

21  A     THAT'S NOT TRUE AT ALL.

22  Q     ALL RIGHT, SIR.  WHERE DID YOU GO AFTER --

23       IS THIS YOUR ONE AND ONLY JOB IN PRIVATE

24       INDUSTRY?

25  A     I WORKED FOR CHEVRON ASPHALT COMPANY WHEN I

1884

1    WAS IN COLLEGE IN THE CONTROL LABORATORY TESTING

2    ASPHALT.   THAT WAS A SUMMER JOB.   I THINK THAT'S

3    ALL THE WORK TAHT I DID FOR PRIVATE INDUSTRY,

4    YES.

5    Q    SINCE 1969 THEN, AFTER YOU RECEIVED YOUR

6    DEGREE, YOU HAVEN'T BEEN INVOLVED IN ANY

7    EMPLOYMENT WITH PRIVATE INDUSTRY?

8    A    NO.

9    Q    THEN AFTER THAT YOU TOOK A VACATION, I THINK

10   YOU'VE DESCRIBED IT AS, IS THAT CORRECT?

11   A    I TOOK A YEAR OFF.   I HAD SAVED SOME MONEY,

12   I WAS REJECTED FOR THE DRAFT --

13   Q    YES, SIR.

14   A    -- AND I TOOK A YEAR OFF.

15   Q    AND I THINK YOU'VE TOLD US BEFORE, YOU

16   HITCHHIKED THROUGH MOROCCO AND MEXICO FOR ABOUT A

17   YEAR?

18   A    AND TEXAS, CALIFORNIA, MEXICO.

19   Q    I GUESS IT'S POSSIBLE SOME OF US RIGHT HERE

20   IN THIS ROOM MAY HAVE SEEN YOU ON THE HIGHWAY?

21   A    THEY MAY HAVE EVEN PICKED ME UP.

22   Q    AFTER 1970 DID YOU GO BACK TO SCHOOL AGAIN?

23   A    YES.

24   Q    AND WHAT YEAR WOULD THAT BE?

25   A    WELL, THAT WAS IN LATE 1970, SEPTEMBER.

1885

1    Q        AND YOU WENT TO GET YOUR MASTERS?

2    A        YES, SIR.

3    Q        AND WHEN DID YOU RECEIVE YOUR MASTER'S

4    DEGREE?

5    A        I COMPLETED THE REQUIREMENTS IN '71, THE

6    DEGREE WAS FORMALLY AWARDED IN '72.

7    Q        I'M GOING TO PUT 1971, 1972, MASTER'S.

8    AFTER 1972 WHEN YOU GOT YOUR MASTER'S DEGREE, FOR

9    WHOM WERE YOU EMPLOYED?

10   A        THE BALTIMORE COUNTY DIVISION OF AIR

11   POLLUTION AND INDUSTRIAL HYGIENE.

12   Q        BALTIMORE COUNTY?  AND HOW LONG DID YOU WORK

13   FOR BALTIMORE COUNTY?

14   A        A LITTLE OVER A YEAR AND A HALF.

15   Q        ONE AND A HALF YEARS.  AND DOES THAT TAKE US

16   UP TO ABOUT 1974?

17   A        '73.

18   Q        THEN AT BALTIMORE COUNTY, DOCTOR, WHAT TYPE

19   OF WORK DID YOU DO THERE?

20   A        I WAS RESPONSIBLE FOR INDUSTRIAL COMPLIANCE

21   WITH THE AIR POLLUTION LAWS, THE AIR POLLUTION

22   REGULATIONS FOR THE STATE OF MARYLAND,

23   PRINCIPALLY COMPANIES USING CHEMICALS, BECAUSE I

24   HAD A BACKGROUND IN CHEMICAL TECHNOLOGY.

25            I ALSO DID SPECIAL INVESTIGATIONS OF TOXIC

1886

1    HAZARDS FOR THE HEALTH DEPARTMENT WHEN

2    PARTICULARLY UNUSUAL OR TOUGH PROBLEMS CAME UP.

3    AND I ALSO LOOKED INTO COMMUNITY EXPOSURE TO

4    ASBESTOS IN VARIOUS BRANCHES THROUGH OTHER PARTS

5    OF THE HEALTH DEPARTMENT AS WELL AS MY OWN

6    DIVISION.

7    Q       DID YOU EVER CONDUCT ANY DUST COUNTS ON

8    ASBESTOS WHILE YOU WERE THERE?

9    A       NO.  I ARRANGED FOR DUST COUNTS TO BE DONE,

10   BUT I DIDN'T ACTUALLY OPERATE THE PUMPS OR SQUINT

11   THROUGH THE MICROSCOPE AND COUNT FIBERS.

12   Q       AND AFTER YOU WERE WITH BALTIMORE COUNTY FOR

13   APPROXIMATELY A YEAR AND A HALF, DID YOU HAVE

14   SOME DISAGREEMENTS WITH THE PEOPLE WHO YOU WORKED

15   WITH THERE?

16   A       YES, I DID.

17   Q       AND DID THIS RESULT IN YOUR LEAVING YOUR

18   EMPLOYMENT WITH BALTIMORE COUNTY AFTER

19   APPROXIMATELY WORKING THERE A YEAR AND A HALF?

20   A       MY DEPARTURE FROM THE JOB IN THE END WAS

21   COMPLETELY MY DECISION, IT WAS IN NO WAY FORCED,

22   BUT THEY DID -- THEY DID PUT PRESSURE ON ME,

23   BECAUSE I HAD TESTIFIED AT A CONGRESSIONAL

24   HEARING ABOUT COMMUNITY EXPOSURE TO ASBESTOS, AND

25   THEY TRIED TO FIRE ME, AND THERE WAS SOME ADVERSE

1887

1    PUBLICITY TO THE HEALTH DEPARTMENT ABOUT THAT,

2    AND THEN THEY HIRED ME BACK WITH FULL BACK-PAY,

3    AND THEN I RESIGNED OF MY OWN FREE WILL.

4    Q    YES, SIR.  NOW, THAT WAS THE BALTIMORE

5    COUNTY, THESE PEOPLE WHO YOU WORKED WITH FOR THE

6    COUNTY --

7    A    RIGHT.

8    Q    -- OF BALTIMORE THAT PUT THIS PRESSURE ON

9    YOU, AS YOU PUT IT?

10   A    RIGHT.  WELL, THEY WERE GOVERNMENT

11   BUREAUCRATS, SUCH AS ONE CAN FIND IN MANY

12   GOVERNMENT AGENCIES.

13   Q    YES, SIR.  AND WHERE DID YOU GO TO WORK

14   NEXT?

15   A    I WENT TO WORK FOR THE CENTER FOR SCIENCES

16   IN THE PUBLIC INTEREST IN WASHINGTON, D.C.

17   Q    LET ME PUT THAT DOWN.  CENTER FOR SCIENCES.

18   HOW LONG DID YOU WORK -- IN THE PUBLIC INTEREST.

19   HOW LONG DID YOU WORK THERE?

20   A    A LITTLE LESS THAN A YEAR.

21   Q    AND ABOUT NINE MONTHS?

22   A    YES.

23   Q    WOULD THAT PUT US TO ABOUT 1974?

24   A    SOMETIME IN 1974, RIGHT.

25   Q    AND WHAT TYPE OF WORK DID YOU DO IN THE

1888

1    CENTER FOR PUBLIC INTEREST?

2  A        WE WOULD -- WE WOULD PETITION GOVERNMENT

3    AGENCIES FOR REGULATIONS.  WE WERE INVOLVED IN --

4    WE WOULD OCCASIONALLY GET INVITED TO

5    CONGRESSIONAL HEARINGS AND TESTIFY ABOUT

6    LEGISLATION THAT WAS BEING CONSIDERED BY VARIOUS

7    BRANCHES OF THE GOVERNMENT, EITHER WITH RESPECT

8    TO TOXIC SUBSTANCES OR ENERGY CONSERVATION, WHICH

9    HAD SUDDENLY BECOME A BIG THING WITH THE ENERGY

10   CRISIS.

11        AND A LOT OF MY ACTIVITIES HAD TO DO WITH

12   ASBESTOS, AND THEN WHEN THE VINYL CHLORIDE THING

13   HIT, THAT IS, THE FACT WAS REVEALED THAT THIS

14   PETROCHEMICAL VINYL CHLORIDE WAS A CAUSE OF

15   CANCER, THE SAME CHEMICAL THAT WAS USED AS A

16   PROPELLANT IN SUCH THINGS AS CLAIROL, SUMMER

17   BLONDE, WE HAD PLENTY OF MORE WORK IN TERMS OF

18   TRYING TO CONTROL PUBLIC EXPOSURE TO THAT

19   CARCINOGEN.  AND I BECAME INVOLVED IN THAT.

20  Q        YES, SIR.  AND YOU LEFT THE CENTER FOR

21   SCIENCE IN THE PUBLIC INTEREST IN LESS THAN A

22   YEAR?

23  A        YES, SIR.

24  Q        AND THEN WHERE APPROXIMATELY -- WHERE DID

25   YOU GO AFTER THAT?

1889

1    A        MY NEXT JOB WAS THE GROUP CALLED THE

2             MARYLAND PUBLIC INTEREST RESEARCH GROUP.

3    Q        IS THERE AN ABBREVIATION FOR THAT?

4    A        IT USED TO CALL ITSELF MARYPIRG,

5             M-A-R-Y-P-I-R-G.

6    Q        THAT'S THE MARYLAND PUBLIC INTEREST RESEARCH

7             GROUP?

8    A        RIGHT.

9    Q        AND HOW LONG WERE YOU THERE?

10   A        ABOUT EIGHT OR NINE MONTHS.

11   Q        WOULD THAT TAKE US INTO 1975?

12   A        RIGHT.

13   Q        AND WAS THIS ANOTHER GROUP -- WELL, TELL ME

14            THIS, WHAT TYPE OF GROUP WAS IT?

15   A        WELL, IT WAS A LITTLE DIFFERENT IN STYLE

16            THAN THE WASHINGTON GROUP.  IT FOCUSED MORE ON

17            STATE AND LOCAL ISSUES, AND THE IDEA WAS TO TRY

18            AND GET STUDENTS INVOLVED IN VARIOUS TYPES OF

19            ACTIVITIES, ENVIRONMENTAL ACTIVITIES, CONSUMER

20            PROTECTION ACTIVITIES, OTHER THINGS THAT THEY

21            WERE INTERESTED IN OR THAT THEY WOULD TAKE AN

22            INTEREST IN THAT WE WERE ALREADY WORKING ON.  IT

23            RANGED FROM THINGS LIKE THE FAT CONTENT IN GROUND

24            BEEF IN THE LOCAL SUPERMARKETS TO TOXIC

25            SUBSTANCES LIKE ASBESTOS.

1890

```
 1    Q        AND YOU SAY YOU REMAINED THERE ABOUT EIGHT
 2         OR NINE MONTHS?
 3    A        YES.
 4    Q        AND AFTER THE EIGHT OR NINE MONTH PERIOD
 5         WERE YOU DISCHARGED OR DISMISSED?
 6    A        I WAS FIRED.
 7    Q        AND YOU WERE FIRED BY THE STUDENTS?
 8    A        RIGHT.   THERE WAS A DISPUTE OVER THEIR
 9         TACTICS, AND I CRITICIZED THEIR TACTICS IN TRYING
10         TO GET SOME STUDENT ELECTED WHO HAD PROMISED TO
11         GIVE THEM MORE MONEY THE NEXT YEAR IF HE WAS
12         ELECTED AS PRESIDENT OF THE STUDENT BODY, AND I
13         TOLD THEM THAT THEY WOULD BE BETTER TO GO OUT OF
14         BUSINESS THAN TO STAY IN BUSINESS DOING SUCH
15         THINGS.   THEY TOLD ME I WAS NAIVE, AND THEY HELD
16         A VOTE, AND THE VOTE WAS SOMETHING LIKE FIVE TO
17         FOUR TO LET ME GO.   IT WAS THE BEST THING THAT
18         EVER HAPPENED TO ME.
19              I PRINTED UP SOME BUSINESS CARDS AND I'VE
20         BEEN AN INDEPENDENT CONSULTANT EVER SINCE.
21    Q        YES, SIR.   AND THEN IN ABOUT -- AFTER YOU
22         WERE DISMISSED BY THE STUDENTS IN ABOUT 19 --
23         WHEN, '76?
24    A        1975.
25    Q        -- 1975, YOU BECAME AN INDEPENDENT
```

1891

1       CONSULTANT, WOULD THAT BE CORRECT?

2    A      YES.

3    Q      AND YOU HAVE BEEN AN INDEPENDENT CONSULTANT

4    SINCE 1975?

5    A      YES, SIR.

6    Q      WITH THE EXCEPTION, I WANT TO GO OVER THIS,

7    THERE WAS A TIME AFTER 1975 WHEN YOU WENT BACK TO

8    SCHOOL FOR THE THIRD TIME TO GET YOUR DOCTOR OF

9    SCIENCE?

10   A      WELL, I CONTINUED TO FUNCTION AS AN

11   INDEPENDENT CONSULTANT DURING THOSE YEARS, TOO,

12   BUT MY CONSULTING ACTIVITIES WERE SOMEWHAT

13   REDUCED FROM WHAT THEY OTHERWISE WOULD HAVE BEEN

14   I SUPPOSE.

15   Q      AND WHEN DID YOU GO BACK TO SCHOOL?

16   A      1981.

17   Q      AND HOW LONG WERE YOU IN SCHOOL?

18   A      FROM -- ABOUT FOUR YEARS.  THE DEGREE WAS

19   AWARDED IN MAY OF 1985, LAST YEAR.

20   Q      AND THAT'S CALLED A DOCTOR OF SCIENCE?

21   A      RIGHT.

22   Q      AND DURING THE PERIOD FROM 1981 TO 1985

23   WHILE YOU WERE GETTING YOUR DOCTOR OF SCIENCE DID

24   YOU WRITE THE BOOK THAT THE JURY HAS HEARD ABOUT

25   ON ASBESTOS?

1892

1    A        YES.

2    Q        NOW, TO MAKE IT CLEAR, IS IT CORRECT THEN

3         THAT YOU DO NOT HAVE A DEGREE IN EPIDEMIOLOGY?

4    A        WELL, I TOOK A NUMBER OF COURSES IN IT, BUT

5         I DON'T HAVE A DEGREE THAT'S FROM THE DEPARTMENT

6         OF EPIDEMIOLOGY.

7    Q        THERE REALLY IS A DEPARTMENT OF

8         EPIDEMIOLOGY, IS THERE NOT?

9    A        RIGHT.

10   Q        AND THERE REALLY ARE REAL LIVE

11        EPIDEMIOLOGISTS?

12   A        THERE ARE PEOPLE WHO GET DEGREES FROM THAT

13        DEPARTMENT.

14

15

16

17

18

19

20

21

22

23

24

25

1893

1    Q        YES, SIR.  AND YOU'RE NOT A BIOSTATISTICIAN,
2    IS THAT CORRECT?
3    A        NO.  I TOOK COURSES IN BIOSTATISTICS FROM
4    THAT DEPARTMENT, BUT I DIDN'T GRADUATE FROM THE
5    DEPARTMENT OF BIOSTATISTICS.  SO, TECHNICALLY,
6    I'M NOT A BIOSTATISTICIAN, NO.
7    Q        OKAY.  AND YOU'RE NOT A MEDICAL DOCTOR?
8    A        THAT'S CORRECT.
9    Q        AND ORIGINALLY WHEN YOU ENROLLED AT
10   JOHNS-HOPKINS TO GET YOUR DOCTOR OF SCIENCE, YOU
11   ACTUALLY SIGNED UP INITIALLY FOR A DEGREE IN THE
12   DOCTOR OF PUBLIC HEALTH OR SOMETHING, DID YOU
13   NOT?
14   A        YES.  WHEN I ORIGINALLY APPLIED TO THE
15   SCHOOL I APPLIED TO BE IN THE -- TO GET A DEGREE
16   OF DOCTOR OF PUBLIC HEALTH.  I DIDN'T UNDERSTAND
17   AT THAT TIME THAT THE PROGRAM IN DOCTOR OF
18   SCIENCE WAS SOMEWHAT MORE FLEXIBLE AND WOULD BE
19   MORE SUITABLE TO MY DESIRES THAN THE MORE
20   RESTRICTIVE REQUIREMENTS, JUST GENERAL
21   REQUIREMENTS THAT THEY HAD FOR PUBLIC HEALTH
22   DEGREES.  I WAS SO ADVISED BY MY ADVISOR.  HE
23   SAID, LOOK, ALL OF MY OTHER STUDENTS ARE IN THE
24   DOCTOR OF SCIENCE PROGRAM, YOU'LL PROBABLY FIND
25   YOURSELF NEEDLESSLY ENCUMBERED IF YOU GO THROUGH

