Page 3

IN THE STATE OF ILLINOIS

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

COUNTY OF CHAMPAIGN

- - - - - - - - - - - - - - - - - -

RONALD ROME, Special Administrator )

of the estate of PHILIP ROME,     )

deceased,                )

       Plaintiff,    ) Case No.

     vs.          ) 06-L-92

ABEX CORPORATION, et al.        )

    Defendants.     )

- - - - - - - - - - - - - - - - - -

DISCOVERY DEPOSITION OF DR. BARRY I. CASTLEMAN

Rockville, Maryland

Tuesday, May 27, 2008

   The deposition of DR. BARRY I. CASTLEMAN was
convened at 10:10 a.m. at the Legacy Hotel, 1775
Rockville Pike, Rockville, Maryland, before Karen K.
Brynteson, Registered Merit Reporter, Certified
Realtime Reporter, and Notary Public.

- - - - -

Page 2

        I N D E X

WITNESS:              EXAMINATION:

BARRY CASTLEMAN

   By Mr. Lee............. 6

   By Mr. Schachter....... 111

   By Mr. Lee............. 127


        E X H I B I T S

EXHIBIT NO:   DESCRIPTION      PAGE NO:

No. 1..... notice of deposition..... 10

No. 2..... gross earnings report.... 16

No. 3..... curriculum vitae......... 16

No. 4..... list of trial testimony.. 16

No. 5..... handwritten notes........ 16

No. 6..... Garlock file index....... 111

No. 7..... Owens-Illinois index..... 126

No. 8..... Owens-Illinois index..... 126



(The original exhibits were retained by the
court reporter to be attached to Mr. Lee's
transcript.)

Page 4

      A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

   JOSEPH D. SATTERLEY, ESQ.
   Sales Tillman Wallbaum Catlett & Satterley, PLLC
   1900 Waterfront Plaza
   325 West Main Street
   Louisville, Kentucky 40202
   (502) 589-5600

ON BEHALF OF CBS CORPORATION:
   JOHN BORNHOFEN, ESQ.      (Telephonically)
   Foley & Mansfield - St. Louis
   1001 Highlands Plaza Drive West
   Suite 400
   St. Louis, MO 63110
   (314) 645-7788


ON BEHALF OF SELAS CORPORATION OF AMERICA:

   SCOT PFEIFFER, ESQ.    (Telephonically)
   Gunty & McCarthy
   150 South Wacker Drive
   Suite 1025
   Chicago, IL 60606
   (312) 541-0022

ON BEHALF OF OWENS-ILLINOIS:
   JOSHUA D. LEE, ESQ.
   Schiff Hardin LLP
   6600 Sears Tower
   Chicago, IL 60606
   (312) 258-5649

Page 5

APPEARANCES (Continued):

ON BEHALF OF GARLOCK SEALING TECHNOLOGIES, LLC:

CARY SCHACHTER, ESQ.,    (Telephonically)
in association with,
Segal McCambridge Singer & Mahoney
233 South Wacker Drive
Suite 5500
Chicago, IL 60606
(312) 645-7800

Page 6

                    P R O C E E D I N G S
                    - - - - - - - - - - -
Whereupon--
          DR. BARRY J. CASTLEMAN,
having been first duly sworn, was examined and
testified as follows:
                    EXAMINATION
BY MR. LEE:
     Q.   Good morning, Dr. Castleman.
     A.   Good morning.
     Q.   My name is Joshua Lee.  I don't think
we have met before today.  So, as you probably
know, I represent a company called
Owens-Illinois.  And I am here to ask you some
questions today with regard to a case called
Rome versus Abex Corporation, et al.
          Are you familiar with that case?
     A.   Yes.
     Q.   And how are you familiar with that
case?
     A.   Well, I reviewed the basic facts in
the case with plaintiff's counsel,
Mr. Satterley, this morning, and that's how I
am familiar with it.
     Q.   Have you reviewed the complaint in

Page 7

that case?
     A.   No, I don't bother reading all
documents involved that you lawyers exchange
with each other in these cases.
     Q.   So all that you know about this case
is what you have learned from Mr. Satterley
this morning?
     A.   That's right.
     Q.   What did Mr. Satterley share with you?
     A.   He told me that Mr. Rome died in his
early '70s from pleural mesothelioma and from
1955 to 1991 he was an operator and a
maintenance worker at a national distilleries
and chemical plant in Tuscola, Illinois,
T-u-s-c-o-l-a, that he was exposed to
insulation, both from hands-on exposure and as
a bystander, that there was a band saw in the
shop where they cut the insulation, that he was
also exposed to gaskets as a bystander to the
removal of old gasketing from flanges and so
on.
          He was never provided with respirators
or warnings about the hazards of asbestos.  And
the defendants I have been told are
Owens-Illinois, Sprinkmann, Garlock, GE, SELAS

Page 8

Corporation, Riley Stoker, Crown Cork and Seal
and Westinghouse.
     Q.   I see that you are referring to some
notes here.  May I take a look at those?
     A.   Sure.
     Q.   Are these your notes from your meeting
this morning with Mr. Satterley?
     A.   They are.
     Q.   Dr. Castleman, based on your
discussions this morning with Mr. Satterley,
you have a list of defendants here which you
named just a few moments ago.  Is it your
understanding that those were the only
defendants ever in this case?
     A.   There may have been others before.  I
didn't ask about that.
     Q.   I note that Pneumo-Abex or Abex
Corporation is not on this list.
     A.   I noted that too when you told me the
name of the case, I realized I didn't have Abex
on the list, so I suppose Abex maybe resolved
their situation and maybe not.  I don't know.
That's between Abex and plaintiff's counsel, I
suppose.
     Q.   All right.  You did not inquire

Page 9

1  whether there were any other defendants ever in
2  this case; is that right?
3      A.  That's right.
4      Q.  You did not -- did you inquire at all
5  as to what Mr. Rome's actual exposure to any
6  asbestos-containing products might have been?
7      A.  No, not as to individual products.
8      Q.  Why is it that you did not inquire as
9  to exposure to individual products?
10     A.  Because that's not evidence that's
11 coming into this case through me.  That's
12 coming in through other witnesses.  I testify
13 about what the defendants knew or could have
14 known or should have known about the hazards of
15 asbestos and hazards of the products.
16     Q.  Would it matter to you the time frame
17 in which Mr. Rome might have been exposed to
18 any individual defendant's products?
19     A.  I don't think so.  I mean, I'm not
20 sure I understand your question, but I'm not
21 testifying on causation in these cases either.
22     Q.  All right, Dr. Castleman.  I am going
23 to mark as Exhibit 1 the notice for your
24 deposition today.
25     (Deposition Exhibit Number 1 was marked for

Page 10

1  identification.)
2  BY MR. LEE:
3      Q.  Have you seen the notice for your
4  deposition?
5      A.  I don't know if I have or not.  I
6  think the plaintiff's lawyer e-mailed it to me
7  but -- no, I don't think I have ever seen that.
8      MR. SATTERLEY:  I don't need a copy of
9  it.
10     MR. LEE:  You don't need a copy?
11     MR. SATTERLEY:  No.
12     THE WITNESS:  We discussed that this
13 morning, but I didn't actually sit down and
14 read it line by line.
15     BY MR. LEE:
16     Q.  So would the first time that you have
17 seen the notice for your deposition in this
18 case have been this morning?
19     A.  Yes.  Well, I didn't even actually
20 look at it then.  We just talked about it.
21     Q.  Okay.  I notice that you have provided
22 for us today a series of binders with some
23 documents in them; is that right?
24     A.  Well, Mr. Satterley did, yes.
25     Q.  Okay.  Did Mr. Satterley get those

Page 11

1  documents from you?
2      A.  He did.  Well, he got them from Albert
3  Donnay, who supplies copies of my documents to
4  lawyers, plaintiff and defense.
5      Q.  Did you take any part in choosing the
6  documents that would be produced today?
7      A.  No.  I mean, these are just files,
8  these are some of my files that Mr. Satterley
9  chose to produce because of the defendants
10 involved in the case, I imagine.
11     Q.  Do you have any understanding as to
12 the various theories, legal theories under
13 which this case is proceeding?
14     A.  No, I am not a lawyer.
15     Q.  Well, Dr. Castleman, I mean, you
16 understand that there are various types of
17 legal theories under which a case like this can
18 proceed, negligence, strict liability.  I
19 believe you have testified in conspiracy cases
20 before; is that right?
21     A.  Yes, I have.
22     Q.  Okay.  Do you know the theories under
23 which this case is going to proceed?
24     A.  Well, I know --
25     MR. SATTERLEY:  Objection, asked and

Page 12

1  answered.
2      THE WITNESS:  I know conspiracy is one
3  of the issues involved, and I suppose the rest
4  is the usual stuff.
5  BY MR. LEE:
6      Q.  How did you come to learn that
7  conspiracy was an issue in this case?
8      A.  Mr. Satterley told me so.
9      Q.  This morning?
10     A.  Yes.
11     Q.  Dr. Castleman, if you will take a look
12 at what is the fourth page in to the notice for
13 your deposition.
14     A.  Exhibit B, you mean?
15     Q.  Yes.
16     A.  Okay.  What do you want to ask me
17 about that?
18     Q.  Well, these are the documents that we
19 requested that you bring with you today from
20 your files.
21     MR. SATTERLEY:  Let me place an
22 objection.  We filed an objection with the
23 Court and set forth the objection and I don't
24 believe there has been a subpoena issued upon
25 Dr. Castleman requiring him to bring anything

Page 13

1  to the deposition.  Out of courtesy, we have
2  brought a number of documents to the
3  deposition, as well as additional copy of his
4  book, the fifth edition of his book, Asbestos,
5  Medical and Legal Aspects, so we would object
6  to him, no requirement that he bring --
7  undertake all the research, spend time
8  necessary to bring all these documents.
9        In addition, we have advised you that
10  you can get any of these documents from Albert
11  Donnay.
12  BY MR. LEE:
13      Q.   Well, Dr. Castleman, let me ask you
14  this:  Mr. Donnay, when he provides documents
15  to various attorneys, do you go to him and tell
16  him that these are the documents that are
17  responsive to the requests --
18      A.   No.
19      Q.   -- to these attorneys?  He just pulls
20  whatever he feels is relevant?
21      A.   Well, he has a list of my files.  He
22  scanned all these files.  So there is a file on
23  Owens-Illinois.  He scanned all those
24  documents.  So if anybody wants to know the
25  Owens-Illinois file, they call him and they say

Page 14

1  give me the Owens-Illinois file and tell me how
2  much I owe you.
3      Q.   Do you have a document on the
4  Asbestosis Research Council, a file on that?
5      A.   I don't know if I do or not.  I have a
6  bunch of -- I mean, I haven't looked at that
7  stuff in about 15 years.  Probably I do have a
8  file on Asabestosis Research Council.  I don't
9  think anyone has ever requested those documents
10  before or Albert would have them on the list of
11  files that he has scanned that he provides to
12  lawyers.
13      Q.   Okay.
14      A.   I suppose if I have such a file, it
15  could be arranged for him to pick it up and
16  scan it and, you know, and send it to me.
17      Q.   If we were to go to Mr. Donnay and ask
18  him for all documents, for instance, that were
19  relied on by you for your statement on page 38
20  of the fourth edition of your book, the Federal
21  Trade Commission investigated this arrangement
22  and found it to be illegal, would Mr. Donnay be
23  able to pull those documents for us?
24      A.   I don't know, but there is an FTC file
25  that he could send you.  I think he has already

Page 15

1  scanned that.
2      Q.   And I guess what I'm getting at,
3  Doctor, it is my understanding if we were to go
4  to Mr. Donnay and ask him for particular
5  documents that would be responsive to these
6  questions, he might not have the knowledge to
7  pull these documents; is that right?
8      A.   That's right.
9      Q.   And so just going to Mr. Donnay would
10  not get us responses that would be -- would not
11  get us documents that would necessarily be
12  responsive to the specific questions that we
13  have asked; is that right?
14      A.   That's right.
15      Q.   And it is my understanding that other
16  than the documents that you have with regard to
17  Owens-Illinois and with regard to Garlock,
18  there are no other documents that have been
19  produced here today; is that correct?
20        MR. SATTERLEY:  That's incorrect.  We
21  have his CV.  We have case lists.  We have his
22  fees for the last five, six years.  We have his
23  book.  So that's not an accurate statement.
24        MR. LEE:  I'm sorry, counsel.  I had
25  not seen these other documents here.  I did not

Page 16

1  know what they were.
2        MR. SATTERLEY:  As a courtesy, we
3  brought these documents, seven binders that I
4  had to Federal Express up here as a courtesy.
5        MR. LEE:  I appreciate that.  I am
6  trying to get at whether we got the documents
7  we asked for.
8        MR. SATTERLEY:  Other than that, you
9  don't.
10        MR. LEE:  Okay.
11        MR. SATTERLEY:  So everybody on the
12  phone knows, Owens-Illinois' counsel is
13  reviewing the case list, the CV, and the list
14  of compensation.
15        MR. LEE:  All right.  Can we mark
16  these subsequent?
17      (Deposition Exhibit Numbers 2, 3 and 4 were marked
18  for identification.)
19  BY MR. LEE:
20      Q.   All right, Doctor.  Doctor, I am going
21  to keep ahold of this.  I am going to mark your
22  notes as an exhibit as well, which I think will
23  be Exhibit 5.
24      (Deposition Exhibit Number 5 was marked for
25  identification.)

Page 17

BY MR. LEE:

Q. Dr. Castleman, what is your understanding about the topics on which you have been identified to testify in this case?

A. I'm going to testify about the public health and corporate history of asbestos. That's my understanding.

Q. Do you intend to give any testimony with regard to issues relating to conspiracies?

A. Probably.

Q. You don't know?

A. Well, I don't know until I'm asked the questions, but I understand conspiracy is an issue in the case and the lawyers have decided what questions they want to ask me about conspiracy.

MR. LEE: Let me just state for the record that Dr. Castleman's disclosure has been filed since last year.

MR. LEE: I understand. I am trying to get an understanding of what he understands he is going to testify to. Sometimes those two things don't match up and that has happened before when Dr. Castleman has testified.

MR. SATTERLEY: Dr. Castleman, just

Page 18

for your benefit, your disclosure in the case I set before you there and you can refer to it if you want.

BY MR. LEE:

Q. Dr. Castleman, have you ever seen this disclosure before?

A. I started looking through it this morning. I didn't read through the whole thing. The part that I read through looked fine.

Q. Okay. Would it be your testimony then that since you have not read through the whole disclosure, you may not, in fact, know the whole scope of your -- of the topics on which you may testify in this case?

A. Look, as far as I understand, these disclosure forms are perfunctory legal papers that are filed in every case by every lawyer that uses me in these cases. And the lawyers use each their own particular expression of what it is I testify about.

And I don't concern myself for the most part with proofreading, if you will, how the lawyers express these things to the courts, nor do I know about the peculiarities of

Page 19

individual state laws in which, under which the lawyers are operating.

And so, you know, I will be happy to answer your questions about what I know, but I don't write these documents and I don't take responsibility for them.

Q. Okay. Dr. Castleman, it is my understanding that you -- and understand, some of these questions you may have been asked before, but I have never met you before. Is that right?

A. Right. You have obviously read a bunch of my testimony. It is your three hours. You can do whatever you want with it.

Q. All right.

MR. SATTERLEY: His and the rest of the folks on the phone.

THE WITNESS: Right.

BY MR. LEE:

Q. Dr. Castleman, you described yourself as a scientist; is that right?

A. Yes.

Q. And you have a Ph.D. from Johns Hopkins in 1984?

A. It is technically called a Doctor of

Page 20

Science degree from Johns Hopkins School of Public Health.