1894

1    WITH DOCTOR OF PUBLIC HEALTH.  SO, WHY DON'T YOU

2    JUST CHANGE IT?  I TOOK HIS ADVICE.

3  Q    YES, SIR.  SO, YOU DID NOT GET A DEGREE AS A

4    DOCTOR OF PUBLIC HEALTH?

5  A    NO.  BUT I MEAN, THE DIFFERENCES ARE RATHER

6    INSIGNIFICANT TO ANYBODY WHO KNOWS.

7  Q    YES, SIR.  BUT THEY'RE SIGNIFICANT ENOUGH SO

8    THAT A DEGREE IS CONFIRMED ON PEOPLE WHO GET A

9    DEGREE AS A DOCTOR OF PUBLIC HEALTH VERSUS A

10    DOCTOR IN SCIENCE.

11  A    YES.  I MEAN, THE PEOPLE GO TO WORK FOR THE

12    SAME PLACES WHEN THEY GET OUT NO MATTER WHICH

13    DEGREE THEY HAVE.

14  Q    YES, SIR.  NOW, DO YOU HAVE ANY EMPLOYEES IN

15    YOUR JOB AS A CONSULTANT?

16  A    NO.  I SUCCEEDED IN NOT HAVING A BOSS OR

17    BEING ONE FOR THE LAST ELEVEN YEARS.

18  Q    I WANT TO ASK YOU ABOUT SOME OF THE THINGS

19    YOU'VE DONE, THEN.  WE'VE TALKED ABOUT GOING BACK

20    TO SCHOOL.  WHEN DID YOU FIRST GET INVOLVED WITH

21    ASBESTOS LITIGATION?

22  A    I USED TO GET LETTERS FROM LAWYERS WHEN I

23    WAS AT THE CENTER FOR SCIENCE IN THE PUBLIC

24    INTEREST, AND I WOULD SEND THEM SOMETHING IF THEY

25    ASKED FOR COPIES OF REPORTS OR SOMETHING, BUT I

1895

1      DIDN'T ACTUALLY GET INVOLVED AS A PARTICIPANT IN

2      ANY WAY UNTIL 1976.

3    Q      WERE YOU CONTACTED DURING THAT YEAR BY A

4      LAWYER FROM TEXAS BY THE NAME OF GILBERT ADAMS?

5    A      YES.  IN BEAUMONT.

6    Q      YES, SIR.  AND WHAT DID MR. ADAMS ASK YOU TO

7      DO?

8    A      MR. ADAMS EXPLAINED THAT HE WAS INVOLVED IN

9      A PROCEEDING SOMEWHAT LIKE THIS INVOLVING A

10     SINGLE PLAINTIFF AND, IN FACT, IT WAS A WIDOW OF

11     A MAN WHO HAD DIED FROM ASBESTOSIS AND

12     MESOTHELIOMA.  AND HE EXPLAINED TO ME THAT IN

13     ORDER TO ESTABLISH HIS CASE HE NEEDED TO SHOW

14     THAT IT HAD BEEN KNOWN FOR A LONG TIME THAT THERE

15     WAS SUCH A DISEASE AS ASBESTOSIS AND HAD BEEN

16     KNOWN FOR SOMETIME THAT THERE WAS SUCH A DISEASE

17     AS LUNG CANCER AND OTHER DISEASES ASSOCIATED WITH

18     ASBESTOS, AND HE ASKED ME IF I WOULD BE WILLING

19     TO JUST PRESENT THIS INFORMATION IN A COURT OF

20     LAW.  AND I SAID THAT I WOULD BE WILLING TO DO

21     THAT.

22   Q      YES, SIR.  AND DID YOU BEGIN THEN AT THAT

23     POINT IN TIME UP TO THE PRESENT TO BEGIN TO

24     TESTIFY AND CONSULT ON A REGULAR BASIS AS YOUR

25     PRIMARY SOURCE OF INCOME FROM 1976 UP UNTIL THE

1896

1    PRESENT IN THE ASBESTOS LITIGATION ON BEHALF OF

2    PLAINTIFFS AND THIS GROUP THAT I THINK YOU'VE

3    TOLD US ABOUT EARLIER, THE ASBESTOS -- YOU'LL

4    HAVE TO FINISH THE NAME OUT.  I FORGOT --

5    ASBESTOS LITIGATION GROUP.

6  A    WELL, THAT'S NOT QUITE THE WAY IT HAPPENED.

7    THE ACTIVITIES IN 1976 WERE RATHER FLEETING AND

8    LIMITED AND DIDN'T INVOLVE A MAJOR PART OF MY

9    INCOME.  IN 1976 AND 1977 MOST OF MY INCOME CAME

10   FROM CONSULTING WITH THE LARGE ENVIRONMENTAL

11   GROUPS AND GOVERNMENT AGENCIES, GROUPS LIKE THE

12   NATURAL RESOURCES DEFENSE COUNSEL, THE

13   ENVIRONMENTAL DEFENSE FUND, AND GOVERNMENT

14   AGENCIES INCLUDING THE FEDERAL TRADE COMMISSION

15   AND THE U. S. CONGRESS OFFICE OF TECHNOLOGY

16   ASSESSMENT.  AND SOME TIME LIKE AROUND 1978 I

17   SUPPOSE IN THE YEAR 1978 I BECAME MUCH MORE

18   INTENSIVELY INVOLVED IN DOING RESEARCH ON THIS

19   WHOLE PROBLEM.  LOOKING INTO THE HISTORY OF THESE

20   WORKERS' COMPENSATION CLAIMS, THESE CONTRACT UNIT

21   COMPENSATION CLAIMS WHICH NECESSITATED GOING TO

22   STATE COMPENSATION BOARDS AND GOING THROUGH

23   VOLUMINOUS RECORDS IN THE STATE AGENCIES, AND

24   THIS I DID AS A CONSULTANT FOR THE ASBESTOS

25   LITIGATION GROUP.

  
1897

1   Q        ALL RIGHT, SIR.

2   A        SO, AT THAT TIME IT BECAME A MAJOR ACTIVITY

3       OF MINE.

4   Q        AND YOU BEGAN, I THINK AT THAT TIME,

5       CHARGING VARIOUS ATTORNEYS WHAT I THINK YOU HAVE

6       REFERRED TO AS RETAINER FEES, WHERE THEY WOULD

7       PUT YOU ON RETAINER, YOU WOULD CHARGE THEM A FEE

8       TO HAVE YOU ON RETAINER TO ASSIST THEM GENERALLY

9       IN THIS LITIGATION.

10  A        THAT WOULD HAVE BEEN PROBABLY AFTER I BECAME

11      USED AS A WITNESS IN THESE TRIALS, WHICH DIDN'T

12      START UNTIL 1979.

13  Q        AND YOUR PRESENT RETAINER FEE I THINK -- I

14      THINK IT'S GONE UP SOME, BUT IS IT PRESENTLY

15      ABOUT TWELVE HUNDRED DOLLARS AN ATTORNEY?

16  A        IT'S A THOUSAND DOLLARS.

17  Q        A THOUSAND DOLLARS AN ATTORNEY?

18  A        FOR WHICH THE ATTORNEY CAN LIST ME IN TWO

19      THOUSAND ASBESTOS CASES AND CHARGE THEM EACH

20      FIFTY CENTS.

21  Q        YES, SIR.  AND THEN WHEN YOU ACTUALLY DO THE

22      WORK FOR THE ATTORNRY, DR. CASTLEMAN, YOU HAVE A

23      CHARGE, I THINK YOU'VE TOLD US ABOUT, OF TWELVE

24      HUNDRED DOLLARS A DAY?

25  A        YES.  THIS IS WHAT I CHARGE TO TESTIFY.

1898

1    Q        YES, SIR.  AND YOU HAD ABOUT TWENTY-FIVE

2    ATTORNEYS WHO HAVE PAID YOU THE INITIAL RETAINER

3    FEE, WOULD THAT BE CORRECT, SIR?

4    A        THAT SOUNDS ABOUT RIGHT.  THIS IS OVER A

5    SEVEN YEAR PERIOD.

6    Q        YES.  BUT IN ADDITION TO PAYING YOU THE

7    RETAINER FEE, THESE ATTORNEYS ARE THEN ALLOWED,

8    IF THEY CONTINUE TO USE YOU IN A NUMBER OF CASES,

9    THEY HAVE TO PAY YOU ONCE THE RETAINER FEE IS

10   EXHAUSTED.

11   A        WELL, THEY HAVE TO PAY ME IF THEY ACTUALLY

12   HAVE TO BRING ME TO TRIAL.

13   Q        YES, SIR.

14   A        IF THEY LIST ME AS A WITNESS AND THEY SETTLE

15   THE CASE ON THE BASIS OF HAVING LISTED MYSELF OR

16   JOE WAGONER OR WHOEVER ELSE THEY USE, THEY DON'T

17   HAVE TO PAY ME ANYTHING.

18   Q        NOW, YOU HAVE MENTIONED DR. WAGONER.  YOU

19   KNOW DR. WAGONER, DO YOU NOT?

20   A        I'VE KNOWN DR. WAGONER FOR MANY YEARS.

21   Q        IN FACT, I THINK YOU EVEN REFERRED TO HIM AS

22   SORT OF A FRIENDLY COMPETITOR.

23   A        MAYBE IN SOME DEPOSITION I COULD HAVE CALLED

24   HIM THAT, BUT I DON'T CONSIDER ANYBODY A

25   COMPETITOR.

1899

1    Q        AND WHEN YOU SAID COMPETITOR, YOU MEANT A

2             COMPETITOR FOR THE TESTIFYING BUSINESS, DID YOU

3             NOT, SIR?

4    A        WELL, HE TESTIFIES ON SOME OF THE SAME

5             THINGS THAT I DO, THE HISTORY OF KNOWLEDGE OF

6             ASBESTOS DISEASE.  I'M, OF COURSE, THOUROUGHLY

7             FAMILIAR WITH THE PUBLISHED LITERATURE AS WELL AS

8             CORPORATE KNOWLEDGE.

9    Q        YES, SIR.  NOW, WHEN YOU FIRST STARTED

10            TESTIFING, YOU LIMITED YOUR TESTIMONY, DID YOU

11            NOT, TO PRODUCING ARTICLES AT VARIOUS TRIALS THAT

12            YOU HAD FOUND OR THAT HAD BEEN GIVEN TO YOU BY

13            PLAINTIFFS' ATTORNEYS?

14   A        YES.  THESE WERE MOSTLY ARTICLES THAT I HAD

15            LOOKED UP IN THE PUBLISHED AND OPEN SCIENTIFIC

16            LITERATURE.

17   Q        YES.  AND IN FACT, I THINK YOU'VE INDICATED

18            IN PRIOR TESTIMONY THAT YOU DID NOT BELIEVE THAT

19            IT WOULD BENEFIT THE JURY TO HEAR WHAT YOUR

20            OPINION WAS CONCERNING THE ARTICLES THAT EITHER

21            THE PLAINTIFFS GAVE YOU OR THAT YOU BROUGHT TO

22            THE TRIAL YOURSELF, HAVE YOU NOT, SIR?

23   A        I MAY HAVE SAID THAT EARLIER BEFORE WE HAD

24            SO MUCH INFORMATION ON CORPORATE KNOWLEDGE, YES.

25   Q        YES, SIR.  IN FACT, DO YOU RECALL TESTIFING

1900

```
 1           IN A CASE CALLED NEIL BACK IN AUGUST OF 1982?
 2    A      YES.
 3    Q      AND DID YOU SAY IN THE NEIL CASE WHEN YOU
 4    WERE ASKED IF IN YOUR TESTIMONY YOU THOUGHT YOU
 5    COULD GIVE OPINIONS DID YOU SAY, "I THINK THAT IT
 6    REALLY DOESN'T AID THE JURY A GREAT DEAL TO KNOW
 7    WHAT I THINK ABOUT ALL THIS STUFF.  I THINK THAT
 8    IT IS, AND OF COURSE THIS OPINION MAY OR MAY NOT
 9    BE SHARED BY OTHER PARTIES INVOLVED IN THESE
10    ACTIONS, BUT I THINK THAT THE DOCUMENTATION, IF
11    IT CAN BE PRESENTED IN A REASONABLY COMPLETE WAY,
12    SPEAKS WELL ENOUGH FOR ITSELF THAT A JURY SHOULD
13    BE ABLE TO UNDERSTAND IT AND EVALUATE IT"?
14    A      I STILL THINK THAT'S TRUE.
15    Q      BUT YOU ARE HERE TODAY AS YOU WERE, I GUESS,
16    DURING 1982 EXPRESSING OPINIONS ABOUT WHAT YOU
17    BELIEVE, THAT THE DOCUMENTS WHICH YOU'VE BROUGHT
18    WITH YOU STATE OR DON'T STATE.
19    A      YES.  THAT'S SORT OF A CUSTOM OF THE
20    COURTROOM, BUT IT'S REALLY THE DOCUMENTS THAT ARE
21    THE BASIS OF MY OPINION WHICH THE JURY IS GOING
22    TO DECIDE ON, NOT WHAT I SAY.  AND WHAT I WAS
23    SAYING THEN AND WHAT I WOULD SAY TODAY IS IF YOU
24    CAN MAKE THIS FULL OF A PRESENTATION OF THE
25    DOCUMENTATION, THAT'S QUITE SUFFICIENT IN ITSELF,
```

1    MY OPINIONS NOTWITHSTANDING.

2    Q       AND YOU HAVE ALSO STATED, HAVE YOU NOT, DR.

3    CASTLEMAN, THAT YOU SEE YOUR PRIMARY PURPOSE AS

4    BRINGING DOCUMENTS TO COURT WHICH WILL HELP THE

5    PLAINTIFFS?

6    A       I DON'T BELIEVE I EVER SAID IT QUITE LIKE

7    THAT.  PERHAPS YOU CAN SHOW ME WHAT EXACTLY IT

8    WAS THAT I SAID.

9    Q       THAT SAME DEPOSITION, WERE YOU ASKED, "WELL,

10   AT TRIAL DO YOU PRESENT THINGS THAT ARE HELPFUL

11   TO THE PLAINTIFFS AND THINGS THAT ARE NOT HELPFUL

12   TO THE PLAINTIFF?"  AND DID YOU STATE, "WE ARE

13   GENERALLY LIMITED TO PRESENTING THINGS THAT ARE

14   MOST HELPFUL TO THE PLAINTIFFS' CASE"?

15   A       AND I GO ON TO SAY, "BUT I THINK IN

16   FAIRNESS, THERE ISN'T VERY MUCH THAT'S HELPFUL TO

17   THE DEFENSE IN THE ENTIRE HISTORY OF THE MEDICAL

18   LITERATURE ON ASBESTOS."

19   Q       YES, SIR.  I UNDERSTAND THAT.  BUT WERE YOU

20   LIMITED TO JUST PRESENTING THINGS MOST HELPFUL TO

21   THE PLAINTIFFS' CASE?

22   A       THAT'S BECAUSE I ONLY ANSWER THE QUESTIONS

23   I'M ASKED, AND THERE AREN'T TOO MANY QUESTIONS

24   YOU CAN ASK ME THAT ARE GOING TO HELP YOU.

25

1902

BY MR. JOSEPHSON:

1

2   Q       WELL, TIME WILL TELL, I GUESS.  I WANT TO
3       ASK YOU ABOUT THE ASBESTOS LITIGATION GROUP, AND
4       THE MEETING THAT YOU'VE HAD WITH THEM.
5   A       YES, SIR.
6   Q       HAVE YOU GONE TO GROUP MEETINGS WHERE THE
7       ASBESTOS -- WHERE PLAINTIFFS' LAWYERS HAVE
8       GATHERED TO SEEK YOUR HELP AND ASSISTANCE IN
9       GATHERING DOCUMENTS FOR THEM?
10  A       YES.
11  Q       NOW, AS AN EXAMPLE, I'LL JUST TAKE ONE
12      DEFENDANT.  YOU BROUGHT WITH YOU -- LET'S TAKE
13      OWENS-ILLINOIS -- YOU BROUGHT WITH YOU EIGHT
14      DOCUMENTS ON OWENS-ILLINOIS, EIGHT OR NINE
15      DOCUMENTS, IS THAT CORRECT?
16  A       THAT SOUNDS ABOUT RIGHT.
17  Q       IS IT YOUR TESTIMONY THAT THE CORRESPONDENCE
18      THAT EXISTS BETWEEN OWENS-ILLINOIS AND THE
19      SARANAC LABORATORIES CONSISTS OF EIGHT OR NINE
20      DOCUMENTS?
21  A       NO.  I MEAN, WE COULD READ DOCUMENTS IN THAT
22      FILE ALL DAY AND ALL NIGHT FOR, YOU KNOW, AT
23      LEAST A COUPLE OF DAYS PROBABLY.  IT WAS A RATHER
24      THICK FILE AT THE SARANAC LABORATORY.  AND I HAVE
25      READ FROM DOCUMENTS WHICH, AT LEAST IN MY