Q. And your degree was in public health?

A. Well, it was technically a Doctor of Science Degree from the School of Public Health. They also have a Doctor of Public Health degree that some lawyers have spent arguing with me about too.

Q. And I am not trying to argue with you about it.

A. I didn't say you were.

Q. I am trying to make sure I am right.

A. I am just explaining.

Q. Am I right your doctorate is in the field of public health?

A. Yes, sir.

Q. Okay. You are not a medical doctor; is that right?

A. I am not a medical doctor.

Q. Are you a historian?

A. Well, I have written a lot about the history in the field of occupational health.

Q. Are you a trained historian?

A. I am not trained as a historian, but the historian for the Johns Hopkins medical

Page 21

1  institutions was one of the faculty members on
2  my thesis committee.
3     Q.   You are not a trained historian; is
4  that correct?
5     A.   I can't add anything to what I just
6  told you.  You've got your three hours.
7     Q.   You are not a lawyer?
8     A.   No, sir.
9     Q.   But what you claim to do is tell the
10 history of asbestos in a comprehensive manner;
11 is that right?
12    A.   Yes.
13    Q.   What method did you employ in
14 conducting the research for your book?
15    A.   I have read everything that I could
16 find that had been documented about history,
17 the public health history of asbestos, stuff
18 that had been published in scientific and
19 medical journals, stuff that had been published
20 in engineering journals, safety publications,
21 industry trade magazines, insurance industry
22 publications.
23        I went to the archives of scientists
24 and institutions that had done work on
25 asbestos, the Federal Government archives,

Page 22

1  government records on worker's compensation
2  claims.  I have read testimony of old timers in
3  the field and people who were involved for the
4  companies or with the companies historically,
5  testified about their historic involvement and
6  knowledge and actions.
7         I had personally interviewed them, a
8  number of the old timers in the field.  That's
9  basically the method, if you will, of doing
10 historical research.  Until we invent a time
11 machine, I think it is the only method.
12    Q.   Well, can you tell me actually what
13 the historical method is?
14    A.   I just did.
15    Q.   Well, you told me what you did.  Can
16 you define the historical method for me?
17    A.   I don't know what you mean by
18 "historical method."  That sounds like lawyer
19 talk to me.
20    Q.   Can you define the meaning of external
21 criticism for me?
22    A.   I don't know what people mean by that
23 phrase.  I mean, I understand the translation
24 of the words, but I don't understand it as a
25 professional jargon phrase.

Page 23

1     Q.   Can you define the term internal
2  criticism for me?
3     A.   I know what internal and I know what
4  criticism mean, but beyond that, I don't have
5  any associations with those words.
6     Q.   So you can't tell me for what purpose
7  you would apply internal criticism in
8  historical research; is that right?
9     A.   No, I don't know what you mean by that
10 term.
11    Q.   The same would be true with regard to
12 external criticism, you can't tell me what that
13 would be used for in historical research; is
14 that right?
15    A.   No.  I mean, like I say, I am not here
16 to talk about professional jargon in doing
17 historical research.  I talk about the research
18 that I did, not about people who write about
19 people who do historical research and invent
20 these phrases.
21    Q.   Can you tell me the person who first
22 wrote on the historical method?
23    A.   No.  I don't know that anyone can be
24 said to be the first person who wrote on the
25 historical method.

Page 24

1     Q.   Doctor, would you agree that in
2  presenting a historical analysis and conducting
3  historic research, you want to avoid as much as
4  possible the risk of presentism?
5     A.   That's another interesting example of
6  how academics justify their existence by
7  inventing new words.  I don't know what whoever
8  used that term meant by that.
9     Q.   Do you know what presentism is?
10    A.   No, I have never heard the word, and I
11 think you might be challenged to try and find a
12 dictionary that would include it.
13        MR. SATTERLEY:  How do you spell
14 presentism?
15        MR. LEE:  P-r-e-s-e-n-t-i-s-m.
16        MR. SATTERLEY:  Thank you very much.
17 BY MR. LEE:
18    Q.   Doctor, would you agree that in doing
19 historical research and analysis, you want to
20 avoid taking what we know now, today, and
21 imposing our knowledge on people who live 50,
22 60, 70 or 100 years ago?
23    A.   Yes.  I mean, if you want to say what
24 people knew back then, you would have to try
25 and base it on what was known and known back

Page 25

1  then.
2  Q.   Also you have to avoid trying to
3  impose our understanding as their
4  understanding; is that right?
5  A.   I suppose so, yes.  I mean, you know,
6  that's why I rely so much on corporate
7  documents to say what people knew historically.
8  Q.   And would you agree that you want to
9  approach any historical analysis without a
10  preconceived notion of the result?
11  A.   Yes, that's the scientific way of
12  doing things.
13  Q.   And you would agree that a historian
14  would want to approach any historical analysis
15  without applying any leftist or rightist
16  perspective; is that right?
17  A.   Well, you basically want to look at
18  whatever evidence you find in the most open way
19  in terms of understanding what people meant by
20  what they said, what people were thinking, what
21  people were doing at the time.
22  Q.   Would you agree that if a historical
23  researcher starts their analysis with a
24  preconceived notion, they would be tempted to
25  stop searching for information when they found

Page 26

1  data that confirmed their perspective?
2  A.   That sounds more like a lawyer making
3  his case.  It wouldn't be a very good way for
4  anybody who is calling himself a historian to
5  proceed.  I mean, the historian would want to
6  look at all the possible evidence and all the
7  possible interpretations of the evidence in
8  order to understand in a scientific way what
9  happened.
10  Q.   You have to consider a broad spectrum
11  of data in order to get an effective image or
12  pictures of what things were like in the past;
13  is that right?
14  A.   Yes.  I basically have tried to
15  consider all the documentation and evidence
16  available about the history of the things I
17  talk about.
18  Q.   Would you agree that in analyzing the
19  data they have, a historian must also consider
20  for whom they are receiving the information
21  they are relying on?
22  A.   From whom?
23  Q.   Yes.
24  A.   Yes, but, again, it depends on the
25  information.  I mean, the corporate documents,

Page 27

1  I have never been shown a corporate document
2  that turned out to be a forgery or fraudulent
3  document as far as I'm concerned.  So it
4  doesn't really matter who gives me the
5  document, if it is a historic document, and it
6  appears to be, and is consistent with
7  everything else I know to be looking like a
8  bona fide historic document, then I will
9  consider it as such and factor that into
10  whatever decisions I make on the matters
11  involved.
12        I mean, I don't believe anything
13  anybody tells me, unless I see the
14  documentation.  I just developed that habit
15  being in this litigation all these years and
16  for reasons that you can well understand.
17  Q.   How many times have you testified at
18  trial in asbestos cases, Doctor?
19  A.   Over 300.
20  Q.   And in those over 300 times you have
21  testified almost exclusively at the request of
22  plaintiffs and against defendants; is that
23  right?
24  A.   I have testified almost exclusively at
25  the invitation of plaintiffs, that's right.

Page 28

1  Q.   Have you ever testified at trial on
2  behalf of a defendant?
3  A.   At the request of a defendant, yes,
4  one time.
5  Q.   And what was that?
6  A.   It was a case of the United States
7  Government was the defendant and the plaintiff
8  was Johns-Manville Corporation.  The case was
9  in the U.S. Court of Claims.
10  Q.   How many times have you testified in
11  depositions?
12  A.   I have been subjected to over 500
13  depositions over 30 years so far.
14  Q.   How much do you charge for your time,
15  Doctor?
16  A.   $300 an hour.
17  Q.   Are you paid to testify at trial?
18  A.   Most of the time.
19  Q.   And are you paid to testify at
20  deposition?
21  A.   Most of the time.
22        MR. SATTERLEY:  Did you bring a check
23  today?
24        MR. LEE:  I have not.
25        MR. SATTERLEY:  We will get your card

Page 29

1   before the end.
2   BY MR. LEE:
3       Q.   Why is it that you use the word
4   "subjected" when you say that you are subjected
5   to depositions, Doctor?
6       A.   Because I consider my life time the
7   most precious thing I have.  And I have left
8   behind hundreds and hundreds of transcripts, a
9   900-page book, file cabinets full of documents.
10  They are all available to the defense lawyers.
11          There is nothing new for me to say
12  about most of these defendants.  And the
13  lawyers keep on taking my deposition anyway.  I
14  generally refer to my depositions as redundant
15  depositions.
16          And even though I usually get paid for
17  doing them, I would far prefer not to do any
18  depositions at all and let you guys keep your
19  money.  That's why.  I think they are a
20  complete waste of time.
21      Q.   Dr. Castleman, you made approximately
22  $340,000 for testifying in asbestos litigation
23  last year; is that right?
24      A.   Yes.
25      Q.   And the year before that you made

Page 30

1   almost $300,000 testifying in asbestos
2   litigation; is that right?
3       A.   Well, you have the figures in front of
4   you.
5       Q.   And the year before that, 2005, you
6   made approximately $250,000 testifying in
7   asbestos litigation; is that right?
8       A.   Right.
9       Q.   It is my understanding, Doctor, that
10  you don't get paid for most of the work you do
11  outside of asbestos litigation; is that right?
12      A.   That's right.
13      Q.   And so what you're telling me today is
14  that you would prefer not to testify and not to
15  make these, this amount of money, and instead
16  to go about your business making no money doing
17  everything else?
18      A.   That's not what I said.  I said I
19  would prefer not to be pestered with all these
20  redundant depositions.  The trials, I don't
21  mind.  You know, if the plaintiffs and the
22  defendants aren't able to resolve their
23  discussions any other way than to go to trial
24  in cases, and I am listed as a witness in the
25  case, and the defendants know darn well what

Page 31

1   I'm going to say, I am more than happy to show
2   up at trials and help the judicial process
3   resolve these people's cases.
4           It is just the depositions that are --
5   I mean, I think that most of the defense
6   lawyers are ripping off their own clients
7   running up a bill deposing me.  I really do.
8   That may not apply to you, but I mean I really
9   do think that that's very widely true.  I have
10  had defendants show up at ten depositions in a
11  single year, defendant companies.
12      Q.   Dr. Castleman, have you done any
13  research within the last two years specifically
14  with regard to Owens-Illinois?
15      A.   No.
16      Q.   Have you been provided with any
17  documents within the last two years with regard
18  to Owens-Illinois?
19      A.   No.
20      Q.   The last edition of your book was
21  published in what year was it, Doctor?
22      A.   2004/2005.
23      Q.   Are you planning on publishing a new
24  edition of your book any time?
25      A.   No.

Page 32

1       Q.   It is true, Doctor, that large
2   portions of your book are identical to your
3   doctoral dissertation; is that right?
4       A.   They were in the first edition.  And
5   generally it has just been expanded since then.
6       Q.   And a lot of the research for your
7   book was paid for by plaintiffs' attorneys; is
8   that right?
9       A.   A lot of the research into discovering
10  some of the documents and examining them
11  originally was work that was done for
12  plaintiffs' lawyers and plaintiffs' lawyers
13  didn't pay me to write my doctoral thesis, of
14  course.
15      Q.   The dust cover of your first edition
16  said to attorneys in asbestos litigation, this
17  book offers a complete documentation on the
18  development of knowledge about asbestos
19  hazards; is that right?
20      A.   I think so.  I didn't write the dust
21  cover.  I wrote the book.
22      Q.   Well, that was a little overboard,
23  wasn't it, Doctor?
24      A.   Usually promotional materials are
25  imprecise and overbroad or exaggerated.  I had

Page 33

1 other disputes with the publisher about that
2 dust cover too. They informed me they owned
3 the book, I was just the author.
4     Q. You certainly haven't studied all the
5 documents relevant to the development of
6 knowledge on asbestos, have you?
7     A. No one probably could. I mean, there
8 are constantly new documents being -- that are
9 emerging. And all I have attempted to do is
10 tell as completely as possible from a public
11 health point of view the essential story to the
12 extent that that can be done in a 900-page
13 book.
14     Q. You haven't done an exhaustive search
15 of newspapers with regard to the development of
16 knowledge on asbestos, have you?
17     A. What's exhaustive? I mean, we now are
18 able to word search The New York Times and, you
19 know, come up with articles on asbestos and
20 cancer in 1948 and 1949 that I had never seen
21 until two or three years ago. I am coming up
22 with more and more articles in newspapers. I
23 keep a file that keeps growing on newspapers
24 and magazine publications about asbestos.
25 That's one of the files you can order from

Page 34

1 Albert Donnay.
2     I am constantly adding to it when new
3 things come to mind, articles in places like
4 Business Week in 1948 that talk about Dr.
5 Heuper's work and cancer from asbestos. But
6 comprehensive? Comprehensive is sitting down
7 and looking at every page of every newspaper
8 that was ever published in the world down at
9 the Library of Congress, I suppose.
10     Q. You haven't done an exhaustive search
11 of newspapers with regard to the development of
12 knowledge on asbestos, have you, Doctor?
13     MR. SATTERLEY: Objection.
14     THE WITNESS: I can't add anything to
15 the lengthy and detailed answer I just gave you
16 on that question.
17 BY MR. LEE:
18     Q. I don't think I actually got a
19 complete answer to that question, Doctor. I
20 got an explanation of what you think might go
21 into an answer to that question, but --
22     A. Okay. Why don't you define the terms
23 then. Tell me what you mean by lengthy and
24 comprehensive because I just told you what I
25 did.