1903

1      OPINION, CHARACTERIZE THE ESSENCE OF THAT FILE.

2          I WOULD BE MORE THAN HAPPY, OF COURSE, TO

3      READ FROM ANY OTHER DOCUMENTS FROM THE SAME FILE

4      SO THAT THE JURY CAN MAKE A BALANCED JUDGMENT OF

5      WHAT IT CONTAINS.

6    Q     BUT IT'S BEEN YOU THAT HAS ACTUALLY MADE THE

7      DECISION OUT OF, LET'S SAY FIFTY OR SIXTY

8      DOCUMENTS, WHICH ONES YOU'VE PRODUCED?

9    A     WELL, THE FILE IS AVAILABLE TO BOTH

10     PLAINTIFFS AND DEFENDANTS.  IT'S A HISTORIC FILE

11     OF SARANAC LABORATORY.

12         YEARS AGO, WHEN I CAME ACROSS THIS FILE,

13     THERE WERE CERTAIN THINGS IN IT WHICH SEEMED TO

14     ME TO REALLY CONTAIN THE ESSENCE OF WHAT THE

15     FINDINGS WERE.  THERE WAS THE FINAL LETTER

16     SAYING, "LOOK, WE'VE TESTED YOUR MATERIAL AND

17     IT'S HAZARDOUS," THERE WERE EARLIER LETTERS THAT

18     SAID THE SAME THING, AND THEN THERE WERE THE

19     ACTUAL REPORTS THAT WERE ATTACHED.

20   Q     WERE THOSE ALL THE LETTERS IN THE SARANAC

21     FILES?

22   A     NO.  THERE WERE PLENTY OF OTHER LETTERS

23     COVERING RELATIVELY MUNDANE MATTERS.

24   Q     AND IT'S YOUR OPINION -- THE REASON I ASK

25     YOU THIS IS BECAUSE INDIVIDUAL LAWYERS WILL BE

1904

1    QUESTIONING YOU ABOUT THE DOCUMENTS WHICH YOU

2    APPARENTLY DIDN'T BRING WITH YOU, AND I WANT TO

3    GET YOUR OPINION AS TO WHETHER THE DOCUMENTS

4    WHICH YOU DIDN'T BRING INVOLVE MUNDANE MATTERS

5    AND DON'T RELATE IN ANY WAY TO THE OPINIONS WHICH

6    YOU GAVE?

7    A    WELL, ALL I CAN SAY IS, THEY DON'T REALLY

8    CHANGE THE FUNDAMENTAL FINDINGS OF THE SARANAC

9    LABORATORY AS THEY WERE REPORTED TO

10   OWENS-ILLINOIS.

11   Q    YES, SIR.  IS THAT A YES OR A NO TO MY

12   QUESTION?

13   A    WELL, ALL I CAN SAY IS, I'M MORE THAN HAPPY

14   TO MAKE AVAILABLE THROUGH MY CROSS-EXAMINATION TO

15   THE JURY ANYTHING THAT YOU WANT TO PRESENT.

16   Q    NOW, WHEN YOU APPLIED TO JOHNS-HOPKINS, AND

17   I THINK IT WAS TO GET YOUR PH.D., OR YOUR DOCTOR

18   OF SCIENCE, WERE YOU FAMILIAR WITH THE STATEMENTS

19   OF A MR. JACOB SILVER?

20   A    I DON'T RECALL THE NAME.

21   Q    I MAY NOT BE -- JACOB SHER?

22   A    I KNOW JACOB SHER.

23   Q    DID YOU WORK FOR HIM?

24   A    NO.

25   Q    DID YOU WORK WITH HIM?

1905

1     A        I HAVE ON OCCASION.

2     Q        DID YOU ASK HIM TO WRITE A LETTER OF

3     RECOMMENDATION FOR YOU TO GET YOUR PH.D.?

4     A        I DON'T EVEN REMEMBER.  PERHAPS.

5     Q        I WANT TO ASK YOU ABOUT THIS STATEMENT BY

6     DR. SHER --

7

8              MR. BALDWIN:  MAY I INQUIRE -- IS HE READING

9     IT FROM A LETTER, OR --

10

11             MR. JOSEPHSON:  NO, YOUR HONOR, I'M READING

12    IT FROM A SUBPOENAED DOCUMENT.

13

14             MR. BALDWIN:  WHAT'S THE EXHIBIT NUMBER, MAY

15    I ASK?

16

17             MR. JOSEPHSON:  IT'S NOT ONE THAT IS AN

18    EXHIBIT, BECAUSE WE HAVEN'T HAD IT MARKED OR

19    LISTED.  BUT IT IS NOT AN AFFIDAVIT, IT IS A

20    SUBPOENAED DOCUMENT, WHICH WAS SUBPOENAED IN A

21    LAWSUIT.

22

23             MR. BALDWIN:  WE HAVE NOT SEEN IT, YOUR

24    HONOR.

25

1906

1       THE COURT:  DO YOU WISH TO EXAMINE IT?

2

3       MR. BALDWIN:  I WOULD.

4

5    BY MR. JOSEPHSON:

6    Q       DID MR. SHER STATE THAT, "MR. CASTLEMAN HAS

7       A TENDENCY TO BECOME VERY EMOTIONALLY INVOLVED IN

8       HIS WORK, HIS SENSE OF --

9

10      MR. BALDWIN:  YOUR HONOR, WE WOULD ASK THAT

11      HE READ THE WHOLE THING AS IT RELATES TO MR.

12      CASTLEMAN IN CONTEXT, NOT PICK OUT ONE SENTENCE.

13

14      MR. JOSEPHSON:  THIS IS --

15

16      THE COURT:  WELL, COUNSEL, YOU'LL HAVE AN

17      OPPORTUNITY ON REDIRECT.  IF THERE ARE ANY

18      PORTIONS OF IT THAT YOU WISH TO USE, COUNSEL WILL

19      MAKE IT AVAILABLE TO YOU.

20

21   BY MR. JOSEPHSON:

22   Q       DOES IT STATE UNDER THE CATEGORY "WHAT DO

23      YOU CONSIDER TO BE THE APPLICANT'S WEAKNESS?",

24      "MR. CASTLEMAN HAS A TENDENCY TO BECOME VERY

25      EMOTIONALLY INVOLVED IN HIS WORK, HIS SENSE OF

BOYD-PARKS REPORTERS

1907

1    OUTRAGE ABOUT CERTAIN CORPORATE ACTIVITIES MAY

2    HAVE COLORED HIS JUDGMENT"?  IS THAT STATEMENT IN

3    THERE?

4  A    THAT'S WHAT HE SAID.

5

6    MR. BALDWIN:  WE ASK THAT WE BE FURNISHED

7    WITH A COPY OF THE DOCUMENT SO WE CAN USE IT ON

8    REDIRECT EXAMINATION,

9

10    MR. JOSEPHSON:  NO PROBLEM, YOUR HONOR.

11

12  BY MR. JOSEPHSON:

13  Q    AND SHORTLY AFTER -- AND MR. SHER IS AN

14    ATTORNEY WITH THE NATURAL RESOURCES DEFENSE

15    COUNCIL, IS THAT CORRECT?

16  A    YES.

17  Q    SOMEONE --

18  A    YOU SHOULD SEE HIS SENSE OF OUTRAGE ABOUT

19    CERTAIN THINGS.

20  Q    YES, SIR.  HE'S SOMEONE WHO YOU ADMIRE AND

21    RESPECT, ISN'T THAT CORRECT?

22  A    YES, HE IS.

23  Q    AND SOMEONE WHO YOU'VE WORKED WITH?

24  A    I'VE WORKED WITH ON OCCASION, YES.

25  Q    I WANT TO THE ASK YOU ABOUT AN EVENT WHICH

1908

1    TOOK PLACE SHORTLY AFTER THIS LETTER OR STATEMENT

2    TO THE DIRECTOR OF ADMISSIONS BY MR. SHER WAS

3    WRITTEN, AND IT'S DATED 2-11-81.  MR. SHER'S

4    STATEMENT.  WE HAVE BEEN TALKING ABOUT A

5    GENTLEMAN, HAVE WE NOT, BY THE NAME OF VANDIVER

6    BROWN, DO YOU RECALL US TALKING ABOUT HIM?

7  A       YES, SIR.

8  Q       I THINK IN THE DOCUMENTS WHICH HAVE BEEN

9    REFERRED TO AS THE SUMNER SIMPSON DOCUMENTS THERE

10   ARE NUMEROUS LETTERS BACK AND FORTH BETWEEN

11   VANDIVER BROWN AND SUMNER SIMPSON AT

12   JOHNS-MANVILLE?

13 A       YES.

14 Q       SHORTLY AFTER MAY, OR FEBRUARY OF 1981, WHEN

15   MR. SHER WROTE HIS LETTER OR STATEMENT TO

16   JOHNS-HOPKINS, DID YOU HAVE OCCASION TO

17   CORRESPOND WITH MR. VANDIVER BROWN?

18 A       YES.  I HEARD THAT MR. VANDIVER BROWN WAS

19   STILL LIVING, CONTRARY TO SWORN ANSWERS TO

20   INTERROGATORIES BY JOHNS-MANVILLE.

21 Q       YES, SIR.  A DEFENDANT WHO'S NOT IN THIS

22   CASE, AS YOU KNOW?

23 A       YES.

24 Q       DID YOU TELL, WRITE VANDIVER BROWN AND TELL

25   HIM THAT YOU WERE WRITING HIM TO ADVISE HIM THAT,

1909

1       "JOHNS-MANVILLE WILL TRY TO TAKE YOUR LIFE TO

2       ASSURE YOUR SILENCE"?

3    A       I THINK I INDICATED THAT THEY MIGHT TRY TO

4       TAKE HIS LIFE, YES.

5    Q       AND AFTER TELLING THIS MAN -- WHO BY THEN

6       WAS APPROXIMATELY IN HIS EIGHTIES, WASN'T HE?

7    A       I BELIEVE SO.  HE DIED SOON AFTERWARD.

8    Q       DO YOU SUSPECT IT WAS JOHNS-MANVILLE?

9    A       NO.  JOHNS-MANVILLE WAS IN BANKRUPTCY COURT

10      BY THEN.

11   Q       YES, SIR.  AFTER TELLING MR. BROWN, VANDIVER

12      BROWN, THAT YOU BELIEVE THAT JOHNS-MANVILLE WAS

13      GOING TO TAKE HIS LIFE TO ASSURE HIS SILENCE, DID

14      YOU THEN SAY AT THE END OF THE LETTER, "IF YOU

15      WOULDN'T MIND, I WOULD LOVE TO HAVE ONE OR TWO

16      PICTURES OF YOU TO USE IN A BOOK I AM WRITING"?

17   A       WELL, THERE WERE OTHER THINGS IN THAT

18      LETTER.

19   Q       YES, SIR.

20   A       I GENUINELY WANTED TO TALK TO MR. BROWN AND

21      DISCUSS CERTAIN KINDS OF THINGS HAVING TO DO WITH

22      PUBLIC POLICY RELATING TO, FOR EXAMPLE, THE

23      POSSIBILITY THAT CRIMINAL SANCTIONS IN THE LAW

24      MIGHT RESULT IN PUBLIC HEALTH BENEFITS IN THE

25      AREA OF OCCUPATIONAL HEALTH.  THERE WERE CERTAIN

1910

1    THINGS I REALLY WOULD HAVE LOVED TO HAVE

2    DISCUSSED WITH MR. BROWN.

3         AND THE REASON FOR MY CONCERN ABOUT HIS

4    HEALTH WAS THAT THE COMPANY HAD SWORN THAT HE WAS

5    DEAD WHEN HE WAS STILL LIVING, THAT THE MAN WAS

6    POTENTIALLY THE MOST DEVASTATING WITNESS AROUND

7    AS FAR AS NOT ONLY THAT COMPANY WAS CONCERNED,

8    BUT THE WHOLE ASBESTOS INDUSTRY, AND THAT MR.

9    BROWN HIMSELF HAD ENUNCIATED A POLICY OF LETTING

10   WORKERS DIE AT JOHNS-MANVILLE RATHER THAN TELL

11   THEM THEY HAD ASBESTOS DISEASES, BECAUSE IF YOU

12   TOLD THEM THEY WERE SICK WITH ASBESTOSIS THEY

13   WOULD FILE WORKER'S COMPENSATION CLAIMS AND COST

14   A LOT OF MONEY.

15   Q     SO, YOU WROTE A MAN WHO WAS IN HIS EIGHTIES

16   WITHOUT ANY BASIS AND TOLD HIM THAT YOU BELIEVED

17   THAT JOHNS-MANVILLE WAS GOING TO TAKE HIS LIFE?

18   A     I SUSPECTED THAT HIS LIFE WAS IN DANGER ONCE

19   IT BECAME KNOWN TO PLAINTIFFS' ATTORNEYS THAT HE

20   WAS STILL ALIVE.

21   Q     DID YOU HAVE ANY EVIDENCE BEFORE YOU WROTE

22   THIS MAN IN HIS EIGHTIES THAT JOHNS-MANVILLE, OR

23   ANYONE ELSE, WAS GOING TO TAKE HIS LIFE?

24   A     I DIDN'T HAVE ANY SOLID EVIDENCE, BUT WHEN

25   THE STATE TROOPER CAME OUT TO ASK ME ABOUT THAT,

1911

1       HE LEFT PERSUADED THAT I HAD JUST CAUSE FOR
2       WARNING MR. BROWN THAT HIS LIFE MIGHT BE IN
3       DANGER.
4            WHAT HAPPENED WAS THAT THE VARIOUS POLICE
5       AGENCIES THEN COMMUNICATED WITH EACH OTHER AND A
6       MARYLAND STATE TROOPER APPEARED AT MY DOOR AND
7       SAID, "WELL, WHAT'S THE BASIS FOR YOUR CONCERN?",
8       AND I TOLD HIM.  AND HE WAS PERSUADED THAT IT WAS
9       NOT A FRIVILOUS CONCERN.
10  Q       YES, SIR.
11  A       THIS POLICEMAN.
12  Q       AND THEN AFTER TELLING THIS MAN IN HIS
13      EIGHTIES THAT HIS EMPLOYER, OLD EMPLOYER, WAS
14      GOING TO KILL HIM, OR YOU BELIEVED WAS GOING TO
15      KILL HIM, YOU ASKED HIM IF HE COULD SEND YOU A
16      PICTURE SO YOU COULD INCLUDE IT IN YOUR BOOK, IS
17      THAT CORRECT, SIR?
18  A       WELL, YOU'VE RATHER SIMPLIFIED THE LETTER.
19      BUT THAT WAS ANOTHER THING THAT I MENTIONED, YES.
20  Q       NOW, AFTER YOU WENT TO JOHNS-HOPKINS TO GET
21      YOUR --
22
23           THE COURT:  IS THIS AS GOOD A PLACE AS ANY
24      TO TAKE OUR BREAK?
25

1912

1          THE COURT:  YES, YOUR HONOR.

2

3          THE COURT:  LET'S TAKE A FIFTEEN MINUTE

4     BREAK.

5

6          THE MARSHAL:  ALL RISE.

7

8          (WHEREUPON, THERE WAS A SHORT RECESS IN THE

9     PROCEEDINGS, AFTER WHICH THEY RESUMED AS FOLLOWS:)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1913

1          THE MARSHAL:  ALL RISE.

2

3          THE COURT:  BE SEATED.  LADIES AND

4     GENTLEMEN, I'VE RECEIVED A REQUEST FROM VARIOUS

5     LAWYERS WHO HAVE PLANES TO CATCH THAT WE SHOW

6     MERCY ON THE JURY TODAY AND SEND YOU HOME A

7     LITTLE EARLY AND SO THEY CAN CATCH THEIR PLANES,

8     AND I THINK IT'S A REASONABLE REQUEST AND WE'LL

9     STOP ABOUT 4:00 WITH THE JURY.  THE LAWYERS WILL

10    HAVE TO STAY A WHILE LONGER AFTER THAT.

11

12    EXAMINATION BY MR. JOSEPHSON:

13    Q       DR. CASTLEMAN --

14

15          MR. JOSEPHSON:  MAY I PROCEED, YOUR HONOR?

16

17          THE COURT:  YES, SIR.

18

19    BY MR. JOSEPHSON:

20    Q       DR. CASTLEMAN, I HAD FORGOTTEN TO ASK YOU

21    THIS.  IS IT CORRECT THAT YOU HAVE GIVEN

22    TESTIMONY EITHER BY WAY OF DEPOSITION OR TRIAL IN

23    THE ASBESTOS LITIGATION ON APPROXIMATELY

24    FIFTY-SEVEN OCCASIONS?

25    A       YES.  THE DEPOSITIONS, OF COURSE, BEING

BOYD-PARKS REPORTERS

19:14

```
 1        CALLED USUALLY BY DEFENDANTS.
 2   Q        YES.  YOU'RE LISTED AS A PLAINTIFF'S WITNESS
 3        AND THEN THE DEFENDANTS, AS THEY HAVE THE RIGHT
 4        TO DO, ASK THE PLAINTIFFS TO PRODUCE YOU FOR YOUR
 5        DEPOSITION, IS THAT CORRECT?
 6   A        YES, AGAIN AND AGAIN AND AGAIN.
 7   Q        YES, SIR.  AS LONG AS YOU WISH TO KEEP BEING
 8        LISTED AS AN EXPERT WITNESS, TESTIFY, AND BE IN
 9        COURT YOU UNDERSTAND FROM HAVING DONE IT SO LONG
10        THAT THE DEFENDANTS HAVE A RIGHT TO TAKE YOUR
11        DEPOSITION, DO YOU NOT, SIR?
12   A        YES.  I JUST DON'T UNDERSTAND WHY THEY KEEP
13        ASKING ME THE SAME QUESTIONS AT DEPOSITIONS TIME
14        AFTER TIME.
15   Q        WELL, I GUESS WE HAVE A LARGE COUNTRY, SIR
16        AND MAYBE NOT ALL OF THE ATTORNEYS HAVE SEEN YOU.
17        NOW, IN CONNECTION WITH YOUR TESTIFING, HAVE
18        THERE BEEN OCCASIONS, SIR, WHEN YOU HAVE NOT BEEN
19        PERMITTED TO OFFER OPINIONS SUCH AS YOU'VE DONE
20        TODAY?
21   A        YES.
22   Q        AND, IN FACT, IN THE STATES OF CALIFORNIA,
23        ALABAMA, OKLAHOMA, FLORIDA, YOU HAVE BEEN
24        CURTAILED OR LIMITED IN YOUR OPINIONS, IS THAT
25        CORRECT, SIR?
```

1

2        MR. HOUSTON:  YOUR HONOR, I OBJECT TO THAT.

3    THAT CAN'T DO ANYTHING EXCEPT TRY TO CAST SOME

4    DOUBT ON THIS COURT'S RULING ON THE ADMISSABILITY

5    OF HIS TESTIMONY.

6

7        THE COURT:  WHAT IS THE RELEVANCE, COUNSEL,

8    WHETHER IT'S --

9

10       MR. JOSEPHSON:  YOUR HONOR, WE HAVE, AS THE

11   COURT'S AWARE, CONTENDED THAT THIS WITNESS IS NOT

12   QUALIFIED TO RENDER THE OPINIONS THAT HE HAS

13   RENDERED, AND ALL I'M TRYING TO DO IS TO

14   DEMONSTRATE THE FACT THAT HE HAS NOT ALWAYS BEEN

15   ABLE TO GIVE OPINIONS BECAUSE OF HIS LACK OF

16   EXPERTISE.

17

18       THE COURT:  I WILL SUSTAIN THE OBJECTION.

19

20   BY MR. JOSEPHSON:

21   Q        NOW, I HAD ASKED YOU ABOUT 1984 AND YOUR --

22   1984, THAT YOU HAD EARNED ABOUT NINETY PERCENT OF

23   YOUR INCOME FROM WORKING IN THE ASBESTOS

24   LITIGATION.  WOULD THAT BE CORRECT?

25   A        SOMETHING LIKE THAT.  I PAID TAXES ON

1916

1        TWENTY-FIVE THOUSAND DOLLARS IN 1984.

2    Q        YES, SIR.  WOULD THE SAME BE TRUE FOR THE

3    GENERAL PERIOD FROM ABOUT 1981 TO 1985, THROUGH

4    1985, THAT SOMEWHERE BETWEEN EIGHTY TO NINETY

5    PERCENT OF YOUR INCOME ON A YEARLY BASIS IS

6    DERIVED FROM TESTIFING IN THE ASBESTOS LITIGATION

7    OR PARTICIPATING IN IT?

8    A        I DON'T HAVE SPECIFIC FIGURES.  IT TENDED TO

9    INCREASE AS A PERCENT OF MY INCOME THE LONGER I

10   WAS IN SCHOOL BECAUSE I JUST WASN'T DOING TOO

11   MUCH BY WAY OF CONSULTING.  I DID A LITTLE

12   CONSULTING FOR THE UNITED NATIONS AND THE WORLD

13   RESOURCES INSTITUTE AND THE INTERNATIONAL LABOR

14   OFFICE, BUT THIS WAS A RATHER -- YOU KNOW, IT

15   DIDN'T CONTRIBUTE HUGELY TO MY INCOME OVER THOSE

16   YEARS AND MOSTLY I WAS A STUDENT.

17   Q        YES, SIR.  AND WERE THERE OCCASIONS WHEN YOU

18   SOUGHT PERMISSION AT JOHNS-HOPKINS TO LEAVE

19   SCHOOL OR TAKE LEAVES FROM SCHOOL SO THAT YOU

20   COULD GO AND TESTIFY?  YOU TOOK A SEMESTER OFF

21   ONE YEAR, DID YOU NOT, SIR, SO YOU COULD

22   PARTICIPATE IN THE ASBESTOS LITIGATION?

23   A        NO.  THAT WASN'T THE REASON I TOOK THE

24   SEMESTER OFF.  IT HAD TO DO WITH THE TUITION

25   CHARGES.  THE COST OF TUITION AT THE SCHOOL IS

BOYD-PARKS REPORTERS

1917

1    RATHER HIGH, JOHNS-HOPKINS BEING A PRIVATE

2    UNIVERSITY.  THERE WERE CHARGING ABOUT SEVEN OR

3    EIGHT THOUSAND DOLLARS A YEAR, AND IN ORDER TO

4    REDUCE THE TUITION CHARGES DURING THE PERIOD

5    WHERE THEY WEREN'T OFFERING ANY COURSES I WAS

6    INTERESTED IN TAKING ANYWAY, I ARRANGED TO TAKE

7    SOME KIND OF A LEAVE OF ABSENCE OR, I FORGET

8    EXACTLY WHAT IT WAS CALLED, FOR A VERY BRIEF

9    PERIOD MAINLY FOR FINANCIAL REASONS.  IT HAD

10   NOTHING TO DO WITH ASBESTOS LITIGATION.

11   Q    AND DID YOU TESTIFY DURING THAT PERIOD OF

12   TIME OR PARTICIPATE IN THE ASBESTOS LITIGATION

13   PROCESS IN 1981, SIR?

14   A    PROBABLY.  I MEAN, THIS IS JUST SOMETHING

15   THAT'S BEEN GOING ON FOR SEVEN YEARS.

16   Q    AND I DON'T MEAN TO BELABOR THE POINT,

17   DOCTOR, BUT AT THE MEETINGS OF THE ASBESTOS

18   LITIGATION GROUP, HAVE YOU INDICATED TO THE

19   GROUP, TO THE PLAINTIFF'S ATTORNEYS THAT YOU ARE

20   READY AND WILLING TO COME TO TESTIFY IN THEIR

21   CASES AND TO PARTICIPATE IN THEIR CASES AND

22   ADVISE THEM OF WHAT YOUR SERVICES ARE AND WHAT

23   THE COSTS ARE?

24   A    WELL, IT DEPENDED ON THE ATTORNEYS AND THE

25   CONDITIONS.  I WASN'T JUST -- I'VE NEVER

1918

```
 1        ADVERTISED MY SERVICES IN ANY KIND OF WAY.  I'VE
 2        NEVER PAID FOR AN ADVERTISEMENT, AND I'VE ALWAYS
 3        BEEN -- I'VE ALWAYS WANTED TO BE MY OWN MAN.  I
 4        WORK FOR PEOPLE ON TERMS WHICH ARE MUTUALLY
 5        ACCEPTABLE.  IF I CAN'T GET ALONG WITH THEM OR IF
 6        THE TERMS AREN'T RIGHT -- I CERTAINLY DON'T COME
 7        AND TESTIFY THE THINGS THAT LAWYERS TELL ME TO
 8        SAY IF I DON'T BELIEVE IN THOSE THINGS IN THE
 9        FIRST PLACE AND SO ON.  THAT'S WHY I'M AN
10        INDEPENDANT CONSULTANT.
11   Q        DR. CASTLEMAN, IS IT ALSO CORRECT THAT A
12        NUMBER OF THE DOCUMENTS RELATING TO VARIOUS
13        COMPANIES WHO WERE IN THE ASBESTOS BUSINESS WERE
14        GIVEN TO YOU OR PARTS OF THEM WERE GIVEN TO YOU
15        BY PLAINTIFF'S ATTORNEYS AS OPPOSED TO YOU
16        FINDING THEM YOURSELF?
17   A        YES.  I'VE EVEN GOTTEN DOCUMENTS FROM
18        DEFENSE ATTORNEYS, TOO, WHICH ARE -- I'M GRATEFUL
19        FOR ANY KIND OF DOCUMENTATION FROM ANY SOURCE.
20   Q        AND YOU HAVE NOW, I BELIEVE, WRITTEN A BOOK,
21        IS THAT CORRECT?
22   A        YES.
23
24
25
```