Page 35

1     Q. I didn't say lengthy or comprehensive,
2 Doctor. I said you haven't done an exhaustive
3 search of newspapers --
4     A. Exhaustive.
5     Q. -- with regard to the development of
6 knowledge on asbestos, have you?
7     A. Exhaustive? Okay. I haven't found
8 every single story on asbestos that ever
9 appeared in any newspaper in the history of the
10 world, that's correct, if that's what you mean
11 by an exhaustive search.
12     Q. What about newspapers in the United
13 States?
14     A. I have looked at some of them. Some
15 of them you can look at, you know, by word
16 searching them through the computer capability
17 now available. Many of them you can't. I have
18 looked at a number of those through a number of
19 those that you can access in that way. But
20 there are bound to be newspapers that I haven't
21 seen, newspaper articles. I'm sure there are
22 newspaper articles I haven't seen or heard of
23 that have appeared on asbestos.
24     And I don't know how anybody would
25 find them. The way I found them has been

Page 36

1 sometimes because the documents are mentioned
2 in internal corporate correspondence, a number
3 of things that come up that way because the
4 companies are talking about something that
5 appeared in Newsweek or Scientific American or
6 something like that. Otherwise I wouldn't have
7 found those.
8     Then there is the capability of word
9 searching, which is much more recent. And so,
10 you know, that's what I have done. I suppose
11 there are plenty of newspaper articles that
12 talk about asbestos and its hazards that I have
13 never seen, not probably so many before 1970,
14 but certainly more recent ones, I haven't even
15 begun to try and read all of those. I mean,
16 there are newspaper stories that come out on
17 asbestos and its hazards somewhere in the world
18 every week.
19     Q. Doctor, sticking with just the United
20 States, what newspapers have you done an
21 exhaustive research of?
22     A. I haven't done an exhaustive research
23 on any of them. To do an exhaustive research,
24 as I understand the word, and that's what I was
25 asking you to define, you have to look at every

Page 37

1  page of every newspaper.  That's exhaustive.
2  And I haven't done that.
3     Q.   What newspapers have you gone through
4  and done a word search on for asbestos?
5     A.   New York Times.  I have had someone
6  working with me to do some of this, and I don't
7  know exactly what the methods he has used has
8  been, but I know he is very thorough.  That's
9  Steven Berger, the author of chapter 6 of my
10 book.  But he has picked up stuff from the Los
11 Angeles Times, Business Week, I think there may
12 be some in the Chicago papers, but I am not
13 sure.
14        In any case, whatever I have been able
15 to accumulate is available in the file of
16 newspaper articles that you can order from
17 Albert Donnay.
18    Q.   Let me ask you about Mr. Donnay for a
19 second, since he has been mentioned a few
20 times.  How is it that Mr. Donnay came to have
21 your files?
22    A.   He is a personal friend.  I worked for
23 his father, who was a Hopkins professor, when I
24 was 19 years old and Albert was seven.  And so
25 at some point maybe five or maybe eight years

Page 38

1  ago, he said:  Maybe I can scan these, some of
2  these files of yours and make them available to
3  people.  And I said:  Sure, go ahead.  And so
4  he started doing it.  I have nothing to do with
5  the finances of that activity.
6     Q.   So this is a for-profit activity that
7  Mr. Donnay is engaged in?
8     A.   Ask him about that.  I suppose he
9  makes some money at it.
10    Q.   You don't make any money off of
11 selling your files?
12    A.   No.  I consider it a public service
13 that he does that.
14    Q.   Chapter 6 of your book is the chapter
15 on alternatives to asbestos litigation; is that
16 right?
17    A.   Alternatives to asbestos --
18    Q.   -- insulation.
19    A.   Insulation, right.
20    Q.   And that's the chapter that Mr. Berger
21 wrote?
22    A.   That's right.
23    Q.   And you have no idea the methods
24 Mr. Berger employed; is that right?
25    A.   No, I was answering about the very

Page 39

1  separate activity of looking up newspaper
2  articles when I told you that.  And I haven't
3  sat down with Mr. Berger and asked him about
4  each and every newspaper he has tried to run
5  these searches on or how he has done it.
6     Q.   Is there a chapter in your book where
7  I could go to find a summary of the research
8  that you have done with regard to newspapers
9  and media?
10    A.   Just a very few -- just a mention of
11 the newspaper articles, that's all, as it
12 mentions at the very end of chapter 10.
13    Q.   There is no section of your book with
14 regard to the knowledge of newspapers in the
15 media with regard to asbestos; is that right?
16    A.   Well, I will give you the page
17 numbers.
18        MR. SATTERLEY:  722, he just told you,
19 the end of chapter 10.
20        THE WITNESS:  Right, 722 through 724
21 briefly summarizes the documentation in
22 newspapers.  And it covers related type of
23 things like -- well, magazines and so on, other
24 kinds of reports published for the general
25 public.

Page 40

1  BY MR. LEE:
2     Q.   And I guess we're probably talking
3  past each other.  All I am asking, Doctor, is
4  is there not a section in your book -- there is
5  a section in your book about knowledge among
6  asbestos textile manufacturers, among brake
7  manufacturers, among insulating manufacturers,
8  among the insurance industry, among the auto
9  industry.  There is not a section like that on
10 newspaper and media, is there?
11    A.   There is nothing but the section I
12 pointed you to.  I don't know what you are
13 asking me for.
14    Q.   And as I looked at that section, it
15 seems to me that the newspapers, they are
16 largely --
17        MR. SATTERLEY:  Object to the form of
18 the question.
19 BY MR. LEE:
20    Q.   -- deal with articles from 1964 on;
21 is that right?
22    A.   The ones in the book do.  I found a
23 number of others as I told you that predate
24 that.  And some of the ones in the book
25 mentioned predate 1964 too, if you look at the

Page 41

1  page above the actual listing of the articles
2  at the bottom of page 723, you will see there
3  was stuff from the 1930s.
4      Q.   It is true, isn't it, that you have
5  included acknowledgment pages in every edition
6  of your book?
7      A.   Yes.
8      Q.   And you have listed a number of names
9  in those acknowledgment pages; is that right?
10     A.   Yes.
11     Q.   And you have listed Mr. Metcalf?
12     A.   Yes.
13     Q.   Is he an asbestos plaintiff's
14  attorney?
15     A.   Yes.
16     Q.   What about Paul Gillenwater?
17     A.   Yes.
18     Q.   He is an asbestos plaintiff's
19  attorney?
20     A.   Yes.
21     MR. SATTERLEY:  Deceased.
22     THE WITNESS:  Oh, really?
23     MR. SATTERLEY:  Yeah, PT.
24  BY MR. LEE:
25     Q.   Russell Budd?

Page 42

1      A.   He is a plaintiff's attorney.  There
2  are plaintiff and defense lawyers that are
3  listed in the acknowledgments page.
4      Q.   What about Joe Rice?
5      A.   You are reading the plaintiff's
6  lawyers first.  Yes, Joe Rice is also a
7  plaintiff or was also a plaintiff's lawyer in
8  asbestos litigation.
9      Q.   And Fred Baron?
10     A.   Same thing.
11     Q.   You acknowledge the helpful
12  existence -- helpful assistance of these people
13  in the preparation of your book; is that right?
14     A.   Well, I acknowledge that they provided
15  me copies of corporate documents I couldn't
16  have found any place in the medical library.
17     Q.   In fact, doctor, what you acknowledge
18  them for is reviewing the completeness of the
19  corporate knowledge presented; is that right?
20     A.   Something like that.  I mean, whatever
21  the acknowledgments page says, it says.  We can
22  sit here and read it if you want to make an
23  absolutely perfect record.  It has been done a
24  hundred times before, but why not.
25     "To assist in the compilation of

Page 43

1  material and in a few cases to review the
2  completeness of corporate knowledge presented."
3      Q.   I would like to talk to you a little
4  bit, Doctor, about the testimony you give
5  sometimes in conspiracy cases, okay?
6      A.   It is your hours.
7      Q.   All right.  You have testified in the
8  past about companies that were suppressing or
9  distorting information about asbestos hazards;
10  is that right?
11     A.   Yes.
12     Q.   You have testified that these
13  companies engaged in concerted actions to
14  suppress or distort knowledge about the hazards
15  of asbestos; is that right?
16     A.   Some companies, yes.
17     Q.   What do you mean by "concerted
18  action"?
19     A.   Well, there are a number of ways that
20  that could take place.  It could be working
21  with your product supplier to inform the buying
22  public that your product is nontoxic.  It could
23  be in holding meetings to consider draft
24  publications about to be submitted for
25  publication in the medical literature for the

Page 44

1  purpose of sanitizing those publications and
2  removing all references to cancer and tumors.
3      It can be keeping the stuff out of the
4  trade magazines like Asbestos Magazine, about
5  how dangerous asbestos is.  Those are the sorts
6  of things that get presented.  And I'm sure you
7  have access to the transcripts of many cases in
8  which conspiracy was alleged in Illinois
9  trials.  We seem to have one every month or two
10  around Bloomington.  And I'm sure you have seen
11  the transcripts of those, if you are doing your
12  job.  Let's take a quick break.
13     MR. SATTERLEY:  Let's take five
14  minutes.
15     (A recess was taken at 10:59 a.m.,
16  after which the deposition resumed at
17  11:04 a.m.)
18  BY MR. LEE:
19     Q.   Doctor, again, I have never had the
20  chance to talk to you, so I need to ask.  I
21  have seen sometimes when you have testified
22  about the concerted action being concerted
23  action by the asbestos industry.  Do you recall
24  that?
25     A.   Well, those terms get used.  I don't

Page 45

1  recall anything in particular.
2      Q.   All right.  What do you mean when you
3  say the asbestos industry?  Who is included in
4  that?
5      A.   I include companies that used asbestos
6  in the manufacture of industrial products or
7  companies that mined asbestos, those two
8  companies.
9      Q.   In your mind, Doctor, does the
10  concerted action that you testified about stem
11  beyond the asbestos industry?
12      A.   Again, I mean, these are general
13  phrases.  And one concept that was introduced
14  by a plaintiff's lawyer back in 1986 was
15  conspiracy of silence.  And in using and
16  adopting this term myself, I applied it to
17  companies that didn't warn people about the
18  hazards of asbestos in their own products or in
19  the products that they were using.
20          I mean, there were companies like the
21  oil companies that demonstrably had knowledge
22  about the hazards of asbestos they were using
23  in insulation going way, way back and yet they
24  continued to use these products, many of these
25  companies, and didn't provide warning or

Page 46

1  protection to the workers that were exposed to
2  the dust, so I include them in the conspiracy
3  of silence as I used that expression.
4      Q.   There were more than 3,000 different
5  products made in the U.S. that contained
6  asbestos; is that right?
7      A.   Well, people have thrown numbers
8  around and that's the number that's most widely
9  quoted, yes.
10      Q.   Well, you have thrown that number
11  around, haven't you, Doctor?
12      A.   Well, yes, but, like I say, I couldn't
13  tell you what the 3,000 products were.  I
14  couldn't tell you how the person who comes up
15  with the number like that distinguishes between
16  what is a new product and what is just a
17  different size and shape of an old product.
18          I mean, just how do you come up with a
19  number like that is something that I would
20  consider probably quite challenging.  Suffice
21  it to say, asbestos was used in a lot of
22  products.
23      Q.   Well, you have used the 3,000 number
24  in your book, have you not?
25      A.   I have referenced the fact that people

Page 47

1  have used that number.
2      Q.   And you used it in a paper that you
3  published in 2006; is that right?
4      A.   Maybe.  You seem to be more familiar
5  with my use of the term than I am off the top
6  of my head.
7      Q.   Would you agree that by 1960, by the
8  1960s, there were hundreds of companies making
9  these thousands of products?
10      A.   Yes, I think there probably were
11  hundreds of companies making different products
12  with asbestos.
13      Q.   And do you believe that by 1960 there
14  was publicly available to all of these hundreds
15  of companies information regarding the hazards
16  of asbestos; is that right?
17      A.   Yes.
18      Q.   And you believe that most if not all
19  of these hundreds of companies making these
20  thousands of products knew prior to 1960 that
21  asbestos was hazardous?
22      A.   I don't know about the -- most of
23  these companies, I don't know anything about.
24  And there are a smaller number of companies
25  that were the major companies, were the largest

Page 48

1  companies, and those are the companies that are
2  the subject of litigation to date and these are
3  the companies about which something is now
4  known about what they knew back in the old
5  days.
6          But there must have been a lot of
7  smaller companies that have just come and gone
8  and about which no information remains.  And
9  these are probably companies that have left
10  behind liabilities that remain uncollected,
11  simply because their identities are no longer
12  traceable and I don't know about them.
13      Q.   Doctor, in addition to the hundreds of
14  companies that were making these
15  asbestos-containing products in the '30s, '40s,
16  '50s, and '60s, would you agree that there are
17  thousands of companies in America using
18  products that contained asbestos?
19      A.   Sure.
20      Q.   Would you agree that many of these
21  companies had industrial hygienists and doctors
22  on staff?
23      A.   What do you mean by "many"?  When you
24  are talking hundreds and thousands, that's a
25  lot of companies.  There weren't that many of

Page 49

1  them that had industrial hygienists and company
2  doctors.  The big companies did.  The little
3  companies didn't.  So the more numerous
4  companies didn't have this kind of help on
5  staff but the companies that accounted for most
6  of the production, industrial production in the
7  United States did.
8      Q.   Would you agree that these companies
9  also knew about the hazards of asbestos?
10     A.   Which companies?
11         MR. SATTERLEY:  These?  Object to the
12  vagueness of the questions.
13  BY MR. LEE:
14     Q.   These thousands of companies that were
15  using asbestos-containing products.
16     A.   I just told you what I don't know and
17  I know.  I know about the major companies that
18  were producing most of these materials because
19  they had been the subject of discovery, but the
20  more numerous small companies that came and
21  went, I know nothing about, or a little about.
22         I occasionally see the reference to
23  some company or another in old documentation
24  and, you know, might be advertising material or
25  something elsewhere some companies named.  And,

Page 50

1  you know, I will look at them and I will say:
2  Oh, that must have been one of those little
3  asbestos manufacturing companies that came and
4  went long ago, about which I know nothing.
5      Q.   You believe that the hazard of
6  asbestos, the hazards of asbestos were widely
7  known in industrial circles in the 1930s; is
8  that right?
9      A.   Yes.  And I am talking about big
10  business.  I mean, I am not talking about the
11  teeny weeny companies.  I am talking about the
12  companies that accounted for the most -- the
13  majority of industrial production in this
14  country.
15     Q.   You would agree, would you not, that
16  none of the thousands of companies that made or
17  used the thousands of asbestos-containing
18  products in the United States prior to 1960 put
19  any warning on any of those products that they
20  might be hazardous prior to 1960?
21     A.   Right, there were no warning labels on
22  the products prior to 1960.
23     Q.   Would you agree that prior to 1960
24  none of the thousands of companies that were
25  making or using asbestos-containing products

Page 51

1  had anything to warn people that you referred
2  to as blue-collar workers?
3      A.   Nothing comes to mind.  I can't think
4  of anything that any company initiated to warn
5  its own workers about the hazards of asbestos,
6  unless they were subject to some kind of
7  pressure to do so prior to 1960.  Nothing comes
8  to mind.
9      Q.   I think you have testified in the past
10  that the Department of Labor said in 1932 that
11  asbestos could be hazardous; is that right?
12     A.   Well, the Department of Labor had
13  publications that indicated that going back to
14  1929 or 1930.
15     Q.   In 1932 did the U.S. government stop
16  using asbestos?
17     A.   No.
18     Q.   Did the U.S. government in 1932 stop
19  using asbestos-containing products they
20  purchased from others?
21     A.   No.
22     Q.   So far as you know, the U.S.
23  government did not in 1932 warn its employees
24  that asbestos could be hazardous; is that
25  right?

Page 52

1      A.   As far as I know, they didn't, but, I
2  mean, they might have.  I just don't have any
3  way of knowing what they did.
4      Q.   And in 1938 --
5      A.   I mean, there was at least one
6  employee of the U.S. government who was
7  compensated for asbestosis who worked at a
8  government hospital as a maintenance worker and
9  was the subject of a disability claim, so it
10  must have been the government told that person
11  something in order for him to recognize his
12  occupational disease and receive compensation
13  for it in 1932.
14     Q.   In 1932 it was the Federal Government,
15  was it not, that recommended the 5 million
16  particles per cubic foot standard?
17     A.   No.
18     Q.   No?
19     A.   No.
20     Q.   Where was that study published?
21     A.   It was published in 1938, and it was
22  --
23     Q.   I'm sorry, 1938.
24     A.   And it was recommended as a tentative
25  guideline by the authors of the study who were

Page 53

1  aware of the limitations and weaknesses of
2  their study and made it clear in their report.
3      Q.   And that's the Driessen study we're
4  talking about?
5      A.   Yes.
6      Q.   In 1938 when the Federal Government
7  published the Driessen study, did it send out a
8  warning to its employees to be careful while
9  handling asbestos-containing products?
10     A.   No.
11     Q.   Did the Federal Government stop using
12 asbestos or asbestos-containing products in
13 1938?
14     A.   No.
15     Q.   You assert that in 1955 the Federal
16 Government made a link between asbestos and
17 cancer; is that right?
18     A.   Well, there were publications from the
19 National Cancer Institute earlier than that,
20 but, you know, Dr. Heuper was continuing to
21 write about this, and there was at least one
22 official publication of the National Cancer
23 Institute in 1955 that talked about asbestos as
24 a cause of occupational cancer.
25     Q.   And in 1955 when that publication came

Page 54

1  out, did the government stop using asbestos or
2  asbestos-containing products?
3      A.   No.
4      Q.   And so far as you know, the Federal
5  Government in 1955 did nothing to warn its
6  blue-collar workers about the possible hazards
7  of asbestos; is that right?
8      A.   That's right.  I mean, there may have
9  been -- I guess I should say the government was
10 apparently doing something in some Navy yards,
11 but it was, I think, a pretty sporadic thing.
12     Q.   I think you have testified in the past
13 that the U.S. government knew very early that
14 asbestos could be hazardous to health; is that
15 right?
16     A.   Well, they knew in 1930 when the Navy
17 -- when the Bureau of Labor Statistics was
18 publishing information on asbestosis, then at
19 least somebody in the government knew.  Even
20 earlier than that the U.S. government published
21 a report in 1918 that was written by an
22 insurance company actuary that said that it was
23 generally the practice of the life insurance
24 companies not to sell life insurance to
25 asbestos workers because they were bad risks,

Page 55

1  and so the U.S. government publications on this
2  go back to 1918.
3      Q.   Okay.  In 1918 that was a report by
4  the Bureau of Labor Standards; is that right?
5      A.   It was statistics, yes.
6      Q.   Labor Statistics, okay.  That was a
7  published report?
8      A.   It was.
9      Q.   It wasn't any secret, was it?
10     A.   No.
11     Q.   And, in fact, I think you have
12 testified in the past that the 1918 report by
13 the Bureau of Labor Statistics had an excellent
14 section on asbestosis; is that right?
15     A.   Yes.  I mean, it was short, but it was
16 to the point.
17     Q.   So by 1918 the government was aware
18 that insurance companies were not writing
19 insurance or setting very high premiums for
20 people who were working with raw asbestos?
21     A.   I guess you could put it that way.
22 The report was written by an insurance company
23 man and published as a government report.
24     Q.   Doctor, when did the U.S. government
25 stop using asbestos?