1919

1    BY MR. JOSEPHSON:

2    Q        AND YOUR BOOK DEALS WITH ASBESTOS MEDICAL

3         AND LEGAL ASPECTS?

4    A        THAT'S WHAT IT'S CALLED.

5    Q        NOW, THIS BOOK IS PRIMARILY A BOOK FOR

6         ATTORNEYS, IS IT NOT, ON HOW TO PREPARE AND GET

7         AN ASBESTOS CASE READY?

8    A        I DON'T TELL ATTORNEYS HOW TO PREPARE THEIR

9         CASES.  I'M NOT AN ATTORNEY, AND I DON'T PURPORT

10        TO KNOW HOW TO TELL ATTORNEYS HOW TO PREPARE

11        THEIR CASES.

12   Q        YES, SIR.  IN FACT, DOESN'T YOUR -- ISN'T IT

13        ADVERTISED AS A BOOK TO ATTORNEYS IN ASBESTOS

14        LITIGATION, "THIS BOOK OFFERS A DOCUMENTATION ON

15        THE DEVELOPMENT OF KNOWLEDGE ABOUT ASBESTOS ,

16        HAZARD, THERE IS AN ABUNDANCE OF VALUABLE

17        MATERIAL FOR THE PLAINTIFF AND THE ATTORNEY

18        PREPARING HIS CASE, AS WELL AS INFORMATION ON HOW

19        TO DEAL WITH DEFENSE ARGUMENTS", ISN'T THAT HOW

20        YOUR BOOK IS ADVERTISED?

21   A        I KNOW.  I WROTE THE BOOK, THE PUBLISHER

22        WROTE THE ADVERTISING.  I ARGUED WITH THE

23        PUBLISHER ABOUT THAT LANGUAGE.  I THOUGHT THAT

24        WAS DEMEANING TO THE BOOK.  I LOST THE ARGUMENT.

25        THEY TOLD ME THEY OWN IT.

1920

1    Q        YES, SIR.  AND WHAT DOES YOUR ASBESTOS BOOK

2             SELL FOR, A COPY?

3    A        SIXTY DOLLARS.

4    Q        I TAKE IT THEN THAT, AT LEAST INSOFAR AS THE

5             ARGUMENT WAS CONCERNED, AS FAR AS YOU KNOW, AFTER

6             YOUR PUBLISHER REVIEWED THE BOOK AND DISCUSSED IT

7             WITH YOU, A CHOICE WAS MADE APPARENTLY TO

8             ADVERTISE IT PRIMARILY NOT AS A BOOK OF SCIENCE,

9             BUT AS A BOOK TO ATTORNEYS, PLAINTIFFS ATTORNEYS,

10            PREPARING THEIR CASE, AS WELL AS INFORMATION ON

11            HOW TO DEAL WITH DEFENSE ARGUMENTS, IS THAT

12            CORRECT?

13   A        THAT'S WHAT THE PRESIDENT OF THE PUBLISHING

14            COMPANY CHOSE TO USE.  HE TOLD ME THAT HE HAD NOT

15            READ THE BOOK AT THE TIME THAT HE SELECTED THAT

16            LANGUAGE.

17   Q        AND IN FACT, INSIDE THE BOOK THERE ARE A

18            NUMBER OF PLAINTIFF'S ATTORNEYS WHO HAVE HELPED

19            YOU OVER THE YEARS AND WHO YOU ACKNOWLEDGE AMONG

20            THE ACKNOWLEDGEMENTS, IS THAT CORRECT?

21   A        YES, THEY HAD PROVIDED DOCUMENTATION WHICH

22            WAS VERY HELPFUL TO ME, INCLUDING DEPOSITIONS,

23            TRIAL TRANSCRIPTS, AND OTHER THINGS THAT I HAD NO

24            OTHER WAY OF GETTING.

25   Q        YES, SIR.  NOW, IN CONNECTION WITH THE CASE

1921

1        AT HAND, WITH RESPECT TO MR. HOUSTON, IS IT

2        CORRECT THAT YOU'VE WORKED FOR HIM ON A NUMBER OF

3        OCCASIONS?

4   A        ONE OR TWO.

5   Q        WELL, IT'S MORE THAN ONE OR TWO, IS IT NOT?

6   A        WELL, HE MAY HAVE LISTED ME IN A LOT OF

7        CASES, BUT I HAVEN'T COME DOWN HERE THAT OFTEN.

8   Q        AND HAVE YOU WORKED FOR MR. BALDWIN BEFORE?

9   A        ONCE, ON ONE CASE.

10  Q        AND MR. THOMPSON AND MR. UMPHREY WHO WERE

11       HERE, HAVE YOU WORKED FOR THEM?

12  A        I WORKED FOR MR. UMPHREY BRIEFLY IN DOING

13       RESEARCH BACK IN 1977.  I'VE ALSO BEEN LISTED IN

14       SOME OF HIS CASES, BUT I'VE NEVER TESTIFIED IN

15       ANY TRIAL FOR HIM, OR WITH HIM.

16  Q        AND WOULD IT BE CORRECT, SIR, TO STATE THAT

17       WHAT YOU'VE DONE IN THIS BOOK IS TO TRY TO

18       PRESENT THE PLAINTIFF'S PERSPECTIVE ON THE

19       ASBESTOS LITIGATION?

20  A        I'VE PRESENTED THE GLOBAL PERSPECTIVE ON THE

21       HISTORY OF THE KNOWLEDGE ABOUT ASBESTOS DISEASE

22       FROM THE STANDPOINT OF OCCUPATIONAL STANDARDS,

23       FROM THE STANDPOINT OF COMPENSATION, FROM THE

24       STANDPOINT OF ARTICLES ON ASBESTOSIS, ARTICLES ON

25       CANCER.  THERE ARE THOUSANDS OF CITATIONS IN

1922

1   THERE.  IT HAS NOT BEEN CRITICIZED FOR

2   INCOMPLETENESS.

3       THE PUBLISHER HAS NOT RECEIVED A SINGLE

4   LETTER FROM ANY PARTY CHARGING THAT THAT BOOK IS

5   SO UNFAIR AS TO WARRANT EVEN A THOUGHT OF LEGAL

6   ACTION.  CONSIDERING THE PARTIES DISCUSSED IN

7   THAT BOOK I FIND THAT REMARKABLE.  AND THE BOOK

8   HAS CONSTITUTED THE MAIN BASIS FOR BY DOCTORAL

9   DISSERTATION, WITH WHICH IT IS LARGELY IDENTICAL,

10   AND THAT DOCTORAL DISSERTATION HAS BEEN ACCEPTED

11   BY THE JOHNS-HOPKINS SCHOOL OF HYGIENE AND PUBLIC

12   HEALTH.

13  Q     DID YOU SEND THE BOOK OUT TO SOME OF THE

14   PLAINTIFFS' ATTORNEYS BEFORE IT WAS PUBLISHED FOR

15   REVIEW?

16  A     ONE OR TWO.

17  Q     HOW MANY OF THE COMPANIES DID YOU SEND YOUR

18   BOOK TO FOR REVIEW BEFORE IT WAS PUBLISHED?

19  A     I FIGURED THEY COULD AFFORD TO BUY IT AFTER

20   IT WAS PUBLISHED.

21  Q     YES, SIR.  AND MANY OF THEM HAVE, HAVEN'T

22   THEY?

23  A     YES.

24  Q     BECAUSE THE PRIMARY SALES OF YOUR BOOK, IF

25   NOT THE ONLY SALES OF YOUR BOOK, HAVE BEEN IN THE

1923

1      LEGAL COMMUNITY --

2    A      WELL --

3    Q      -- WOULDN'T THAT BE CORRECT?

4    A      WELL, CONSIDERING THE NUMBER OF LAWYERS

5    INVOLVED IN ASBESTOS LITIGATION, THAT'S BEEN THE

6    PRIMARY SALES, BUT BY NO MEANS THE ONLY SALES.

7    MEDICAL LIBRARIES, LAW LIBRARIES, MEDICAL

8    SCHOOLS, PUBLIC HEALTH SCHOOLS.

9    Q      ONE OF THE PEOPLE THAT YOU HAVE ACKNOWLEDGED

10   IN YOUR ACKNOWLEDGMENT SECTION IS A GENTLEMAN BY

11   THE NAME OF DR. GARRETT SCHEPERS, IS THAT

12   CORRECT?

13   A      YES.

14   Q      IS THAT SOMEONE WHOSE OPINION YOU RESPECT?

15   A      YES.

16   Q      IS THAT SOMEONE WHO YOU CONSIDER AN

17   AUTHORITY ON ASBESTOS AND ASBESTOSIS?

18   A      THAT'S SOMEONE I CONSIDER KNOWLEDGEABLE

19   ABOUT WHAT HAPPENED ABOUT THE PROBLEMS OF

20   ASBESTOS DISEASE MANY YEARS AGO.  I CONSIDER HIS

21   EXPERIENCES VALUABLE, NOT NECESSARILY HIS

22   OPINIONS --

23   Q      YES, SIR.

24   A      -- PUBLISHED IN THE LITERATURE.

25   Q      DR. SCHEPERS HAS ALSO TESTIFIED IN A NUMBER

1924

1    OF CASES ON BEHALF OF PLAINTIFFS AS YOU HAVE, HAS

2    HE NOT, SIR?

3  A    SO I UNDERSTAND.  HE USED TO WORK FOR

4    INDUSTRY.

5  Q    YES, HE DID.  AND HE WORKED AT THE SARANAC

6    LABORATORIES, TOO, HE WAS THE DIRECTOR, WAS HE

7    NOT?

8  A    YES.

9  Q    AND EVEN THOUGH HE WORKED AT SARANAC, AS DID

10    DR. GARDNER AND DR. VORWALD, YOU DON'T CONSIDER

11    HIM A CREATURE OF INDUSTRY, DO YOU?

12  A    WELL, I BELIEVE HE MAY HAVE BEEN AT ONE

13    TIME.

14  Q    WAS HE A CREATURE OF INDUSTRY IN 1964?

15  A    I DON'T REALLY THINK THOSE ARE THE KINDS OF

16    TERMS THAT YOU CAN DESCRIBE PEOPLE WITH AS WELL

17    AS YOU CAN DESCRIBE ORGANIZATIONS LIKE THE

18    INDUSTRIAL HYGIENE FOUNDATION.

19  Q    WELL, DR. SCHEPERS WASN'T WORKING FOR THE

20    INDUSTRIAL HYGIENE FOUNDATION IN 1964, WAS HE,

21    SIR?

22  A    NO.  BY THAT TIME I BELIEVE HE WAS WORKING

23    FOR THE U.S. GOVERNMENT.

24  Q    SO, HE WOULD NOT HAVE BEEN A CREATURE OF

25    INDUSTRY?

1925

1    A        NOT IN TERMS OF HIS EMPLOYMENT, PERHAPS

2            MAYBE HIS OUTLOOK SOMEWHAT.

3    Q        THAT'S THE SAME DR. SCHEPERS WHO YOU SHOWED

4            MEMOS SPEAKING BEFORE THE ASBESTOS TEXTILE

5            INSTITUTE IN 1955 AND 1956, TALKING ABOUT THE

6            DANGERS OF CANCER AND ASBESTOS?

7    A        YES.  HE WAS TRUSTED ENOUGH TO BE INVITED TO

8            THE TRADE ASSOCIATION AT THAT TIME.

9    Q        SO, HE WOULD HAVE BEEN SUSPECT AT THAT TIME,

10            EVEN THOUGH HE WAS DELIVERING THE MESSAGE WHICH

11            WAS PUT BEFORE THE JURY?

12    A        HE WAS SUSPECT ENOUGH SO THAT THEY DIDN'T

13            GIVE HIM ANY CONTRACTS.

14    Q        HAVE YOU HAD A CHANCE OR OCCASION TO READ

15            THE PUBLICATION BY DR. GARRETT SCHEPERS, WHOSE

16            CONTRIBUTION TO YOUR WORK YOU ACKNOWLEDGE,

17            ENTITLED, "ASBESTOSIS", JANUARY, 1964, PUBLISHED

18            IN "DISEASES OF THE CHEST"?

19    A        I DON'T RECALL SPECIFICALLY WHAT WAS IN THAT

20            ARTICLE.  I'VE HEARD OF ARTICLES HE WROTE AROUND

21            THAT TIME.

22    Q        WELL, LET ME JUST ASK YOU ABOUT THIS, I'LL

23            PUT THIS UP LATER, BECAUSE I'VE GOT A LOT OF

24            THINGS TO COVER, BUT DO YOU RECALL BEING ASKED

25            QUESTIONS ABOUT WHETHER IT WOULD HAVE BEEN FALSE

1926

1    AND MISLEADING TO LABEL ASBESTOS AS NONTOXIC IN

2    1952 OR IN 1960, BASED UPON WHAT WAS KNOWN ABOUT

3    IT?

4    A    YES.

5    Q    AND DO YOU RECALL TESTIFYING THAT TO DO SO

6    WAS MISLEADING?

7    A    YES.

8    Q    FALSE?

9    A    WORDS TO TO THAT EFFECT.

10   Q    YES, SIR.  AND WERE YOU AWARE OF THE FACT

11   THAT IN 1964, THE SAME YEAR OF DR. SELIKOFF'S

12   WORK, IN AN ARTICLE ENTITLED "ASBESTOSIS", THAT

13   DR. GARRETT SCHEPERS STATED, "ASBESTOS IS NOT

14   CURRENTLY CONSIDERED A TOXIC SUBSTANCE, SINCE IT

15   DOES NOT PRODUCE SYSTEMIC POISONING", WERE YOU

16   FAMILIAR WITH THAT QUOTE, SIR?

17   A    NO.  BUT, I MEAN, HE'S JUST SAYING THAT

18   TECHNICALLY THE WAY ASBESTOS KILLS YOU ISN'T

19   REFERRED TO AS TOXICITY, IT'S CALLED FIBROSIS, OR

20   SOMETHING LIKE THAT.  IT'S A MATTER OF SEMANTICS.

21        TO WRITE A PUBLICATION IN A TRADE MAGAZINE

22   AS OPPOSED TO A MEDICAL ARTICLE, THE USE OF THE

23   CHARACTERIZATION NONTOXIC IS GROSSLY MISLEADING.

24   Q    YES, SIR.  BUT AS USED AS A MEDICAL TERM,

25   ASBESTOS IS NOT THEN AND IS NOT NOW TOXIC, IS IT,

1927

1    SIR?

2    A        IN THE GENERAL COMMON SENSE OF THE WORD,

3    ASBESTOS IS TOXIC.

1928

1   Q        IN THE MEDICAL SENSE OF THE WORD AS WE SIT

2            HERE TODAY IN 1986, ASBESTOS MEDICALLY IS DEFINED

3            AS NONTOXIC, IS IT NOT, SIR, OR DO YOU KNOW?

4   A        I DON'T THINK IT'S DEFINED AS NONTOXIC.  YOU

5            LOOK UP THE WORD "TOXIC" IN DICTIONARIES, AND YOU

6            CAN DEFINE IT -- YOU CAN INCLUDE IT OR NOT

7            INCLUDE IT DEPENDING ON WHICH DEFINITION YOU

8            CHOOSE.  "TOXIC" MEANS HARMFUL TO YOU IF YOU GET

9            IT IN YOUR BODY.  I'M SURE THE DICTIONARY SAYS

10           THAT.

11  Q        NOW, YOU HAVE WORKED FOR AN INDIVIDUAL, AN

12           ATTORNEY ALSO IN TEXAS BY THE NAME OF FRED

13           BARREN.  IS THAT CORRECT?

14  A        YES.

15  Q        AND WHEN YOU -- HE'S AN ATTORNEY OVER IN

16           DALLAS?

17  A        YES.

18  Q        WHEN YOU WORKED FOR HIM, WAS YOUR JOB TO BE

19           THE MEDICAL LIBRARIAN OR RESEARCHER?

20  A        I WAS HIRED AS A CONSULTANT.

21  Q        WAS YOUR PRIMARY FUNCTION THAT AS A

22           LIBRARIAN OR RESEARCHER?

23  A        I HAVE NEVER WORKED AS A LIBRARIAN.  I HAVE

24           BEEN CALLED A LIBRARIAN IN COURTROOMS ALL OVER

25           THE UNITED STATES, BUT I HAVE NEVER REALLY WORKED

1929

1       AS A LIBRARIAN.  I'M NOT QUALIFIED AS A

2       LIBRARIAN, SIR.

3   Q       NOW, I WANT TO GO ON AND I WANT TO ASK YOU

4       SOME QUESTIONS ABOUT SOME OF THE DOCUMENTS THAT

5       YOU'VE BROUGHT BEFORE US AND SOME OF THE WORK

6       THAT YOU'VE DONE, BUT BEFORE I DO THAT WHAT I

7       WOULD LIKE TO DO IS TO GET SOME BASIC BACKGROUND

8       ON YOU REGARDING YOUR QUALIFICATIONS TO TESTIFY

9       IN CERTAIN AREAS.  HAVE YOU EVER TESTIFIED BEFORE

10      AS A TOXICOLOGIST?

11  A       NO.

12  Q       HAVE YOU EVER TESTIFIED BEFORE AS AN

13      EPIDEMIOLOGIST?

14  A       NO.

15  Q       HAVE YOU -- AND YOU'VE TESTIFIED THAT YOU'RE

16      NOT A MEDICAL DOCTOR?

17  A       THAT'S TRUE.  I MEAN, I HAVE NOT TESTIFIED

18      ON ANY OF THOSE SPECIALTIES IN COURTS, COURTS

19      BEING RATHER STRICT ABOUT WHAT THEY CONSIDER

20      QUALIFICATIONS AND TESTIMONY TO BE.

21  Q       YES, SIR.  THEN YOU ARE HERE AS AN EXPERT,

22      ARE YOU NOT, AS SOMETHING CALLED AN EXPERT ON THE

23      STATE OF CORPORATE KNOWLEDGE?

24  A       IN THIS PARTICULAR COURT, I AM.  IN THIS

25      PARTICULAR TRIAL, I AM.

1930

1   Q        YES, SIR.  AND THAT'S NOT SOMETHING THAT HAS

2   ANYTHING TO DO WITH GETTING A DEGREE AS A DOCTOR

3   OF SCIENCE, IS IT, SIR?

4   A        IT IS IF YOUR DOCTORAL DISSERTATION IS

5   CALLED "ASBESTOS, AN HISTORICAL CASE STUDY OF

6   CORPORATE RESPONSE TO AN INDUSTRIAL HEALTH

7   HAZARD."

8   Q        YES, SIR.  THERE IS NO COURSE ON THE STUDY

9   OF STATE OF MIND OF CORPORATE ORGANIZATIONS, IS

10  THERE, SIR?

11  A        THERE PROBABLY IS IN BUSINESS SCHOOLS.

12  Q        BUT NOT IN ANY OF THE SCHOOLS YOU'VE GONE

13  TO?

14  A        NO.  I HAVEN'T STUDIED BUSINESS PER SE.

15  I'VE STUDIED PUBLIC HEALTH.

16  Q        NOW, WHILE YOU'RE AN ENGINEER, YOU'VE NEVER

17  BEEN A REGISTERED PROFESSIONAL ENGINEER, HAVE

18  YOU, SIR?

19  A        NO.

20  Q        AND YOU DON'T HAVE ANY EXPERTISE OR ANALYSIS

21  IN MAKING A DIAGNOSIS AS TO WHETHER SOMEONE'S

22  CONDITION WAS RELATED TO ASBESTOS EXPOSURE OR

23  NOT?

24  A        I DON'T PRACTICE MEDICINE WITHOUT A LICENSE,

25  NO.

1931

1   Q        AND YOU PERSONALLY HAVE NEVER DONE ANY WORK

2        WITH ASBESTOS-CONTAINING MATERIALS SUCH AS ARE

3        BEING DISCUSSED TODAY?

4   A        I WORKED IN THE CHEMICAL PLANT WHERE THERE

5        WAS ASBESTOS INSULATION ALL AROUND. WE WERE

6        CONSTANTLY REDESIGNING THE PIPING IN THE PLANT,

7        TAKING OFF INSULATION, REARRANGING THE PIPING,

8        WORKING IN SAMPLE PREPARATIONS. ONE WAS

9        CONSTANTLY REARRANGING THE EQUIPMENT. I'M SURE I

10        WAS EXPOSED TO ASBESTOS IN THAT JOB. I'M SURE I

11        HAD MY HANDS ON ASBESTOS MATERIALS ON THAT JOB.

12   Q        THAT WASN'T MY QUESTION, DOCTOR. MY

13        QUESTION WAS DID YOU EVER WORK AS ANY PART OF ANY

14        JOB THAT YOU EVER DID WITH ASBESTOS INSULATION

15        MATERIALS?

16   A        I THOUGHT I ANSWERED YOUR QUESTION, BUT I

17        CAN'T ADD TO WHAT I'VE ALREADY SAID.

18   Q        NOW, THERE'S ALSO A FORMAL TRAINING AS A

19        HISTORIAN, IS THERE NOT?

20   A        WELL, THERE ARE SCHOOLS, YES. SCHOOLS GIVE

21        DEGREES IN HISTORY. LIKE, THERE ARE DEPARTMENTS

22        OF HISTORY.

23   Q        AND YOU HAVEN'T GONE THROUGH ANY OF THAT

24        KIND OF FORMAL TRAINING?

25   A        NO.

1932

1    Q      NOW, WHEN YOU BECOME AN EXPERT ON CORPORATE

2        STATE OF KNOWLEDGE, WOULD YOU AGREE WITH ME THAT

3        BEFORE YOU FORM OPINIONS, WHETHER ORALLY OR IN

4        WRITING, THAT IT'S INCUMBENT UPON ANY PERSON SUCH

5        AS YOURSELF TO REVIEW AND ANALYZE ALL OF THE

6        DOCUMENTATION AVAILABLE?

7    A      THIS I HAVE TRIED TO DO.

8    Q      YES, SIR.  AND ONE WHO PULLS THINGS OUT OF

9        CONTEXT OR DOESN'T BOTHER TO REVIEW ALL OF THE

10       DOCUMENTS BEFORE ONE FORMS AN OPINION WOULD NOT

11       BE DOING HIS JOB AS A HISTORIAN OR AN EXPERT ON

12       THE STATE OF CORPORATE KNOWLEDGE, WOULD HE, SIR?

13   A      IT'S IMPOSSIBLE TO REVIEW ALL THE DOCUMENTS.

14      ONE REVIEWS ALL THE DOCUMENTS THAT ONE CAN GET.

15      I'M WELL AWARE OF THE MOST PROMINENT DOCUMENTS

16      THAT HAVE BEEN INTRODUCED BY BOTH PLAINTIFFS AND

17      DEFENDANTS IN THE HISTORY OF THE ASBESTOS

18      LITIGATION.  I GET CROSS-EXAMINED WITH DOCUMENTS.

19      IF THEY'RE NOT BROUGHT INTO THE COURTROOM BY

20      PLAINTIFFS, I GET CROSS-EXAMINED WITH THEM BY THE

21      DEFENDANTS.  SO, ONE WAY OR THE OTHER I HAVE AN

22      OPPORTUNITY TO SEE THE MAIN DOCUMENTATION THAT

23      EXISTS.

24    Q      YES, SIR.  IN OTHER WORDS, YOU KNOW, FOR

25      INSTANCE, TODAY BASED ON PAST EXPERIENCE THAT

1933

1      OTHER DEFENDANTS WILL BE TAKING DOCUMENTS WHICH

2      YOU DID NOT CHOOSE TO BRING OUT WHEN YOU WERE

3      TELLING YOUR STORY AND ASK YOU QUESTIONS ABOUT

4      THOSE DOCUMENTS, BASED ON PAST EXPERIENCE, ISN'T

5      THAT CORRECT, SIR?

6    A      QUITE LIKELY.  I MEAN, WE HAVEN'T OBVIOUSLY

7      DISCUSSED EVERY SINGLE PIECE OF DOCUMENTATION

8      THAT'S COME OUT --

9    Q      YES, SIR.

10   A      -- IN THE LAST, WHAT DAY OR DAY AND A HALF

11     OR TWO.

12   Q      AND YOU ALSO KNOW, DO YOU NOT, SIR, THAT THE

13     ISSUE IN THIS CASE IS NOT WHETHER ASBESTOS CAUSES

14     ASBESTOSIS OR WHETHER ASBESTOS CAUSES LUNG

15     CANCER.  YOU'RE AWARE OF THAT, ARE YOU NOT, SIR?

16   A      WELL, PERHAPS YOU CAN EXPLAIN WHAT YOU MEAN.

17     OKAY.  I MEAN, THE ISSUE OF ASBESTOS CAUSING

18     DISEASE IS NOT DISPUTED.  THAT'S WHAT YOU'RE

19     SAYING?

20   Q      YOU UNDERSTAND THAT?

21   A      I UNDERSTAND THAT IT'S NOT DISPUTED TODAY.

22   Q      I WANT TO ASK YOU --

23

24        MR. HOUSTON:  IN VIEW OF THAT QUESTION,

25     COUNSEL, MAY I ASK, HAVE YOU CHANGED --

1934

```
 1
 2            THE COURT:  THAT'S NOT APPROPIATE AT THIS
 3       TIME, MR. HOUSTON, IF I ANTICIPATE WHERE YOU'RE
 4       GOING.  I SUGGEST WE DISCUSS IT OUTSIDE THE
 5       PRESENCE OF THE JURY.
 6
 7            MR. HOUSTON:  THAT'S FINE.  I WAS GOING TO
 8       APPROACH THE BENCH, YOUR HONOR.
 9
10  BY MR. JOSEPHSON:
11  Q         I WANT TO ASK YOU, IF I MIGHT, ABOUT SOME OF
12       THE COMPANIES WHO ARE ON YOUR CHART AND SOME WHO
13       AREN'T, WHO YOU DIDN'T DISCUSS, TO GET YOUR VIEWS
14       ON THOSE COMPANIES, IF I MIGHT, SIR.  FOR
15       INSTANCE, G.A.F. RUBEROID.  DO YOU SEE THEM ON
16       THIS CHART?
17  A         NO.  BUT I WOULD BE HAPPY TO TICK OFF THE
18       THINGS THAT RELATE TO THEM.
19  Q         I THINK IT IS ON THE CHART.  DO YOU SEE
20       THAT?
21  A         OH, YES.
22  Q         OKAY.  JUST LET ME ASK YOU THIS.  WERE THEY
23       PART OF THE ASBESTOS CONSPIRACY THAT YOU'VE
24       DESCRIBED, AMONG INDUSTRY?
25  A         THE CONSPIRACY OF SILENCE?
```