Page 56

1      A.   I don't know.
2      Q.   Do you know when the U.S. government
3  stopped purchasing asbestos-containing
4  products?
5      A.   No, I don't know if the government has
6  done that or, if so, when.
7      Q.   Doctor, in 1935 the Commonwealth of
8  Pennsylvania did a study of people working with
9  raw asbestos; is that right?
10     A.   Well, they were working in factories
11 making different products, including asbestos
12 as one of the raw materials in the product.
13     Q.   And that study showed that people
14 working with raw asbestos could develop
15 asbestosis; is that right?
16     A.   It showed that people working in those
17 factories making the products they made in
18 those factories, having the exposures to
19 asbestos that they obtained in the various
20 processes in those factories, 25 percent of
21 them had asbestosis.  They didn't just shovel
22 raw asbestos around.
23     Q.   In 1935 you would agree that the
24 government of the Commonwealth of Pennsylvania
25 knew that asbestos could be hazardous, would

Page 57

1  you not?
2    A.   Right, they did.
3    Q.   Pennsylvania didn't stop using
4  asbestos-containing products in 1935, did it?
5    A.   No.
6    Q.   Did Pennsylvania ban the use of
7  asbestos in 1935?
8    A.   No.
9    Q.   And you have never seen any evidence
10 that Pennsylvania did anything in 1935 to warn
11 workers that asbestos could be hazardous to
12 health, have you?
13   A.   Well, I mean, they published this
14 report.  All these reports are using as the
15 keystone for asking this question, are
16 published and publicly available.  They are not
17 the kinds of things that would have been read
18 or provided to ordinary working people.  And
19 what the government of Pennsylvania did to warn
20 the maintenance workers in Pennsylvania
21 government buildings about the hazards of
22 asbestos or anything like that, I don't know.
23 I don't have any evidence that the government
24 of Pennsylvania initiated any kind of program
25 of that kind.

Page 58

1    Q.   Have you done any investigation to see
2  if they did?
3    A.   No.
4    Q.   Why not?
5    A.   Because I don't know how you would
6  even begin to find anything like that out 75
7  years later.
8    Q.   The Commonwealth of Pennsylvania
9  published more reports on the hazards of
10 asbestos in the '30s and '40s; is that right?
11   A.   They did.
12   Q.   The Commonwealth of Pennsylvania even
13 had state inspection of industrial facilities
14 in the 1930s and '40s; is that right?
15   A.   I am not sure what they had.  You
16 might characterize a state inspection.  They
17 published one report about a General Electric
18 plant that they said was a good example of a
19 dust-controlled asbestos processing operation
20 in 1942 but there were very few such reports.
21 And the extent of any inspection the state of
22 Pennsylvania did, I don't know.
23      I don't get the impression that there
24 was ever anybody cited, for example, for
25 violating any kind of government regulations or

Page 59

1  standards by the state of Pennsylvania in the
2  1930s, '40s, '50s or '60s.
3    Q.   As far as you know, the Commonwealth
4  of Pennsylvania did not warn workers of the
5  hazards of asbestos in 1942; is that right?
6    A.   Well, I don't know what contact the
7  state had with the workers in the plants when
8  they went through the General Electric plant on
9  whose report -- on which they reported in 1942.
10 I just don't have any way of knowing that.
11      But there is no record of the state of
12 Pennsylvania having discussed the hazards of
13 asbestos with the workers at the GE plant.
14 That's not noted in the report.
15   Q.   Going all the way back to 1935, New
16 York required worker's compensation for dust
17 diseases; is that right?
18   A.   Right.  Under the worker's
19 compensation laws, they required compensation
20 for diseases like asbestosis.
21   Q.   So asbestosis was included in the
22 diseases that could be compensated for under
23 the New York worker's compensation law in 1935;
24 is that right?
25   A.   Yes.

Page 60

1    Q.   Didn't New York ban the use of
2  asbestos in 1935?
3    A.   No.
4    Q.   Did the state of New York stop buying
5  and using asbestos-containing products in 1935?
6    A.   No.
7    Q.   You aren't aware of any warning New
8  York gave to blue-collar workers in 1935 about
9  the hazards of working with asbestos, are you?
10   A.   I don't know what the state of New
11 York told its own workers about the hazards of
12 working with asbestos in 1935 or for the 30
13 years after that.
14   Q.   In fact, you aren't aware of any
15 warning that New York ever gave to blue-collar
16 workers regarding the potential hazards of
17 asbestos, are you?
18   A.   No.  I mean, I'm aware of one worker
19 that was filing some kind of legal case against
20 the state of New York in 1943 alleging that he
21 had asbestosis from doing brake repairs for 16
22 years.  And I don't know if the state of New
23 York reacted to that by starting to warn and
24 protect workers doing that kind of work or not.
25   Q.   In 1934 asbestosis became a

Page 61

1   compensable disease in North Carolina; is that
2   right?
3       A.   Yes.
4       Q.   And that was actually through a
5   Supreme Court decision; is that right?
6       A.   A state Supreme Court decision, yes.
7       Q.   And that was a published state Supreme
8   Court decision?
9       A.   Yes.
10      Q.   North Carolina didn't stop using
11  asbestos-containing products in 1934, did it?
12      A.   No.
13      Q.   And North Carolina didn't warn its
14  workers that they were at risk for asbestos or
15  asbestos-containing products in 1934, did they?
16      A.   I don't know what the state of North
17  Carolina told its own employees about the
18  dangers of working with asbestos in 1934 or any
19  time since.
20      Q.   You would agree that no state in the
21  union has ever banned asbestos; is that right?
22      A.   Well, that's right.
23      Q.   And to your knowledge no state has
24  ever stopped using or buying
25  asbestos-containing products; is that right?

Page 62

1       A.   Well, the State of Maryland, we did
2   something, banned the use of asbestos in
3   industrial clothing in 1984 or at least there
4   was legislation being proposed for that.  I'm
5   not sure if it passed, come to think of it.
6       But generally these kinds of things
7   were done at the federal level after 1970 or
8   not at all.  They weren't the kinds of things
9   that were done by the states.  The states did
10  ban sprayed asbestos fireproofing, that's
11  another example, but that was right at the time
12  that the Environmental Protection Agency was
13  being created and finding its footing.
14      The EPA was still new on the scene,
15  and at that time a number of cities and states
16  did ban sprayed asbestos fireproofing in the
17  construction of new buildings.
18      Q.   Doctor, to your knowledge no state has
19  completely stopped using or buying
20  asbestos-containing products; is that right?
21      A.   I suppose so.  I mean, I haven't made
22  an investigation of what all the states in the
23  country are doing as far as that.
24      Q.   Am I right that the state of Illinois,
25  according to you, knew back in the 1930s that

Page 63

1   asbestos could be hazardous to health?
2       A.   Sure.  The state enacted legislation
3   and occupational disease law in 1936 that
4   specifically dealt with the worker's
5   compensation for asbestosis and silicosis.
6       Q.   The state of Illinois did not ban
7   asbestos in the '30s, '40s, '50s or '60s, did
8   they?
9       A.   No.
10      Q.   And as far as you knew, even up until
11  today, even though the state of Illinois has
12  known about the hazards of asbestos, it has not
13  warned its blue-collar workers of those
14  hazards; is that right?
15      A.   I don't know what the state of
16  Illinois has told its own employees about the
17  hazards of asbestos, so there are probably
18  plenty of states that have people that work on
19  state vehicles doing such things as brake and
20  clutch work, who are as a matter of course
21  warned and trained about the hazards and the
22  means to minimize them.
23      I just don't know about these things.
24  I am not saying they don't go on.  I just don't
25  know about how each and every state in the

Page 64

1   United States manages its personnel issues with
2   respect to asbestos exposure among its
3   employees.
4       Q.   Dr. Castleman, would you lump the U.S.
5   government in the asbestos industry?
6       A.   No, the U.S. government never made
7   money selling asbestos or asbestos products.
8       Q.   So the only people that you would lump
9   into the asbestos industry are people who make
10  money off of asbestos?
11      A.   Well, I mean, the U.S. government's
12  use of asbestos was as the consumer, not as a
13  producer or distributor or supplier.  To the
14  extent that the U.S. government ever warehoused
15  these products, it was simply as a matter of
16  maintaining stocks of what the government
17  regarded as strategic minerals and materials
18  that weren't mined in sufficient quantities
19  within the United States.
20      And it is very different from the
21  commercial activities of the companies that
22  manufactured asbestos products.
23      Q.   Has the U.S. government ever mined
24  asbestos itself?
25      A.   I don't think so.

Page 65

1    Q.   Has the U.S. government ever
2  contemplated mining asbestos itself?
3    A.   I don't know.  I mean, generally
4  that's done by people who, you know, are in the
5  business sector, not by the government.
6    Q.   You have talked in the past
7  disparagingly of the Industrial Hygiene
8  Foundation, have you not?
9         MR. SATTERLEY:  Object to the form of
10  the question but go ahead.
11        THE WITNESS:  I have criticized the
12  Industrial Hygiene Foundation, if that's what
13  you mean.
14  BY MR. LEE:
15    Q.   You have insinuated in the past that
16  it was part of the conspiracy of silence as you
17  put it; is that right?
18    A.   Yes.
19    Q.   It is true, is it not, that the annual
20  meetings of the IHF were covered by trade
21  magazines?
22    A.   Well, they were sometimes covered by
23  major newspapers.  I don't know about trade
24  magazines, but they were -- I think they were
25  maybe mentioned in trade magazines as well.

Page 66

1    Q.   I think on page 682 of your book,
2  Doctor, maybe I am reading it wrong --
3         MR. SATTERLEY:  Fifth edition?
4         MR. LEE:  Sure.
5         MR. SATTERLEY:  682?
6         MR. LEE:  Yes.  Do you see the
7  paragraph that starts with "there were regular
8  published IHF medical, engineering and legal
9  conferences."
10        THE WITNESS:  Yes.
11  BY MR. LEE:
12    Q.   About halfway down the line starting
13  with chapter and then close parenthesis.  Do
14  you see that?
15    A.   I do see that the IHF annual meetings
16  were not only covered by industry trade
17  magazines but also prestigious newspapers.
18    Q.   Does that refresh your recollection as
19  to whether the IHF annual meetings were covered
20  by trade magazines?
21    A.   This is probably something I read in
22  the IHF describing itself.  And I reference the
23  IHF as a source of this.  The reason I was
24  being cautious about answering your question is
25  I couldn't off the top of my head recall

Page 67

1  specific trade magazines that covered their
2  annual meetings, but I see that I never had an
3  annotation of specific magazines, it was just
4  the general class industry trade magazines
5  mentioned in the IHF's own report that I cite
6  at the end of that paragraph as my source.
7    Q.   Okay.  Then would you agree with me
8  that the annual meetings of the IHF were
9  covered by trade magazines?
10    A.   Yes, they probably were.  I just don't
11  off the top of my head know what trade
12  magazines to refer you to.
13    Q.   Well, you would agree that the annual
14  meetings of the IHF were covered by prestigious
15  newspapers like the Wall Street Journal and the
16  New York Times?
17    A.   Yes.
18    Q.   And also by the Associated Press and
19  the United Press International?
20    A.   Yeah.  I mean, I have no reason to
21  doubt that what was reported in the source that
22  I cite, it was correctly reported.
23    Q.   You read The New York Times, do you
24  not?
25    A.   Sometimes I do.  I don't read it

Page 68

1  regularly, but I read it usually when I am
2  traveling with long airplane rides.
3    Q.   Do you know for how long The New York
4  Times has had a science desk?
5    A.   No.
6    Q.   Do you know for how long The New York
7  Times has been publishing articles relating to
8  asbestos?
9    A.   Well, I mean, the industrial uses of
10  asbestos and the asbestos business has probably
11  been covered by the Times back to the '30s or
12  the '20s.  There are probably lots of articles
13  about Johns-Manville and the Morgan interests,
14  Morgan banking interests taking over them, but
15  I don't know how long The New York Times -- I
16  don't know that The New York Times covered
17  anything about the health hazards of asbestos
18  before 1948.  That's the earliest I can recall.
19  There might be something earlier than that.  I
20  don't remember anything.
21    Q.   Do you know for how long the Wall
22  Street Journal has been publishing articles
23  relating to asbestos?
24    A.   Well, again, the asbestos business may
25  be a long time.  The earliest article in the

Page 69

1  **Wall Street Journal in which the hazards of**
2  **asbestos was floated was, I think, 1959.**
3      Q.   What about the Associated Press?
4      **A.   I don't know about that.**
5      Q.   Have you done any research into that?
6      **A.   No.**
7      Q.   What about Mr. Berger?
8      **A.   Not as far as I know has he done any**
9  **research as to what might be available from the**
10 **AP in terms of their historic reports on**
11 **asbestos.**
12     Q.   Would knowing what newspapers and
13 press were covering with regard to asbestos be
14 relevant to the corporate or to the knowledge
15 of asbestos hazards?
16     **A.   Sure.  I mean, anything that's made**
17 **public in some sense informs some people.**
18     Q.   Would it be relevant to your testimony
19 with regard to the conspiracy of silence?
20     **A.   It might.**
21     Q.   Doctor, you are familiar with the
22 International Labor Office, are you not?
23     **A.   Yes.**
24     Q.   That's a tri-court -- it is an
25 organization that has a tripartite arrangement

Page 70

1  with representatives from labor, employment,
2  and government from each of the countries it
3  represents; is that right?
4      **A.   Labor employers and government.  You**
5  **read that wrong.  Yes.**
6      Q.   U.S. labor unions are represented by
7  the ILL?
8      **A.   No.  U.S. labor unions are represented**
9  **at the ILO.**
10     Q.   Thank you for the clarification.
11     **A.   The United States delegation consists**
12 **of employers, government, and unions.  And so**
13 **each country that's represented in the ILO has**
14 **that kind of representation that can come.**
15     Q.   By 1930 the ILO had discussed the
16 potential hazards of asbestos; is that right?
17     **A.   Yes.  Well, they held a major**
18 **conference in South Africa that year, and they**
19 **published a first volume of their encyclopedia**
20 **on occupational health in that year.  Both of**
21 **these occasions included asbestos.**
22     Q.   You have seen documentation that at
23 least by 1944 that even in New York they were
24 concerned about potential hazards of asbestos;
25 is that right?