1935

1    Q        YES.

2    A        YES.

3    Q        OKAY.  AND RAYMARK, WHO IS NOT A DEFENDANT

4             IN THIS CASE, RAYMARK OR RAYBESTOS-MANHATTAN,

5             THEY SEEM TO HAVE -- THEY AND JOHNS-MANVILLE SEEM

6             TO HAVE MOST OF THE CHECKS.  WOULD RAYMARK HAVE

7             BEEN AN ACTIVE PARTICIPANT IN THE CONSPIRACY OF

8             SILENCE OR WHATEVER THE CONSPIRACIES THAT YOU

9             ENUMERATED WERE, SIR?

10   A        YES, SIR.

11   Q        OKAY.  AND JOHNS-MANVILLE I TAKE IT WOULD

12            HAVE BEEN IN ALL THE CONSPIRACIES?

13   A        WELL, JOHNS-MANVILLE WAS A DOMINANT MEMBER

14            OF THIS SCENARIO, YES.

15   Q        YES.  THEY WERE THE DOMINANT AND LARGEST

16            MEMBER OF THIS INDUSTRY, CORRECT?

17   A        I SAID A DOMINANT MEMBER.

18   Q        THE LARGEST MEMBER, WERE THEY NOT, SIR?

19   A        I BELIEVE THEY HAD THE LARGEST INVESTMENT IN

20            ASBESTOS, BUT THEY WERE BY NO MEANS THE LARGEST

21            CORPORATION INVOLVED.  OWENS-ILLINOIS, FOR

22            EXAMPLE, IS LARGER THAN JOHNS-MANVILLE.

23   Q        YES, SIR.  BUT OWENS-ILLINOIS, AS YOU KNOW

24            FROM YOUR HISTORY, WAS ONLY IN THE ASBESTOS

25            BUSINESS FOR APPROXIMATELY -- ASBESTOS -- MADE

1936

1     ONE PRODUCT WITH ASBESTOS FOR A TEN YEAR PERIOD,

2     IS THAT CORRECT, 1948 TO 1958?

3   A     WELL, THEIR INTERESTS SPANNED FIFTEEN YEARS

4     COUNTING THE EARLIEST CONTACT WITH SARANAC IN

5     1943, AND, OF COURSE, THEIR KNOWLEDGE ABOUT

6     ASBESTOS GOES BACK BEFORE THAT.

7   Q     THEY WERE IN THE ASBESTOS -- THEY

8     MANUFACTURED A PRODUCT WHICH CONTAINED ASBESTOS

9     FROM 1948 TO 1958, DID THEY NOT, DOCTOR?

10  A     I'M SURE THEY DID.

11  Q     AND THAT WAS THE ONE AND ONLY PRODUCT AND

12     ONE AND ONLY TIME THAT THEY WERE IN THE BUSINESS

13     OF MANUFACTURING COMMERCIALLY PRODUCTS THAT

14     CONTAINED ASBESTOS, IS IT NOT, SIR, FROM YOUR

15     STUDY, YOUR INTIMATE STUDY OF CORPORATE

16     KNOWLEDGE?

17  A     I BELIEVE THAT'S TRUE.

18  Q     SO, WHEN YOU SAY THEY WERE LARGER THAN

19     JOHNS-MANVILLE, THEY WERE PRIMARILY A GLASS AND

20     BOTTLING COMPANY, WERE THEY NOT, SIR?

21  A     YES.  BUT THEY HAD THE ACCESS TO KNOWLEDGE

22     THAT COMES WITH BEING LARGE.

23  Q     NOT TALKING ABOUT THAT, SIR.  WHEN YOU SAID

24     THEY WERE A LARGE COMPANY, THEY WERE A LARGE

25     COMPANY AND THEIR PRIMARY INTEREST WERE IN THE

1937

1       GLASS AND BOTTLING BUSINESS, IS THAT CORRECT,

2       SIR.

3   A       YES.

4   Q       WHERE IS JOHNS-MANVILLE'S PRIMARY INTEREST,

5       PRIMARY INVESTMENT AS YOU PUT IT, PRIMARY

6       ACTIVITY WAS IN THE ASBESTOS MINING,

7       MANUFACTURING, DISTRIBUTION OF INSULATION, IS

8       THAT CORRECT?

9   A       INSULATION AND OTHER PRODUCTS WITH ASBESTOS,

10      YES, INITIALLY.  I MEAN, THEY ALL DIVERSIFIED

11      SOMEWHAT AFTER A TIME.  JOHNS-MANVILLE BECAME

12      QUITE A DIVERSIFIED COMPANY.

13  Q       YES, SIR.  AND RAYMARK WAS CALLED

14      RAYBESTOS-MANHATTAN, IS THAT --

15  A       RIGHT.

16  Q       BACK UP UNTIL THE 1960'S, IS THAT CORRECT?

17  A       MORE RECENTLY THAN THAT, YES.

18  Q       AND YOU CHARACTERIZED RAYMARK AND

19      JOHNS-MANVILLE AS THE TWO MAJOR PLAYERS IN THE

20      ASBESTOS LITIGATION -- IN THE ASBESTOS INDUSTRY,

21      AS YOU CALL IT, IS THAT CORRECT?

22  A       THEY WERE IN THE 1930'S, YES.

23

24

25

1938

1    BY MR. JOSEPHSON:

2    Q        AND RAYMARK CONTINUED IN THE ASBESTOS

3        INDUSTRY AS YOU'VE CALLED IT ALL THE WAY UP UNTIL

4        THE 1970'S, DID THEY NOT, SIR?

5    A        YES.   I MEAN, THEY STILL MANUFACTURE

6        PRODUCTS CONTAINING ASBESTOS TODAY.   THAT'S BY NO

7        MEANS THEIR SOLE LINE OF BUSINESS.

8    Q        BUT UP UNTIL AND THROUGH THE 1960'S ASBESTOS

9        PRODUCTS WERE IN FACT THE BULK OF THE BUSINESS OF

10        RAYBESTOS-MANHATAN, WERE THEY NOT, SIR?

11    A        THAT'S RIGHT.

12    Q        AND --

13    A        OR AT LEAST THAT'S MY UNDERSTANDING.

14    Q        AND ANOTHER ONE OF THE BIG PLAYERS THAT

15        YOU'VE MENTIONED, ONE OF THE MAJOR PLAYERS I

16        THINK YOU'VE CHARACTERIZED THEM AS, WAS A COMPANY

17        WHICH IS NOW KNOWN AS NICOLET, BUT WHICH IN THE

18        PAST WAS CALLED KEASBY-MATTISON.   THEY'RE NOT ON

19        THIS CHART, ARE THEY?

20    A        NO.

21    Q        BUT YOU HAVE DESCRIBED THEM IN NUMEROUS

22        DOCUMENTS, HAVE YOU NOT?

23    A        YES.

24    Q        AND WOULD YOU AGREE WITH ME THAT

25        KEASBY-MATTISON, NOW KNOWN AS NICOLET, WAS A

1939

1    MAJOR PLAYER IN THE ASBESTOS INDUSTRY?

2  A     YES.

3  Q     NOW --

4  A     THAT'S MY UNDERSTANDING.

5  Q     YES, SIR.  WE WERE TALKING ABOUT GAF

6    RUBEROID.  GAF RUBEROID, WHICH IS NOT A DEFENDANT

7    IN THIS CASE, IS ALSO A -- WAS ALSO A -- RUBEROID

8    WAS WAS ALSO A MAJOR PLAYER IN THE ASBESTOS

9    INDUSTRY, AS YOU PUT IT, IS THAT CORRECT?

10  A     YES.  THAT'S MY UNDERSTANDING.

11  Q     AND ARE YOU FAMILIAR WITH A COMPANY CALLED

12    COMBUSTION ENGINEERING?

13  A     YES.

14  Q     AND WERE THEY ALSO IN THE BUSINESS OF

15    MANUFACTURING PRODUCTS CONTAINING ASBESTOS?

16  A     YES, THEY WERE.

17  Q     AND THEY WENT UNDER THE NAME, I THINK, OF

18    DETRICH FOR A WHILE, OR THEY BOUGHT A COMPANY

19    CALLED DETRICH WHICH MADE ASBESTOS INSULATION, IS

20    THAT CORRECT, SIR?

21  A     I DON'T REMEMBER OFFHAND.  I GATHER THEIR

22    ROLE IN THE INDUSTRY WAS NOT SUCH A LARGE ROLE.

23  Q     BUT THEY WERE ANOTHER COMPANY IN THIS

24    ASBESTOS INDUSTRY AS YOU'VE CALLED IT?

25  A     YES.

1940

1    Q      AND THEN CAN WE AGREE THAT WE HAVE

2         IDENTIFIED AT LEAST JOHNS-MANVILLE, RAYMARK,

3         KEASBY-MATTISON, OR NICOLET, GAF RUBEROID,

4         COMBUSTION ENGINEERING AS PLAYERS IN THE ASBESTOS

5         INDUSTRY?

6    A      YES.

7    Q      AND ALL BUT -- AND THAT JOHNS-MANVILLE,

8         RAYMARK, GAF RUBEROID, NICOLET, ARE WHAT YOU

9         WOULD CHARACTERIZE AS MAJOR PLAYERS IN THE

10        ASBESTOS INDUSTRY?

11   A      YES.

12   Q      NOW, I WANT TO ASK YOU ABOUT ONE OF THE

13        DOCUMENTS HERE.  THIS IS A DOCUMENT FROM THE

14        ASBESTOS TEXTILE INSTITUTE, IS THAT CORRECT?

15   A      YES.

16   Q      AND IT SHOWS AS MEMBERS OF THE ASBESTOS

17        TEXTILE INSTITUTE KEASBY-MATTISON, THAT WOULD BE

18        NICOLET, IS THAT CORRECT?

19   A      YES.

20   Q      JOHNS-MANVILLE CORPORATION?

21   A      YES.

22   Q      SOUTHERN ASBESTOS COMPANY?

23   A      YES.

24   Q      RAYBESTOS-MANHATTAN, ASTER-HILL

25        MANUFACTURING COMPANY, DO YOU SEE THAT?

1941

1    A        YES, SIR.

2    Q        ON THE DAY OF THE MEETING THAT YOU WERE

3    ASKED ABOUT, MARCH 7, 1957, WHERE THESE PEOPLE

4    DECIDED NOT TO FUND THE STUDY BECAUSE IT WAS

5    BEING DONE IN CANADA, DOES IT APPEAR FROM THIS

6    DOCUMENT THAT ANY OF THE DEFENDANTS, AS YOU

7    UNDERSTAND THEM TO BE, WERE PRESENT AT THIS

8    MEETING?

9    A        NO.

10   Q        AGAIN, WHO WAS PRESENT WOULD HAVE BEEN THE

11   MAJOR PLAYERS IN THE INDUSTRY, OR SOME OF THE

12   MAJOR PLAYERS?

13   A        IN THE ASBESTOS TEXTILE INDUSTRY?

14   Q        YES, SIR.  JOHNS-MANVILLE CORPORATION,

15   KEASBY AND MATTISON, RAYBESTOS-MANHATTAN, WOULD

16   THAT BE CORRECT?

17   A        YES.

18   Q        AND THIS EXHIBIT, WHERE SOMEBODY NAMED DR.

19   GOODMAN CRITICIZED DR. SELIKOFF, DR. GOODMAN WAS

20   ASSOCIATED WITH RAYBESTOS-MANHATTAN, RAYMARK, IS

21   THAT CORRECT?

22   A        YES.

23   Q        AND YOU KNOW THAT THEY'RE NOT A DEFENDANT IN

24   THIS CASE, OR THAT'S YOUR UNDERSTANDING, IS IT

25   NOT, SIR?

1942

1    A        THAT'S RIGHT.

2    Q        AND WAS THIS FROM THE MINUTES OF THE

3             ASBESTOS TEXTILE INSTITUTE?

4    A        IT WAS.

5    Q        AND YOU KNOW, SIR, THAT THIS GROUP OF PEOPLE

6             WHO CRITICIZED DR. SELIKOFF DOES NOT CONTAIN ONE

7             OF THE DEFENDANTS WHO ARE BEFORE THIS COURT IN

8             THIS CASE?

9    A        THAT'S RIGHT.

10   Q        NOW, I WANT TO ASK YOU ABOUT THE ASBESTOS

11            MAGAZINE, IF I MIGHT.  YOU RECALL BEING ASKED

12            ABOUT THIS DOCUMENT, ASBESTOS, SHOWING THE TITLE,

13            FROM MR. ROSSITER TO SUMNER SIMPSON AT RAYMARK,

14            DO YOU RECALL BEING SHOWN THAT?

15   A        YES, SIR.

16   Q        DOES IT INDICATE THAT A COPY OF THIS LETTER

17            WAS SENT TO ANY ONE OF THE DEFENDANTS WHO ARE

18            BEFORE THIS COURT?

19   A        NO.

20   Q        ASBESTOS WAS A PUBLICATION THAT WAS

21            PUBLISHED HOW OFTEN?

22   A        MONTHLY.

23   Q        AND I BELIEVE YOU'VE ALREADY TESTIFIED, HAVE

24            YOU NOT, SIR, THAT IN SPITE OF THE FACT THAT

25            SOMEBODY HERE WANTED TO KEEP AN ARTICLE OUT ABOUT