Page 71

1      **A.   I don't remember what you are**
2  **referring to.**
3      Q.   There was a shipbuilding union in New
4  York?
5      **A.   Oh, there was a letter that Phil**
6  **Drinker wrote to somebody and he talks about**
7  **this union guy who was raising concerns about**
8  **some of the work they were doing in the**
9  **shipyard, apparently having to do with**
10 **asbestos.  I don't recall exactly how it was**
11 **expressed.**
12     **So it is this kind of second -- we**
13 **don't have it on the letterhead of the union or**
14 **anything like that.  We have the secondhand**
15 **reference to some union guy raising some**
16 **concerns in, I think it was, 1944.**
17     Q.   So you would agree at least by 1944
18 information about the hazards of asbestos had
19 reached at least that union?
20     **A.   Had reached one individual in one**
21 **union somewhere in the northeast United States.**
22     Q.   You are aware of the conferences the
23 Saranac Laboratory had hosted; is that right?
24     **A.   Yes.**
25     Q.   Am I correct that there were seven of

Page 72

1  those?
2      **A.   There were seven.**
3      Q.   You have seen the proceedings of those
4  conferences?
5      **A.   I have seen the proceedings of the six**
6  **that were published and the fragments of the**
7  **proceedings of the seventh that survived and**
8  **were located in the four walled archives.**
9      Q.   At the seventh conference, was that
10 1952?
11     **A.   Yes.**
12     Q.   The potential hazards of asbestos were
13 discussed openly, were they not?
14     **A.   They were discussed by company lawyers**
15 **and doctors potently at a meeting that was**
16 **never published.**
17     Q.   And union representatives, correct?
18     **A.   Well, there was one guy, one doctor**
19 **from the United Mine Workers who also showed**
20 **up, and I think he had brought one other person**
21 **with him from his union.**
22     Q.   And that was Dr. Lorin Kerr?
23     **A.   Lorin Kerr, yes.**
24     Q.   Would you agree that Dr. Lorin Kerr
25 being present at that conference means that at

Page 73

1   least by 1952 the leadership of the United Mine
2   Workers knew about the hazards of asbestos?
3       A.   I would say that the doctor from the
4   United Mine Workers knew about the hazards of
5   asbestos, yes.
6       Q.   In 1952 did the United Mine Workers
7   issue a warning to its workers that working
8   with asbestos or asbestos-containing products
9   could be hazardous to health?
10      A.   Not as far as I'm aware.
11      Q.   I think we have talked today about
12  Dr. Heuper; is that right?  Am I pronouncing
13  his name correctly?
14      A.   I don't know if we have talked about
15  him today or not, but we will probably get
16  around to it, H-e-u-p-e-r, Dr. Heuper.
17      Q.   I think we talked about him with
18  regard to the 1955 publication by the United
19  States; is that right?
20      A.   Oh, yes, you are right.  I did mention
21  his name.
22      Q.   You would agree Dr. Heuper was active
23  in the field of dust diseases and asbestos
24  disease in the 1940s and '50s, correct?
25      A.   He was active in the field of

Page 74

1   occupational cancer in the '40s and '50s, and
2   asbestos is one of the things he wrote about.
3       Q.   He published a lot of articles?
4       A.   Yes.
5       Q.   He was actually -- was he the chief of
6   the National Cancer Institute at that time?
7       A.   No.
8       Q.   Was he a chief of a division of the
9   National Cancer Institute?
10      A.   He was the chief of the environmental
11  cancer section of the National Cancer Institute
12  and the section was, as I understand, dissolved
13  as soon as Heuper retired in 1964.
14      Q.   Well, he was the chief of that section
15  from 1948 to 1964?
16      A.   Right.
17      Q.   Dr. Heuper was actually the author of
18  the 1955 publication that you claim linked
19  asbestos and cancer; is that right?
20      A.   Yes.
21      Q.   In 1959 Dr. Heuper made a presentation
22  to the AFL-CIO, did he not?
23      A.   Yes.
24      Q.   That presentation is still part of his
25  published papers?

Page 75

1       A.   It was never published.
2       Q.   As part of his papers?
3       A.   It is part of his collected papers in
4   the history of medicine section in the National
5   Library of Medicine.
6       Q.   The AFL-CIO is the largest labor
7   organization in the country; is that right?
8       A.   Yes.
9       Q.   All right.  And you would agree that
10  by 1959, the AFL-CIO was aware of a potential
11  link between asbestosis and cancer; is that
12  right?
13      A.   I don't recall exactly what it was
14  Heuper told them, and all I have by way of
15  reference is my own very brief summary.  What
16  it was was he gave them a long talk about
17  health hazards in industry, particularly cancer
18  hazards in industry, and asbestos was just one
19  of many subjects that he discussed with the
20  people who were at that meeting in 1959.
21      Q.   So you would agree that by 1959
22  Dr. Heuper had told the AFL-CIO about the
23  potential link between asbestosis and cancer;
24  is that right?
25      A.   I can't add anything to what I have

Page 76

1   already said.  He gave a talk to some people
2   from the AFL-CIO in 1959 and talked about
3   occupational cancer hazards in general and
4   included in that a brief mention of asbestos,
5   at least as far as the paper he handed out
6   apparently goes.
7       Q.   In 1959 after the AFL-CIO had this
8   discussion with Dr. Heuper, did it announce
9   that its members would no longer work with
10  asbestos or asbestos-containing products?
11      A.   No.
12      Q.   You are familiar with the Asbestos
13  Workers Union?
14      A.   Yes.
15      Q.   And that has actually a longer name,
16  which I will probably butcher if I try.  But
17  that's essentially the union that represented
18  the insulators; is that right, Doctor?
19      A.   Yes.
20      Q.   You are aware of a letter to the IHF
21  in 1955 where the Asbestos Workers Union
22  expressed concerns about the potential hazards
23  of asbestos for its workers; is that right?
24      A.   Yes.  I mention it in my book.  They
25  were anxious about possible health hazards and

Page 77

1  they went to the IHF in the hope that they
2  could get some information to help them, which
3  they were unable to get.
4     Q.   And in 1957 the minutes of the meeting
5  of the Western States Conference of the
6  Asbestos Workers Union show that they were
7  investigating the causes of asbestosis on their
8  own; is that right?
9     A.   I don't think they used the word
10 asbestosis.
11    Q.   Okay.
12    A.   They were concerned about lung disease
13 in their workers and still trying to figure out
14 what was going on as far as I can remember.
15    Q.   In fact, at that time the Asbestos
16 Workers Union is compiling facts and figures on
17 their own about asbestosis; is that right?
18    A.   In the 1950s?
19    Q.   Yes.
20    A.   Not as far as I know.  They may have
21 noticed that six guys in a particular local had
22 died of lung diseases.  If you call that
23 compiling facts and figures, I mean, I think it
24 is just the kind of compiling that goes on when
25 people are in a group and they know about each

Page 78

1  other's severe medical problems as they come
2  up.  I don't think it was so much an effort of
3  compiling as just knowing about Jim and Henry
4  and John and what's happened to them.
5     Q.   When did the Asbestos Workers Union
6  first issue a warning to its workers regarding
7  the potential hazards of asbestos?
8     A.   I don't recall anything before they
9  met with Selikoff in 1962 at one of these
10 meetings that the -- I guess it was the
11 business agents of this union held every five
12 years.  And Selikoff came to the 1962 meeting
13 and talked a little about his efforts to
14 investigate the health hazards in the trade and
15 the studies weren't complete at that time.
16 They were just starting.
17      But I suppose Selikoff told them
18 something about the hazards of asbestos in
19 1962.  I don't recall what exactly the
20 transcript would say about that.
21    Q.   You don't have any evidence, do you,
22 Doctor, that Owens-Illinois ever attempted to
23 suppress the publication of asbestos research?
24    A.   No.  I mean, the only example I can
25 think of is the Cable studies and they were

Page 79

1  apparently published without prior approval of,
2  approval or disapproval of Owens-Illinois.
3     Q.   And, in fact, going along with that
4  answer, Doctor, you have no evidence that
5  Owens-Illinois ever attempted to edit the
6  results of the asbestos research, do you?
7     A.   Well, I don't think that they knew
8  that this was going to be published until it
9  was in print, and so they didn't have occasion
10 to exercise that option of trying to edit the
11 research.
12    Q.   Doctor, you have no evidence that
13 Owens-Illinois ever attempted to edit the
14 results of asbestos research, do you?
15    A.   Well, the only paper that was
16 published about asbestos and Owens-Illinois
17 products was published by the Saranac Lab, and
18 it appears to have been published without
19 advance notice to Owens-Illinois, so
20 Owens-Illinois didn't get the option to edit it
21 or not to edit it.
22    Q.   So that means that you have no
23 evidence that Owens-Illinois ever attempted to
24 edit the results of asbestos research; is that
25 right?

Page 80

1     A.   I have already answered your question
2  twice.  I have nothing to add to what I already
3  said.  They couldn't edit something that they
4  weren't presented with until after it was
5  published.  They didn't have the occasion to
6  edit it, so they didn't edit it.
7     Q.   You have no evidence that
8  Owens-Illinois ever even attempted to edit the
9  results of asbestos research; is that right?
10      MR. SATTERLEY:  Object to the form of
11 the question, asked and answered.
12      THE WITNESS:  I think you are beating
13 this one to death.  They expressed some -- they
14 expressed surprise that they weren't given the
15 thing to look at the thing before the thing was
16 published.  And they expressed some relief that
17 the form of the report didn't name their
18 product but they didn't have the option of
19 editing or not editing it.
20 BY MR. LEE:
21    Q.   And my question wasn't whether they
22 did.  My question is you have no evidence that
23 Owens-Illinois ever even attempted to edit the
24 results of asbestos research, do you, Doctor?
25    A.   Well, I mean, I just don't see how you

Page 81

1  **attempt to interfere with something that you**
2  **don't know is happening. Nobody could do that.**
3    Q.  So the answer is you have no evidence
4  that Owens-Illinois ever attempted to edit the
5  results of asbestos research; is that right?
6      MR. SATTERLEY: Objection, asked and
7  answered, four times now.
8      THE WITNESS: Well, upon reflection,
9  there is the matter of about J.C. Wagner. And
10 Owens-Illinois did hire Dr. Wagner as a
11 consultant. And Dr. Wagner did receive checks
12 from Owens-Illinois and Dr. Wagner did publish
13 some strange things about how all the cancers
14 from asbestos were from chrysolite and not
15 amosite and chrysotile. And he did this while
16 he was an undisclosed consultant to
17 Owens-Illinois. So I guess I am glad you asked
18 me this question all these times because I
19 hadn't thought about that.
20     But Dr. Wagner's work for
21 Owens-Illinois was disclosed by an attorney for
22 attorney Newell when they had their falling out
23 a few years ago. And I would say it is an open
24 question of what role Owens-Illinois played in
25 some of these later publications of Dr. Wagner

Page 82

1  in the 1990s, in the early 1990s. They may
2  have been involved in distortion of
3  suppression -- however you put it -- I guess
4  distortion of what was appearing in the
5  scientific literature.
6  BY MR. LEE:
7    Q.  We will come back to Dr. Wagner. You
8  have no evidence that Owens-Illinois ever
9  attempted to delay the publication of any
10 asbestos research, do you, Doctor?
11   **A.  No, I don't think so.**
12   Q.  You have no evidence that
13 Owens-Illinois ever attempted to restrict the
14 publication of information regarding asbestos
15 hazards, do you?
16   **A.  Well, by saying that their product was**
17 **nontoxic, that's all a question of what you**
18 **mean by restrict. They certainly seem to have**
19 **been pretty restrictive about their own**
20 **disclosures when it came to things like that.**
21   Q.  You have no information that
22 Owens-Illinois ever attempted to encourage or
23 convince any scientific or trade magazine to
24 restrict the publication of information
25 regarding asbestos hazards, do you?

Page 83

1    **A.  No, I don't think so. I mean, the**
2  **trade magazines published what Owens-Illinois**
3  **wanted to publish and things like the petroleum**
4  **engineer. If Owens-Illinois said the stuff was**
5  **nontoxic, that's what the trade magazines**
6  **published.**
7    Q.  You have no evidence Owens-Illinois
8  ever attempted to alter or delete cancer
9  findings from asbestos research, do you?
10   **A.  No, although, again, the question of**
11 **what went on with Dr. Wagner is at least**
12 **related to that subject area.**
13   Q.  You have no evidence Owens-Illinois
14 ever attempted to alter or delete cancer
15 findings from asbestos research, do you?
16     MR. SATTERLEY: Objection, asked and
17 answered.
18     THE WITNESS: I can't add anything to
19 what I just said.
20 BY MR. LEE:
21   Q.  You have no evidence Owens-Illinois
22 ever tried to hide the potential association
23 between asbestos exposure and cancer, do you?
24     MR. SATTERLEY: Tried to hide?
25 BY MR. LEE:

Page 84

1    Q.  Yes.
2    **A.  Again, putting aside the issue of what**
3  **went on with Dr. Wagner in the late '80s and**
4  **the 1990s, I don't.**
5    Q.  You have no evidence that
6  Owens-Illinois ever planned with or assisted or
7  encouraged another company to edit asbestos
8  research; is that right?
9    **A.  Not research, no.**
10   Q.  You have no evidence that
11 Owens-Illinois ever planned with or assisted or
12 encouraged another company to delay the
13 publication of asbestos research; is that
14 right?
15   **A.  No, I can't think of an example of**
16 **that either.**
17   Q.  And you have no evidence that
18 Owens-Illinois ever planned with or assisted or
19 encouraged another company to alter, delete, or
20 edit cancer findings for asbestos research; is
21 that right?
22   **A.  Can you read that again?**
23   Q.  Sure.
24     THE REPORTER: "Question: And you
25 have no evidence that Owens-Illinois ever

Page 85

1  planned with or assisted or encouraged another
2  company to alter, delete, or edit cancer
3  findings for asbestos research; is that right?"
4       THE WITNESS:  I think so.
5  BY MR. LEE:
6       Q.   You have no evidence that
7  Owens-Illinois ever learned about any attempt
8  by any other company to control the results of
9  asbestos research; is that right?
10      **A.   Well, they learned from Saranac**
11  **Laboratory that some of the work Saranac Lab**
12  **was doing was regarded as confidential, even as**
13  **the Saranac Lab told them about it.  So they**
14  **were privy to the fact that there were**
15  **companies doing stuff that wasn't just being**
16  **routinely made public in a completely**
17  **transparent way.**
18      Q.   You don't know what if anything
19  Owens-Illinois was told about that research
20  that was being conducted by these other
21  companies, do you?
22      **A.   All I know is they received a few**
23  **lines about it in a report that they received**
24  **from the Saranac Lab.  What they were told in**
25  **addition to that, I have no way of knowing.**

Page 86

1       Q.   You have no evidence that
2  Owens-Illinois ever learned about any attempt
3  by any other company to suppress information
4  about asbestos hazards, do you?
5       **A.   That's what we were just talking**
6  **about.  They were told that there was stuff**
7  **being done by Saranac for asbestos companies**
8  **and they were told a little about the findings,**
9  **but they were also told:  Hey, look, this is**
10  **confidential information.**
11      Q.   You have no evidence in the form of
12  correspondence, company documents, or testimony
13  that Owens-Illinois was ever a part of any
14  agreement to suppress information about
15  asbestos hazards, do you?
16      **A.   You mean a formal signed agreement?**
17  **No, nobody was ever part of a formal, signed**
18  **agreement to suppress asbestos hazards.  They**
19  **did it.**
20      Q.   You have no evidence in the form of
21  correspondence, company documents, or testimony
22  that Owens-Illinois was ever a part of any
23  agreement to edit asbestos research, do you?
24      **A.   No, it was never any agreement by, any**
25  **written agreement by companies to edit asbestos**