1943

1      THE DANGERS OF ASBESTOS, THAT IN FACT MANY

2      ARTICLES WERE IN FACT PUBLISHED BY THIS MAGAZINE

3      RELATING TO THE DANGERS OF ASBESTOS?

4    A      THAT'S NOT WHAT I SAID.   THERE WAS EXACTLY

5      ONE ARTICLE THAT WAS PUBLISHED WHEREUPON SOMEBODY

6      IN THE INDUSTRY MADE IT KNOWN TO THE MAGAZINE

7      THAT THAT WAS NOT DESIRED, AND SUBSEQUENT TO

8      1930, IN MARCH, NO ARTICLES ON ASBESTOSIS

9      APPEARED AGAIN IN ASBESTOS MAGAZINE.

10   Q      HOW LONG DID THIS PUBLICATION LAST?

11   A      UNTIL 1983.

12   Q      AND THIS REFERENCE THAT YOU'VE HAD RELATES

13     TO MR. ROSSITER AND SUMNER SIMPSON OF

14     RAYBESTOS-MANHATTAN, IS THAT CORRECT?

15   A      MS. ROSSITER, YES.

16   Q      I WANT TO ASK YOU ABOUT ANOTHER PUBLICATION

17     THAT YOU HAVE DISCUSSED.

18

19     THE COURT:  HAVE WE LOST A CHART?

20

21     MR. JOSEPHSON:  NO.   YOUR HONOR, IT MAY HAVE

22     BEEN A BLOW-UP, I MEAN, IT MAY HAVE BEEN

23     SOMETHING THEY PUT ON THE SCREEN THAT I'M

24     THINKING WAS A CHART, BUT I'LL GO ON AND THEN I

25     CAN LOOK FOR THAT LATER.

1944

1
2       BY MR. JOSEPHSON:
3       Q       THE SUMNER SIMPSON DOCUMENTS WHICH YOU
4               DESCRIBED ARE PRIMARILY -- ARE ENTIRELY
5               CORRESPONDENCE INVOLVING JOHNS-MANVILLE AND
6               RAYMARK, ARE THEY NOT?
7       A       THEY ARE FILES FROM SUMNER SIMPSON OF THE
8               RAYBESTOS-MANHATTAN CORPORATION.  THEY INVOLVE
9               QUITE A NUMBER OF COMPANIES.
10      Q       YES, SIR.  WOULD YOU AGREE WITH ME THAT THE
11              BULK OF THE CORRESPONDENCE IN THE 1930'S INVOLVES
12              CORRESPONDENCE BETWEEN SOMEONE AT JOHNS-MANVILLE
13              AND SOMEONE AT RAYBESTOS-MANHATTAN?
14      A       YES, I AGREE WITH YOU.
15      Q       AND WHEN WERE THOSE DOCUMENTS FOUND?
16      A       1978, I BELIEVE.
17      Q       AND IS IT NOT CORRECT THAT THEY HAD BEEN
18              LOCKED IN A SAFE BY SOMEONE AT
19              RAYBESTOS-MANHATTAN FOR OVER FORTY YEARS?
20      A       WELL, I DON'T KNOW WHAT THEY DID WITH THEM,
21              BUT THE DOCUMENTS HAD NOT BEEN MADE PUBLICALLY
22              AVAILABLE UNTIL THAT TIME.
23      Q       AND DIDN'T THE SON OF SUMNER SIMPSON, A MR.
24              WILLIAM SIMPSON, PRODUCE THOSE RAYBESTOS
25              DOCUMENTS AT A DEPOSITION WHICH WAS TAKEN OF HIM

1945

1       IN 1978?

2   A        SO, I UNDERSTAND, YES.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1946

1    Q        THE TWO PRINCIPLE CORRESPONDANTS WERE AN

2    INDIVIDUAL NAMED VANDIVER BROWN OF

3    JOHNS-MANVILLE, IS THAT CORRECT?

4    A        YES.

5    Q        AND SUMNER SIMPSON OF RAYBESTOS-MANHATTAN.

6    A        YES.

7    Q        AND THOSE WERE -- THIS CORRESPONDENCE WENT

8    ON FOR WHAT PERIOD OF TIME?

9    A        AROUND 1934 UNTIL AROUND 1950, 1954, I

10   BELIEVE.

11   Q        NOW, YOU MENTIONED SEVERAL ASSOCIATIONS, AND

12   I WANT TO ASK YOU ABOUT THOSE.

13

14            THE COURT: ARE YOU GETTING AWAY FROM SUMNER

15   SIMPSON AT THIS POINT?

16

17            MR. JOSEPHSON: YES, YOUR HONOR.

18

19            THE COURT: WHY DON'T WE STOP HERE?

20

21            MR. JOSEPHSON: ALL RIGHT.

22

23            THE COURT: LET ME REMIND THE JURY, WE AGAIN

24   HAVE A WEEKEND COMING UP, THE COURT'S EARLIER

25   INSTRUCTIONS ARE STILL IN EFFECT.  I NOTICED ONE

1947

1　OF THE T.V. STATION TRUCKS PARKED OUTSIDE.  THEY

2　REDISCOVER US ABOUT EVERY FOUR OR FIVE DAYS.  SO,

3　TO BE PARTICULARLY CAREFUL AGAIN ABOUT PUBLICITY,

4　AND DON'T DISCUSS THE CASE WITH ANYONE.

5　　I KNOW YOU'VE SERVED A LONG TIME ON THIS

6　CASE, AND IF IT'S ANY CONSULATION, I CAN TELL YOU

7　THAT SOME OF THE PROCEDURES WE HAVE UTILIZED HAVE

8　DRASTICALLY REDUCED THE LENGTH OF TIME OF THIS

9　CASE AND IF IT WERE TRIED IN SOME OTHER PLACE IT

10　WOULD BE CALCULATED TO LAST THREE TO FOUR MONTHS

11　WHICH IS CERTAINLY NOT GOING TO BE THE CASE HERE.

12　　I'M ADVISED THAT PLAINTIFFS' BEST ESTIMATE

13　AT THIS POINT IS THAT THEY THINK THEY WILL BE

14　ABLE TO CONCLUDE THEIR CASE NEXT THURSDAY, AND

15　THEN THE DEFENDANTS WILL PRESENT THEIR SIDE.  SO,

16　WE ARE MAKING SOME PROGRESS, AND IT'S IMPORTANT

17　THAT WE MAINTAIN THE INTEGRITY OF THE DECISION

18　MAKING CAPABILITY OF THIS JURY AND I WANT YOU TO

19　CONTINUE TO BE PARTICULARLY CAREFUL.

20　　I'M GOING TO EXCUSE YOU, AND WE'LL RESUME

21　WITH THE JURY AT 9:00 O'CLOCK MONDAY MORNING.

22　THE JURY CAN BE EXCUSED UNTIL THAT TIME.

23

24　　(WHEREUPON, THE JURY WAS EXCUSED FROM

25　THE COURTROOM AT 4:00 P.M., AFTER WHICH THE

1948

1    PROCEEDINGS RESUMED AS FOLLOWS:)

2

3        THE COURT:  DOCTOR, YOU MAY STEP DOWN IF YOU

4    WISH.

5        LADIES AND GENTLEMEN, LET ME DISCUSS SEVERAL

6    THINGS WITH YOU.  I'M GIVING SOME CONSIDERATION

7    AND HAVE BEEN DOING SOME WORK ON THE CHARGE, AND

8    THERE ARE A NUMBER OF MATTERS THAT I'VE BEEN

9    WRESTLING WITH A LITTLE BIT.  FIRST OF ALL, HOW

10   MUCH LAG TIME ARE THE REPORTERS HAVING BETWEEN

11   THE TESTIMONY AND WHEN YOU ACTUALLY GET IT TYPED?

12

13       THE COURT REPORTER:  ABOUT THREE HOURS.

14

15       THE COURT:  I WISH FOR YOU TO MAKE A COPY

16   FOR ME OF DR. CASTLEMAN'S TESTIMONY EARLIER AS IT

17   RELATES TO FIBREBOARD ONLY, AND I WISH TO BORROW

18   PLAINTIFFS' EXHIBITS.  THAT'S ONE I DID NOT WRITE

19   THE NUMBERS DOWN ON, THE FIBREBOARD EXHIBITS THAT

20   MR. BALDWIN USED IN THE PRESENTATION WITH THE

21   CHARTS, SO I MAY REVIEW THEM SOME TIME OVER THE

22   WEEKEND.  YOU CAN LEAVE THEM HERE UNLESS YOU NEED --

23   I CAN'T IMAGINE THAT YOU WOULD NEED THEM OVER THE

24   WEEKEND.

25

1949

1    MR. HOUSTON:  NO, SIR.

2

3    THE COURT:  ALL RIGHT.

4

5    MR. HOUSTON:  THE EXHIBITS AND THE CHARTS,

6    YOUR HONOR?

7

8    THE COURT:  PLEASE.  NOW, ON THE SUCCESSOR

9    QUESTION WITH KEENE.  IS IT COUNSEL'S VIEW -- LET

10   ME JUST START WITH MR. WEBER IN THIS RESPECT.  IS

11   IT YOUR VIEW, MR. WEBER, THAT FIRST OF ALL

12   WHETHER THIS IS A FACT QUESTION OR A LEGAL

13   QUESTION?

14

15   MR. WEBER:  I THINK IT'S GOING TO BE

16   INITIALLY A LEGAL QUESTION, YOUR HONOR, WHEN THE

17   EVIDENCE SHAKES OUT, AND EVENTUALLY IT MAY BE A

18   FACT QUESTION IF IT SURVIVES THE COURT'S

19   SCRUTINY.

20

21   THE COURT:  WELL, IS THE QUESTION OF

22   SUCCESSOR LIABILITY A FACT QUESTION OR A LEGAL

23   QUESTION?

24

25   MR. WEBER:  INITIALLY, IT'S A LEGAL

1950

1    QUESTION.

2

3        THE COURT: WELL, I KNOW YOU KEEP SAYING

4    INITIALLY.  YOU'RE TALKING ABOUT AN INSTRUCTED

5    VERDICT.  I APPRECIATE THAT, BUT --

6

7        MR. WEBER: YOU'RE ASKING WHO IT WILL

8    ULTIMATELY BE DECIDED BY?

9

10        THE COURT: YES, SIR.

11

12        MR. WEBER: IF IT'S NOT DECIDED BY THE COURT

13    TO INSTRUCT A VERDICT.  I THINK IT'S PROBABLY A

14    FACT QUESTION.

15

16        THE COURT: ALL RIGHT.  IS IT GOING TO BOIL,

17    IN YOUR VIEW, BOIL DOWN TO THE COURT BEING

18    REQUIRED TO LOOK THROUGH AN ERIE VERSUS TOMPKINS

19    GLASS, EVEN THOUGH IT MAY BE DARKLY, TO DETERMINE

20    WHAT THE TEXAS SUPREME COURT WOULD DO WITH A

21    PRODUCT LINE LIABILITY QUESTION?

22

23        MR. WEBER: I THINK THAT'S GOING TO BE PART

24    OF IT. OF COURSE, ALL THESE CONTRACTS WERE MADE

25    IN NEW YORK AND NEW JERSEY AND PLACES LIKE THAT.

1951

1    WE'RE TRYING A CASE IN TEXAS AND MY INITIAL

2    IMPRESSION, I HAVEN'T COMPLETED MY BRIEFING, IS

3    THAT YOU'LL PROBABLY LOOK TO TEXAS LAW, BUT I'M

4    NOT AT ALL SURE ON THAT.  I'VE BRIEFED IT BOTH

5    WAYS.

6

7         THE COURT:  WELL, I'VE HEARD NO EVIDENCE OF

8    THE CONTRACT EXCEPTION TO THE GENERAL RULE.

9    PRICE, YOU ARE WANTED AT THE DOOR.  WHETHER I

10   WILL OR NOT, I DON'T KNOW.  I'VE READ WITH

11   INTEREST THE GREGGS CASE, AND I'VE ALSO READ WITH

12   INTEREST THE PITTSBURGH-CORNING CASE OUT OF

13   PENNSYLVANIA.

14

15        MR. WEBER:  YES, SIR.

16

17        THE COURT:  I'M ASSUMING, AND I MAY BE

18   WRONG, BUT I'M ASSUMING I'VE HEARD ALL I'M GOING

19   TO HEAR FROM THE PLAINTIFFS.

20

21        MR. HOUSTON:  NO, SIR.  THERE WILL BE SOME

22   MORE.  THERE WILL BE SOME FROM THE CATALOG.

23   THERE WILL BE SOME CATALOG EVIDENCE, AND THERE

24   WILL BE SOME MORE EVIDENCE FROM THEIR

25   INTERROGATORIES.

1952

1
2      THE COURT:  CAN YOU JUST CHARACTERIZE IT FOR
3   ME?  I'M NOT GOING TO RULE ON IT TODAY, YOU
4   UNDERSTAND.
5
6      MR. HOUSTON:  I UNDERSTAND.  KEENE WAS
7   PUTTING OUT PRODUCTS, MY RECOLLECTION IS, I'LL
8   SHOW SOME CATALOGS PUTTING OUT ASBESTOS PRODUCTS,
9   INSULATION PRODUCTS BACK IN THE EARLY SIXTIES,
10   YOUR HONOR.  THEY USED REPEATEDLY THE, CONTINUED
11   THE NAME OF BALDWIN-EHERT-HILL PRODUCTS, ALL THE
12   SAME TRADE NAMES AS BALDWIN-EHERT-HILL.  THEY
13   CARRIED THE EHERT NAME AND HAVE BEEN IN THE
14   BUSINESS FOR FORTY YEARS.
15
16
17
18
19
20
21
22
23
24
25