Page 87

1  research.
2       Q.   You have no evidence in the form of
3  correspondence, company documents, or testimony
4  that Owens-Illinois was ever part of any
5  agreement to keep silent about asbestos
6  hazards, do you?
7       **A.   I don't think there was ever any**
8  **formal written agreement by any companies to**
9  **keep silent about asbestos hazards.  These**
10  **things weren't usually done by written**
11  **agreement.**
12      Q.   You have never seen any proof that
13  Owens-Illinois was part of any agreement to
14  keep asbestos health information from plant
15  workers, have you?
16      **A.   No.**
17      Q.   You have never seen any proof in the
18  form of correspondence, company documents, or
19  any other documentation that indicates that
20  Owens-Illinois ever was a part of any agreement
21  not to put warnings on asbestos products, have
22  you?
23      **A.   No.  I mean, I have never seen an**
24  **agreement of companies to not put warnings on**
25  **asbestos products, a written agreement.  I have**

Page 88

1  **never seen such a thing.**
2       MR. SATTERLEY:  If you guys have one,
3  we would be happy to review it.
4       MR. LEE:  Can we take a quick break?
5       MR. SATTERLEY:  Sure.
6       MR. SCHACHTER:  This is Cary
7  Schachter.  May I ask if I have a chance to ask
8  questions?
9       THE WITNESS:  It depends how much time
10  is left.  You can sort that out.
11      MR. SATTERLEY:  We have an hour and
12  five minutes left, I think.
13      MR. SCHACHTER:  Five-minute break?
14      MR. SATTERLEY:  Yes.
15      (A recess was taken at 11:54 a.m.,
16  after which the deposition resumed at
17  12:00 p.m.)
18  BY MR. LEE:
19      Q.   Doctor, I think we talked, I know we
20  talked a little bit earlier about Dr. Wagner;
21  is that right?
22      **A.   Right.**
23      Q.   And you are talking about Dr. J.C.
24  Wagner?
25      **A.   Right.**

Page 89

1    Q.   Dr. Wagner is the person who in 1960
2  reported the first epidemiological study with
3  regard to asbestos exposure in mesothelioma; is
4  that right?
5    A.   Yes.
6    Q.   And what Dr. Wagner did is he found
7  mesothelioma cases in South Africa asbestos
8  miners; is that right?
9    A.   And others.  Other people other than
10  miners.
11    Q.   Okay.  And you talked earlier, drew
12  some criticism about Dr. Wagner's opinion with
13  regard to crocidolite asbestos; is that right?
14    A.   Right.
15    Q.   Now, you would agree that Dr. Wagner's
16  first report dealt with persons who were mining
17  or in an area around crocidolite mines; is that
18  right?
19    A.   Among others, yes.
20    Q.   Well, the South African miners
21  Dr. Wagner was working with in 1960 were mining
22  for cidolite; is that correct?
23    A.   Wagner was working with people who had
24  died.  He wasn't working with miners.  He was
25  working with people who had died of

Page 90

1  mesothelioma.  Some of them were miners; some
2  of them living in the mining regions; some were
3  working in other occupations.  Those were all
4  tabulated at the end of his report.
5    Q.   The kind of asbestos being mined in
6  Dr. Wagner's report was crocidolite; is that
7  right?
8    A.   To the extent he described miners, it
9  was crocidolite, yes.
10    Q.   And the people living around the mines
11  were living around crocidolite mines; is that
12  right?
13    A.   That's right, but not all the people
14  in the report were people whose exposure can be
15  attributed to crocidolite.
16    Q.   You would agree that Dr. Wagner's
17  report came out two years after Owens-Illinois
18  stopped making Kaylo?
19    A.   Right.
20    Q.   You would agree that even today
21  crocidolite is recognized as the most potent
22  form of asbestos fiber; is that right?
23    A.   From the standpoint of mesothelioma,
24  that's probably true.
25    Q.   You wouldn't dispute that Dr. Wagner

Page 91

1  made great advances in the study of asbestos
2  medicine, would you?
3    A.   No.
4    Q.   So your criticisms largely stem from
5  your insinuation that Dr. Wagner was somehow
6  tainted by Owens-Illinois in the mid-to-late
7  1980s; is that right?
8    A.   Right.
9    Q.   And you think that taint came from
10  Dr. Wagner's agreement to work as an expert on
11  behalf of Owens-Illinois?
12    A.   Well, he was -- he never disclosed
13  that he was getting money from Owens-Illinois.
14  And, in fact, I think he made statements to the
15  contrary.  And it was -- it was best expressed
16  in Handley's memorandum, Handley's affidavit,
17  exactly what the deal was with Owens-Illinois
18  and Wagner.
19    Q.   So you are talking -- you are talking
20  about the Handley affidavit; is that right?
21    A.   Right.
22    Q.   And you understand that was an
23  affidavit made by, I believe it is Paul
24  Handley; is that right?
25    A.   Right.

Page 92

1    Q.   And you realize that Paul Handley made
2  this affidavit in litigation between
3  Owens-Illinois and Turner and Newell; is that
4  right?
5    A.   Right.
6    Q.   And it is your understanding that Paul
7  Handley was an attorney representing Turner and
8  Newell in that litigation?
9    A.   Yes.
10    Q.   And do you also understand that that
11  affidavit was made after Mr. Handley caused
12  Turner and Newell to suffer a default judgment
13  in that case?
14    A.   I don't know that Mr. Handley caused
15  Turner and Newell to suffer a default judgment
16  at all.  I'm not clear about that.
17    Q.   Do you understand the facts that
18  surround the making of that affidavit?
19    A.   Not all of them, probably.
20    Q.   Would the fact that the affidavit was
21  submitted in support of a motion for relief
22  from the default judgment have any bearing to
23  you on its reliability?
24    A.   No.  I mean, I knew that at the time
25  and I know it now.  And I have also seen copies

Page 93

1   of the canceled checks since the Handley
2   affidavit came out.  Wagner did receive money
3   for his services.
4       Q.   Doctor, you receive money for your
5   services, do you not?
6       A.   Yes, but I testify freely about how
7   much I receive.  You have got a complete court
8   record in that.
9       Q.   Do you disclose your hourly rate when
10  you publish articles?
11      A.   No.
12      Q.   No one does, do they?
13      A.   Well, I don't get paid to publish
14  articles.  My hourly rate is zero.
15      Q.   Your hourly rate is not disclosed in
16  your book, is it?
17      A.   No, but I didn't get paid to publish
18  the book either.
19      Q.   You don't disclose how you get
20  royalties from the book, do you not, Doctor?
21      A.   I think I am up to five dollars an
22  hour for royalties from the book.  I think I am
23  up to minimum wage.
24      Q.   You don't disclose how much you get
25  paid on a yearly or monthly basis, do you?

Page 94

1       A.   I do.
2           MR. SATTERLEY:  We produced it.
3   BY MR. LEE:
4       Q.   When you publish articles.
5       A.   No.  People who read articles in
6   scientific journals aren't reading them to be
7   bothered with extraneous information like that.
8       Q.   It is my understanding from your
9   testimony that you believe that Dr. Wagner
10  received for his services to Owens-Illinois an
11  amount of approximately $300,000; is that
12  right?
13      A.   Yes.
14      Q.   And that was over 15 years?
15      A.   I don't know how many years it went
16  over.  I think it was mostly over a period of
17  about five years, but there may have been a
18  longer period of time involved.  Again, I'd
19  have to look at the canceled checks.
20      Q.   You made over $300,000 last year?
21      A.   Right.
22      Q.   Just from asbestos litigation?
23      A.   That's right.  And I disclosed that.
24      Q.   You testified before Congress and the
25  American people that you disclosed the fact

Page 95

1   that you make about $25,000 a month testifying
2   on behalf of plaintiffs' counsels?
3       A.   I disclosed that I testify as an
4   expert in asbestos litigation when I make
5   congressional testimonies.  I don't include all
6   these details, but I disclose that I testify as
7   an expert witness in asbestos litigation.  And,
8   of course, my testimony before Congress, nobody
9   pays me anything for.  I might spend weeks
10  preparing to testify at a congressional hearing
11  and write the testimony and document things and
12  I never get paid anything for that.
13      Q.   When you testify before Congress, do
14  you disclose the fact that you make about
15  $25,000 per month testifying on behalf of
16  plaintiffs' counsel?
17      A.   I can't add anything to what I just
18  told you.
19      Q.   The answer is no; is that right,
20  Doctor?
21      A.   The answer is I testify before
22  Congress that I am involved in asbestos
23  litigation as an expert witness.  I don't
24  provide figures on how much my earnings are.
25  That's not why I am invited to testify at the

Page 96

1   congressional hearing.
2       Q.   Do you think how much money you make
3   should be taken into -- in testifying for
4   plaintiffs' counsel in asbestos litigation
5   should be taken into account when people are
6   determining how much weight to give to your
7   testimony?
8       A.   If I am testifying, certainly if I am
9   testifying in a court, they are entitled to
10  know that, and they are always told about that.
11      Q.   What about when you testify before
12  Congress?
13      A.   Well, I testify -- I answer any
14  questions that any of the members of Congress
15  that are at the hearing want to ask me.  If
16  there is a member of Congress that wants to ask
17  me what I get paid and who I get paid by, and
18  how many cases I testify in, and all the rest
19  of this stuff, I will answer it.
20      Q.   But you don't stand up and say when
21  you introduce yourself to Congress --
22      A.   Excuse me.  Let's go off the record a
23  second.
24          (Discussion off the record.)
25          THE WITNESS:  Back on the record.

Page 97

BY MR. LEE:

Q.   You don't freely offer to Congress when you testify before the American people that you make approximately $25,000 per month testifying on behalf of plaintiffs' counsel, do you?

MR. SATTERLEY:  Objection, asked and answered.

THE WITNESS:  You have three hours to question me.  If you want to repeat the same question for the next hour and a half, you can do it.

MR. SATTERLEY:  There is not an hour and a half left.  There is 50 minutes left.

THE WITNESS:  And the other lawyers, you can sort it out with them about, you know, who gets to waste the next 50 minutes, but I can't add anything to what I have already told you about that.  I think this is really, you know, whatever term you guys use for persecuting the witness to keep on asking me this.

I mean, I testify that I'm involved in asbestos litigation as an expert witness.  I'm upfront about that.  I think it is pretty

Page 98

obvious from my testimony that my role in litigation is not in the defense of companies that have suppressed and distorted the hazards of asbestos for years and years.  I think that's transparent from the content of my Senate testimony.

And anybody who wants to know about, you know, what I get paid, certainly the senators or members of Congress can ask me those questions if he wants to ask them and I will answer those questions.  In fact, I think I have answered them to members of the committee staff who asked me about these things.  It is no secret.  It is a matter of sworn testimony in countless depositions and trial.

Q.   So it is your understanding that it has never been disclosed to anyone, other than through the Handley affidavit, that Dr. Wagner was a consultant for Owens-Illinois; is that right?

A.   Well, there are also the canceled checks that are consistent with what Handley talked about.  And there may have been additional information contained in Jacques

Page 99

McCullough's book, which was published about three or four years ago that talks about Dr. Wagner's services to Owens-Illinois.

Q.   Dr. Castleman, do you recall testifying in a case in Bloomington, Illinois called McClure?

A.   Called what?

Q.   McClure?

MR. SATTERLEY:  How long ago?  Do you know the date?

BY MR. LEE:

Q.   I believe it was 1997.

A.   It is hard to remember every case I have testified in.  As I told you, I have testified in over 300 trials and over 500 depositions.

Q.   Well, maybe this will refresh your recollection.  McClure was the subject of an Illinois Supreme Court decision that overturned a verdict in that case.  Do you recall that?

A.   I don't recall that, but I may have been told about it at the time.  I don't know.

Q.   In the last ten years, would your testimony have changed at all with regard to Owens-Illinois and what you believe is its

Page 100

involvement in a conspiracy of silence?

A.   Well, I don't think I knew anything about Dr. Wagner's services to Owens-Illinois in 1997, so that might be one thing that would come up.

Q.   Anything else?

A.   Nothing else that comes to mind.

Q.   Again, all you know with regard to Dr. Wagner is what you have reviewed through canceled checks and the Handley affidavit; is that right?

A.   Those are the main things.  There may have been additional information contained in Jacques McCullough's book.  He did interview Dr. Wagner and although I didn't think -- I don't think he ever got to ask him about this matter, there may be additional information there.

Q.   Dr. Castleman, would you agree that if a person held beliefs, even beliefs you may think are wrong, holds them truthfully, they should be allowed to testify with regard to those beliefs?

A.   Sure.  They should simply be open about their financial relationships with

Page 101

1 parties at interest.
2    Q.   Who would the parties at interest be
3 with regard to Dr. Wagner?
4    A.   It would certainly include
5 Owens-Illinois hiring him as a consultant.
6    Q.   Who should Dr. Wagner have disclosed?
7       MR. SATTERLEY:  Objection, you need to
8 let him answer the question, not arguing with
9 him.  You cut him off and start getting upset
10 and arguing with him.  Let him finish answering
11 the question.
12      MR. LEE:  I am trying to clarify the
13 question because he was not answering the
14 question I asked.
15      MR. SATTERLEY:  Well, let him finish
16 answering it.  Don't cut him off rudely.  And
17 then you can ask him a different question again
18 or clarify your question.
19 BY MR. LEE:
20    Q.   Well, we can do that, Doctor
21 Castleman, but I prefer to clarify my question
22 so you don't have to answer two questions, as I
23 understand that this is an imposition on you.
24    A.   Look, it is going to be over when it
25 is over.  That's all I know.  Ask me whatever

Page 102

1 you would like.
2    Q.   Dr. Castleman, to whom should
3 Dr. Wagner have disclosed his consulting
4 relationship with Owens-Illinois?
5    A.   I believe there may have been legal
6 documents in which Dr. Wagner spoke to the
7 issue of different fiber types and didn't
8 disclose that he was a consultant to
9 Owens-Illinois, but I can't recall specific
10 examples of that.
11      I know he was involved in cases in
12 Australia in 1992 or 1994, and I would
13 occasionally see that he would be disclosed in
14 litigation in other cases.  And certainly in
15 that context that disclosure should have been
16 made, that he was a paid consultant to
17 Owens-Illinois.
18    Q.   Are you sure that it wasn't?
19    A.   I don't know.  I know that it was a
20 surprise to me and everybody I knew when the
21 Handley affidavit was filed that Wagner had
22 this relationship with Owens-Illinois.
23    Q.   What have you done to investigate, if
24 anything, what disclosures may have been made
25 about Dr. Wagner's relationship with

Page 103

1 Owens-Illinois?
2    A.   I haven't gone back, say, to try and
3 find all the disclosures that he may have made
4 in all the legal cases that he may have been
5 involved in -- and I don't even know how I
6 would be able to find out about that -- in
7 order to see whether there are -- where he
8 directly addresses the question of financial
9 conflicts of interest.  I don't.  I don't know
10 how I would even investigate that.
11    Q.   Other than in litigation, to whom
12 should Dr. Wagner have disclosed his consulting
13 relationship with Owens-Illinois?
14    A.   Well, nowadays people disclose
15 potential conflicts, financial conflicts of
16 interest in medical articles but they didn't
17 used to do that 15 or more years ago.  It
18 wasn't routinely done.  And so I don't think
19 that he could be held to that standard, since
20 it wasn't a standard at the time in the
21 ordinary publication of scientific work, even
22 on subjects like this.
23      I guess just in litigation-related
24 activities is where it should have been done.
25    Q.   Do you know if Dr. Wagner worked for