1953

1    THE COURT:  YOU CONTEND THE EVIDENCE WILL BE

2    THAT AFTER 1968 THE B.E.H., BALDWIN-EHRET-HILL,

3    OR THE EHRET PRODUCTS, WERE CONTINUED TO BE

4    MANUFACTURED JUST AS THEY WERE BEFORE KEENE

5    PURCHASED NINETY-EIGHT PERCENT OF THE STOCK?

6

7    MR. HOUSTON:  MY UNDERSTANDING, JUST EXACTLY

8    NO CHANGE AT ALL, SAME NAME, SAME BOXES, SAME

9    EVERYTHING.

10

11    THE COURT:  AND IF THAT IS THE EVIDENCE,

12    THEN WE'LL DEAL WITH THAT CONTEXT.  OKAY.  NOW,

13    THE MOTION TO PRODUCE FILED BY THE PLAINTIFF --

14    NOW, BACK TO PRODUCT LINE, OR BACK TO KEENE, IT

15    APPEARS TO ME THAT I GUESS THE PROPER TIME FOR

16    THE COURT TO DEAL WITH IT IS AT THE CLOSE OF

17    PLAINTIFFS' CASE.

18    IN THE MEANTIME I WISH TO READ ANYTHING

19    EITHER SIDE WANTS ME TO READ, SO I CAN BE

20    PREPARED FOR THAT WHEN THE TIME COMES.

21

22    MR. WEBER:  ALL RIGHT, SIR.

23

24    THE COURT:  PLAINTIFF'S MOTION TO PRODUCE

25    RELATING TO COVERAGE AND AGREEMENTS --

1954

1          MR. HOUSTON:  MAY I ASK THE COURT, IN

2   HELPING ON THE BRIEF, WOULD YOU GIVE US TWO QUICK

3   CITATIONS OF THOSE CASES?

4

5          THE COURT:  MR. AINSWORTH --

6

7          MR. HOUSTON:  I ASSUME FROM WHAT YOU SAID

8   THAT THEY WERE --

9

10         THE COURT:  YOU HAVE A TEXAS COURT OF CIVIL

11  APPEALS CASE, FAIRLY RECENT, THAT COMPLETELY

12  REJECTS PRODUCT LINE LIABILITY, DISCUSSES THE

13  FOUR EXCEPTIONS, GOES INTO IT IN GREAT DETAIL AND

14  DEPTH, WITH AN ANALYSIS.  I DON'T KNOW THE WRIT

15  HISTORY.  DID WE FIND THE WRIT HISTORY?

16

17         MR. AINSWORTH:  NO WRIT HISTORY.

18

19         THE COURT:  NO WRIT HISTORY.  PENNSYLVANIA

20  COURT WITH ONE OF THE DEFENDANTS IN THIS CASE

21  TAKES, WITH AN AIRY APPROACH, TOTALLY OPPOSITE

22  RESULTS.

23

24         MR. HOUSTON:  IT SOUNDS LIKE I'M GOING TO

1955

1    LIKE ONE OF THEM, AND DON'T LIKE THE OTHER ONE.

2

3        MR. WEBER:  I THINK THAT THE PENNSYLVANIA

4    CASE IS DIFFERENT --

5

6        THE COURT:  IT'S LIKE A GOLF SHOT, SOMEBODY

7    LIKES EVERY SHOT.

8        NOW, PLAINTIFFS' MOTION TO PRODUCE THE

9    WELLINGTON AGREEMENTS.  I REMAIN PERSUADED,

10   REGARDLESS OF SOME VERY MIXED SIGNALS I RECEIVED

11   FROM COUNSEL OVER THE LAST TWO WEEKS, THAT WE ARE

12   STILL NOT IN A LIMITED FUND POSTURE SO FAR AS

13   WELLINGTON IS CONCERNED, AND THAT THERE IS

14   SUFFICIENT SOLVENCY TO SATISFY ANY JUDGMENT IN

15   THIS CASE.

16       NOW, WITH THE COURT BEING SATISFIED OF THAT,

17   TELL ME WHY YOU'RE ENTITLED TO HAVE YOUR MOTION

18   GRANTED.

19

20       MR. HOUSTON:  WELL, YOUR HONOR, THEY SAY

21   THAT, BUT THEN THEY TELL US AT THE SAME TIME THAT

22   THEY'VE GOT SUCH A BAD CASH FLOW POSITION THAT

23   THEY CAN'T EVEN TALK SETTLEMENT IN THE CASE ALONG

24   THE TERMS THAT WE WANT TO TALK SETTLEMENT ON.

25

1956

1    THE COURT:  I UNDERSTAND THAT WE HAVE

2    RECEIVED SERIOUS MIXED SIGNALS, LIKE I SAY.  I

3    REMAIN PERSONALLY SATISFIED THAT THEY'RE IN A

4    POSTURE TO SATISFY ANY JUDGMENT THAT MAY BE

5    ENTERED IN THIS CASE, AND THAT MAY NOT BE THE

6    CONSIDERATION, THERE MAY BE SOME OTHER REASON

7    THAT YOU WOULD BE ENTITLED TO HAVE THE MOTION

8    GRANTED.

9    I ADMIT TO TRYING TO PROCEED CAUTIOUSLY IN

10   THIS RESPECT.  I DON'T WANT TO INTERJECT A

11   COLLATERAL ISSUE AFTER TWO WEEKS OF TRIAL IN THIS

12   THING THAT COULD RESULT -- COULD MAKE US DO THIS

13   OVER.  THAT'S THE LAST THING I WANT.

14

15   MR. HOUSTON:  WE DON'T WANT IT EITHER, YOUR

16   HONOR.

17

18   MR. BALDWIN:  YOUR HONOR, I WOULD LIKE TO

19   SPEAK TO THAT.  I THINK THAT THE INFORMATION

20   REQUESTED IN THE WELLINGTON, THE MOTION TO

21   PRODUCE, SHOULD BE PRODUCED AT LEAST TO THE COURT

22   IN THE INITIAL STAGE, AND THE COURT CAN RESERVE

23   JUDGMENT AS TO WHETHER THE JURY SEES IT.

24   I THINK IT'S IMPORTANT FOR THE COURT TO

25   HAVE, TO KNOW HOW TO DRAW THE CHARGE, FOR

1957

1    EXAMPLE.

2

3         THE COURT:  WELL, YOU'RE GOING BACK TO A

4    MARY CARTER TYPE ANALYSIS.

5

6         MR. BALDWIN:  THAT'S RIGHT.  THESE PEOPLE

7    HAVE MADE A DEAL BETWEEN THEMSELVES AS TO HOW

8    THEY'RE GOING TO PAY ANY JUDGMENT THAT IS PAID IN

9    THIS -- THAT THIS JURY RENDERS IN THIS CASE.

10   NOW, THAT'S GOING TO EFFECT THE CREDITABILITY OF

11   THE WITNESSES, IT'S GOING TO EFFECT THE WAY THEY

12   TESTIFY, AND I REALLY THINK THAT WE'RE ENTITLED

13   TO SHOW THAT IN ORDER TO SHOW TO THE JURY THE

14   REAL PARTIES IN INTEREST IN THIS CASE, AND THE

15   REASON THAT CERTAIN WITNESSES MIGHT TESTIFY A

16   CERTAIN DIRECTION.  IT GOES TO THE ALL IMPORTANT

17   QUESTION OF BIAS AND PREJUDICE, AND I THINK THAT --

18   I DON'T SEE HOW THE COURT CAN PREPARE A CHARGE IN

19   THIS CASE WITHOUT KNOWING WHAT THE WELLINGTON

20   AGREEMENT IS.

21        I DON'T SEE HOW YOU CAN MAKE A DUNCAN

22   SUBMISSION.

23

24        THE COURT:  I THINK I CAN CHARGE THIS JURY

25   IN THE MORNING.

1958

1

2      MR. BALDWIN:  WELL, I'M SURE YOU COULD, BUT

3  I DON'T KNOW -- I DON'T KNOW HOW YOU CAN

4  DETERMINE WHAT PERCENT.   IF THE JURY ANSWERS AN

5  ISSUE THAT ONE OF THESE DEFENDANTS IS ONE OR TWO

6  PERCENT AT FAULT, I DON'T KNOW WHAT EFFECT THAT

7  WILL HAVE, I DON'T THINK THE COURT KNOWS.

8

9      MR. JOSEPHSON:  MAY I RESPOND?

10

11      THE COURT:  JUST A MINUTE.

12

13      MR. HOUSTON:  FROM AN IMMEDIATE STANDPOINT,

14  WHAT HAS JUST HAPPENED IN THE LAST FIVE MINUTES,

15  IT OCCURS TO ME THAT WE'RE ENTITLED TO IT, IF FOR

16  NO OTHER REASON, BECAUSE IT MIGHT LEAD TO THE

17  PRODUCTION OF RELEVANT EVIDENCE.

18      MR. WEBER IS STILL INSISTING, AND INSISTING,

19  AND INSISTING, THAT HE IS ENTITLED TO GET OUT OF

20  THIS THING FOR KEENE.

21      HE REPRESENTS KEENE INDIVIDUALLY.   HE IS ONE

22  OF THE LEAD COUNSEL FOR THE WELLINGTON PEOPLE,

23  AND I'M TOLD, BUT THEY WON'T TELL YOU THE EXACT

24  TERMS, BUT I'M TOLD THAT IT DOESN'T MAKE ANY

25  DIFFERENCE TO WELLINGTON AT ALL.   IF YOU CONVICT

1959

1    ONE --

2

3        THE COURT:  WELL, IT CERTAINLY DOES FROM A

4    PUNITIVE STANDPOINT.

5

6        MR. HOUSTON:  WELL, IF YOU CONVICT ONE OF

7    THESE DEFENDANTS -- NO, HE'S NOT TALKING ABOUT

8    PUNITIVE, HE WANTS OUT ON EVERYTHING, IS WHAT

9    HE'S TALKING ABOUT.

10

11       THE COURT:  I UNDERSTAND THAT.  IF HE GETS

12   OUT ON EVERYTHING HE'S GOING TO BE OUT ON

13   PUNITIVE.

14

15       MR. HOUSTON:  BUT THE POINT I'M TALKING

16   ABOUT, THEN THEY TELL ME ON THE OTHER HAND THAT

17   THEY PROBABLY HAVE PUNITIVE COVERAGE, BUT IT WILL

18   DEPEND ON WHAT THE ULTIMATE INTERPRETATION OF

19   TEXAS LAW IS.

20

21       MR. BALDWIN:  THEY COULD ALL GET TOGETHER

22   AND AGREE TO PILE IT ALL ON AN INSOLVENT OR NEAR

23   INSOLVENT DEFENDANT, AND WE HAVE NO WAY OF

24   KNOWING.  I THINK THAT WE'RE -- IF WE MADE A DEAL --

25

1960

1      THE COURT:  NOW, DON'T FORGET THAT THE COURT

2  HAS EXAMINED IN CAMERA DOCUMENTATION IN THIS CASE

3  RELATING TO SOLVENCY ON THE QUESTION OF LIMITED

4  FUNDS, AND CONCLUDED --

5

6      MR. BALDWIN:  I'M NOT SPEAKING TO THE

7  QUESTION OF PAYING A JUDGMENT, I'M SPEAKING TO

8  THE CREDITABILITY OF THE WITNESSES.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1961

1    THE COURT:  WELL, THERE IS NOT -- YOU'RE NOT

2    GOING TO HAVE AN INSOLVENT DEFENDANT AMONG THESE

3    EIGHT.  NOW, IF THEY'RE SUCCESSFUL IN PUTTING IT

4    ALL ON STANDARD, YOU HAVE A PROBLEM.

5

6    MR. BALDWIN:  WELL, IF ALL EIGHT OF THEM

7    GANG UP THEY'VE GOT A HECK OF A LOT BETTER CHANCE

8    THAN IF THEY FIGHT FOR THEMSELVES, YOUR HONOR,

9    WHICH IS PRECISELY THE POINT I'M MAKING.

10

11    MR. JOSEPHSON:  YOUR HONOR, IT WOULD BE --

12    WHEN MR. BALDWIN CAN PRODUCE THE WITNESS WHO HAS --

13    COLORED HIS TESTIMONY AND TESTIFIED IN A MANNER

14    DIFFERENT THAN THAT WHICH HE HAS TESTIFIED IN THE

15    PAST, I WOULD LIKE TO KNOW THE NAME OF SUCH A

16    WITNESS, AND HOW HE CHANGED HIS TESTIMONY.

17    THE COURT KNOWS THE PRINCIPAL WITNESSES IN

18    THIS CASE, BECAUSE THEY HAVE TESTIFIED BEFORE,

19    AND THE COURT KNOWS THE ISSUES UNDER WHICH THEY

20    TESTIFIED.

21

22    THE COURT:  LET ME INTERRUPT YOU.

23

24    MR. JOSEPHSON:  YES, SIR.

25

1962

1       THE COURT:   IS THERE A PERSON IN EXISTENCE

2   WHO HAS THE INFORMATION SOUGHT IN THE MOTION WHO

3   COULD BE SUMMONED TO THIS COURT WITH TWENTY-FOUR

4   HOURS NOTICE?

5

6       MR. JOSEPHSON:   FROM I UNDERSTAND, YOUR

7   HONOR, EACH INDIVIDUAL DEFENDANT HAS --

8

9       THE COURT:   NOW MR. JOSEPHSON, YOU'VE

10  STRETCHED MY CREDIBILITY.   SOME PERSON KNOWS WHAT

11  THE DEAL IS.

12

13      MR. JOSEPHSON:   THERE'S NO DOUBT ABOUT THAT.

14  I THOUGHT YOU WERE TALKING ABOUT INDIVIDUAL

15  FORMULAS, YOUR HONOR.

16

17      THE COURT:   INCLUDING INDIVIDUAL FORMULAS.

18  THERE IS SOME PERSON IN EXISTENCE WHO KNOWS THE

19  WHOLE DEAL.

20

21      MR. JOSEPHSON:   I'M TOLD, YOUR HONOR, THAT

22  AT A MEETING ATTENDED IN YOUR HONOR'S PRESENCE

23  THAT A COPY OF THE WELLINGTON AGREEMENT WAS

24  HANDED TO YOU.

25

1963

1     MR. BALDWIN:  ON THE COPY OF THE WELLINGTON

2   AGREEMENT, YOUR HONOR.  I HAVE SEEN IT, AND IT

3   DOES NOT SET FORTH THE PERCENTAGE IN WHICH THE

4   DEFENDANT PAY A JUDGMENT OR SETTLEMENT.

5

6     THE COURT:  BACK TO MY QUESTION.  IS THERE A

7   PERSON WHO THIS COURT COULD SUMMON TO APPEAR AND

8   TESTIFY OUTSIDE THE PRESENCE OF THE JURY IN THE

9   EVENT THE COURT EVER BECOMES CONVINCED THAT THERE

10   IS SOME MODIFICATION OF A POSITION AS A RESULT OF

11   THE AGREEMENT?

12

13     MR. JOSEPHSON:  YOUR HONOR, I AM SURE THIS

14   IS SOMEBODY WHO CAN EXPLAIN IT.

15

16     THE COURT:  I'M SURE THERE IS TO.

17

18     MR. JOSEPHSON:  I DIDN'T MEAN TO SUGGEST

19   THAT THERE WASN'T ANYBODY, I SUGGESTED THAT ONE

20   PERSON MAY NOT HAVE ALL OF THE DETAILS.  THAT'S

21   ALL I WAS TRYING TO SAY.  BUT WOULD CERTAINLY BE

22   ABLE TO EXPLAIN TO THE COURT --

23

24     THE COURT:  WILL YOU PRODUCE TO THIS COURT

25   MONDAY MORNING THE NAME OF A PERSON OR PERSONS

1964

1    THAT THE COURT WILL HOLD IN CAMERA, IF NEED BE,

2    WHO IS AVAILABLE ON TWENTY-FOUR HOUR NOTICE TO

3    APPEAR IN THE EVENT THE COURT PERCEIVES A

4    MODIFICATION OF POSITION THAT MIGHT JUSTIFY THE

5    PLAINTIFFS IN HAVING ACCESS TO THE INTERNAL

6    ARRANGEMENTS OF THE EIGHT PARTICIPANTS?

7

8        MR. JOSEPHSON:  I CERTAINLY WILL.

9

10       THE COURT:  ALL RIGHT.  GIVEN THAT

11   REPRESENTATION, I AM AT THIS TIME DENYING THE

12   MOTION.

13

14       MR. JOSEPHSON:  I WONDERED ALSO, YOUR HONOR,

15   IF WE MAY -- I DON'T KNOW IF IT'S NECESSARY, BUT

16   I WOULD LIKE TO FILE A BRIEF IN RESPONSE TO THEIR

17   MOTION ON THIS POINT, ALONG WITH -- I'LL

18   CERTAINLY GIVE THE COURT THE NAME OF THE PERSON,

19   BUT I WOULD LIKE TO FILE --

20

21       THE COURT:  I HAVE DENIED IT AT THIS POINT.

22

23       MR. JOSEPHSON:  I UNDERSTAND.

24

25       THE COURT:  I'LL RECONSIDER IF YOU WANT ME

1965

1    TO.

2

3          MR. JOSEPHSON:  NO, I DON'T WANT YOU TO.  I

4    THOUGHT YOU WERE JUST HOLDING IT OPEN, AND IF YOU

5    WERE BEFORE YOU RULED --

6

7          MR. BALDWIN:  AT SOME POINT IN TIME WE WOULD

8    LIKE TO MAKE A RECORD ON THIS.

9

10         MR. JOSEPHSON:  I WOULD LIKE TO GIVE THE

11   NAME TO THE COURT IN CHAMBERS, IF I MIGHT, IN

12   CAMERA.

13

14         THE COURT:  THAT'S WHYY I EXTENDED THE

15   OPTION.

16

17         MR. HOUSTON:  JUDGE, LET'S DON'T FORGET THIS

18   THING, THE LAST THING YOU TOUCHED ON WHEN YOU

19   SAID, QUOTE, I KNOW IT WAS BEING A SLIGHTLY

20   FACETIOUS AND WHATNOT ON YOUR RULING.  YOU SAID,

21   "WELL, IF ALL OF THESE EIGHT WELLINGTON

22   DEFENDANTS ARE SUCCESSFUL IN DUMPING LIABILITY

23   SOLELY ON STANDARD, THEN THEY HAVE BEEN

24   SUCCESSFUL IN THE DEFENSE," AND THIS IS WHAT

25   CONCERNS US.  MR. WEBER IS LEAD COUNSEL FOR

1966

1   WELLINGTON, HE'S THE SOLE COUNSEL FOR KEENE

2   CORPORATION, AND HIS FIRM REPRESENTS STANDARD,

3   THE VERY ONE YOU'RE TALKING ABOUT, AND TO THE

4   EXTENT THAT THEY --

5

6       THE COURT:  OF COURSE, THAT WOULD BE TRUE IF

7   THERE WERE NO WELLINGTON AGREEMENT, THE OTHER

8   EIGHT COULD DUMP IT ON STANDARD, OR ON ANY OTHER

9   DEFENDANT.

10

11      MR. HOUSTON:  NOT WITH HIS ONE LAW FIRM

12  REPRESENTING BOTH OF THEM.  THEY CAN'T DO IT WITH

13  STANDARD JUST SITTING THERE AND JUST LETTING THEM

14  POLITELY DOING IT.

15

16      MR. BALDWIN:  AND THEN YOU GET INTO --

17

18      MR. HOUSTON:  SEE, STANDARD HELPS THEM DO

19  IT, AND THIS IS WHERE THE VICE IS.

20

21      MR. BALDWIN:  YOUR HONOR, JUST YOU SAID,

22  THEY CAN DUMP IT ON EIGHT IF THERE'S NOT A

23  WELLINGTON AGREEMENT.  BUT THE POINT I'M MAKING

24  IS, WHEN THEY GET TO THE POINT WHERE THEY GET

25  TOGETHER AND SAY, "WE'RE GOING TO DUMP IT ON "X"

1967

1  OR "Y"," AND IN EXCHANGE FOR THAT MONEY CHANGES

2  HANDS, THEN YOU GET INTO THE SETTLEMENT, AND

3  WE'RE ENTITLED TO KNOW WHAT IT IS, AND WHERE IT

4  IS, AND SO IS THE COURT, AND MONEY IS CHANGING

5  HANDS IN THE WELLINGTON AGREEMENT.

6      THE WAY THEY PAY THESE JUDGMENTS IS NOT ANY