Page 104

1 defendants other than Owens-Illinois?
2    A.   Yes, CSR.  That was an asbestos mining
3 company in Australia.  They did a lot of other
4 things, but they owned asbestos mines.  And he
5 was a witness for them when I last saw him in
6 court in Sydney, Australia.
7    Q.   So if Dr. Wagner were testifying in
8 litigation on behalf of defendants, you think
9 it would be pretty clear to the jury and to the
10 Court that Dr. Wagner testified on behalf of
11 defendants, would you not?
12    A.   Yes, but even so, I think if he has a
13 financial conflict of interest that goes beyond
14 testifying in a particular case, that that
15 should also be disclosed, at least if it is
16 asked for by opposing counsel, which I would
17 think it would have been.
18    Q.   You don't know that it was, do you?
19    A.   No, I don't, but the lawyers in
20 Australia that I have worked with are competent
21 lawyers and there aren't that many lawyers that
22 do asbestos cases in Australia, and I would
23 expect that they would have asked for that.
24    Q.   Dr. Castleman, I note in your book you
25 have a discussion, I think it is on page 437 of

Page 105

1  household asbestos diseases; is that right?
2  **A.   Yes.**
3  Q.   And it is my understanding, though it
4  is hard to tell from your book -- I am trying
5  to find the exact place.  The first published
6  article with relation to household --
7  MR. SATTERLEY:  What page number are
8  you on?
9  MR. LEE:  440.
10 BY MR. LEE:
11 Q.   Household exposures and mesothelioma
12 was in the 1960s; is that right?
13 **A.   Yes, actually Wagner had one case in**
14 **1960 and then, of course, Newhouse and**
15 **Thompson's article in --**
16 Q.   In 1965.
17 **A.   -- published in '65 and presented in**
18 **'64.**
19 Q.   And Newhouse is the first article that
20 drew a link between household exposure and
21 mesothelioma; is that right?
22 **A.   First article to actually report the**
23 **cases, yes.  Again, Wagner did report a case, I**
24 **didn't report it in my book, because one of**
25 **Wagner's cases was a case too, 1960.**

Page 106

1  Q.   Okay.  Would you agree, Doctor, the
2  hazards of working with asbestos-containing
3  products were known to workers by 1970?
4  MR. SATTERLEY:  Known to workers?
5  MR. LEE:  Workers.
6  MR. SATTERLEY:  Object to the form of
7  the question.
8  THE WITNESS:  The answer is no.
9  BY MR. LEE:
10 Q.   What about 1972?
11 **A.   No.  I mean, to workers, what do you**
12 **mean by workers?  It was known to some workers,**
13 **but it wasn't known to most workers.**
14 Q.   Let's talk about insulation,
15 insulators.
16 **A.   Oh, okay.  Now I know.**
17 Q.   1970.
18 **A.   That's a little clearer.  It was known**
19 **to some of them, but not all of them.**
20 Q.   Brake mechanics you started warning in
21 1972; is that right?
22 **A.   In Baltimore County, in Maryland, I**
23 **started trying to put warnings out to brake**
24 **mechanics, that's right.**
25 Q.   Would you agree that by 1980 the

Page 107

1  hazards of working with asbestos-containing
2  products were known to insulators?
3  **A.   No.  I just don't know how to put a**
4  **date on that.  I mean, with time, more and more**
5  **members of this one union of insulators became**
6  **aware of the hazards of asbestos.  But as to**
7  **individuals, I don't know when, you know, it**
8  **can be said that any individual knew or that**
9  **all individuals in the union knew.  I don't**
10 **have a year for that.  I don't have an answer**
11 **for you.**
12 Q.   What about brake mechanics?
13 **A.   Same thing.  It is even more true of**
14 **brake mechanics because they weren't in a**
15 **union.  And who was telling them?  The EPA web**
16 **site?**
17 Q.   Well, you were.
18 **A.   I was.  Wow, that's Baltimore County,**
19 **it is one county.  There are 23 counties in**
20 **Baltimore city in the State of Maryland alone.**
21 **I was one little county in one state and not a**
22 **real big state, you know, I did what I could,**
23 **but I think that it is not used to -- it is not**
24 **helpful to have an exaggerated impression of**
25 **one's own accomplishments in the matters of**

Page 108

1  **this kind.  Excuse me.  Off the record a**
2  **second.**
3  **(Brief telephone interruption.)**
4  THE WITNESS:  We're back on the
5  record.
6  BY MR. LEE:
7  Q.   Dr. Castleman, the four black binders
8  that are here today, have you reviewed what
9  materials are in those binders?
10 **A.   Well, they are my files.  I haven't**
11 **looked in the binders this morning, but they**
12 **are copies of my files.**
13 Q.   Dr. Castleman, we asked you to bring
14 today with you all documents that support or
15 relate to the claim Owens-Illinois participated
16 in a conspiracy concerning asbestos,
17 asbestos-containing products or
18 asbestos-related health risks or that
19 Owens-Illinois committed or participated in any
20 acts in furtherance of such a conspiracy.
21 Would all of those -- would all the
22 documents responsive to that be included in
23 these binders?
24 MR. SATTERLEY:  Let me place an
25 objection.  We objected, filed a written

Page 109

1  objection that it would be impossible for him
2  to bring all the documents that possibly relate
3  to this, but certainly we have attempted to
4  produce the Owens-Illinois's files and we have
5  produced copies of the book.  But with that
6  objection, Doctor, if you understand it, you
7  can answer it.
8       THE WITNESS:  I think this is the best
9  effort I could make to provide you with the
10  documentation you requested, would be to
11  provide the Owens-Illinois file to you, which
12  has been done, my Owens-Illinois file.
13  BY MR. LEE:
14      Q.   Dr. Castleman, other than the notes
15  that you provided me earlier, is there any
16  other correspondence between you and
17  plaintiff's counsel for this case?
18      A.   No.
19      Q.   Have you provided a bill for this
20  case?
21      A.   No.
22      Q.   Dr. Castleman, we talked earlier that
23  there were, there was litigation going back as
24  far as the 1930s, and I think sometimes you
25  have described litigation going back even

Page 110

1  farther than that regarding worker's
2  compensation suits for asbestosis; is that
3  right?
4       **A.   Yes, this is all covered in chapter 3**
5  **of my book.**
6       Q.   Sure.  I am not fighting with you
7  about that.  What I am asking you is would you
8  agree then that by the 1930s, there were
9  plaintiffs' counsel in this country who
10  understood the hazards of asbestos?
11      **A.   Oh, at least they knew and understood**
12  **enough to make money off of it or tried to.**
13      Q.   Do you know when any group of
14  plaintiffs' attorneys ever came together and
15  tried to warn workers prior to 1960 about the
16  hazards of asbestos?
17      A.   No.
18      Q.   And you would agree that the suits
19  continued all the way through the 1970s; is
20  that right?
21      **A.   Well, there are all kinds of suits**
22  **but, yes, there is sporadic filing of lawsuits**
23  **until the 1970s and then there were a lot more.**
24      Q.   And the changes in the 1970s, the
25  Federal Government issued new standards with

Page 111

1  regard to asbestos; is that right?
2       **A.   Well, that's one thing that changed in**
3  **the 1970s was the OSHA standard for asbestos**
4  **and the existence of OSHA.**
5       MR. LEE:  I think those are all the
6  questions I have for you right now.
7       MR. SATTERLEY:  Anybody on the phone
8  have any questions?
9       MR. SCHACHTER:  Cary Schachter, I
10  represent Garlock.
11            EXAMINATION
12  BY MR. SCHACHTER:
13      Q.   Dr. Castleman, were your notes marked
14  as an exhibit?
15      MR. LEE:  Yes.
16  BY MR. SCHACHTER:
17      Q.   And I am wondering if we can have
18  marked as the next exhibit number, the index to
19  the Garlock binder.
20      MR. SATTERLEY:  Yes.  Let me get it
21  out of the binder.
22   (Deposition Exhibit Number 6 was marked for
23  identification.)
24  BY MR. SCHACHTER:
25      Q.   Dr. Castleman, is Exhibit 6 the index

Page 112

1  to your articles related to Garlock?
2       MR. SATTERLEY:  Not articles.  You
3  mean the documentation?
4       MR. SCHACHTER:  Exactly, I'm sorry.
5       THE WITNESS:  This is an index of the
6  documents in my Garlock file.  It is very nice.
7  I have never seen such an index.  Would you
8  make me a copy too?
9       MR. SATTERLEY:  Yes.
10      THE WITNESS:  I should have these
11  documents into files but that's one of the
12  things about not having a boss and not being a
13  boss is you don't have the luxury of telling
14  somebody to go type you up an index of the
15  documents in your file.
16      MR. SCHACHTER:  Thank you.
17      MR. SATTERLEY:  Here is your copy.
18  BY MR. SCHACHTER:
19      Q.   The additions of your book, Asbestos:
20  Medical and Legal Aspects through the fourth
21  edition did not contain a Garlock-specific
22  section; is that right?
23      **A.   That's correct.  I neglected your**
24  **client, and I'm sorry for that.**
25      Q.   That's okay.  Before the fifth edition

Page 113

1  was sent to the printers, you sat down and
2  reviewed all the information you had that might
3  relate to Garlock so that you could compose a
4  section dealing with that company; is that
5  correct?
6      A.   That's correct.
7      Q.   And that section appears on page 592
8  through page 594 of the fifth edition of your
9  book; is that correct?
10     A.   Yes.
11     Q.   Does the discussion in your book about
12 Garlock describe your opinions on the main
13 points about what Garlock knew and did with
14 regard to the health hazards of its
15 asbestos-containing products?
16     A.   Well, it doesn't so much contain
17 opinions as to documentary basis for any
18 opinions I would have.
19     Q.   Okay.  Does the discussion in your
20 book contain the significant documentary
21 evidence about what Garlock knew and did with
22 regard to the health hazards of its
23 asbestos-containing product that formed the
24 support for your opinions?
25     A.   Yes, I mean, to the extent that you

Page 114

1  can do that within the space of two full pages,
2  two full pages in a book.
3      Q.   Is there significant documentary
4  evidence that you have received that reinforces
5  or changes any of your opinions about Garlock
6  that was not available at the time you wrote
7  this discussion that's in the fifth edition?
8      A.   No, I don't think so.
9      Q.   Do you have the opinion that Garlock
10 participated in a conspiracy to conceal
11 knowledge about the risks of asbestos products?
12     A.   Yes.
13     Q.   And is that the same conspiracy of
14 silence that you mentioned during the other
15 cross-examination?
16     A.   Well, it is the conspiracy of silence
17 and their active involvement in the Asbestos
18 Textile Institute.
19     Q.   Okay.  Is there a specific vote or act
20 that Garlock did or made as a member of the
21 Asbestos Textile Institute that you believe
22 documents its participation in a conspiracy?
23     A.   No.  I mean, I can't point to a
24 particular vote or act.  It is just the fact
25 that they were a member of the Asbestos Textile

Page 115

1  Institute.  They were in attendance at meetings
2  where various things were done by the Asbestos
3  Textile Institute in the 1950s and the 1960s
4  and even into the 1970s, that I note in, at
5  least in my summary here in the book.
6      Q.   Okay.  Are you aware that Garlock was
7  not a member of the Asbestos Textile Institute
8  during certain portions of time during the
9  1950s?
10     A.   I understand that's true, yes.
11     Q.   Thank you.  You mentioned a meeting
12 attended in, let's see here, 1956 at which
13 George Houghton was present at an ATI meeting.
14 Do you recall that reference in your
15 discussion?
16     A.   Yes.
17     Q.   Do you know what purpose George
18 Houghton had for being at that meeting?
19     A.   I suppose he was there to represent
20 the interests of his company.
21     Q.   Do the meeting minutes reflect any
22 statements he made at that meeting?
23     A.   No.  I don't know that the meeting
24 minutes reflect the statements of any
25 individual or, you know, maybe they do, but I

Page 116

1  don't have them right in front of me.
2      Q.   Do you believe it is a good thing for
3  companies to share information about reducing
4  the level of exposure to asbestos by workers in
5  its facilities?
6      A.   Sure.  I mean, in terms of companies
7  working together to improve the safety of their
8  industrial activities, that's a good thing.
9      Q.   You mentioned on page 593 at the end
10 airborne plant asbestos fiber concentrations
11 recorded between 1972 and 1976.  What specific
12 documents are the documentation for those
13 measurements?
14     A.   I haven't looked at this file in a
15 long time.
16         MR. SATTERLEY:  I'm sorry.  I didn't
17 hear it.
18         THE WITNESS:  I am looking for the
19 Garlock file.  We're getting specific.
20         MR. SATTERLEY:  Which binders?  You
21 have four binders here.
22         THE WITNESS:  Just bring them over.
23         MR. SATTERLEY:  There is two.
24         MR. SCHACHTER:  I'll tell you what.  I
25 have limited time.  You didn't review that

Page 117

1  issue before preparing for your deposition or
2  in preparation for this deposition?
3      MR. SATTERLEY:  Can you ask him the
4  question again?
5      THE WITNESS:  I haven't looked at this
6  stuff for a long time, no.  I don't sit down
7  and review these files every time I get
8  deposed.  I wouldn't have time for anything
9  else if that's what I did.
10 BY MR. SCHACHTER:
11     Q.    Then I will defer that question.  If
12 we have time at the end, I will ask you to go
13 back and do that but let's move on to other
14 things.
15     A.    Sure.
16     Q.    As a historian of the evidence of the
17 dangers of asbestos, are you aware of any
18 published study that has in epidemiological
19 research determined that there are health risks
20 associated with use of gaskets or packing?
21     **A.    The only study I know that's specific**
22 **to one of these products is a report of a**
23 **worker whose only exposure was to gaskets.  And**
24 **that was published in 1995.**
25     Q.    And the name of the author of that

Page 118

1  report is --
2      **A.    It is an Italian paper.  Just a**
3  **minute.  Pinto was the first author.  It is**
4  **reference 99 on page 367 of my book.**
5      Q.    Thank you.
6      **A.    And the article is in English, even**
7  **though it is published in an Italian journal.**
8      Q.    Are you familiar with a product
9  manufactured by Johns-Manville called Transite?
10     **A.    Yes.**
11     Q.    Is that a product that customarily
12 contains crocidolite?
13     **A.    Well, it contains chrysotile and**
14 **crocidolite asbestos, as I understand.**
15     Q.    And it would have contained both kinds
16 of asbestos at the same time, right?
17     **A.    Right.**
18     Q.    And have you ever been involved in a
19 case involving the Johns-Manville New Orleans
20 factory where Transite pipe was made?
21     **A.    Maybe years back.  I don't remember.**
22     Q.    Are you familiar with that plant?
23     **A.    Not in particular.  Not particularly,**
24 **no.**
25     Q.    And have you -- do you have any

Page 119

1  familiarity with the products that were made
2  there in the 1940s?
3      **A.    No.**
4      Q.    It is your opinion that by the 1940s
5  Johns-Manville knew of the dangers of asbestos
6  and was actively suppressing knowledge about
7  those dangers, right?
8      **A.    I think that's fair to say, yes.**
9      Q.    And that Johns-Manville was not
10 warning of the dangers of asbestos-containing
11 products in the 1940s, right?
12     **A.    No, they were not.**
13     Q.    Okay.  And it would have had that
14 knowledge and engaged in that act of not
15 revealing the knowledge certainly by 1946?
16     **A.    Yeah, I think that's fair to say.**
17     Q.    Have you ever done any work in any
18 case involving the same plant where Mr. Rome
19 worked and allegedly obtained exposure?
20     **A.    No, I don't think so.**
21     Q.    Are you currently a paid faculty
22 member of any academic institution?
23     **A.    No.  I have never been a paid faculty**
24 **member, although occasionally they paid me, but**
25 **they never had an obligation to pay me when I**