7  DIFFERENT THAN A SETTLEMENT THAT'S MADE UNDER

8  SIMMONS.

9      IN ADDITION TO THAT, THE CASES THAT I'VE

10  CITED TO THE COURT WHERE THEY HELD THAT YOU'RE

11  ABLE TO SHOW INSURANCE IN ORDER TO SHOW THE REAL

12  BIAS, THE REAL PARTY IN INTEREST IN A LAWSUIT.

13  WE DON'T KNOW WHO THE REAL PARTIES IN INTEREST

14  HERE IN THIS LAWSUIT, ALL WE KNOW IS THERE'S SOME

15  LOOSE AGREEMENT OUT THERE WHERE EIGHT DEFENDANTS

16  HAVE GOTTEN TOGETHER, AND THEY'RE DEFENDING THIS

17  LAWSUIT, BUT WE DON'T KNOW WHO THE REAL TARGET IS

18  THE WHOLE TIME WE TRY IT.  OUR HANDS ARE TIED, WE

19  CAN'T SHOW THE JURY THAT WE'VE MADE A DEAL.

20

21      THE COURT:  THAT'S RIGHT.  THAT'S RIGHT.

22  MR. BALDWIN.  AS MUCH AS WE HAVE ALL ENJOYED THIS

23  TRIAL, I HOPE WE DON'T DO IT OVER.  I'M GOING TO

24  TRY MY BEST.

25      AT THIS TIME I'M GOING TO DENY THE MOTION.

1968

1       YOU'LL MAKE A REPRESENTATION MONDAY.

2

3           MR. JOSEPHSON:  YES.

4

5           THE COURT:  IF I, BASED ON MY EXPERIENCE

6       WITH HAVING TRIED A LOT OF THESE CASES, PERCEIVE

7       A POSITION MODIFICATION, I WILL IMMEDIATELY

8       NOTIFY COUNSEL, AND WE'LL RECONSIDER THE

9       QUESTION.

10          THAT'S THE BEST I CAN DO AT THIS POINT.

11

12          MR. BALDWIN:  I WOULD JUST LIKE TO BE GIVEN

13      AN OPPORTUNITY TO MAKE A RECORD OF THE SIMMONS,

14      BECAUSE I FEEL VERY SERIOUS ABOUT THIS.

15

16          MR. JOSEPHSON:  I HAVE A MOTION.

17

18          MR. SADLER:  ARE WE GOING TO SUBMIT DUNCAN

19      ON EACH OF THESE EIGHT DEFENDANTS?

20

21          THE COURT:  I WOULD ANTICIPATE THAT YOU

22      WOULD.  DO YOU KNOW HOW TO AVOID THAT?

23

24          MR. SADLER:  WELL, THAT'S WHY WE NEED THE

25      AGREEMENT, SO WE'RE NOT -- THIS IS WHY -- I DON'T

1969

1   SEE HOW IN THIS WORLD IT CAN POSSIBLY BE

2   REVERSIBLE ERROR FOR US TO HAVE DISCOVERY WITH

3   THE AGREEMENT, NOT INTO EVIDENCE, TO KNOW WHAT IT

4   IS SO THAT WE'LL KNOW WHETHER OR NOT IT GOES INTO

5   EVIDENCE.

6

7       MR. HOUSTON:   THEY TELL US THE SAME PEOPLE

8   ARE GOING TO PAY IT, YOUR HONOR, BUT REGARDLESS

9   OF WHICH ONE YOU STICK.   NOW, THIS APPLIES IN THE

10  FACE OF THE DOCUMENT.   THIS IS WHAT THEY TELL US.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1970

1    THE COURT: HOW IS IT DIFFERENT FROM AN

2    INSURANCE CONTRACT, AN INSURANCE AGREEMENT?

3

4    MR. SADLER: WELL, WE'RE ENTITLED TO KNOW

5    THE INSURANCE CONTRACT UNDER DISCOVERY, AND WE

6    OUGHT TO BE ENTITLED TO KNOW THIS UNDER

7    DISCOVERY.

8

9    THE COURT: YOU'RE ENTITLED TO KNOW THE

10   EXTENT OF COVERAGE, BECAUSE IT ASSISTS YOU IN

11   NEGOTIATION. WE HAVE PASSED THE POINT --

12

13   MR. SADLER: AND NOW WE'RE TALKING ABOUT A

14   DUNCAN SUBMISSION WITH THE CHARGE TO THE JURY.

15

16   THE COURT: RIGHT.

17

18   MR. BALDWIN: AND CASES HOLDING IN THE BRIEF

19   THAT I CITED, THAT THE COURT SHOULD NOT SUBMIT

20   THEIR POSITIONS, WHICH ARE MEANINGFUL, AND THAT'S

21   EXACTLY AND PRECISELY WHAT THIS COURT WOULD BE

22   DOING IS SUBMITTING AN ISSUE THAT IT DOESN'T

23   MATTER HOW THIS JURY ANSWERS.

24

25   THE COURT: WELL, IF YOU ARE CORRECT IN THAT

1971

1    POSITION, IS THAT NOT CORRECTABLE POST-VERDICT?

2

3        MR. BALDWIN:   THE DAMAGE IS DONE THEN.

4

5        THE COURT:   HOW IS THE DAMAGE DONE?

6

7        MR. BALDWIN:   THE CASE HAS BEEN TRIED, WE

8    DON'T KNOW WHAT BIAS AFFECTS WHAT WITNESS, WE

9    DON'T KNOW THE REAL PARTY AT INTEREST WHEN THEY

10   PUT A WITNESS ON THE WITNESS STAND, WE DON'T KNOW

11   HOW TO GO ABOUT CROSS-EXAMINING HIM BECAUSE OF

12   HIS BIAS OR PREJUDICE, BECAUSE WE DON'T KNOW

13   WHO'S REPRESENTING HIM, WE DON'T KNOW --

14

15       THE COURT:   WELL, I CAN SEE THIS TRIAL

16   DEGENERATING TO A POINT WHERE THE FOCUS IS ON THE

17   FACT THAT AN AGREEMENT EXISTS AMONGST EIGHT

18   DEFENDANTS, AND I THINK -- I THINK THAT WOULD BE

19   A SERIOUS MISTAKE THAT WOULD PLACE THE WHOLE

20   RESULT IN JEOPARDY.

21

22       MR. BALDWIN:   WE DON'T WANT TO DO THAT, BUT

23   WE WOULD LIKE TO KEEP IT IN PERSPECTIVE.

24       WE DIDN'T MAKE THIS AGREEMENT, THEY MADE

25   THIS AGREEMENT.

1972

1

2          MR. JOSEPHSON: YOUR HONOR, I HAD A MOTION

3     ON ANOTHER AGREEMENT WHICH --

4

5          THE COURT: GO AHEAD.

6

7          MR. JOSEPHSON: -- THE COURT, I BELIEVE,

8     MADE, WITH AN ORDER. IT HAS COME TO MY ATTENTION

9     THAT OF MR. BALDWIN'S CASES, SOME THIRTY-THREE

10    BELONG TO THE CASE OF JAMES DRAKE VERSUS

11    JOHNS-MANVILLE SALES CORPORATION, AND I DO NOT

12    KNOW IF SAID CASES ARE BEING CONSIDERED IN THE

13    CLASS, BUT IF THEY ARE, WE WOULD CALL TO THE

14    ATTENTION OF THE COURT AN AGREED ORDER BY ALL

15    PARTIES, INCLUDING MR. BALDWIN AND ALL OF THE

16    DEFENSE COUNSEL, SIGNED BY THE COURT ON DECEMBER

17    8, 1980 --

18

19         THE COURT: THIS IS THE MATTER THAT YOU HAD

20    MENTIONED TO ME EARLIER?

21

22         MR. JOSEPHSON: YES, YOUR HONOR, INDICATING

23    THAT IN THE EVENT THAT THE CASES CAN'T BE SETTLED

24    AFTER PRETRIAL DISCOVERY, THEN THIS CASE SHALL BE

25    TRANSFERRED PURSUANT TO 28 USC 1404(A), TO THE

1973

1   UNITES STATES DISTRICT COURT, MIDDLE DISTRICT OF

2   TENNESSEE, NASHVILLE DIVISION, FOR TRIAL ON THE

3   MERITS.   THE ORDER SIGNED AND ENTERED ON DECEMBER

4   8, 1980.   MR. BALDWIN IS CERTAINLY HERE

5   REPRESENTING TWELVE PLAINTIFFS IN A CASE CALLED

6   MAYFIELD, BUT WE BELIEVE THAT, AND WE MOVE, THAT

7   THIS CASE THAT THESE PLAINTIFFS, IF THEY ARE IN

8   FACT BEFORE THE COURT, BELONGING TO THE DRAKE

9   CASE, BE SEVERED OUT AND THE CASE TRANSFERRED AND

10  TRIED IN IT'S ENTIRETY IN NASHVILLE, TENNESSEE.

11       IN THE ALTERNATIVE, WE WOULD ASK THAT ANY OF

12  THE MINI TRIALS AFTER JUDGMENT IS RENDERED HERE,

13  ALTHOUGH WE DO NOT SEE HOW THAT COULD BE POSSIBLE

14  TO HAVE A JUDGMENT RENDERED HERE TRIED UNDER

15  TEXAS LAW WHEN ALL OF THESE CASES PROBABLY ARE

16  GOVERNED BY TENNESSEE LAW, BUT ALTERNATIVELY WE

17  WOULD ASK THAT THE MINI TRIALS BE TRANSFERRED TO

18  THE UNITED STATES DISTRICT COURT, MIDDLE DISTRICT

19  OF TENNESSEE, NASHVILLE DIVISION.

20       BUT WE SEE A SERIOUS CONFLICT OF LAW

21  PROBLEM, BECAUSE THESE CASES PROBABLY WOULD HAVE

22  BEEN GOVERNED IN THEIR ENTIRETY, INCLUDING ACTUAL

23  AND PUNITIVE DAMAGES, UNDER TENNESSEE LAW AND NOT

24  TEXAS LAW.   SO, WE THINK FOR THAT REASON THAT THE

25  ENTIRE THIRTY-THREE DRAKE CASES SHOULD BE

1974

1    TRANSFERRED TO THE UNITED STATES DISTRICT COURT,

2    MIDDLE DISTRICT OF TENNESSE.

3

4        THE COURT:  NOW, I DON'T KNOW WHERE I AM ON

5    THIS THING.  I'M GOING TO TAKE THAT UNDER

6    ADVISEMENT.

7        MR. BALDWIN, IF YOU CAN, OVER THE WEEKEND,

8    GIVE COUNSEL A COPY OF THE ORDER THAT YOU SAY YOU

9    HAVE, I WOULD LIKE TO HAVE A COPY ALSO, AND IF

10   YOU CAN DETERMINE WHETHER THE LISTED, I GUESS

11   THEY'RE LISTED, WHETHER THE CASES LISTED ARE IN

12   FACT IN OUR INVENTORY OF CASES IN THIS CLASS,

13   WE'LL DEAL WITH IT AT SOME POINT SOME WAY.

14

15       MR. BALDWIN.  RIGHT.  I WOULD LIKE TO WAIT

16   UNTIL MONDAY --

17

18       THE COURT:  I DON'T KNOW WHERE I AM ON THAT

19   QUESTION.

20

21       MR. BALDWIN:  I HAVEN'T HAD ANY NOTICE OF A

22   MOTION, AND I WILL NOT --

23

24       MR. HOUSTON:  YOUR HONOR, IF I CAN HELP ON

25   THAT, IF I'M IN ERROR, THEY WERE INCLUDED AND

1975

1    THEY WERE CHECKED AS PART OF THE MCGOVERN

2    PROTOCOL, CHECKED ON, WE'VE BEEN IN TRIAL TWO

3    WEEKS, I'M CLASS COUNSEL, AND I CERTAINLY DON'T

4    WANT TO DISTURB IT AGAIN.  THIS THING CAN PROCEED

5    TO JUDGMENT, AND IF THE WORSE EVER COMES, YOU CAN

6    SEND THE MINI TRIALS BACK TO TENNESSEE.

7

8        THE COURT:  WE'LL JUST --

9

10       MR. HOUSTON:  I JUST DON'T WANT TO TAKE IT

11   OUT AGAIN AND --

12

13       THE COURT:  -- DEAL WITH IT AT SOME POINT,

14   BUT IT IS A MATTER THAT CERTAINLY HAS TO BE DEALT

15   WITH.

16       NOW, I HAVE ONE OTHER MATTER ON MY LIST.

17   MR. WEBER HAD A REQUEST REGARDING THE MASTER.

18   YOU HAD REQUESTED SOME MODIFICATION OR SOME

19   ADDITIONAL INFORMATION, AND THE MASTER SAID HE

20   WAS INCLUDING ALL OF IT EXCEPT TWO THINGS, IS

21   THAT CORRECT?

22

23       MR. WEBER:  HE HAD TOLD ME THE OTHER DAY,

24   MR. SADLER AND I HAD DISCUSSED THIS BRIEFLY, HE

25   TOLD ME THE OTHER DAY THAT HE HAD NO PROBLEM

1976

1    FURNISHING THE INFORMATION REQUESTED, EXCEPT THAT

2    AS TO TWO ITEMS, THAT THE COURT HIMSELF WOULD

3    HAVE TO DECIDE THOSE ISSUES.

4         I HAVE SINCE TALKED WITH MR. --

5

6         THE COURT:  NOW, YOU ARE FAMILIAR WITH THE

7    FACT THAT I HAVE HAD ABSOLUTELY NOTHING TO DO

8    WITH WHAT HE'S DONE OR THE MANNER IN WHICH HE'S

9    DONE IT --

10

11        MR. WEBER:  YES, SIR.

12

13        THE COURT:  -- FROM EITHER FORM OR SUBSTANCE

14   CONTENT?

15

16        MR. WEBER:  I UNDERSTAND BY CONVERSATIONS

17   THAT HE IS BREAKING OUT THE CASES BY ATTORNEY, BY

18   PLAINTIFF'S ATTORNEY, WHICH I BELIEVE HAD NOT

19   BEEN DONE PREVIOUSLY.

20        AND IT'S FURTHER MY INFORMATION, YOUR HONOR,

21   THAT HE'S EXPECTING TO HAVE SOME ADDITIONAL

22   THINGS DONE BY MONDAY, TOGETHER WITH INFORMATION

23   TO BE FURNISHED TO EVERYBODY.  IF THAT'S SO, I

24   THINK AFTER HAVING TALKED TO MR. WILLIAMS, WHO I

25   BELIEVE HAD TALKED TO MR. MCGOVERN, AND I TALKED

1977

1    TO HIM BRIEFLY AFTER HE WAS TALKING TO PRICE,

2    THAT WE PROBABLY ARE NOT GOING TO BE ABLE TO

3    DISCUSS ANYTHING MEANINGFULLY AT THIS TIME UNTIL

4    WE GET THAT ADDITIONAL INFORMATION.

5

6         THE COURT:  WELL, IN OTHER WORDS, I DON'T

7    NEED TO DEAL WITH --

8

9         MR. WEBER:  I DON'T BELIEVE YOU DO.

10

11        THE COURT:  I TRUST YOU'LL CALL IT TO MY

12   ATTENTION?

13

14        MR. WEBER:  INDEED I WILL, YES.

15

16        THE COURT:  YES, MA'AM.

17

18        MS. CLARK:  I'VE BEEN VERY QUIET, JUDGE.

19

20        THE COURT:  I'VE NOTICED.

21

22        MS. CLARK:  TRYING TO STAY OUT OF THE WAY.

23

24        THE COURT:  CONSISTENT WITH THE STONEWALLING

25   POSITION THAT YOU TOOK ON THE STIPULATIONS.

1

2          MS. CLARK:  YES, SIR.  AFTER THAT I DECIDED

3    I WAS GOING TO BE DOWNHILL FROM THERE, SO I

4    THOUGHT I WOULD JUST GET OUT OF THE WAY.  JUDGE,

5    I JUST WANTED TO MAKE IT CLEAR THAT EVERYBODY,

6    ALL THE PLAINTIFFS, ARE AWARE OF THE FINANCIAL

7    SITUATION, INSURANCE SITUATION, AND CORPORATE

8    WORTH, OR LACK OF WORTH, OF STANDARD,

9          I HAVE MADE A TWO MILLION DOLLAR OFFER TO

10   SETTLE ALL THE CLASSES TWO WEEKS AGO, MR. UMPHREY

11   AND MR. THOMPSON AGREED TO TAKE A PER CASE

12   PORTION OF THAT.  THIS OFFER TO MR. BALDWIN AND

13   MR. HOUSTON, AND WHOEVER ELSE, WHATEVER EQUALLY

14   IT WOULD COME OUT TO, OBVIOUSLY IS STILL OPEN,

15   HAS NEVER BEEN WITHDRAWN.

16          I EVEN TALKED TO MR. SADLER, IF THEY WERE

17   AFRAID OF PERHAPS MY INADVERTENTLY GETTING SOME

18   DUNCAN SUBMISSION ON ME, THAT IF THEY WANTED TO

19   JUST LET ME GO VOLUNTARILY, I WOULD LEAVE AND

20   NEVER COME BACK, BUT MY RESPONSE FROM THAT WAS,

21   "WE WON'T LET YOU GO, NO WAY, NO HOW."

22          BUT I DON'T WANT THE RECORD, EVEN THOUGH I'M

23   BEING A LITTLE FACETIOUS AT THIS POINT, TO

24   INDICATE THAT SOMEHOW I'M SITTING THERE NOT

25   TRYING TO GET OUT OF THIS CASE, OR NOT

1   REPRESENTING THAT I WOULD AT ANY TIME MAKE THE

2   SAME AGREEMENT WITH THESE PLAINTIFFS AS I HAVE

3   WITH MR. UMPHREY'S AND MR. THOMPSON'S PLAINTIFFS.

4   THEY'RE WELL AWARE OF THE SITUATION THAT WE HAVE,

5   AND I DON'T REALLY PERSONALLY, IF I CAN HAVE A

6   PERSONAL PRIVILEGE POINT, LIKE MR. HOUSTON'S

7   IMPLICATION, MAYBE NOT VERY VEILED, THAT, YOU

8   KNOW, I'M SOMEHOW TRYING TO TAKE THE FALL FOR THE

9   OTHER -- OR YOU WERE THE ONE THAT DID THAT JUDGE,

10  BUT I KNOW YOU WERE BEING FACETIOUS.  BUT THAT

11  I'M IN THERE HELPING THEM COME UP WITH THIS.

12      I DON'T KNOW WHAT THEIR AGREEMENT IS, AND I

13  DON'T WANT TO KNOW, ALL I KNOW IS THAT I'M NOT

14  INVOLVED IN IT, AND IF THEY'LL AGREE TO SETTLE

15  WITH ME TODAY, IT WILL BE A DONE DEAL.  SO, I

16  THANK YOU.

17

18      THE COURT:  ALL RIGHT.  SINCE WE'VE BEEN

19  DEALING WITH LETTERS FOR THE PAST TWO DAYS, I'LL

20  SHARE ONE LETTER WITH YOU BEFORE YOU GO HOME, IT

21  WON'T TAKE BUT A MINUTE.  THIS IS A LETTER FROM

22  AN AUSTIN ATTORNEY TO MR. BILL WHITEHURST, WHO I

23  UNDERSTAND IS COORDINATING THE LAWYER TOUR

24  BUSINESS.  WHO IS IT FOR, MR. AINSWORTH?

25

1980

1    MR. AIMSWORHT: THE STATE BAR WAS GOING TO
2    MEET IN PARIS THIS SUMMER.

3

4    THE COURT: IT HAS TO DO WITH CANCELLING
5    PART OF THE TOUR. WE CAN GO OFF THE RECORD,
6    GENTLEMEN.

7

8    (WHEREUPON, THERE WAS AN OFF THE RECORD
9    DISCUSSION, AFTER WHICH THE PROCEEDINGS RESUMED
10   AS FOLLOWS:)

11

12

13   THE COURT: ENJOY YOUR WEEKEND. WE'LL
14   RESUME AT 9:00 O'CLOCK MONDAY MORNING.

15

16   THE MARSHAL: ALL RISE.

17

18   (WHEREUPON, THE PROCEEDINGS WERE IN RECESS
19   FROM 4:40 P.M., MARCH 21, 1986, UNTIL MONDAY MORNING
20   AT 9:00 O'CLOCK A.M., MARCH 24, 1986, AT WHICH
21   TIME THE FOLLOWING OCCURRED:)

22

23

24

25