Page 120

1  **was on the faculty at Hopkins, for example.**
2      Q.    And you are not currently on the
3  faculty at Hopkins?
4      **A.    That's correct.**
5      Q.    You are not -- you have not made a
6  study of which medical articles in the
7  historical literature were considered reliable
8  by physicians at the time, have you?
9      **A.    I don't know how one could make a**
10 **study of that.**
11     Q.    Okay.  And you are not a medical
12 doctor, so you do not have a medical opinion
13 about any of the medical articles in the
14 historical literature about whether they are
15 reliable medical articles, correct?
16     **A.    Well, I mean, I read these articles**
17 **for their public health value, not for -- not**
18 **as a physician would, so I extract them, the**
19 **significance from a public health point of**
20 **view, but I am not reading them as a physician**
21 **going over the details, if you will, of whether**
22 **what they said about the fine points of the**
23 **pathology they are describing were perfectly**
24 **well expressed or correct.**
25     Q.    And would you agree that the public

Page 121

1   health perspective is to err on the side of
2   overprotection?
3       A.   Yes, I mean, if you have uncertainty,
4   generally the public health approach is to try
5   to be a little overcautious, rather than
6   under-cautious.
7       Q.   Certainly.  And you have mentioned
8   Dr. Irving Selikoff in your testimony.  Do you
9   consider him a reliable authority for the time
10  period in which he wrote on the dangers of
11  asbestos; is that correct?
12      A.   On the medical aspects, yes.
13      Q.   Although you have some training in
14  industrial hygiene, you are not a practicing
15  industrial hygienist, correct?
16      A.   That's right.
17      Q.   And you have not published in the
18  industrial hygiene literature; is that correct?
19      A.   Oh, I think I have published, you
20  know, maybe some letters about threshold limit
21  values, that's all.
22      Q.   But you have not undertaken a review
23  of any industrial hygiene literature to
24  determine which industrial hygiene articles are
25  reliable and which industrial hygiene articles

Page 122

1   are not reliable, have you?
2       A.   You mean with respect to history of
3   knowledge on asbestos?
4       Q.   Yes.
5       A.   No, I haven't.  I have come across
6   some articles in that industrial hygiene
7   literature, but I haven't made a systematic
8   search of each and every one.
9       Q.   And with regard to the industrial
10  hygiene issues about Mr. Rome's specific
11  exposure, you have not undertaken to formulate
12  an opinion; is that correct?
13      A.   I'm not sure I understand your
14  question.
15      Q.   I'm sorry.  You haven't evaluated
16  Mr. Rome's particular exposure to any given
17  product, correct?
18      A.   Well, that's correct.
19      Q.   And you have not attempted to
20  determine which industrial hygiene studies in
21  the literature would apply to Mr. Rome's
22  activities?
23      A.   No, I think you're asking about kinds
24  of questions that go beyond what my testimony
25  is going to be about.

Page 123

1       Q.   Thank you.  When you appeared before
2   Congress in March of 2007, were you compensated
3   for your time or paid for your travel for that
4   testimony?
5       A.   No.
6       Q.   Who paid for the travel?
7       A.   I lived near Washington.
8       Q.   Okay.
9       A.   But, I mean, I generally pay for my
10  own travel no matter where I am going.  I am
11  going to Brazil and Korea in the next couple
12  months.  I am going to pay for that too.
13      Q.   Well, have a nice trip.  You prepared
14  written -- a written report that constituted
15  your testimony in March of 2007; is that
16  correct?
17      A.   Well, I mean, my Senate testimony was
18  provided as a written statement and is
19  available on the web site of the Senate
20  committee that held the hearing.
21      Q.   Did you work with any lawyers in
22  drafting that testimony?
23      A.   Well, I may have asked for information
24  from the lawyers, but I can't off the top of my
25  head recall any assistance I received from

Page 124

1   lawyers.  I think this was just stuff I put
2   together from materials that I had around.
3       Q.   Can you tell us the names of the
4   lawyers with whom you requested information in
5   preparing that testimony?
6       A.   I am trying to think of whether I
7   requested anything from individuals, individual
8   lawyers, and nothing comes to mind.
9       Q.   Who contacted you with a request for
10  you to appear?
11      A.   I don't really remember now who it was
12  that called me.  It might have been Eric Olson.
13      Q.   And who is he?
14      A.   He is with the -- no, that's another
15  Senate committee.  It was probably Bill
16  Camilla, who was working with the Senate
17  Committee on Health, Education, Labor and
18  Pensions, the committee I testified before in
19  March, so he was the committee staffer.  He
20  probably would have been the person who
21  contacted me.
22      Q.   How did you know him?
23      A.   I didn't know him.
24      Q.   Okay.
25      A.   He just called me up and told me who

Page 125

1  he was and said he was working on Senator
2  Murray's bill and they wanted to hold hearings
3  and they wanted me to testify.
4      Q.   Did he inform you how he got your
5  name?
6      A.   Probably, but I don't remember.  I
7  knew Senator Murray's, I had been in contact
8  with Senator Murray's office before that time.
9      Q.   In your review of the literature on
10 asbestos disease, when was the first time an
11 epidemiological case control or cohort study
12 was published that showed exposure to asbestos
13 as low as the level of 1 fiber per CC creates
14 an elevated risk of mesothelioma?
15     A.   I don't know that we have an
16 epidemiological study that gives us information
17 on a population that was exposed at that low
18 level.  I think generally we have -- I mean,
19 the populations that have been -- that have had
20 asbestos exposure that have been subject to
21 study on which we have decent exposure
22 measurements are generally people who had more
23 exposure than that.
24     And the risks at that level of
25 exposure are generally a matter of

Page 126

1  extrapolation rather than direct measurement.
2      Q.   Thank you.  There may be other lawyers
3  who want to ask questions in the remaining
4  time.  Accordingly, I have that one question
5  about the documents and I assume that that
6  would -- let me ask this.
7      The question I asked before about the
8  documents according to your statement about the
9  fiber measurements of Garlock, would those be
10 among the documents in the binders there?
11     A.   They should be, yes.
12     Q.   Okay.
13         MR. SCHACHTER:  Then I will pass the
14 witness.  Thank you, sir.
15         MR. SATTERLEY:  Anybody else have
16 questions on the telephone?  What I would like
17 to do is to mark as Exhibit 7 and 8 the two
18 indexes of the Owens-Illinois documents.  We
19 will mark the first one, this one here as 7,
20 and the second index as number 8.
21     (Deposition Exhibit Number 7-8 were marked for
22 identification.)
23         MR. SATTERLEY:  And any additional
24 questions?
25         MR. LEE:  No.

Page 127

1          MR. SATTERLEY:  Just I want to put on
2  the record, you are taking the four binders
3  that I brought, Owens-Illinois binders?
4          MR. LEE:  Yes.
5          MR. SATTERLEY:  You can have them and
6  we will close out the deposition.
7          MR. SCHACHTER:  Did you bring a binder
8  for Garlock?  Do you want to send it to us?
9          MR. SATTERLEY:  I have four binders of
10 Garlock.  If you want to pay for the copying,
11 certainly.
12         MR. SCHACHTER:  I think we already
13 have it, but if you didn't want to have to take
14 it back with you.
15         MR. SATTERLEY:  I will take it back
16 with me and read it on the airplane.  I will
17 start thinking about the case.
18         MR. LEE:  Hold on one second.  Let's
19 go for one second.
20             EXAMINATION
21 BY MR. LEE:
22     Q.   Before we finish, Dr. Castleman, we
23 talked about the large number of asbestos
24 manufacturers and asbestos product users in the
25 1940s, '50s, and '60s.  How did you come about

Page 128

1  to determine which company should be in your
2  book?
3      A.   Well, because those were companies
4  about which I had actual information about
5  their historic knowledge about the hazards of
6  asbestos and their corporate response.
7      Q.   How did you come to have that
8  information?
9      A.   Because they were involved in
10 litigation and the documentation came up
11 through the process of legal discovery.
12     Q.   Would it be true then that if you have
13 not gotten documentation through the process of
14 legal discovery, you have not gone out to
15 search for other companies to include in your
16 book?
17     A.   I have gone out to look for
18 information on companies, but it is extremely
19 limited what you can find without the means of
20 legal discovery to open doors and files.  It is
21 really quite, quite a big difference.
22     Q.   Sorry.  So would you agree that to a
23 large extent the information contained in your
24 -- well, let me go back.  Would you agree to a
25 large extent the scope of the information

Page 129

1  contained in your book is determined by the
2  defendants that plaintiffs' counsel sue?
3      **A.   Well, it is determined by the**
4  **companies that were the major companies in the**
5  **industry that become the defendants in the**
6  **litigation and become subject to the authority**
7  **of the courts and have to produce documents.**
8          **Those are the companies about which we**
9  **have knowledge about what they have known and**
10  **done.  And the other companies are just**
11  **vanished into history, so to speak.**
12      Q.   So you would agree that in large part
13  the scope of your book is dependent upon the
14  companies that plaintiffs' attorneys decide to
15  sue?
16      **A.   Well, the companies that were left as**
17  **viable corporations from the companies that**
18  **sold all these asbestos products all these**
19  **years by the 1970s.**
20      Q.   So really, Doctor, you can answer yes
21  or no.  If it is no, that's fine.  To a large
22  extent, the scope of the information in your
23  book is determined by who plaintiffs' counsel
24  determined to sue; is that correct?
25          MR. SATTERLEY:  Objection, asked and

Page 130

1  answered.
2          THE WITNESS:  Yeah, I can't add
3  anything to what I have already told you.
4  BY MR. LEE:
5      Q.   Is it true or is it not, Doctor?
6          MR. SATTERLEY:  Objection, asked and
7  answered.
8          THE WITNESS:  I explained it.  The
9  only companies that were left were the
10  companies that were left to sue.  The other
11  companies were gone.  The other companies were
12  never subject to the authority of the courts.
13  The other companies were never put in a
14  position where their historic documents ever
15  came to light.
16          So we don't know about those other
17  companies.  There isn't any way to find that
18  out until somebody invents a time machine.  And
19  then you would still have trouble probably
20  getting people to talk to you, having been so
21  long dead and probably having forgotten so much
22  more.
23  BY MR. LEE:
24      Q.   Dr. Castleman, then, is it true that
25  the information that you have and that you have

Page 131

1  included in your book is also at least in part
2  dependent on what information was sought by
3  plaintiffs' attorneys?
4      **A.   I think the plaintiffs' attorneys were**
5  **very thorough in seeking information.  They may**
6  **have been, you know, the response may have been**
7  **less thorough than the seeking, but in any case**
8  **I have a pretty high regard for thoroughness of**
9  **the plaintiffs' attorneys in seeking**
10  **information and fairly.  I have to say I am**
11  **also quite impressed with the thoroughness of**
12  **some defendants in producing documents in**
13  **response to the efforts to get them to produce**
14  **the information.**
15      Q.   Dr. Castleman, I didn't ask you about
16  your affinity for plaintiffs' counsel.
17          MR. SATTERLEY:  Or defense counsel.
18          THE WITNESS:  I didn't say anything
19  about my affinity for them.  I said I have a
20  high regard for them.
21  BY MR. LEE:
22      Q.   Or your regard for them.
23      **A.   I said I have a high regard for their**
24  **thoroughness.  That doesn't mean I like them**
25  **individually or personally.**

Page 132

1      Q.   I didn't ask you about your regard for
2  plaintiffs' counsel, their efforts or anything
3  else.  In fact, I am going to ask that the
4  question that I put to you be read back and ask
5  that you answer that question.
6          THE REPORTER:  "Question: Dr.
7  Castleman, then, is it true that the
8  information that you have and that you have
9  included in your book is also at least in part
10  dependent on what information was sought by
11  plaintiffs' attorneys?"
12          THE WITNESS:  Yes.  I mean, to the
13  extent that if plaintiffs' attorneys didn't ask
14  certain questions from defendants and if it is
15  not the kind of stuff that would have been
16  available in the public domain, that those
17  kinds of questions and answers wouldn't have
18  been made available to me.
19  BY MR. LEE:
20      Q.   Or if it is not the type of stuff
21  would have been interesting for litigation; is
22  that true?
23          MR. SATTERLEY:  Object to the form of
24  the question.
25          THE WITNESS:  Well, I suppose there

Page 133

1  are things that wouldn't have been interesting
2  for litigation that I would have found
3  interesting, plaintiffs' attorneys wouldn't
4  have asked defendants about, although nothing
5  in particular comes to mind as I am trying to
6  answer that.
7       But, sure, there are plenty of things
8  that might not be of interest in litigation but
9  which might be of interest to me as a
10 historian.
11 BY MR. LEE:
12     Q.   Dr. Castleman, am I correct that what
13 you intend to do in this case is to offer
14 testimony regarding documents that you found
15 over the course of the last 30 years or so and
16 provide your opinion of what those documents
17 show?
18     MR. SATTERLEY:  Objection.
19     THE WITNESS:  That's part of what I
20 would do.  I mean, I would -- I mean, what I --
21 I guess bring to this is that I have an
22 understanding about the history of occupational
23 health in this country based on being involved
24 in the field for over 35 years and
25 investigating very thoroughly into the history

Page 134

1  of the field, particularly with respect to
2  asbestos, and having the benefit of the kind of
3  documentation that one only gets to see through
4  litigation.
5       And so I mean sometimes a jury might
6  be shown a bunch of individual documents and it
7  might not be as clear without some explanation
8  about who the parties were that were involved
9  and what kinds of relationships existed and
10 what was going on in the country at the time
11 with respect to government regulations, with
12 respect to compensation laws and so on, so that
13 the trier of fact might have a better
14 understanding of what was really happening,
15 what the individual documents are a part of,
16 historically speaking.
17 BY MR. LEE:
18     Q.   Do you anticipate testifying as to the
19 insinuations that can be made from those
20 documents as to agreements between companies
21 and such?
22     **A.   I don't know really how to answer**
23 **that.  I mean, I answer questions to the best**
24 **of my ability.  If I can't answer a question, I**
25 **just say I can't answer the question.**

Page 135

1       MR. LEE:  All right, Doctor.  I think
2  that's all I have for you.
3       THE WITNESS:  I think we have --
4       MR. SATTERLEY:  It has taken us three
5  hours.
6       THE WITNESS:  We have shot the time.
7  We still have some nice weather here in the
8  area.  I will waive signature.
9       (Whereupon, at 12:59 p.m., the
10 signature of the witness having been duly
11 waived, the witness being present and
12 consenting thereto, the taking of the instant
13 deposition ceased.)

Page 136

1  STATE OF MARYLAND, to wit:
2    I, Karen K. Brynteson, the officer before whom the
3  foregoing deposition was taken, do hereby certify that
4  the within-named witness personally appeared before me
5  at the time and place herein set out, and after having
6  been duly sworn by me, according to law, was examined
7  by counsel.
8    I further certify that the examination was
9  recorded stenographically by me and this transcript is
10 a true record of the proceedings.
11   I further certify that I am not of counsel to any
12 of the parties, nor an employee of counsel, nor
13 related to any of the parties, nor in any way
14 interested in the outcome of this action.
15   As witness my hand and notarial seal this
16 _____ day of _____, 2008.
17
18
19
20       _____
21       KAREN K. BRYNTESON
22       Notary Public
23
24
25 MY COMMISSION EXPIRES:  7-01-09